**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA, LOUISE HAMBURG – PLAINTIFF-INTERVENOR**<br><br>v.<br><br>**THE DORCHESTER OWNERS ASSOCIATION** | **CIVIL ACTION**<br><br>**NO. 20-1396** |

**MEMORANDUM AND ORDER**

Baylson, J.                                                                                                       September 30, 2020

## I.     Introduction

Plaintiff Louise Hamburg owns a condominium in the Dorchester on Rittenhouse Square, a high-end residential complex managed by the Dorchester Owners Association ("DOA"). The Dorchester has a strict "no pets" policy that allows tenants with disabilities to keep assistance animals only with DOA's approval. In the present case, Hamburg and the United States Department of Justice ("DOJ") allege that DOA's practices regarding review of assistance animal requests violate the Fair Housing Act by imposing an unreasonable burden on tenants with disabilities and deterring them from living in the Dorchester.

DOA has moved for the dismissal of Plaintiffs' claims for punitive damages under the FHA. Plaintiffs have each opposed the motion. For the foregoing reasons, the Court will DENY DOA's motion to dismiss.

1

**II.     Factual History**

The Court assumes that following alleged facts — taken from the United States' Complaint and incorporated into Hamburg's Intervenor Complaint — are true for the purposes of the present motion.

a.  DOA's "No Pets" Policy

DOA is the governing body for the Dorchester, a thirty-two-story apartment complex in Philadelphia.  Compl. at ¶¶ 4, 6.  DOA is composed of at least seven members, and it employs approximately forty people for the operation of the Dorchester.  Id. at ¶ 6.

The Dorchester has a long-standing "no pets" policy for its residents.  Id. at ¶ 9.  In 2009, however, DOA implemented an exception to this policy to allow tenants with disabilities to keep "assistance animals" in their units.  Id. at ¶¶ 10, 11.  The 2009 iteration of the "no pets" policy required that tenants inform DOA of their need for an assistance animal, complete a written request form for an exemption, and submit any documentation that DOA requested regarding their need.  Id. at ¶ 13.  The documentation requirement called for a letter from a "treating medical doctor" regarding the need for an assistance animal, certification of the animal's training from a pet instructor, and pet genealogy reports.  Id. at ¶ 14.  Non-tenants could not apply for permission to bring an assistance animal into the building when visiting.  Id.

Even if DOA granted that exemption, the tenant was still subject to numerous restrictions.  For example, the tenant could not use a passenger elevator when accompanied by her pet; she could use only the freight elevator.  Id.  And, regardless of which passenger arrived at the freight elevator first, the pet owner would have to wait for the next elevator if any other passenger objected.  Id.  An otherwise-qualified assistance animal would be subject to size and breed

2

restrictions and had to wear a bark suppressant collar at all times. Id. DOA could require any fee or deposit that it saw fit to levy on a tenant. Id. Tenants with assistance animals had to maintain a $1 million insurance policy with DOA as a beneficiary and agree to pay attorney's fees and costs incurred by any action by the assistance animal. Id. Violating the terms of the assistance animal accommodation incurred increasing fines and, upon a fourth violation, would result in a permanent ban on the animal in the Dorchester. Id. at ¶ 16.

Between December 26, 2017 and May 25, 2018, DOA amended the assistance animal policy. Id. at ¶ 17. The amended 2018 policy lifted requirements for fees, deposits, and the pet instructor certification prerequisite. Id. at ¶¶ 18, 19. It also removed the ban on visitors' "qualified ADA service animals." Id. at ¶ 18. While tenants with assistance animals still had to use the freight elevator, they were not required to exit the elevator upon the request of another tenant unless the requestor was first in line for the elevator, and only for medical reasons. Id.

On April 3, 2019, however, DOA "reinstate[d]" several of the restrictions on assistance animals, including the $1 million insurance policy requirement, common area ban, size/breed requirements, and agreement to pay any related attorney's fees. Id. at ¶ 20.[1] The 2019 policy further added a muzzle restriction for any animal in a common area, regardless of any history of aggression. Id. at ¶ 21. DOA again amended the assistance animal policy on March 4, 2020, keeping some of the same restrictions as the previous policies. Id. at ¶ 22.

---

[1] Although not explicitly detailed as restrictions that the 2018 policy lifted, Plaintiffs' language here suggests that DOA removed them before "reinstat[ing]" or "reincorporat[ing]" these restrictions in April 2019. Id.

b.  Hamburg's Request for an Assistance Animal

Louise Hamburg has suffered from severe anxiety since she was a child, a condition that impairs her ability to function. Id. at ¶ 24. Her dog, a 32-pound Australian labradoodle, lessens her anxiety and increases her ability to function in high-stress situations. Id. She has owned a condominium in the Dorchester on Rittenhouse since 1999, although she has maintained her residence elsewhere since that time. Id. at ¶¶ 4, 8.

On December 25, 2017, Hamburg first contacted DOA through an email to the Dorchester's then-general manager, Patricia Yonekawa. Id. at ¶ 26. In that email, she requested approval to bring her dog to her residence at the Dorchester, attaching a letter from an online clinical psychotherapist describing her medical need for the dog's presence. Id. at ¶¶ 26, 27.

Yonekawa responded the next day with two emails. Id. at ¶¶ 29, 30. The first provided the 2009 animal assistance policy with the request form and instructions to get the required certifications from a medical doctor, a pet trainer, and a veterinarian. Id. at ¶ 29. The second email clarified the instructions from her prior email, and she included DOA's attorney Gary Krimstock as a recipient. Id. at ¶ 30. Hamburg then replied to Krimstock by email, noting that she was unable to complete the DOA request form, as it was designed for a *service animal* — an animal trained to provide specific services — as opposed to a *support animal* — an animal whose mere presence ameliorates mental or psychological disabilities. Id. at ¶ 31. Hamburg was therefore unable to fully complete the form, *e.g.* regarding the specialized training her dog had received. Id. She also reiterated her belief that the letter she had provided from a psychotherapist satisfied the Fair Housing Act. Id.

4

On December 28, 2017, another DOA attorney, Joshua Horvitz, notified Hamburg that DOA had rejected her request for an assistance animal, but he told her that she could reapply with a completed request form. Id. at ¶ 32. Hamburg replied to the email requesting that Horvitz contact her so she could discuss her inability to complete the form. Id.

On January 8, 2018, Hamburg again emailed Yonekawa, Krimstock, and Horvitz, after not receiving any responses. Id. at ¶ 33. In her email, she requested an update on her application and included further information about the Fair Housing Act. Id. Horvitz replied two days later, telling Hamburg that they would confer with DOA regarding her request. Id. at ¶ 34.

On January 22, 2018, still without a response from DOA or its representatives, Hamburg called and sent a partially completed form to Yonekawa. Id. at ¶ 35. The partially completed form contained annotations explaining why Hamburg could not provide information regarding her dog's specialized training or service expectations. Id. DOA's president responded to her partial form on January 30, 2018, stating that DOA would not reconsider her request unless she provided a fully completed request form. Id. at ¶ 36. Hamburg replied the same day reiterating why she could not complete the form and including further Fair Housing Act information. Id.

On February 7, 2018, Yonekawa sent new questions to Hamburg requesting further information, mostly regarding her history of meetings with the online psychotherapist whose letter Hamburg included in her initial contact. Id. at ¶ 37. Hamburg did not respond. Id. at ¶ 38.

Instead, Hamburg filed a complaint with the U.S. Department of Housing and Urban Development on April 30, 2018, and she initiated a new DOA request on July 20, 2018 for a pet exemption. Id. at ¶¶ 39, 40. In this renewed request, Hamburg included another letter, this time from a clinical psychologist with whom she had met in person, detailing her medical need for a

support animal. Id. at ¶ 40. Again, Yonekawa responded to this application with a list of questions on August 14, 2018. Id. at 41. Hamburg replied the same day, answering some of these questions while refusing to answer others that she believed were "beyond the scope of FHA requirements." Id. at ¶ 42.

On April 1, 2019, over seven months later, Hamburg received a letter from Yonekawa requesting more information about Hamburg's visits with the psychologist, stating DOA was still reviewing her request. Id. at ¶ 43. Hamburg refused to answer further questions due to her belief that the long delay indicated a lack of good faith from DOA. Id. at ¶ 44.

Hamburg was not alone; on August 14, 2018, two other unit owners in the Dorchester requested an exemption for their pet. Id. at ¶ 46. The unnamed parties completed the required form and provided the requested documentation as DOA requested. Id.

As of the Complaint's filing in March 2020, DOA had approved neither Hamburg's nor the other two tenants' requests for an exemption to the "no pets" policy. Id. at ¶¶ 45, 46. All three applicants have had to live elsewhere as a result of DOA's non-approval of their requests. Id.

### III.   Procedural History

Hamburg filed a complaint with the United States Department of Housing and Urban Development ("HUD") on April 30, 2018. Compl. at ¶ 47. On July 24, 2019, HUD and Hamburg elected to transfer the proceedings from administrative law court to federal court; the relevant administrative law judge terminated the proceeding the same day. Id. at ¶ 48. DOJ then filed a Complaint on behalf of the United States on March 12, 2020. ECF 1, seeking injunctive relief, monetary damages for Hamburg, and a civil penalty. Hamburg, with permission of the Court, filed her Intervenor Complaint on June 4, 2020, ECF 7, 8, which included a claim for punitive damages.

DOA filed its Motion to Dismiss Intervenor-Plaintiff's Claims for Punitive Damages on July 15, 2020. ECF 11. DOJ responded in opposition to the motion on August 12, 2020, ECF 16; Hamburg did the same on August 13, 2020. ECF 17. DOA replied on August 26, 2020. ECF 22.

## IV. Legal Standard

In considering a motion to dismiss under Rule 12(b)(6), the Court "accept[s] all factual allegations as true [and] construe[s] the complaint in the light most favorable to the plaintiff." Warren Gen. Hosp. v. Amgen, Inc., 643 F.3d 77, 84 (3d Cir. 2011) (internal citations omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

The Court in Iqbal explained that, although a court must accept as true all factual allegations contained in a complaint, that requirement does not apply to legal conclusions; therefore, pleadings must include factual allegations to support the legal claims asserted. Iqbal, 556 U.S. at 678, 684. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678 (citing Twombly, 550 U.S. at 555). Accordingly, to survive a motion to dismiss, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

## V. Discussion

DOA's motion to dismiss briefing encompasses two general arguments. First, DOA argues that Plaintiffs failed to plead sufficient facts to support a claim for punitive damages. Def.'s Reply Brief at 3. Second, DOA contends that DOJ did not explicitly request punitive damages in the

Complaint, cannot now seek punitive damages without amending its Complaint, and has no standing to oppose DOA's motion to dismiss punitive damages. Id. at 1–2. The Court will address these questions in reverse order.

  a. Punitive Damages

DOA targeted its motion to dismiss at Hamburg's claims for punitive damages. Mot. To Dismiss, ECF 11 ("Defendant's Motion to Dismiss Intervenor-Plaintiff's Claim for Punitive Damages"). Perhaps unsurprisingly given the nature of this case, DOJ responded with an opposition brief, to defend both DOJ and Hamburg's pursuit of punitive damages. Opp. to MTD, ECF 16. DOA argues that DOJ did not have standing to oppose its motion to dismiss, because "Plaintiff [DOJ] asserted no such claim [for punitive damages]." Def.'s Reply Brief at 1. "[I]n opposing the DOA's motion, for the first time Plaintiff [DOJ] maintains that the DOA's actions . . . warrant punitive damages," id., and "the complaint may not be amended by the briefs in opposition to a motion to dismiss." Id. at 1–2 (citing Pennsylvania ex. Rel. Zimmerman v. Pepsico, 836 F.2d 173, 181 (3d Cir. 1988)).

In cases on behalf of private persons, (monetary damages pursuant to 42 U.S.C. § 3613(c)(1), among other statutes); see also 42 U.S.C. § 3613(c)(1) ("court may award to the plaintiff actual and punitive damages").

  b. Sufficiency of the Allegations

A plaintiff can plead a violation of the FHA by alleging (1) she has an FHA-covered disability, (2) defendant knew or should have known about that disability, (3) a reasonable accommodation for that disability may be necessary for the plaintiff to have an equal opportunity

8

to enjoy the dwelling, and (4) defendant denied that accommodation. Giebeler v. M & B Assocs., 343 F.3d 1143, 1147 (9th Cir. 2003).

To receive punitive damages under the FHA, a plaintiff must show that the defendant's denial of a reasonable accommodation involves malicious intent or "reckless or callous indifference to the federally protected rights of others." Alexander v. Riga, 208 F.3d 419, 430-31 (3d Cir. 2000) (citing Smith v. Wade, 461 U.S. 30, 56 (1983)). "'Malice' and 'reckless indifference,' in this context, however, refer not to the egregiousness of the landlord's conduct, but rather to the landlord's knowledge that it may be acting in violation of federal law." Id. (citing Kolstad v. Am. Dental Assoc., 527 U.S. 526, 535-36 (1999)). At the motion to dismiss stage, the relevant inquiry is whether "the complaint failed to allege facts from which the court could reasonably infer a plausible basis" that the defendant acted with malice or recklessness. J. Fletcher Creamer & Son, Inc. v. Hiscox Ins. Co. Inc., Civ. Act. No. 19-21638 (ES) (MAH), 2020 WL 2899499, *6 (D.N.J. June 2, 2020) (collecting cases).

**Order**

Having reviewed the allegations of the Complaint, the Court will **DENY** the Motion to Dismiss this Complaint as to punitive damages at this time. The Government is not seeking for itself punitive damages and this Court is not aware of any statutory provision that would allow a judge or jury to award punitive damages in favor of the United States. On the other hand, the Intervenor-Plaintiff may have a claim for punitive damages depending on the nature of the evidence introduced at trial. The Court will reserve any decision on the adequacy of that evidence until the trial takes place.

9

BY THIS COURT:

s/ Michael M. Baylson

**MICHAEL M. BAYLSON**
**United States District Court Judge**

O:\CIVIL 20\20-1396 United States v Dorchester\20cv1396 MTD Memo.docx