**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | NO. 2:20-cv-01396-MMB |
| | : | |
| Plaintiff, | : | |
| | : | |
| LOUISE HAMBURG, | : | |
| | : | |
| Plaintiff-Intervenor, | : | |
| | : | |
| v. | : | |
| | : | |
| THE DORCHESTER OWNERS' ASSOCIATION, | : | |
| | : | |
| Defendant. | : | CIVIL ACTION |

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.     THE DORCHESTER

1. The Dorchester on Rittenhouse Square ("the Dorchester"), a thirty-two-story condominium complex containing 541 residential units, is located at 226 W. Rittenhouse Square, Philadelphia, Pennsylvania. *See* U.S. Compl. at ¶ 4 (ECF No. 1); Def.'s Answer at ¶ 4, (ECF No. 12); Def.'s Mem. in Supp. of Mot. for Protective Order at p. 3 (ECF No. 45-2); Ex. A,[1] Decl. of Condominium of The Dorchester ("Dorchester Decl.") at § 7.1(a), p. 14 (stating that "the only permitted use" of the units "is as a Residence").

---

[1] All documents attached as exhibits are true and correct copies of documents that were produced or otherwise generated in this litigation.  Exhibit B, Bailey Decl. at ¶¶ 2-7.  Exhibits A, I-J, L-M, O-R, V-BB, DD-HH, LL-NN, and PP are true and correct copies of documents produced by the Defendant in discovery and were marked by the Defendant with bates numbers beginning with "DOA." *Id.* at ¶ 2.  Exhibits W, Y, and MM predominately consist of communications documents produced by the Defendant in discovery marked with bates numbers beginning with "DOA," but each exhibit also contains an additional document marked with bates numbers beginning with "US" that were produced to the Defendant by the United States. *Id.* at ¶ 5.

1

2. Defendant, the Dorchester Owners' Association ("DOA" or the "Association"), is the condominium association governing the Dorchester. *See* U.S. Compl. at ¶ 6; Def.'s Answer at ¶ 6. The DOA is an unincorporated association made up of the unit owners. Ex. A, Dorchester Decl. at § 2.01, p. 3.

3. The governing body of the Association is the Dorchester Council (the "Council"). The Council is made up of seven members, including a council president and vice-president. *See* U.S. Compl. at ¶ 6; Def.'s Answer at ¶ 6; Ex. A, Dorchester Decl. at § 8.01, p. 19.

4. The current DOA Council is made up of F.P.D. (President), J.H.W. (Vice President), J.W., M.L.S., J.M., E.K., and S.F. *See* Ex. C, Def.'s Resp. to Pl.'s Interrog. No. 2; Ex. D, E.K. Dep. 22:3-15; Ex. E, M.L.S. Dep. 25:3-13; Ex. F, F.P.D. Dep. 13:12-18.; Ex. G, J.W. Dep. 28:19-23. Except for J.M., who was elected to the Council around May of 2018, all of these individuals have held office continually since at least 2015. Ex. C, Def.'s Resp. to Pl.'s Interrog. No. 2.[2]

5. The Council generally meets at least once a month, typically on the first Wednesday of every month. *See* Ex. F, F.P.D. Dep. 20:6-12. Minutes are typically prepared reflecting who was in attendance, when the meeting began and ended, and what issues were discussed. *See* Ex. F, F.P.D. Dep. 20:13-21:12; Ex. E, M.L.S. Dep. 33:15-34:24.

6. The Council has authority to issue Community Rules and Regulations governing the use and enjoyment of the Dorchester, provided that they are consistent with the Declaration. Those rules may be changed by a majority of the Association. *See* Ex. A, Dorchester Decl. at § 7.02(l), p. 19.

---

[2] To comply with the Protective Order filed in this case, which designates "names" as "confidential information," the United States has used initials for the name of each person discussed in its Statement of Undisputed Facts and Memorandum of Law. *See* ECF No. 21 at 1(A). For ease of reference, the United States has provided the Court with a table listing the full names that correspond to each set of initials used here. *See* Ex. QQ.

7. The Council has "final and binding" authority to resolve "any questions of interpretation or application of the provisions of" the Dorchester's "Declaration, the Code of Regulations, or the Community Rules and Regulations …."  Ex. A, Dorchester Decl. at § 8.02, p. 19.

8. The DOA employs approximately forty people to carry out the operations of the building, including a general manager, a 24-hour front desk staff, doormen, valet service, and an in-house maintenance team.  U.S. Compl. at ¶ 6; Def.'s Answer at ¶ 6.

9. P.Y. served as the general manager of the Dorchester from approximately August 1997 until she retired on August 31, 2019.  *See* Ex. H, P.Y. Dep. 39:4-16; Ex. C, Def.'s Resp. to Pl.'s Interrog. Nos. 2-3.

10. D.S. has served as general manager of the Dorchester since August 1, 2019.  *See* Ex. C, Def.'s Resp. to Pl.'s Interrog. Nos. 2-3.

11. K.M. has been employed as the resident services director of the Dorchester since 2012. *See* Ex. C, Def.'s Resp. to Pl.'s Interrog. Nos. 2-3.

## II.     THE DORCHESTER'S POLICIES AND PRACTICES WITH RESPECT TO ASSISTANCE ANIMALS

### A.     Community Rules and Regulations

12. In 1980, the Council adopted the Dorchester's "Community Rules & Regulations" "to govern the use and enjoyment of the premises."  Ex. I, DOA's Community Rules and Regulations ("Community Rules") at 1; *see also* Ex. E, M.L.S. Dep. 50:11-24 (acknowledging copy of the DOA's Community Rules, which has been included here at Exhibit I); Ex. H, P.Y, Dep. 89:19-24 ("The condominium has a set of rules and regulations. It is for the owners and the residents. It is management's responsibility to ensure that the owners and residents receive copies of that and that they follow these rules and regulations.").  Those regulations were last revised on June 5, 2019.  Ex. I, Community

Rules at 1; Ex. E, M.L.S. Dep. 54:3-8. All owners, lessees, and occupants of the Dorchester are subject to and must comply with these rules. Ex. I, Community Rules at 1.

13. The Community Rules state that "[n]o pets are permitted in the [Dorchester] building at any time." Ex. I, Community Rules at § VII, p. 12. The Community Rules contain one provision referencing service animals, making clear that any such animal must be registered with the Association, and that persons with service animals must generally use the freight elevator and the back door when accompanied by their service animal. *Id*. at § II(A). ("No animals shall be taken on the main passenger elevators. Animals that are specifically trained as assist [sic] animals and properly registered with the Association shall be restricted at all times to the freight elevators and, when opened, to ingress or egress only from the back door."). This is the only provision in the Community Rules that references the possibility that some residents with disabilities might have assistance animals at the Dorchester. *See* generally Ex. I, Community Rules.

**B. The Dorchester's Assistance Animal Policies – 2015 to the Present**

(1) The 2015 Assistance Animal Policy

14. In early 2015, the Council adopted an assistance animal policy entitled "The Dorchester Condominium Reasonable Accommodation Policy for an Assistance Animal." Ex. J, The Dorchester Condominium Reasonable Accommodation for an Assistance Animal Policy (the "Policy" or the "2015 Policy"). *See also* Ex. K, Def.'s 2d Supplemental Resp. to Pl.'s Interrog. No. 4 (referencing Ex. RR, document used during depositions containing the 2015 Policy); Ex. H, P.Y. Dep. 113:8-114:13; Ex. F, F.P.D. Dep. 44:3-12. The 2015 Policy remained in effect until April 3, 2019, when the Council adopted a new policy. *See* Ex. K, Def.'s 2d Supplemental Resp. to Pl.'s Interrog. No. 4; Ex. F, F.P.D. Dep. 45:1-10.

15. The 2015 Policy stated that the Council would ordinarily respond to requests for accommodations for assistance animals within 30 days after the request was complete, or within 10 days after the next Council meeting. Ex. J, 2015 Policy at p. 2 ("The Association will attempt to provide a response to the resident within 30 days after the Association receives a fully completed request with all required documentation and certifications or within 10 business days after the next regularly-scheduled meeting of the Dorchester Council, whichever provides the Association with the most time to consider the fully completed request.").

16. The 2015 Policy defined an assistance animal, "most common[ly] … dogs," as "an animal that does work or performs tasks for the benefit of a person with a disability, or provides other assistance that alleviates one or more symptom or effect of a person's disability." Ex. J, 2015 Policy at p. 1.

17. On February 6, 2019, the Council met and determined that its existing Assistance Animal Policy did not provide for accommodations for "companion animals," and that it would need to adopt a new policy addressing such accommodations. Exhibit L, Meeting Minutes of the DOA Council ("Meeting Minutes"), at DOA-000692 – DOA-000693 [Minutes of Feb. 6, 2019 Meeting] ("The policy now in place is for an assistance animal, there is no companion animal policy in place. Council is now in the process of creating a companion animal policy.").

    (2)  The April 3, 2019 Assistance Animal Policy.

18. On April 3, 2019, the Council adopted a new Assistance Animal Policy entitled "The Dorchester Condominium Reasonable Accommodation Policy for an Emotional Support or Service Animal." Ex. M, Apr. 3, 2019 Assistance Animal Policy ("April 3, 2019 Policy" or

"April Policy"). *See also* Ex. K, Def.'s 2d Supplemental Resp. to Pl.'s Interrog. No. 4

(referencing Ex. SS, document used during depositions containing the 2019 Policy). *See*

*also* Ex. L, Meeting Minutes at DOA-000694 [Minutes of Apr. 3, 2019 Meeting] (noting

that the "Emotional Support Animal Policy as presented" was unanimously approved). The

2019 Policy noted that accommodations for assistance animals could include

accommodations for an "emotional support animal," which the policy defined as "an animal

that provides emotional support for the benefit of a person with a disability, which support

alleviates one or more symptoms or effects of a person's disability." Ex. M, 2019 Policy at

p. 1.

    (3)  <u>The March 4, 2020 Assistance Animal Policy</u>

   19. On April 30, 2018, unit owner Louise Hamburg filed a complaint with the U.S.

Department of Housing and Urban Development ("HUD"), alleging that the Dorchester had

violated the Fair Housing Act by refusing to grant her request for an accommodation for her

assistance animal. Ex. N, Hamburg HUD Compl. and Charge of Discrimination and

Determination of Reasonable Cause ("Housing Discrimination Compl.") at HUD-00000053

– HUD-00000055. On July 8, 2019, HUD issued a charge of discrimination and a

determination of reasonable cause finding that the Dorchester had violated the Fair Housing

Act by failing to grant Ms. Hamburg's request. *Id*. at HUD-00000010 – HUD-00000044. In

the charge and determination, HUD referenced several provisions of the Dorchester's

Assistance Animal Policies. *Id*. at HUD-00000020 – HUD-00000022; HUD-00000028 –

HUD-00000031; HUD-00000034 – HUD-00000035.

   20. On March 4, 2020, the Dorchester adopted a new assistance animal policy entitled

"The Dorchester Condominium Reasonable Accommodation Policy for an Emotional

Support or Service Animal."  Exhibit O, Assistance Animal Policy adopted March 4, 2020

("March 4, 2020 Policy" or "2020 Policy").  *See also* Ex. K, Def.'s 2d Supplemental Resp.

to Pl.'s Interrog. No. 4 (referencing Ex. TT, document used during depositions containing

the 2020 Policy).

    **C.**    **Restrictions and Limitations on Assistance Animals in the Dorchester's Policies**

      (1)  Persons Accompanied by Assistance Animals Must Use the Freight Elevator
          and the Rear Entrance

21. Both the 2015 Policy and the 2019 Policy required persons accompanied by

assistance animals to use the service elevator and the rear entrance when entering or leaving

the building.  Ex. J, 2015 Policy at (c), p. 5 ("The Unit Owner, resident with, or owner of, the

Assistance Animal shall escort the Assistance Animal in and out of the Dorchester exclusively

from the freight elevator through the rear entrance and never through the front entrance or the

lobby area, unless the rear entrance is locked, and cannot be opened by the Dorchester staff ….");

Ex. M, 2019 Policy at (c), p. 5 (same).

22. The above restriction does not appear in the 2020 Assistance Animal Policy, but the

provision requiring persons accompanied by their assistance animals to use the freight elevator

and the rear entrance remains in the Community Rules and Regulations, which was in effect

during that time and remains in effect.  *Supra* ¶ 13; *see also* Ex. I, Community Rules at § II(A)

(stating "[n]o animals shall be taken on the main passenger elevators.  Animals that are

specifically trained as assist animals and properly registered with the Association shall be

restricted at all times to the freight elevators and, when opened, to ingress or egress only

from the back door.).

23. In a September 2016 letter to a resident who had requested an accommodation for an

assistance animal for his fiancée, the Dorchester made clear that the requirement that persons

accompanied with their assistance animals use the freight elevator and not access other common areas was strictly enforced.  Ex. P, P.Y. Ltr. to D.M., Sept. 22, 2016 (stating that "[i]f and when the animal is approved, it must be carried in a Dorchester approved carrier as it enters or exits the building.  The animal will only be allowed in the freight elevators and your Unit.  It is not allowed in any of the common elements including but not limited to common hallways, fire stairwells, pool area, gym, garage and amenities.  There will be no warning if the Rules and Regulations regarding service and companion animals are not followed; immediate lease termination will be required.")

24. The Dorchester told two current owners, B.H. and C.H., that they must use the freight elevator when accompanied by B.H.'s assistance animal.  *See infra* ¶ 68.

    (2)  <u>The Dorchester Does Not Consider Requests for Accommodations for Assistance Animals from Prospective Residents</u>.

25. All of the Dorchester's Policies specify that requests for an accommodation for an assistance animal must be made by a "resident."  *See, e.g.*, Ex. J, 2015 Policy at p. 2 ("To that end, the Association has a "Form to Request An Assistance Animal" (attached to this Policy) which *a resident* with a disability shall use to make a reasonable accommodation request for an Assistance Animal.") (emphasis added); Ex. M, 2019 Policy at p. 2 (same); Ex. O, 2020 Policy at p. 3 ("To that end, the Association has developed a "Form to Request An Assistance Animal" (attached to this Policy as Addendum 'B') which *a resident* with a disability may use to make a reasonable accommodation request for an Assistance Animal.") (emphasis added).

26. The DOA has interpreted and applied its policies to only consider requests for accommodations for assistance animals from owners and residents, and not from prospective residents.  *See* Ex. Q, K.M. Email to L.A.C., Sept. 19, 2018 (responding to inquiry from real

estate agent about a potential tenant with a service animal: "There is a lengthy application/registration process. I'll reach out to our attorney and ask them to send me the forms. *From my understanding, the policy doesn't allow for the process to start until after a lease is signed, but that the animal is not allowed in the building until the process is complete.*") (emphasis added); Ex. R, L.L. Communications with D.S., May 5, 2020 – June 9, 2020 ("L.L./D.S. Communications"), at DOA-001326 (D.S. stating in June 9, 2020 email that due to pandemic and demonstrations, "Council decided to postpone any consideration of requests or the propriety of such requests by non-owners/nonresidents…."); Ex. F, F.P.D. Dep. 136:13-23 (confirming that policy of not considering requests for accommodations for assistance animals from non-residents or non-owners is still in effect) ("[W]e're not ready to be considering bringing in new animals from outsiders into the Dorchester at this point.").

> (3) The Dorchester Required Residents with Assistance Animals to Maintain at Least $1 Million in Insurance

27. The 2015 Policy and April 3, 2019 Policy required that residents granted accommodations for assistance animals provide proof they have insurance in an amount of at least $1,000,000 naming the Association as an additional insured. Ex. J, 2015 Policy at p. 3; Ex. M, Apr. 3, 2019 Policy at p. 3. Residents without assistance animals were not subject to this requirement. *See* Ex. S, K.M. Dep. 129:4-9 (explaining that only insurance requirement for residents generally was that they maintain minimum coverage of $25,000).

**D. The Dorchester Granted No Accommodations for Assistance Animals Until After the United States Filed this Lawsuit on March 12, 2020**

28. The United States filed this action on March 12, 2020. *See* U.S. Compl.

29. The Association granted no accommodation for assistance animals until June 2020, when the Council granted an accommodation to B.H. and C.H. for an assistance animal. Exhibit T, D.S. Dep. 33:23-34:8, 158:9-159:22; Ex. F, F.P.D. Dep. 29:24-30:9, 90:6-11.

30. Since June 2020, the Association has granted two additional accommodations for assistance animals, one in or around October 2020, and one after that. *See* Ex. F, F.P.D. Dep. 29:24-31:5; Ex. T, D.S. Dep. 33:23-34:8.

## III.    B.H. AND C.H.'S REASONABLE ACCOMMODATION REQUEST TO LIVE WITH AN ASSISTANCE ANIMAL AT THE DORCHESTER.

### A.    B.H. and C.H.

31. B.H. and C.H. ("Mr. and Mrs. H," collectively the "Hs"), a married couple, are owners, together with their son and daughter-in-law, of unit # ███ at the Dorchester. *See* Exhibit U, C.H. Decl. at ¶ 1. The Hs have owned unit # ███ since 2005. *Id*. Prior to 2018, the Hs lived primarily in Radnor, Pennsylvania. *Id*. at ¶ 5.

32. In 2016, while living at their home in Radnor, B.H. began experiencing mental health impairments, including depression, following his heart surgery and re-hospitalization to treat an infection. *See* Ex. U, C.H. Decl. at ¶ 2. These impairments have substantially limited and continue to substantially limit his major life activities of working, caring for himself, living independently, and interacting with others. *Id*.

33. After he began to experience the substantial limitations described above, B.H. began to rely on their family dog, Gracie, a golden-doodle, as his constant companion for emotional support; Gracie provided a soothing and relaxing presence that positively affected both B.H.'s emotional wellbeing and physical recovery. *See* Ex. U, C.H. Decl. at ¶ 3; Ex.V, B.H. First Reasonable Accommodation for an Assistance Animal Request and Supplemental Documentation, Oct. 2018 ("B.H. 2018 Request") at DOA-002344 [R.W.'s Letter in Support of

B.H.'s 2018 Request, Aug. 23, 2018]; Ex. W, B.H. Second Reasonable Accommodation for an

Assistance Animal Request and Supplemental Documentation, July 2019 ("B.H. 2019 Request")

at DOA-004827 – DOA-004828 [Dr. R.W.'s Letter in Support of B.H.'s 2019 Request, July 6,

2019]; Ex. X, B.H. Third Reasonable Accommodation for an Assistance Animal Request and

Supplemental Documentation, May 2020 ("B.H. 2020 Request") at DOA-001355 – DOA-

001356 [Dr. R.W.'s Letter in Support of B.H.'s 2020 Request, May 2020].

**B. The Hs Request an Accommodation from the Dorchester on or about October 25, 2018**

34. In 2018, the Hs decided to move to their Dorchester condominium from their home in

Radnor to be closer to B.H.'s doctors in Philadelphia. *See* Ex. U, C.H. Decl. at ¶ 5.

35. On August 14, 2018, C.H. sent K.M., Director of Resident Services at the Dorchester, an

email regarding the couple's plans to move into their condo in the fall. *See* Ex. Y,

Communications between the Hs and K.M. ("Hs/K.M. Communications") at DOA-001867; *see

also* Ex. U, C.H. Decl. at ¶¶ 6-7. At the conclusion of the email, C.H. informed K.M. that "We

will be moving into the unit with an emotional support dog. I am happy to forward

documentation if you require it." *See* Ex. Y, Hs/K.M. Communications at DOA-001867; *see also*

Ex. U, C.H. Decl. at ¶¶ 6-7.

36. Later that day, K.M. replied, stating in relevant part: "Regarding the emotional support

dog, I've requested the forms from our attorney and will forward them to you once I have them.

Please be aware that this is a fairly comprehensive process and until the process is complete and

the dog receives approval, the dog may not enter the building." Ex. Y, Hs/K.M.

Communications at DOA-001867; *see also* Ex. U, C.H. Decl. at ¶ 7.

37. On August 25, 2018, B.H. reminded K.M. that they were "still awaiting those forms you

mentioned that need to be completed and approved in order to bring our emotional support dog

with us to the Dorchester." Ex. Y, Hs/K.M. Communications at DOA-002350; *see also* Ex. U, C.H. Decl. at ¶ 7.

38. On October 1, 2018, C.H. emailed K.M. again, reminding him that she had yet to receive any assistance animal paperwork. *See* Ex. Y, Hs/K.M. Communications at DOA-002361; *see also* Ex. U, C.H. Decl. at ¶ 7. K.M. responded that evening, *id.* at DOA-001845, attaching the revised "Form to Request an Assistance Animal," Ex. Y, Hs/K.M. Communications at DOA-002161 – DOA-002164, and the "Instructions to Medical Professional for Documenting a Disability Under the Federal Fair Housing Amendments Act," *id.* at DOA-002165. *See also* Ex. U, C.H. Decl. at ¶ 7.

39. On October 25, 2018, C.H. mailed the completed form and supplemental documentation to the Association and informed K.M. by email that she had sent it. *See* Ex. V, B.H. 2018 Request; Ex. Y, Hs/K.M. Communications, at DOA-003917; *see also* Ex. U, C.H. Decl. at ¶ 8. This packet included letters from both B.H.'s psychologist, Dr. R.W., and Gracie's veterinarian, Dr. A.G. *See* Ex. V, B.H. 2018 Request; Ex. U, C.H. Decl. at ¶ 8 (stating that packet for first application included "the signed form (provided to us by the Dorchester), a letter from Gracie's veterinarian, Dr. [A.G.] and a letter from [B.H.'s] psychologist, Dr. [R.W.].").[3]

40. Dr. R.W.'s letter, dated August 23, 2018, stated in relevant part as follows:

> [B.H.] is currently under my professional care for treatment of an emotional/mental illness defined by the DSM-IV. His condition substantially limits one or more of his major life activities. I have recommended an emotional support animal as part of his treatment program. The presence of this emotional support animal is necessary for [B.H.'s] mental health and for him to function independently.
>
> Please be advised that the name of [B.H.'s] dog is Gracie. She is a medium sized golden doodle weighing approximately 55 pounds. Her innately gentle manner and social companionability have proven to be salutary to [B.H.] as he has recovered from major heart surgery. Her

---

[3] The Defendant did not produce a copy of the veterinarian's letter, and C.H. did not retain a copy.

> presence soothes and significantly relaxes him. When he is at home she is
> his constant companion, and it is clear to me upon interviewing that
> Gracie's ongoing presence is essential to his emotional well being as well
> as his physical recovery.

Ex. V, B.H. 2018 Request at DOA-002344; *see also* Ex. U, C.H. Decl. at ¶ 8.

41. On October 31, 2018, K.M. confirmed that the DOA had received the Hs' request and told C.H. that the request had been "passed … along for review by our attorney." Ex. Y, Hs/K.M. Communications at DOA-003916; *see also* Ex. U, C.H. Decl. at ¶ 7.

### C. The Dorchester Ignores the Hs' Request for Several Months

42. The Dorchester's Reasonable Accommodation Policy that was in effect at the time provided that the Dorchester would ordinarily respond to completed requests for accommodations within 30 days or within ten days of the next Council meeting, whichever allowed for more time for consideration by Council. *See* Ex. J, 2015 Policy at 2. The Council did not adhere to this procedure with respect to the Hs' request. *See* Ex. L, Meeting Minutes at DOA-004038 – DOA-004041, DOA 000689 – DOA-000694; Ex. F, F.P.D. Dep. 83:4-13; *see also* Ex. B, Bailey Decl. at ¶ 2.

43. The Council met in November 2018, December 2018, January 2019, February 2019, March 2019, and April, 2019, but the minutes for those meetings contain no discussion of the Hs' request. *See* Ex. L, Meeting Minutes at DOA-004038 – DOA-004041, DOA 000689 – DOA-000694; *see also* Ex. B, Bailey Decl. at ¶ 2.

44. On November 27, 2018, C.H. emailed K.M. asking if he "ha[d] any word about our assistance dog." Ex. Y, Hs/K.M. Communications, at US-00000037; *see also* Ex. U, C.H. Decl. at ¶ 7. K.M. responded the following day, saying, "I know the paperwork was submitted to our attorney. Apparently Pennsylvania has recently passed some new legislation that relates to assistance animals, so they are having to take a little more time than anticipated, as they work to

ensure they have an understanding of that new legislation."[4] Ex. Y, Hs/K.M. Communications at US-00000036 – US-00000037; *see also* Ex. U, C.H. Decl. at ¶ 7.

45. On or around January 3, 2019, Mr. B.H. called K.M. and left a voicemail, "following up on the paperwork he submitted for the assistance animal," and requested a call back. Ex. Y, Hs/K.M. Communications, at DOA-002458 [K.M.'s Jan. 3, 2019 email to P.Y. describing B.H.'s voicemail]; *see also* Ex. U, C.H. Decl. at ¶ 7.

46. At no time did any DOA Council member or employee ask the Hs for any additional information about the October 25, 2018 request, or express to the Hs any purported concerns or deficiencies about R.W.'s letter, or any other part of the contents of the request. *See* Ex. U, C.H. Decl. at ¶ 8; *see also* Ex. F, F.P.D. Dep. 81:7-82:1 (acknowledging that he never spoke to R.W or expressed any concerns to the Hs about R.W.'s letter).

## D. The Association Requires the Hs to Submit A New Reasonable Accommodation Request

47. At their May 1, 2019 Council meeting, the DOA Council discussed the Hs' reasonable accommodation request for the first time. *See* Ex. L, Meeting Minutes; *see also supra* ¶ 43. According to the minutes from that meeting, the Association made the following determination: "The [Hs] are moving into the building in the beginning of June. They had filled out forms for an assistance animal. They have a companion animal and management is directed to forward the appropriate forms to the [Hs] to be filled out prior to the dog coming into the building." Ex. L, Meeting Minutes at DOA-000695 – DOA-000697; *see also* Ex. B, Bailey Decl. at ¶ 2.

---

[4] The law K.M. referred to was the Assistance and Service Animal Integrity Act, Act 118-2018 (House Bill 2049), which the Pennsylvania Governor signed on October 24, 2018. Assistance and Service Animal Integrity Act,2018 Pa. Legis. Serv. Act 2018-118 (H.B. 2049) (PURDON'S). The April 3, 2019 Assistance Animal Policy incorporates a statement regarding the law into the new forms appended to the Policy. *See* Ex. M, Apr. 3, 2019 Policy at DOA-001174, DOA-001176 – DOA-001177.

48. The Association did not immediately send the Hs the new forms, however. At some point prior to June 7, 2019, K.M. told the Hs that the Association was waiting for HUD to approve the new forms. *See* Ex. Y, Hs/K.M. Communications at DOA-002308 [June 7, 2019 email from K.M. to P.Y. recounting conversation with the Hs]; *see also* Ex. U, C.H. Decl. at ¶ 7.

49. On June 25, 2019, C.H. wrote to K.M. asking that he "[p]lease let us know when you hear back from HUD regarding our dog Gracie." Ex. Y, Hs/K.M. Communications at DOA-001848; *see also* Ex. U, C.H. Decl. at ¶ 7. K.M. replied on June 26, and stated, "I will follow up with Pat on the HUD issue." Ex. Y, Hs/K.M. Communications at DOA-001848; *see also* Ex. U, C.H. Decl. at ¶ 7.

50. On or around June 27, 2019, B.H. left a voicemail for K.M. asking for the name of their contact at HUD. *See* Ex. Y, Hs/K.M. Communications at DOA-003018 [K.M. writes to the Hs on June 27, 2019: "I got [B.H.]'s voicemail today. I spoke to [P.Y.] yesterday regarding your request. I am not aware of who our contact at HUD is, as I'm not really involved in the process at all."]; *see also* Ex. U, C.H. Decl. at ¶ 7.

51. In response, on June 27, 2019, K.M. sent the Hs an email, attaching the Association's new form, entitled "Dorchester Reasonable Accommodation Request.pdf." *See* Ex. Y, Hs/K.M. Communications at DOA-003018; *see also* Ex. U, C.H. Decl. at ¶ 7. In addition to stating that he did not know "who our contact at HUD is," K.M. informed the Hs that "… [P.Y.] said we are apparently very close to an approval, so she has asked me to provide you with a set of updated forms." Ex. Y, Hs/K.M. Communications at DOA-003018; *see also* Ex. U, C.H. Decl. at ¶ 7. K.M. goes on to say, "I know you've already completed a set, but we will need this updated set completed at this time. This way, we can fast track everything as soon as it is approved." Ex. Y, Hs/K.M. Communications at DOA-003018; *see also* Ex. U, C.H. Decl. at ¶ 7.

52. Soon afterward, B.H. left a voicemail for K.M. complaining about having to submit a new form for a request that they had submitted in October 2018.  *See* Ex. Y, Hs/K.M. Communications at DOA-002210 [K.M. writes to the Hs on June 28, 2019: "I am sorry I missed your call, but I did get your voicemail."]; *see also* Ex. U, C.H. Decl. at ¶ 7.  K.M. responded by email on June 28, 2019, informing the Hs that he had checked with P.Y. and determined, "we have absolutely no problem simply reusing the original letters [in the Hs' new reasonable accommodation request], assuming nothing has changed since you obtained them."  Ex. Y, Hs/K.M. Communications at DOA-002210; *see also* Ex. U, C.H. Decl. at ¶ 7.  K.M. also told B.H. to be more "civil" in future messages, saying the Association is "trying to help you" but also has to comply with "federal law as dictated to us by HUD" in addition to considering "the wants/needs of the Association as a whole."  Ex. Y, Hs/K.M. Communications at DOA-002210; *see also* Ex. U, C.H. Decl. at ¶ 7.

53. On June 28, 2019, C.H. responded to K.M., stating:

> [B.H.] is rightfully frustrated since you told us a year ago we would hear in 60 days. We are paying for a condo we cannot use and feel discriminated unfairly because we gave complied [sic] with the Associations requirements. … a year's wait is excessive with barely a word from the Association.

Ex. Y, Hs/K.M. Communications at DOA-002210; *see also* Ex. U, C.H. Decl. at ¶ 7.  C.H. also stated that they had asked both R.W. and A.G. for new letters, but adds that they "both are busy professionals and they, too, we're [sic] surprised that it has taken the Association this long to approve the emotional support animal."  Ex. Y, Hs/K.M. Communications at DOA-002210; *see also* Ex. U, C.H. Decl. at ¶ 7.  C.H. also explained that B.H. had been hospitalized again in the end of April, "[t]his time for mental status changes that affect his mental, physical and emotional well being this, in part, further explains his frustration."  Ex. Y, Hs/K.M. Communications at DOA-002210; *see also* Ex. U, C.H. Decl. at ¶ 7.

54. On July 8, 2019, the Hs began to submit documentation in support of their second reasonable accommodation request for B.H.'s assistance animal to be permitted to reside with them in their unit at the Dorchester. *See* Ex. W, B.H. 2019 Request; Ex. U, C.H. Decl. at ¶ 9; s*ee also infra* ¶ 55-58. The first package the Hs dropped off at the Dorchester included a new request form, dated July 8, 2019, utilizing the form from the new April 3, 2019 Assistance Animal Policy. *See* Ex. W, B.H. 2019 Request at DOA-004822 – DOA-004826; Ex. U, C.H. Decl. at ¶ 9. It also included copies of an ESA certificate and an ESA ID card, along with a support letter, signed by A.R.M. to "certify" Gracie as an emotional support dog. *See* Ex. W, B.H. 2019 Request, at DOA-004819 – DOA-004821; Ex. U, C.H. Decl. at ¶ 9. The Hs obtained these items when they sought to register Gracie as an emotional support animal at www.americanservicepets.com and filled out the site's online questionnaire. *See* Ex. U, C.H. Decl. at ¶ 9.

55. On July 8, 2019, C.H. emailed K.M. twice, believing that her first email did not properly send, to tell K.M. that she had left a package containing the reasonable accommodation request described above at the front desk. *See* Ex. Y, Hs/K.M. Communications, at DOA-001862, DOA-002212; Ex. U, C.H. Decl. at ¶¶ 7, 9. Specifically, she told K.M. that she had left an envelope with "some additional information regarding our dog Grace and her certification as an emotional support animal for [B.H.]" at the Dorchester's front desk with an employee, Mack. Ex. Y, Hs/K.M. Communications at DOA-001862; *see also id*., at DOA-004834 – DOA-004835 [envelope that contained documents with description written by C.H. on outside: "[K.M.] Information Re: Grace – for Emotional Support for [B.H.] Unit 1614"]; Ex. U, C.H. Decl. at ¶¶ 7, 9. C.H. also told K.M. that:

> [w]e have begun the process of filing a complaint with HUD since we feel discriminated. […] We have completed all required paperwork as

suggested by the Association a year ago and still have not be [sic] approved. I believe you said we would hear in 30 days a year ago, but our request has been ignored to date. We have paid our condo fees, parking, and wifi for a year and have not been able to live there.

Ex. Y, Hs/K.M. Communications, at DOA-001862; *see also* Ex. U, C.H. Decl. at ¶ 7.

56. K.M. responded later that evening to both of C.H.'s emails duplicatively, stating that "[w]e did receive the package (I emailed you confirmation of this already, so your email did go through). I put the package on [P.Y.]'s desk. She is currently out of the office but will address it upon her return on July 15th." Ex. Y, Hs/K.M. Communications, at DOA-001862; *see also* Ex. U, C.H. Decl. at ¶¶ 7, 9.

57. On or around July 14, 2019, the Hs also sent the Dorchester an updated letter from their dog's veterinarian, A.G., dated July 14, 2019, to be included as part of the supporting documentation for their second reasonable accommodation request. *See* Ex. W, B.H. 2019 Request, at US-00000054; Ex. U, C.H. Decl. at ¶ 9.

58. On July 15, 2019, C.H. left K.M. an envelope containing an updated letter from R.W. to be included in the supporting documentation for their second assistance animal request, with a note that K.M., "[p]lease find enclosed an update [sic] letter from [R.W.]. It is important that the Association sees this." Ex. Y, Hs/K.M. Communications, at DOA-004808; *see also* Ex. U, C.H. Decl. at ¶ 7*; see also* Ex. W, B.H. 2019 Request, at DOA-004827 – DOA-004828 [R.W.'s letter]. R.W.'s letter, dated July 6, 2019, reiterated B.H.'s need for an assistance animal to mitigate his physical, mental, and emotional symptoms from heart disease and included additional information about B.H.'s current psychological state as a result of his recent health problems:

> . . . [B.H.] unfortunately continues in a very depleted state which renders Gracie's presence even more critical to his maintaining some essential sense of well-being and hope. The psychological component of recovery from any such severe medical insult is strongly dependent on the presence of loving others, including pets, who provide an enduring sense of

> attachment and reassurance. I cannot overemphasize to you how crucial
> Gracie is to [B.H.], especially as she has been his close companion since
> well before his initial medical insult and has unfailingly stayed by his side
> since then.

Ex. W, B.H. 2019 Request, at DOA-004827 – DOA-004828; *see also* Ex. U, C.H. Decl. at ¶ 9.

59. On July 22, 2019, the Hs filed a complaint with HUD alleging that the Dorchester had violated the Fair Housing Act by failing to grant their request for an accommodation for an assistance animal. *See* Ex. Z, Hs' HUD Housing Discrimination Complaint; *see also* Ex. U, C.H. Decl. at ¶ 10.

60. On July 25, 2019, at the direction of F.P.D, P.Y. emailed the Hs eleven questions specifically concerning B.H.'s doctor-patient relationship with A.R.M., who had signed the certification the Hs obtained when they purchased a vest for Gracie. Ex. AA, Communications between the Hs and Dorchester General Managers ("Hs/GM Communications") at DOA-002306; Ex. BB, Internal DOA Council and Dorchester Management Communications ("Internal DOA Communications") at DOA-003431 [email from F.P.D. to P.Y., dated July 25, 2019: "[P.Y.], please email the questions to [B.H.]."]; *see also* Ex. U, C.H. Decl. at ¶¶ 7, 9. The Association Council did not include any questions about the letter from B.H.'s psychologist, R.W., or any questions about B.H.'s doctor-patient relationship with R.W. *See* Ex. U, C.H. Decl. at ¶ 9.

61. On August 16, 2019, C.H. informed K.M. that their house in Radnor had been sold and their Ocean City, New Jersey shore house would be their new temporary address "[u]ntil we hear that our emotional support (assistance) dog has been approved to bring to the Dorchester …." Ex. Y, Hs/K.M. Communications at DOA-001854; *see also* Ex. U, C.H. Decl. at ¶ 7.

62. Other than the July 25, 2019 email, the Hs received no further communications or inquiry from anyone at the Dorchester about their July 2019 reasonable accommodation request. *See* Ex. U, C.H. Decl. at ¶ 9.

**E.** **After the United States Filed this Action, the Association Granted the Hs'**
**Reasonable Accommodation Request for an Assistance Animal in June 2020.**

63. On January 23, 2020, Gracie passed away. *See* Ex. U, C.H. Decl. at ¶ 4.

64. On March 12, 2021, the United States filed its complaint against the Association in this

matter. *See* U.S. Compl. The Complaint referred to the Dorchester's failure to grant the Hs'

request although it did not refer to them by name. *Id*. at ¶ 46.

65. On May 4, 2020, the Hs informed D.S., who had taken over as the Dorchester's general

manager from P.Y., that Gracie had died and they were in the process of purchasing a new dog.

*See* Ex. AA, Hs/GM Communications at DOA-001057; *see also* Ex. U, C.H. Decl. at ¶¶ 7, 11.

They asked D.S. for a new reasonable accommodation for an assistance animal application and

the current Dorchester requirements so they could proceed with getting approval for a new dog.

*See* Ex. AA, Hs/GM Communications at DOA-001057 ("We are in the process of getting another

dog for him. Please send us a new application and Dorchester requirements as we proceed."); *see*

*also* Ex. U, C.H. Decl. at ¶¶ 7, 11. At D.S.'s instruction, K.M. sent the Hs the Dorchester's new

March 2020 Reasonable Accommodation for an Assistance Animal Policy along with the

associated forms on May 5, 2020. *See* Ex. Y, Hs/K.M. Communications at DOA-001435; *see*

*also* Ex. U, C.H. Decl. at ¶ 7.

66. On May 7, D.S. emailed C.H., saying that he "would like the opportunity to discuss your

request at you [sic] earliest convenience." Ex. AA, Hs/GM Communications at DOA-000964;

*see also* Ex. U, C.H. Decl. at ¶ 7. She responded the next day, stating that they could set up a call

after the Hs had submitted their new application. *See* Ex. AA, Hs/GM Communications at DOA-

000964; *see also* Ex. U, C.H. Decl. at ¶ 7.

67. On May 11, 2020, the Hs submitted their third request for a reasonable accommodation

for an assistance animal and sent it to the Dorchester. *See* Ex. AA, Hs/GM Communications at

DOA-001357; Ex. X, B.H. 2020 Request; *see also* Ex. U, C.H. Decl. at ¶ 11. On their new request form, the Hs listed their dog's name as "TBD," as they had not yet finalized their purchase of a dog, but noted under the question of "breed" and "weight" that they wanted either a Cockpoo or American Cocker Spaniel, in the range of 18-25 lbs. *See* Ex. X, B.H. 2020 Request; *see also* Ex. U, C.H. Decl. at ¶ 11. In addition to the new form, their application also included an unsigned letter from R.W., dated May 2020, and the Hs emailed and mailed the identical signed letter from R.W. to D.S. on May 15, 2020. *See* Ex. AA, Hs/GM Communications at DOA-000944 – DOA-000945 [email and attached photo of letter], DOA-004453 – DOA-004454 [R.W.'s signed letter]; *see also* Ex. U, C.H. Decl. at ¶¶ 7, 11.

68. On May 18, 2020, D.S. called the Hs and informed them that they had been granted "tentative" approval for their ESA by the Dorchester Council but that the Council would like to meet with them first. *See* Ex. AA, Hs/GM Communications at DOA-004455 [Hs' email to D.S., dated May 19, 2020: "Thank you again for calling on Monday to tell us that we have 'tentative' approval for an ESA from the Dorchester Council."]; *see also* Ex. U, C.H. Decl. at ¶¶ 7, 11. The Dorchester Council's requested meeting with the Hs took place by Zoom on May 29, 2020, with F.P.D. and J.H.W. representing the Council.[5] *See* Ex. U, C.H. Decl. at ¶ 12. F.P.D. stated that the DOA Council had tentatively agreed to grant the Hs' May 11, 2020 request subject to some qualifications. *Id*. Specifically, F.P.D. said that the Council would like the Hs to (1) use the Dorchester's freight elevator when entering or exiting the building; (2) have the dog wear a vest identifying her as a support dog; and (3) wait until after the COVID-19 pandemic was over to bring their dog into the Dorchester. *Id*. The Hs agreed to use the freight elevator and have

---

[5] The Hs repeatedly requested that counsel for the United States be permitted to attend the meeting requested by the Dorchester. *See* Ex. AA, Hs/GM Communications, at DOA-004455, DOA-000915, DOA-000953; *see also* Ex. U, C.H. Decl. at ¶¶ 7, 12. Accordingly, counsel for the United States and counsel for the Dorchester also attended the May 29, 2020 meeting. *See* Ex. U, C.H. Decl. at ¶ 12.

their dog wear a vest, but declined to postpone moving in until the end of the pandemic. *Id*.

Instead, they offered to wait at least two weeks. *Id*. F.P.D asked that the Hs give the Council

prior notice before bringing their dog into the building and promised that the Hs would be

informed of the Council's decision the morning after their next regularly scheduled Council

meeting, which was to be held on June 3, 2020. *Id*.

69. On June 8, 2020, D.S. notified C.H. that "[t]he Dorchester Owners Association has

approved [B.H.]'s request." Ex. AA, Hs/GM Communications at DOA-000919; *see also* Ex. U,

C.H. Decl. at ¶¶ 7, 13. The Hs moved into their condo later that month with B.H.'s new

emotional support dog, Angie. *See* Ex. U, C.H. Decl. at ¶ 13.

### F. Defendant Has Offered No Explanation for Its Failure to Grant the Hs' October 25, 2018 and July 8, 2019 Reasonable Accommodation Requests

70. The Dorchester designated F.P.D. as its 30(b)(6) witness regarding the Dorchester's

response to the Hs' 2018 and 2019 requests for an assistance animal. *See* Ex. F, F.P.D. Dep.

10:2-18; Ex. JJ, F.P.D. Dep. Notice and List of Topics, at Topic 6. When asked why the

Dorchester had delayed over 18 months in granting the Hs' request to have an assistance animal

in their unit in the Dorchester, his only explanations were that their original dog died, that the

Hs' were not pressing the issue, and that the Dorchester granted their May 2020 request. Ex. F,

F.P.D. Dep. 60:2-5; 61:19-21; 63:9-14; 64:4-13; 65:2-8; 85:23-86:2; 92:7-17. He declined to say

whether he thought that the Dorchester had taken too long to grant Hs permission to have an

Assistance Animal. *Id*. at 92:22-95:21.

### IV. A.M.'S REASONABLE ACCOMMODATION REQUEST TO LIVE WITH AN ASSISTANCE ANIMAL AT THE DORCHESTER

71. A.M. and M.M, a married couple, have been the owners of unit #██ at the Dorchester

since March 2016. *See* Ex. CC, A.M. Decl. at ¶ 1. They purchased the unit so that they could

easily visit their children and grandchildren who live in Philadelphia. *Id*. Their primary residence is in Bucks County, Pennsylvania. *Id*.

72. A.M. suffers from autophobia, the fear of being alone. *See* Ex. CC, A.M. Decl. at ¶ 2; Ex. DD, A.M. Reasonable Accommodation for an Assistance Animal Request and Supplemental Documentation ("A.M. Request") at DOA-004772 [letter in support of request from I.S., dated Jan. 15, 2019]. As a result of this condition, A.M. experiences physical and mental impairments, including severe anxiety, heart palpitations, sweating, nausea, and shortness of breath. *See* Ex. CC, A.M. Decl. at ¶ 2; Ex. DD, A.M. Request at DOA-004772. A.M.'s autophobia and the associated physical and mental impairments it causes substantially limits the major life activities of sleeping and living independently. *See* Ex. CC, A.M. Decl. at ¶ 2; Ex. DD, A.M. Request at DOA-004772.

73. As M.M. travels frequently overseas for his work, A.M. relies on the presence of her emotional support animal, Jammie, a whoodle mini, to help her combat her symptoms of autophobia, which are especially severe at night. *See* Ex. CC, A.M. Decl. at ¶ 3; Ex. DD, A.M. Request at DOA-004772 [letter in support of request from I.S., dated Jan. 15, 2019].

74. In or around December 2018, A.M. requested information about the Dorchester's reasonable accommodation for an assistance animal policy. *See* Ex. CC, A.M. Decl. at ¶¶ 4, 5; Ex. EE, A.M. Communications with K.M. and P.Y. ("A.M./Dorchester Communications") at DOA-002599 [K.M. email to A.M., dated Dec. 10, 2018: "Please see attached… the forms to register a service/assistance animal."]. In response, K.M. sent her the Dorchester's "Form to Request an Assistance Animal," Ex. EE, A.M./Dorchester Communications at DOA-002606 – DOA-002609, and the Dorchester's "Instructions to Medical Professional for Documenting a Disability Under the Federal Fair Housing Amendments Act," *id*. at DOA-002610, on December

10, 2018, *id*., at DOA-002599; *see also* Ex. CC, A.M. Decl. at ¶ 5. These were the same two documents that K.M. sent the Hs on October 1, 2018. *See supra* at ¶ 38.

75. On January 31, 2019, A.M. submitted her request for an accommodation for an assistance animal and supporting documentation to the Dorchester. Ex. EE, A.M./Dorchester Communications at DOA 004748 [A.M. states to K.M.: "I brought all necessary documents to [P.Y.] on January 31st"]; *see also* Ex. CC, A.M. Decl. at ¶¶ 4, 5; Ex. F.P.D. Dep. 107:14-22.

76. As required by the Dorchester, A.M.'s request included a completed form, dated January 30, 3029, Ex. DD, A.M. Request at DOA-004762 – DOA-004765, and a letter from her clinical psychologist I.S., dated January 15, 2019, *id*. at DOA-004772; *see also* Ex. CC, A.M. Decl. at ¶ 4. I.S.'s letter stated in relevant part:

> I am writing this letter regarding my patient [A.M.] (DOB: [withheld]) who I have been treating since 02/21/2018. This patient has a mental condition that requires ongoing psychological treatment.
>
> She has mental impairment that substantially limit her ability to function normally in the situations when she is alone at home. Due to her diagnosis of autophobia (the fear of being alone at home) she develops severe anxiety with a strong physiological response (a heart palpitation, sweating, nausea, shortness of breath, etc.). A presence of her dog at home prevents developing of anxiety attacks and alleviate [sic] her fears. The patient does not experience anxiety attacks when her dog is next to her at home. She is able to perform her usual activities and chores.
>
> [A.M.] needs to have her dog living with her as this dog is a factor that contributes a great deal to reducing her mental impairment and stabilizing her anxiety kevel [sic].

Ex. DD, A.M. Request at DOA-004772; *see also* Ex. CC, A.M. Decl. at ¶ 4. A.M.'s request packet also included a copy of I.S.'s Psychologist License from Pennsylvania's Bureau of Professional and Occupational Affairs, Ex. DD, A.M. Request, at DOA-004773, and a copy of a certificate designating Jammie as an emotional support animal and A.M.as her handler from US

Service Animals, *www.usserviceanimals.org, id*., at DOA-004774; s*ee also* Ex. CC, A.M. Decl. at ¶ 4.

77. On February 20, 2019, A.M. wrote to K.M. to inquire as to the status of her application, noting that it had been "20 days since I submitted my application and supporting documents for my dog."  Ex. EE, A.M./Dorchester Communications at DOA-004750; *see also* Ex. CC, A.M. Decl. at ¶ 5.  After receiving A.M.'s second follow-up email on February 26, K.M. responded on February 26, stating that P.Y. had told him that "our attorneys are reviewing the submittal. It is taking longer than expected due to recent changes in PA state legislature related to emotional support animals."  Ex. EE, A.M./Dorchester Communications at DOA-004748 – DOA-004749; *see also* Ex. CC, A.M. Decl. at ¶ 5.  A.M. responded on February 28 to both K.M. and P.Y., and offered her attorney's assistance in "speed[ing] up the review process [of the recent changes in PA legislature]."  Ex. EE, A.M./Dorchester Communications at DOA-004748; *see also* Ex. CC, A.M. Decl. at ¶ 5.

78. On March 4, 2019, A.M. emailed K.M. to ask "how much longer I have to wait for the permission to bring my ESA dog into my condo?"  Ex. EE, A.M./Dorchester Communications at DOA-004748; *see also* Ex. CC, A.M. Decl. at ¶ 5.

79. On March 5, 2019, A.M. called K.M. and told him that she needed to stay in her unit from March 7-9, and that "since she has not yet heard from us she doesn't know what to do."  Ex. EE, A.M./Dorchester Communications at DOA-004751 (K.M. email to P.Y., Mar. 5, 2019, conveying conversation he had that day with A.M.); *see also* Ex. CC, A.M. Decl. at ¶ 5.  A.M. also noted that she may have to get a hotel room in order to keep her dog with her since she is not permitted to have the dog in the Dorchester.  *See* Ex. EE, A.M./Dorchester Communications at DOA-004751 (K.M. email to P.Y., Mar. 5, 2019, conveying conversation he had that day with

A.M.); *see also* Ex. CC, A.M. Decl. at ¶ 5.  K.M. told her it was unlikely that they would have an answer for her in two days.  *See* Ex. EE, A.M./Dorchester Communications at DOA-004751 (K.M. email to P.Y., Mar. 5, 2019, conveying conversation he had that day with A.M.); *see also* Ex. CC, A.M. Decl. at ¶ 5.

80. Sometime prior to March 8, 2019, A.M. requested the contact information for the Association's attorney, and K.M. gave her the contact information for G.K.  Ex. EE, A.M./Dorchester Communications at DOA-001841 [A.M. Mar. 11, 2019 email to K.M. stating that she tried to call G.K. after receiving his contact info from K.M.]; *see also* Ex. CC, A.M. Decl. at ¶ 5.  A.M. emailed K.M. on March 11, 2019, stating, "[a]fter you share [sic] your attorney information I tried to contact him on Thursday and again today.  Unfortunately I'm getting ignored as you are.  Do you have any suggestions for me on what to do and how we can speed up the process?  Or may be [sic] you've heard anything back from [G.K.'s] office?"  Ex. EE, A.M./Dorchester Communications at DOA-001841; *see also* Ex. CC, A.M. Decl. at ¶ 5.

81. On March 12, 2019, K.M. wrote back to A.M., informing her that he had given her the name of the wrong attorney:

> The Council has full control over this matter and has actually retained a different attorney than our standard house counsel for this matter.  I apologize for the confusion, but I didn't know about this since the Council is handling the matter directly.  I don't even know which attorney they are using.  I will pass your email on to them.

Ex. EE, A.M./Dorchester Communications at DOA-001841; *see also* Ex. CC, A.M. Decl. at ¶ 5.  A.M. responded on the same day to K.M., asking if this was "good news or another delay."  Ex. EE, A.M./Dorchester Communications at DOA-001841; *see also* Ex. CC, A.M. Decl. at ¶ 5.  She also stated that the Council had had her application for forty days and that she wanted to know

why they were not responding to her.  *See* Ex. EE, A.M./Dorchester Communications at DOA-001841; *see also* Ex. CC, A.M. Decl. at ¶ 5.

82. On March 12, 2019, K.M. forwarded A.M.'s March 12 email to P.Y., and stated, "[w]hen [A.M.] stopped in last week, she told me she needs the dog in order to sleep at night, since she cannot sleep alone. She says without the dog she would scream in the middle of the night."  Ex. EE, A.M./Dorchester Communications at DOA-001841; *see also* Ex. CC, A.M. Decl. at ¶ 5.

83. On May 13, 2019, A.M. wrote to P.Y., noting that it had been more than 100 days since she submitted her reasonable accommodation request, before stating, "[y]ou and I had been in constant communication where you've been asking me for my patience in the process that has to involved [sic] HUD."  Ex. EE, A.M./Dorchester Communications at DOA-004756; *see also* Ex. CC, A.M. Decl. at ¶ 5.  She goes on to say,

> [m]y condition is getting worse and delayed process is causing me more anguish and anxiety, sleepless night [sic] and physical discomfort!  At this point you are denying me of living in my condo and making my life completely impossible and full of stress.  The more I read about the issue, the more I see that Dorchester condo Council is simply prolonging this case without any merit.

Ex. EE, A.M./Dorchester Communications at DOA-004756; *see also* Ex. CC, A.M. Decl. at ¶ 5. She then asked that P.Y. share three hyperlinked articles that she included at the bottom of her email with the Council that related to emotional support animals and the PA statute on emotional support animals from October 24, 2018 that K.M. had previously referenced as part of the reason for the delay in her approval.  *See* Ex. EE, A.M./Dorchester Communications at DOA-004756; *see also* Ex. CC, A.M. Decl. at ¶ 5; *supra* ¶ 77.

84. A.M. sent a follow up email to P.Y. on May 17, 2019, asking why her previous email had been "ignored." Ex. EE, A.M./Dorchester Communications at DOA-002517; *see also* Ex. C, A.M. Decl. at ¶ 5.

85. A.M. filed a complaint of discrimination in housing on June 12, 2019 with the City of Philadelphia Commission on Human Relations. *See* Ex. FF, A.M. Housing Discrimination Complaint with City of Phila. Commission on Human Relations ("A.M. Complaint"); *see also* Ex. CC, A.M. Decl. at ¶ 6.

86. On July 30, 2019, N.K., who A.M. retained as counsel for this matter, sent a letter to P.Y. saying that the Association was in violation of various civil rights laws. *See* Ex. GG, N.K. Ltr. to P.Y. at DOA-002359; *see also* Ex. CC, A.M. Decl. at ¶ 6.

87. In response to the letter, the Association set up a meeting with A.M. and N.K. for August 5, 2019. *See* Ex. CC, A.M. Decl. at ¶ 7. In attendance from the Association were P.Y., P.F.D., and J.H.W. *Id.* The Association required that A.M. and all other attendees sign an agreement to treat the meeting as a confidential settlement discussion. *See* Ex. HH, Confidentiality and Privilege Agreement, Aug. 5, 2019; *see also* Ex. CC, A.M. Decl. at ¶ 7.

88. The Dorchester has never granted A.M.'s request. *See* Ex. CC, A.M. Decl. at ¶ 8.

89. Since the meeting on August 5, 2019, A.M. received no further communications or inquiry from anyone at the Dorchester about her request until June 8, 2021. *See* Ex. II, A.M. Communications with K.M. Post Aug. 5, 2019 Meeting ("A.M./K.M. Communications") at p. 2 [K.M. June 8, 2021 email]; *see also* Ex. CC, A.M. Decl. at ¶ 8. On that date, K.M. responded to emails A.M. had sent on May 28, 2021 and June 4, 2021 inquiring about the status of her request. *See* Ex. II, A.M./K.M. Communications at p. 2 [K.M. June 8, 2021 email]; *see also* Ex. CC, A.M. Decl. at ¶ 8. K.M. acknowledged that the Dorchester had taken no further action on her request

because she had filed a complaint with the City of Philadelphia but asked that she let him know if she wished to provide the Council with additional information.  *See* Ex. II, A.M./K.M. Communications at p. 2 [K.M. June 8, 2021 email]; *see also* Ex. CC, A.M. Decl. at ¶ 8.  A.M. responded on June 9, 2021, making clear that she still wanted the Dorchester to grant her January 31, 2019 request and asked K.M. to let her know if he needed any additional information.  *See* Ex. II, A.M./K.M. Communications at p. 1 [A.M. June 9, 2021 email]; *see also* Ex. CC, A.M. Decl. at ¶ 8.

90. The Dorchester designated F.P.D. as its 30(b)(6) witness regarding the Dorchester's response to A.M.'s request.  *See* Ex. F, F.P.D. Dep. 10:2-18; Ex. JJ, F.P.D. Dep. Notice and List of Topics, at Topic 6.  When asked why the Dorchester had not granted A.M.'s accommodation, F.P.D. replied that the reason was that A.M. filed a complaint with the City of Philadelphia "before the Dorchester ruled on or made the decision on her request for an emotional support animal."  Ex. F, Devine Dep. 107:23-108:17.  He was unable to identify any other reason why the Dorchester had not granted her request.  *Id*. at 124:16-126:18.

## V.    L.L.'S REASONABLE ACCOMMODATION REQUEST TO LIVE WITH AN ASSISTANCE ANIMAL AT THE DORCHESTER

91. L.L. suffers from generalized anxiety disorder and panic disorder.  *See* Ex. KK, L.L. Decl. at ¶¶ 2, 5; Ex. LL, L.L.'s First Reasonable Accommodation for an Assistance Animal Request with Supporting Documentation ("L.L. Mar. 24, 2020 Request") at DOA-001979 [letter from Dr. N.C. in support of request].  These mental impairments substantially limit her major life activities of working, reading, and concentrating.  *See* Ex. KK, L.L. Decl. at ¶¶ 2, 5; Ex. LL, L.L. Mar. 24, 2020 Request at DOA-001979 [letter from Dr. N.C. in support of request].  In addition to medication, to help her cope with the symptoms of her disorders, L.L. has an emotional

support animal, a chihuahua mix. *See* Ex. KK, L.L. Decl. at ¶¶ 3, 5; Ex. LL, L.L. Mar. 24, 2020 Request at DOA-001979 [letter from Dr. N.C. in support of request].

92. L.L.'s mother, D.L, has been a resident and owner at the Dorchester since 1999. *See* Ex. KK, L.L. Decl. at ¶ 4. As D.L. began to need more frequent care, L.L. decided to pursue renting or purchasing a unit at the Dorchester so that she would be closer to her mother. *Id.*

93. On or about February 12, 2020, L.L. and her real estate agent, D.G., viewed units #308, #1108, and #2908 at the Dorchester. *See* Ex. KK, L.L. Decl. at ¶ 5.

94. On February 13, 2020, D.G. contacted D.S. on L.L.'s behalf to inquire as to the Dorchester's policy on assistance animals. *See* Ex. MM, D.G. Communications with D.S. and K.M. ("D.G./Dorchester Communications") at DOA-002136 [email from D.G. to D.S. on Feb. 13, 2020: "Thank you for taking my call."]; *see also* Ex. KK, L.L. Decl. at ¶¶ 5, 7. He later followed up this call with an email to D.S., in which he said, "[a]s stated I have a client with a certified emotional support animal, that wants to purchase in the building, please send the application as stated so we can get the ball rolling for an offer." Ex. MM, D.G./Dorchester Communications at DOA-002136; *see also* Ex. KK, L.L. Decl. at ¶¶ 5, 7. K.M. emailed D.G. the Dorchester's 2019 Reasonable Accommodation for an Assistance Animal Policy the same day and also asked D.G. which unit his client was interested in purchasing. *See* Ex. MM, D.G./Dorchester Communications at DOA-002136; *see also* Ex. KK, L.L. Decl. at ¶¶ 5, 7. D.G. responded that it was units #2908 and #1108. *See* Ex. MM, D.G./Dorchester Communications at DOA-002208; *see also* Ex. KK, L.L. Decl. at ¶¶ 5, 7.

95. On March 24, 2020, D.G. emailed L.L.'s completed reasonable accommodation request to K.M. Ex. MM, D.G./Dorchester Communications at DOA-001973; *see also* Ex. KK, L.L. Decl. at ¶¶ 5, 7; Ex. LL, L.L. Mar. 24, 2020 Request.

96. Among other documents, L.L.'s request packet included a completed request form dated March 24, 2020, Ex. LL, L.L. Mar. 24, 2020 Request at DOA-001974 – DOA-001978, and a letter from her psychologist, N.C., Ph.D., dated February 28, 2020, *id*. at DOA-001979; s*ee also* Ex. KK, L.L. Decl. at ¶ 5. The letter stated in relevant part that:

> I have been treating [L.L.] since February 5, 2019 for Generalized Anxiety Disorder and Panic Disorder as delineated by the diagnostic criteria of the DSM-5. I am familiar with her mental health history before I began treating her as well as her history of and current medications to augment treatment of her mental health condition. I am familiar with [L.L's] functional limitations and the substantial limitation of more than one of her major life activities.
> […]
> It is clear to me that [L.L.] requires her Assistance Animal (a 9 lb Chihuahua) just as much as medication and psychotherapy to allow her to mitigate her anxiety and panic disorder symptoms.
>
> [L.L's] emotional support animal is *essential* to reduce the anxiety and panic symptoms so that she can adequately function (sleeping, concentrating, focusing, reading) and remain gainfully employed.
>
> […] Other than an emotional support animal, I do not believe any other accommodation would suffice to allow [L.L] to adequately function.

Ex. LL, L.L. Mar. 24, 2020 Request at DOA-001979; *see also* Ex. KK, L.L. Decl. at ¶ 5. Additionally, L.L.'s request contained a letter from her veterinarian, C.R.H., DVM, DACVIM. *See* Ex. LL, L.L. Mar. 24, 2020 Request at DOA-001980 – DOA-001981; *see also* Ex. KK, L.L. Decl. at ¶ 5.

97. On March 25, 2020, K.M. emailed D.G., informing him that the Council had updated the Dorchester's Reasonable Accommodation for an Assistance Animal Policy on March 4, 2020, and that L.L. would need to resubmit her request using the updated form. *See* Ex. MM, D.G./Dorchester Communications at DOA-000959; *see also* Ex. KK, L.L. Decl. at ¶ 7. K.M. attached the policy to this email. *See* Ex. MM, D.G./Dorchester Communications at DOA-000959; *see also* Ex. KK, L.L. Decl. at ¶ 7. K.M. also again asked which unit L.L. was

interested in at the Dorchester.  *See* Ex. MM, D.G./Dorchester Communications at DOA-000959;

*see also* Ex. KK, L.L. Decl. at ¶ 7.  D.G. responded that L.L. was interested in unit #1108 and

asked if K.M. could inform him of what changes had been made to the policy.  *See* Ex. MM,

D.G./Dorchester Communications at DOA-000959; *see also* Ex. KK, L.L. Decl. at ¶ 7.  K.M.

responded, stating, "[s]he should fill out the revised copy as if it were new, as there have been

updates in response to FHEO-2020-01."  Ex. MM, D.G./Dorchester Communications at DOA-

000959; *see also* Ex. KK, L.L. Decl. at ¶ 7.

98. On March 26, 2020, D.G. emailed K.M. to inquire as to when the next Council meeting

was scheduled to take place and L.L.'s request would be reviewed.  *See* Ex. MM,

D.G./Dorchester Communications at DOA-000927; *see also* Ex. KK, L.L. Decl. at ¶ 7.  He

explained: "[w]e are on a timeline for getting our agreement of sale together. The client also

wants to be sure she can get the updates requested on the new ESA form from both doctor's [sic]

back to you in a timely manner."  Ex. MM, D.G./Dorchester Communications at DOA-000927;

*see also* Ex. KK, L.L. Decl. at ¶ 7.  K.M. responded shortly after, stating that "[y]our client

hasn't submitted anything that can be reviewed yet. We need the most recent set of forms

completed and returned with the requested documentation.  The Council meets once a month and

is set to meet via teleconference next week."  Ex. MM, D.G./Dorchester Communications at

DOA-000927; *see also* Ex. KK, L.L. Decl. at ¶ 7.  D.G. emailed again and asked specifically

which day the Council was meeting, so he could provide L.L.'s request prior to that meeting, and

K.M. finally answered that it was on Wednesday.  Ex. MM, D.G./Dorchester Communications at

DOA-000957; *see also* Ex. KK, L.L. Decl. at ¶ 7.

99. On March 26, 2020, D.G. emailed D.S. L.L.'s revised request, and requested that K.M.

"confirm that this will be reviewed at the next meeting on Wednesday as we are in a time crunch

regarding contracts." Ex. MM, D.G./Dorchester Communications at DOA-001496; *see also* Ex. KK, L.L. Decl. at ¶¶ 6, 7; Ex. NN, L.L.'s Second Reasonable Accommodation for an Assistance Animal Request with Supporting Documentation ("L.L. Mar. 26, 2020 Request"). K.M. forwarded D.G.'s email to D.S. on March 26. *See* Ex. MM, D.G./Dorchester Communications at DOA-001496; *see also* Ex. KK, L.L. Decl. at ¶ 7.

100. L.L.'s second request contained a recompleted form dated March 26, 2020, Ex. NN, L.L. Mar. 26, 2020 Request at DOA-001497 – DOA-001501, additional copies of the original letters from Honey's veterinarian and Dr. N.C., *id.* at DOA-001502, DOA-001504 – DOA-001505, as well as an addendum from Dr. N.C., dated March 26, 2020, *id.* at DOA-001503. *See also* Ex. KK, L.L. Decl. at ¶ 6. The addendum stated:

> As I understand it, the additional information pertaining to what The Dorchester wants to know from me is whether I have *observed* [L.L.] interact with her emotional support animal.
>
> … I affirm that I, [L.L's] treating pychologist [sic], have repeatedly observed [L.L.] interact with the emotional support animal for which she is requesting reasonable accommodation pursuant to 42 U.S.C. §3604 (f).

Ex. NN, L.L. Mar. 26, 2020 Request at DOA-001503; *see also* Ex. KK, L.L. Decl. at ¶ 6.

101. On April 2, 2020, D.S. emailed D.G., stating that "[t]he Dorchester Owners Association Council met last night and considered the materials you provided. Council assigned two of its members to meet with you and pursue an interactive dialogue about L.L.'s request." Ex. MM, D.G./Dorchester Communications at US-00000497; *see also* Ex. KK, L.L. Decl. at ¶ 7. He then requested that D.G. identify whether he and L.L. would be available on April 7 or April 9 for an in-person meeting with the two assigned Councilmembers. *See* Ex. MM, D.G./Dorchester Communications at US-00000497; *see also* Ex. KK, L.L. Decl. at ¶ 7.

102. D.G. requested that the Association "arrange a conference call with all parties," as opposed to meeting in person as he was, at the time, "not permitted to do any in person meetings with clients or in person real estate business meetings," due to the COVID-19 pandemic and City of Philadelphia restrictions on in-person gatherings. Ex. MM, D.G./Dorchester Communications at US-00000496; *see also* Ex. KK, L.L. Decl. at ¶ 7.

103. On April 3, 2020, D.S. emailed D.G., saying "[w]e prefer a face-to-face meeting with your client," and that D.G. could join the meeting over Zoom or a conference call. Ex. MM, D.G./Dorchester Communications at US-00000495; *see also* Ex. KK, L.L. Decl. at ¶ 7.

104. On April 4, 2020, D.G. forwarded an email from L.L. in which she stated that an in-person meeting was in opposition to the City's stay-at-home order and requested that the meeting be held telephonically. *See* Ex. MM, D.G./Dorchester Communications at US-00000494; *see also* Ex. KK, L.L. Decl. at ¶ 7. L.L. also requested that the Dorchester provide an agenda or additional information about the purpose of the meeting. *See* Ex. MM, D.G./Dorchester Communications at US-00000494; *see also* Ex. KK, L.L. Decl. at ¶ 7.

105. On April 8, 2020, D.S. sent D.G. a conference call number to use for the meeting but provided no additional details about the purpose of the meeting. *See* Ex. MM, D.G./Dorchester Communications at US-00000493; *see also* Ex. KK, L.L. Decl. at ¶ 7.

106. On April 8, 2020, D.G. again asked D.S., "what is the proposed agenda for the call?", to which D.S. responded on April 9, 2020: "Council has assigned two of its members to meet with you and L.L. to discuss your request." Ex. MM, D.G./Dorchester Communications at US-00000492; *see also* Ex. KK, L.L. Decl. at ¶ 7.

107. On behalf of the Dorchester, D.S., F.P.D., and J.H.W. attended a telephonic meeting on April 9 with L.L. and D.G. *See* Ex. KK, L.L. Decl. at ¶ 8; Ex. OO, L.L. Notes from Apr. 9, 2020

Meeting with the Dorchester Council ("L.L. Apr. 9, 2020 Meeting Notes"). During the call, F.P.D. asked L.L. and D.G. a series of questions concerning their knowledge of the Dorchester's no-pets policy and other bi-laws. *See* Ex. KK, L.L. Decl. at ¶ 8; Ex. OO, L.L. Apr. 9, 2020 Meeting Notes at p. 1. F.P.D. stated that many people had specifically moved into the building because it was pet free and had voted to affirm the no-pets policy.[6] *See* Ex. KK, L.L. Decl. at ¶ 8; Ex. OO, L.L. Apr. 9, 2020 Meeting Notes at p. 1. He also asked L.L. if she was aware that there were no other pets in the building and that she would be the first person in the building with a dog. *See* Ex. KK, L.L. Decl. at ¶ 8; Ex. OO, L.L. Apr. 9, 2020 Meeting Notes at p. 2. L.L. replied that she was aware there were cats in the building. *See* Ex. KK, L.L. Decl. at ¶ 8; Ex. OO, L.L. Apr. 9, 2020 Meeting Notes at p. 2. F.P.D. asked L.L. why she wanted to be the first person in the building with a dog when other residents would be unhappy and angry towards her while riding in the elevator with her dog when there are other buildings nearby that allowed dogs. *See* Ex. KK, L.L. Decl. at ¶ 8; Ex. OO, L.L. Apr. 9, 2020 Meeting Notes at p. 2. After further discussion, F.P.D. ended by stating that in light of the information he had provided, she should strongly consider whether she wanted to live in the Dorchester and be the first person to reside in the building with a dog, where pets were not wanted. *See* Ex. KK, L.L. Decl. at ¶ 8; Ex. OO, L.L. Apr. 9, 2020 Meeting Notes at p. 2. J.H.W. also spoke briefly, stating that he had moved to the Dorchester because of its no-pets policy and had allergies and knew of many other residents who had allergies and a fear of dogs. *See* Ex. KK, L.L. Decl. at ¶ 8; Ex. OO, L.L. Apr. 9, 2020

---

[6] The Association held a plebiscite in 2003 to determine whether dogs should be permitted in the Dorchester. *See* Ex. PP, Dorchester's Weekly Management Update, August 1, 2003. As of August 1, 2003, the Association's Weekly Management Update reported that only 252 residents had voted, and no change was made to the Community Rules. *Id.*; *see also* Ex. T, D.S. Dep. 26:17-27:12 (where he says there was only one change to the Community Rules from 1979 to present in 2019.)

35

Meeting Notes at p. 2.  L.L. prepared notes of the meeting at or near the time that it concluded. *See* Ex. KK, L.L. Decl. at ¶ 8.

108. On May 5, 2020, L.L. emailed D.S. to inquire as to the status of her reasonable accommodation request.  *See* Ex. R, L.L./D.S. Communications at DOA-001182; *see also* Ex. KK, L.L. Decl. at ¶ 9.  D.S. responded on May 12, 2020, and stated that, "[a]t the conclusion of that [April 9, 2020] conference call, you advised us to hold your March 26 request in abeyance until you reported back to us."  Ex. R, L.L./D.S. Communications at DOA-001182; *see also* Ex. KK, L.L. Decl. at ¶ 9.  D.S. stated that he would "arrange a meeting for the Dorchester Owners' Association Council to consider your request as promptly as I can."  Ex. R, L.L./D.S. Communications at DOA-001182; *see also* Ex. KK, L.L. Decl. at ¶ 9.

109. On May 13, L.L. responded that there was a misunderstanding and that she in fact wanted the Council to review her request.  *See* Ex. R, L.L./D.S. Communications at DOA-001182; *see also* Ex. KK, L.L. Decl. at ¶ 9.  Specifically, she said, "[d]espite the historical information relayed to me by [F.P.D.] during the conference call on April 9, 2020 for which I agreed to participate in good faith, and then being subjected to his confrontational tactics, tone, and repeated insistence that I reconsider my interest in residing at the Dorchester, I would like to move forward with this process."  Ex. R, L.L./D.S. Communications at DOA-001182; *see also* Ex. KK, L.L. Decl. at ¶ 9.

110. On May 26, 2020, after hearing nothing further from the Dorchester concerning her request, L.L. again emailed D.S.to ask about its status.  *See* Ex. R, L.L./D.S. Communications at DOA-001326 – DOA-001327; *see also* Ex. KK, L.L. Decl. at ¶ 9.  She commented that, "[a]s the Governor has lifted some of the restrictions pertaining to real estate, I am eager to move forward after such a lengthy delay."  Ex. R, L.L./D.S. Communications at DOA-001326 – DOA-001327;

*see also* Ex. KK, L.L. Decl. at ¶ 9.  D.S. replied on May 29, and informed her that the review of her request had been scheduled to occur at the Council's general meeting on June 3, 2020, and that he would follow up with her "shortly thereafter."  Ex. R, L.L./D.S. Communications at DOA-001326; *see also* Ex. KK, L.L. Decl. at ¶ 9.

111. Following the April 9, 2020 meeting, L.L. and D.G. viewed unit #1709 at the Dorchester.  *See* Ex. KK, L.L. Decl. at ¶ 9.

112. On June 9, 2020, D.S. emailed L.L. to inform her that the Council had

> … decided to postpone any consideration of requests or the propriety of such requests by non-owners/non-residents to introduce new animals into the Dorchester building.  Accordingly, Council determined that it would not consider your request, or seek additional information from you, at the present time, and probably not until the pandemic has run its course or its impact has been fully assessed. To assist you, I have attached a list of other condominium and apartment buildings in and around Rittenhouse Square and the surrounding neighborhood that presently accommodate animals and which likely would welcome you as an owner.

Ex. R, L.L./D.S. Communications at DOA-001326; *see also* Ex. KK, L.L. Decl. at ¶¶ 9, 10.

Since June 9, 2020, L.L. has received no further communications from anyone at the Dorchester about her request for an accommodation.  *See* Ex. KK, L.L. Decl. at ¶ 10.

Respectfully submitted on this <u>30th</u> day of June 2021.

*For the United States of America:*

JENNIFER ARBITTIER WILLIAMS
Acting United States Attorney
For the Eastern District of Pennsylvania

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division
U.S. Department of Justice

<u>/s/ *Yenisey Rodríguez*</u>

ELIZABETH L. COYNE
Assistant United States Attorney
Eastern District of Pennsylvania
615 Chestnut Street, Ste. 1250
Philadelphia, PA 19106
Phone: (215) 861-8447
Elizabeth.Coyne@usdoj.gov

SAMEENA SHINA MAJEED
Chief
TIMOTHY J. MORAN
Deputy Chief
MAZEN M. BASRAWI
JAMES FLETCHER
YENISEY RODRIGUEZ
Trial Attorneys
Housing and Civil Enforcement
Section / Disability Rights Section
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, D.C. 20530
Phone: (202) 598-5799
Yenisey.Rodriguez@usdoj.gov

| Exhibit | Title | Filed Status |
|---------|-------|--------------|
| Exhibit A | Declaration of Condominium of The Dorchester. | Public |
| Exhibit B | Amanda Bailey Declaration, signed 06/30/2021. | Public |
| Exhibit C | Objections and Reponses of the Dorchester Owners' Association to Plaintiff's First Set of Interrogatories, 10/2/2020. | Under Seal |
| Exhibit D | E.K. Deposition Transcript, 05/03/2021. | Under Seal |
| Exhibit E | M.L.S. Deposition Transcript, 05/06/2021. | Under Seal |
| Exhibit F | F.P.D. Deposition Transcript, 05/24/2021. | Under Seal |
| Exhibit G | J.H.W. Deposition Transcript, 05/07/2021. | Under Seal |
| Exhibit H | P.Y. Deposition Transcript, 04/07/2021. | Under Seal |
| Exhibit I | The Dorchester Community Rules and Regulations, 06/05/2019. | Public |
| Exhibit J | The Dorchester Condominium Reasonable Accommodation for an Assistance Animal Policy, undated but adopted approximately in early 2015. | Public |
| Exhibit K | Second Supplemental Objections and Responses of the Dorchester Owners' Association to Plaintiff's First Set of Interrogatories, 05/15/2021. | Under Seal |
| Exhibit L | Meeting Minutes of the DOA Council:<br>• November 7, 2018<br>• December 2, 2018<br>• January 9, 2019<br>• February 6, 2019<br>• March 6, 2019<br>• April 3, 2019<br>• May 1, 2019 | Under Seal |

| | | |
|---|---|---|
| Exhibit M | The Dorchester Condominium Reasonable Accommodation Policy for an Emotional Support or Service Animal, adopted 04/03/2019. | Public |
| Exhibit N | Louise Hamburg/ U.S. Department of Housing and Urban Development ("HUD") documents:<br>• Housing Discrimination Complaint, filed 04/30/2018<br>• HUD Charge of Discrimination and Determination and Reasonable Cause, dated 07/08/2019 | Public |
| Exhibit O | Assistance Animal Policy entitled The Dorchester Condominium Reasonable Accommodation Policy for an Emotional Support or Service Animal, adopted 03/04/2020. | Public |
| Exhibit P | P.Y. letter to D.M. dated 09/22/2016. | Under Seal |
| Exhibit Q | K.M. email to L.A.C., dated 09/19/2018. | Under Seal |
| Exhibit R | Email correspondence, attachments, and other records of communication between L.L. and D.S., dated 05/05/2020 to 06/09/2020. | Under Seal |
| Exhibit S | K.M. Deposition Transcript, 04/08/2021. | Under Seal |
| Exhibit T | D.S. Deposition Transcript, 05/18/2021. | Under Seal |
| Exhibit U | C.H. Declaration, signed 06/29/2021. | Under Seal |
| Exhibit V | Hs First Reasonable Accommodation for an Assistance Animal Request and Supplemental Documentation, Oct. 2018. | Under Seal |
| Exhibit W | Hs Second Reasonable Accommodation for an Assistance Animal Request and Supplemental Documentation, July 2019. | Under Seal |

| | | |
|---|---|---|
| Exhibit X | Hs Third Reasonable Accommodation for an Assistance Animal Request and Supplemental Documentation, May 2020. | Under Seal |
| Exhibit Y | Email correspondence, attachments, and other records of communication between the Hs and K.M., Dorchester Resident Services Director, dated from 08/14/2018 to 05/05/2020. | Under Seal |
| Exhibit Z | Hs' HUD Housing Discrimination Complaint, dated 07/22/2019. | Under Seal |
| Exhibit AA | Email correspondence, attachments, and other records of communication between the Hs and the Dorchester General Managers, P.Y. and D.S., dated 07/25/2019 to 06/08/2020. | Under Seal |
| Exhibit BB | Internal DOA Council and Dorchester Management communications. | Under Seal |
| Exhibit CC | A.M. Declaration, signed 06/30/2021. | Under Seal |
| Exhibit DD | A.M. Reasonable Accommodation for an Assistance Animal Request and Supplemental Documentation, January 2019. | Under Seal |
| Exhibit EE | Email correspondence, attachments, and other records of communication between A.M. and K.M. and P.Y., dated 12/08/2018 to 05/17/2019. | Under Seal |
| Exhibit FF | A.M. Housing Discrimination Complaint filed with the City of Philadelphia Commission on Human Relations, dated June 12, 2019. | Under Seal |
| Exhibit GG | N.K. letter to P.Y., dated July 30, 2019. | Under Seal |
| Exhibit HH | Confidentiality and Privilege Agreement, signed by F.P.D., P.Y., J.H.W., Thomas Zimmerman, N.K., and A.M., dated 08/05/2019. | Under Seal |
| Exhibit II | Email correspondence between A.M. and K.M. after the Aug. 5, 2019 Meeting, dated 05/28/2021 – 06/08/2021. | Under Seal |

| Exhibit JJ | F.P.D. Deposition Notice with List of Definitions and Topics, 05/19/2021. | Under Seal |
|---|---|---|
| Exhibit KK | L.L. Declaration, dated 06/29/2021. | Under Seal |
| Exhibit LL | L.L. First Reasonable Accommodation for an Assistance Animal Request with Supporting Documentation, dated 03/24/2020. | Under Seal |
| Exhibit MM | Email correspondence, attachments, and other records of communication between D.G. and D.S. and K.M., dated 02/13/2020 to 04/09/2020. | Under Seal |
| Exhibit NN | L.L. Second Reasonable Accommodation Request, dated 03/26/2020. | Under Seal |
| Exhibit OO | L.L. Notes from April 9, 2020 Meeting with Dorchester Council. | Under Seal |
| Exhibit PP | The Dorchester's Weekly Management Update, August 1, 2003. | Public |
| Exhibit QQ | Table of Abbreviations | Under Seal |
| Exhibit RR | United States' Deposition Exhibit 5 | Public |
| Exhibit SS | United States' Deposition Exhibit 22 | Public |
| Exhibit TT | United States' Deposition Exhibit 32 | Public |