**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | NO. 2:20-cv-01396-MMB |
| | : | |
| Plaintiff, | : | |
| | : | |
| LOUISE HAMBURG, | : | |
| | : | |
| Plaintiff-Intervenor, | : | |
| | : | |
| v. | : | |
| | : | |
| THE DORCHESTER OWNERS' | : | |
| ASSOCIATION, | : | |
| | : | |
| Defendant. | : | CIVIL ACTION |

**MEMORANDUM IN SUPPORT OF THE UNITED STATES'
MOTION FOR PARTIAL SUMMARY JUDGMENT MOTION AS TO LIABILITY**

The undisputed material facts in this case establish that the Dorchester Owners'

Association (the "Association") has engaged in unlawful discrimination on the basis of disability

in violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq*. Specifically, it is

undisputed that the Association has (1) refused to grant reasonable accommodations from its no-

pet policies for persons with disabilities requesting to reside with their assistance animal;[1] and

(2) imposed discriminatory restrictions on persons with disabilities requiring such

accommodations that were not imposed on other residents of the Dorchester on Rittenhouse

---

[1] This brief uses the term "assistance animal" to refer to emotional support animals, except when quoting a witness's or entity's use of another term. This is because "animals that … provide therapeutic emotional support for individuals with disabilities," are one type of assistance animal. *Assessing a Person's Request to Have an Animal as a Reasonable Accommodation under the Fair Housing Act*, FHEO-2020-01 (Jan. 28, 2020), https://www.hud.gov/sites/dfiles/PA/documents/HUDAsstAnimalNC1-28-2020.pdf (last visited Jun. 29, 2021) ("There are two types of assistance animals: (1) service animals, and (2) other trained or untrained animals that do work, perform tasks, provide assistance, and/or provide therapeutic emotional support for individuals with disabilities * * *").

Square (the "Dorchester"). Because these facts are undisputed, the United States has established as a matter of law that the Association has engaged in a pattern or practice of refusing rights guaranteed by the Fair Housing Act and has denied rights protected by the statute to a group of persons raising an issue of general public importance, within the meaning of 42 U.S.C. § 3614(a).

## I. FACTUAL BACKGROUND

### A. THE ASSOCIATION REFUSED TO GRANT REASONABLE ACCOMMODATIONS REQUESTED FOR PERSONS WITH DISABILITIES WHO ARE ENTITLED TO ASSISTANCE ANIMALS

The Dorchester, located in Philadelphia, is a high-rise condominium complex with 541 residential units. Statement of Undisputed Material Facts ("SUF") at ¶ 1. The Association, acting through a seven-person Council, is tasked with enforcing the building's rules and regulations, *id*. at ¶¶ 2-3, 6-7, and those rules do not allow residents living at the Dorchester to have dogs or other pets. SUF at ¶ 13. Since at least 2015, the Association has had in place a reasonable accommodation policy by which residents can request accommodations from the building's no-pet rule in order to live with assistance animals, including dogs or other animals that provide emotional support to persons with disabilities. SUF at ¶¶ 14-17 (2015 policy), ¶ 18 (2019 policy), and ¶¶ 19-20 (2020 policy). Until the United States filed this lawsuit in March 2020 however, *see* U.S. Compl. (ECF No. 1), the Association had never granted such a request. SUF at ¶¶ 28-30. As explained in more detail below, it is undisputed that the Association refused to grant accommodations for assistance animals as requested and needed by B.H., A.M., and L.L.[2]

---

[2] To comply with the Protective Order filed in this case, which designates "names" as "confidential information," the United States has used initials for the name of each person discussed in its Statement of Undisputed Facts and Memorandum of Law. *See* ECF No. 21 at 1(A). For ease of reference, the United States has provided the Court with a table listing the full names that correspond to each set of initials used here. *See* Ex. QQ.

1. **The Association refused to grant B.H.'s October 2018 and July 2019 requests for an accommodation for his assistance animal.**

B.H. and C.H. (collectively the "Hs.") co-own a residence, unit # ███, in the Dorchester with their son. SUF at ¶ 31. The Hs' primary residence was located in Radnor, Pennsylvania until 2018. *Id.*

In 2016, while living in their primary residence, B.H. developed postoperative depression after a quadruple coronary artery bypass surgery. SUF at ¶ 32. This depression limited B.H.'s ability to work, care for himself, and maintain social relationships. SUF at ¶¶ 32, 40, 53, 58. Because of the changes to his mental health, B.H. started to depend on the companionship of his family dog, Gracie. SUF at ¶¶ 33, 40, 58.

In 2018, the Hs decided to sell their primary residence in Radnor and move into their condominium in the Dorchester so as to be closer to B.H.'s doctors at the Hospital of the University of Pennsylvania ("Penn Medicine"). SUF at ¶ 34. In advance of their move, the Hs notified the director of resident services at the Dorchester on August 14, 2018, that they would be moving into their unit with B.H.'s assistance animal, and asked the Dorchester to send them the necessary forms so that they could obtain permission. SUF at ¶¶ 34-35.

After the Dorchester sent them the forms on October 1, 2018, the Hs submitted their first request for an assistance animal on October 25th, using the Dorchester's forms. SUF at ¶¶ 38-39. In support of this request, the Hs included (among other things) a letter from B.H.'s psychologist explaining that he was a person with a disability who required an assistance animal. SUF at ¶¶ 39-40.

The Dorchester's policy at the time stated that they generally would respond to reasonable accommodation requests for assistance animals within 30 days; but the Dorchester failed to follow that timeline. SUF at ¶¶ 15, 42-43, 47. The Dorchester did not respond to the

Hs' request for seven months. SUF at ¶¶ 43-49. At that time, on June 27, 2019, the Association instructed the Hs to *re-submit* their request for an accommodation using the new forms adopted by the Council. SUF at ¶ 51. The Hs then submitted a new request in July 2019, but the Dorchester also failed to grant that request. SUF at ¶¶ 51-62.

On multiple occasions the Hs complained to the Dorchester about the delay, pointing out, among other things, that they had to primarily reside away from Penn Medicine in Ocean City, New Jersey, SUF at ¶ 61, since they could not live in the Dorchester with their dog, and that they were paying condominium fees and other expenses for a condominium they were unable to use, SUF at ¶ 55. After continued delay, the Hs told the Association that their conduct constituted discrimination on the basis of B.H.'s disability, and on July 22, 2019, they filed a Complaint with HUD. SUF at ¶¶ 55, 59.

The Council did not grant the Hs an accommodation until June 8, 2020, more than a year and a half after the Hs submitted their first request for a reasonable accommodation in October 2018. SUF at ¶ 69. This occurred only after the Hs' first dog had died, SUF at ¶ 65, the Hs had submitted a third request for an accommodation on May 11th, 2020, *id*. at ¶ 67, and the United States had filed this lawsuit, *id*. at ¶ 28.

**2. The Association refused to grant A.M.'s request for an accommodation for her assistance animal because she filed a complaint with the Philadelphia Commission on Human Relations.**

A.M. and her husband M.M. have co-owned a residence at the Dorchester, unit #███, since March 2016. SUF at ¶ 71. While the couple primarily resides in Bucks County, Pennsylvania, A.M. and M.M. purchased their condominium so that they could more easily visit their children and grandchildren, many of whom live in Philadelphia. SUF at ¶ 71; *see also* Exhibit CC at ¶ 1, Declaration of A.M. ["A.M. Decl."].

A.M. suffers from autophobia, the fear of being alone or lonely.  SUF at ¶ 72.  Solitude, even in a safe place like home, may cause her extreme anxiety that manifests in debilitating physical symptoms such as heart palpitations, sweating, nausea, and shortness of breath, among others.  A.M. Decl. at ¶ 2.  Her phobia is especially acute at night.  SUF at ¶¶ 73, 82.  Because her husband frequently travels overseas for work, A.M. relies on the presence of her assistance animal, Jammie, to alleviate the onset of anxiety attacks or related symptoms.  SUF at ¶ 73.

On January 31, 2019, A.M. requested an accommodation for her assistance animal.  SUF at ¶ 75.  Per the Dorchester's policy, A.M. submitted a completed form and provided staff with a letter from her clinical psychologist.  SUF at ¶ 76.  This letter confirmed that A.M. needs to live with her dog "as this dog is a factor that contributes a great deal to reducing her mental impairment and stabilizing her anxiety kevel [sic]."  SUF at ¶ 76.

Although the Dorchester's policy at the time specified that they would ordinarily respond to inquiries within 30 days, SUF at ¶¶ 15 and 42, the Association ignored A.M.'s request.  SUF at ¶¶ 77-81, 83-84, 89.  After not receiving a response from the Association for over four months, A.M. filed a housing discrimination complaint with the Philadelphia Commission on Human Relations (the "City of Philadelphia") on June 12, 2019.  SUF ¶ 85.

To date, the Association has never granted the accommodation requested by A.M.  SUF at ¶ 88-89.  The only explanation the Association has offered for not doing so is that A.M. filed a complaint with the City of Philadelphia while her request for a reasonable accommodation was pending with the Association.  SUF at ¶ 90.

**3. The Association refused to consider L.L.'s request for an accommodation for her assistance animal because she was not a current resident or owner of a unit at the Dorchester.**

While L.L. has never owned or rented a unit at the Dorchester, her mother, D.L. has owned a condominium since 1999.  SUF at ¶ 92.  To more readily care for her elderly mother, L.L. became interested in purchasing or renting a residence at the Dorchester.  SUF at ¶¶ 92-93.  L.L. retained a real estate agent and viewed three available units on February 12, 2020.  SUF at ¶ 93.  Before making any offers to rent or buy, the day after viewing the units, L.L.'s real estate agent contacted the Dorchester on her behalf to request an accommodation for her assistance animal as L.L. suffers from anxiety and panic disorders, for which she has an assistance animal.  SUF at ¶¶ 91, 94.  The Dorchester emailed him a copy of the Dorchester's 2019 Policy.  SUF at ¶ 94.

On March 24, 2020, L.L. submitted her request for a reasonable accommodation to live with her dog.  SUF at ¶ 95.  Per the Association's policy, this request included, among other things, a letter from L.L.'s psychologist stating that her assistance animal is "*essential* to reduc[ing] the anxiety and panic or symptoms so that she can adequately function (sleeping, concentration, focusing, reading) and remain gainfully employed," and that no other "accommodation would suffice to allow [L.L.] to adequately function."  SUF at ¶ 96 (emphasis in the original).  In response, on March 25, 2020, the Dorchester instructed L.L. to resubmit her request using the Association's updated forms.  SUF at ¶ 97.  L.L. did so on March 26, 2020.  SUF at ¶ 99.

The Association requested a meeting with L.L. and her agent, and that meeting took place on April 9, 2020.  SUF at ¶¶ 101, 107.  At this meeting, F.P.D., the Council's President, pressed L.L. to reconsider her interest in living at the Dorchester, stating among other things that her

neighbors would likely act unkindly toward her as the first person in the building to have a dog. SUF at ¶ 107.

On June 9, 2020, Dorchester staff informed L.L. that the Council would not consider her request as it had decided not to consider requests from non-residents until the COVID "pandemic has run its course or its impact has been fully assessed." SUF at ¶ 112. At his deposition on May 23, 2021, F.P.D., confirmed that this policy of not considering requests for accommodations from prospective residents was still in effect. SUF at ¶¶ 26, 112.

**B. THE DORCHESTER ADOPTED AND ENFORCED DISCRIMINATORY TERMS AND CONDITIONS ON ACCOMMODATIONS FOR ASSISTANCE ANIMALS**

In addition to refusing to grant the reasonable accommodations for assistance animals requested by the Hs, A.M., and L.L., the Association has also imposed discriminatory restrictions on such accommodations. SUF at ¶¶ 21-27. Its policies, for instance, explicitly require that persons accompanied by assistance animals use the service elevator and the back entrance to enter and leave the building. SUF at ¶¶ 21-24. The Association enforced the elevator restriction against the Hs by asking them to use the freight elevator after notifying them that their third request had been "tentatively" approved. SUF at ¶¶ 24, 68. Additionally, until 2020, the Council's policies required persons with assistance animals to obtain a $1 million insurance policy, even though it does not impose such a requirement on other residents. SUF at ¶ 27. As illustrated by its action in response to requests by L.L. and A.M., the Council also has implemented a policy of refusing to consider requests for accommodations for assistance animals by prospective residents or from residents who file housing discrimination complaints against the Dorchester. SUF at ¶¶ 25-26, 90, 112.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Once a moving party shows the absence of a genuine issue of material fact, the non-moving party must come forward with specific evidence, not mere allegations or denials, which demonstrates the existence of a genuine issue for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *accord United States v. Commander*, 734 F. App'x 824, 829 (3d Cir. 2018), *cert. denied*, 139 S. Ct. 613 (2018).  As explained below, the undisputed facts establish that the Association has and continues to violate the Fair Housing Act, and the United States is therefore entitled to partial summary judgment on liability.

## III.    ARGUMENT

The Fair Housing Act (FHA) makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of [the disability] of a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available."  42 U.S.C. 3604(f)(2).[3]  Conduct qualifying as "discrimination" includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a person with a disability] equal opportunity to use and enjoy a dwelling."  42 U.S.C. § 3604(f)(3)(B).  See also *Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 176 (3d Cir. 2005) (explaining and distinguishing between types of disability discrimination claims under the FHA).

---

[3] This brief uses the term "disability" in place of the term "handicap," which appears in the statute, *see* 42 U.S.C. § 3604(f)(2), except when quoting a witness's or entity's use of another term.  The two terms can be used interchangeably, *see Helen L. v. DiDario*, 46 F.3d 325, 330 n.8 (3d Cir. 1995), *cert. denied*, 516 U.S. 813 (1995), as both terms have the same legal meaning, *see Bragdon v. Abbott*, 524 U.S. 624, 631 (1998).

## A. THE ASSOCIATION REFUSED TO GRANT REASONABLE ACCOMMODATIONS TO PERSONS WITH DISABILITIES WHO NEEDED ASSISTANCE ANIMALS IN VIOLATION OF FAIR HOUSING ACT, 42 U.S.C. § 3604(f)(3)(B)

In order to establish that a defendant refused to make a reasonable accommodation, a plaintiff must establish: (1) that the accommodation requested in rules, policies, practices, or services was *reasonable*; (2) that it was *necessary* to afford a person with a disability an *equal opportunity* to use and enjoy a dwelling; and (3) that the defendant *refused* to make the accommodation. *See, e.g.*, *Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 105 (3d Cir. 2018) (citing to 42 U.S.C. § 3604(f)(3)) (emphasis in the original). As explained below, the United States has established each of these elements with respect to B.H., A.M., and L.L.

As an initial matter, B.H., A.M., and L.L. are persons with disabilities. Under the FHA, a "disability" includes "a physical or mental impairment which substantially limits one or more … major life activities." 42 U.S.C. § 3602(h)(1). See *Wind Gap Mun. Auth.* 421 F.3d at 179. A mental impairment includes "[a]ny mental or psychological disorder, such as … emotional or mental illness." 24 C.F.R. § 100.201(a)(2). Major life activities include "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 24 C.F.R. § 100.201(b).

The undisputed evidence in the record establishes that the Hs, A.M., and L.L. are each a person with a disability within the meaning of the FHA. *See* Ex. U at ¶ 2, Declaration of C.H. ["C.H. Decl."]; A.M. Decl. at ¶ 2; Exhibit KK at ¶ 2, Declaration of L.L. ["L.L. Decl."]. Each of them submitted letters from medical professionals documenting his or her disabilities and explaining to the Dorchester how these mental impairments substantially limit one or more of his or her major life activities. *See* SUF at ¶¶ 40, 58, 67 (explaining that B.H.'s depression substantially limits his major life activities of  working, caring for himself, living independently,

and maintaining social relationships); ¶ 76 (explaining that A.M.'s autophobia substantially limits her ability to live independently when she is alone and causes heart palpitations, sweating, nausea, and shortness of breath); ¶¶ 96, 100 (explaining that L.L.'s anxiety and depression disorders substantially limit major life activities of sleeping, concentrating, focusing, reading, and working).

The Association admits that it had no basis to question the veracity of the statements in the letters from the treating medical professionals submitted by B.H., A.M. and L.L. SUF at ¶¶ 70, 90, 112.

**(1) The accommodations requested were reasonable.**

Defendants bear the burden of proving that the requested accommodation is unreasonable. *Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Twp. of Scotch Plains*, 284 F.3d 442, 446 (3d Cir. 2002) (adopting burden-shifting analysis where "the plaintiff bears the initial burden of showing that the requested accommodation is necessary to afford handicapped persons an equal opportunity to use and enjoy a dwelling, at which point the burden shifts to the defendant to show that the requested accommodation is unreasonable."); *accord Vorchheimer*, 903 F.3d at 112.

It is well established that among the accommodations that "may be necessary" under the FHA are accommodations from no-pet policies for assistance animals, including "the use of an emotional support animal in one's own home, despite the existence of a rule, policy or law prohibiting such an animal." *Revock v. Cowpet Bay W. Condo. Ass'n*, 853 F.3d 96, 110 (3d Cir. 2017) (collecting cases); *see also* 24 CFR. § 100.204(b) (citing examples that include creating an exception to a no-pets policy to allow a resident to have a service dog).

Defendants have acknowledged that such an accommodation is reasonable by explicitly providing for it in their policies. SUF at ¶¶ 14-20. Furthermore, the Dorchester granted three requests for assistance animals after the United States filed its lawsuit, thus acknowledging that granting such a request where it is necessary is reasonable and feasible. SUF at ¶¶ 28-30. Accordingly, there is no dispute that B.H., A.M., and L.L. all requested accommodations that were reasonable, assuming the other elements of a reasonable accommodation are established.

### (2) The accommodations were necessary to afford persons with disabilities an equal opportunity to use and enjoy their residences.

A reasonable accommodation is "necessary" within the meaning of the FHA when it is "essential" and not merely "preferable" to afford a person with a disability an equal opportunity to use and enjoy the dwelling of his or her choice. *Vorchheimer*, 903 F.3d at 107. As was set forth in the letters that the Hs, A.M., and L.L. submitted, it is essential for each person's well-being that they live with their assistance animal. SUF at ¶¶ 40, 58 (explaining that B.H.'s dog soothes and significantly relaxes him, proving essential to his emotional well-being and sense of hope as well as his physical recovery from major heart surgery and subsequent infections); ¶ 76 (explaining that A.M.'s dog prevents anxiety attacks and reduces mental impairments so that she may perform her usual activities and chores); ¶¶ 96, 100 (explaining that L.L.'s dog is essential to reducing that panic and anxiety symptoms, enabling her to adequately function).

The Association admits that it had no basis to question the veracity of the statements in the letters from the treating medical professionals submitted by the Hs, A.M. and L.L. SUF at ¶¶ 70, 90, 112.

### (3) The Association refused to grant the requested accommodations.

A "refusal" to provide a reasonable accommodation "may be actual or constructive" and an "undue delay" can constitute a refusal. *Revock*, 853 F.3d at 110-111 (citations and internal

quotation marks omitted). "For a housing provider's action to be considered a 'refusal' under the Fair Housing Act, the provider must have had a prior 'opportunity to accommodate.'" *Id*.

It is undisputed that the Association had sufficient opportunity to accommodate the requests made here. B.H., A.M., and L.L. each requested an accommodation in writing. SUF ¶¶ 39, 54-55, 57-58, 75, 95, 99; *Revock*, 853 F.3d at 111 (establishing that an opportunity to accommodate exists where "a plaintiff petitions for an accommodation or declares that she is entitled to it."); *accord Lloyd v. Presby's Inspired Life*, 251 F. Supp. 3d 891, 900 (E.D. Pa. 2017). Moreover, each request was supported by letters from mental health professionals indicating that the dog provided essential emotional support that alleviates identifiable symptoms. *See* discussion *supra* Part III.A(1), (3). This information was more than sufficient to establish that each person was entitled to the accommodation that was requested. *See Colwell v. Rite Aid Corp.*, 602 F.3d 495, 506 (3d Cir. 2010) (holding with respect to a reasonable accommodation claim brought under the ADA that employers need only "enough information to know of both the disability and desire for an accommodation") (citation and internal quotation marks omitted). Each person provided the Dorchester with information that they were persons with disabilities and that they needed an assistance animal. Thus, the Association had an opportunity to accommodate their requests.

The Association's delay in granting B.H.'s requests for an accommodation constitutes a refusal. It is well established that an undue delay is sufficient to establish an unlawful refusal; an outright refusal is not required. *See Revock*, 853 F.3d at 110-111 (noting "[a]n undue delay in granting a reasonable accommodation" may amount to a refusal). Here, the fact that the Association waited over seven months to act on the Hs third request alone constitutes refusal. SUF at ¶ 39-62. *See Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1286

(11th Cir. 2014) (reasonable fact finder could not have concluded that defendant was still undertaking meaningful review of an accommodation request where request had been pending for at least 6 months); *Madden v. Canus Corp.*, No. 2:19-CV-01632-JDW, 2019 WL 6498062, at *3 (E.D. Pa. Dec. 3, 2019) (collecting cases holding that an indeterminate delay of 6 months or more has the same effect as an outright denial); *Groome Res. Ltd. v. Par. of Jefferson*, 234 F.3d 192, 199 (5th Cir. 2000) (upholding district court's finding that the defendants' failure to take any steps to address the plaintiff's application four months after the lawsuit was filed constituted a denial of a reasonable accommodation).  Moreover, ignoring the Hs' first two requests and then waiting more than a year-and-a-half after receiving the Hs' first request in October 2018 before granting B.H. an accommodation in 2020 establishes that the Association refused to grant him an accommodation as a matter of law. SUF at ¶¶ 63, 67-69.[4] *Astralis Condo. Ass'n. v. Sec'y, U.S. Dep't of Hous. and Urban Dev.*, 620 F.3d 62, 68-69 (1st Cir. 2010) (finding actionable refusal to grant accommodation where condominium association delayed decision on request for handicapped parking spaces for a year).  The fact that the Association ultimately granted the Hs' request does not impact the analysis for refusal.  *Revock*, 853 F.3d at 111 (finding a refusal still "occurs when the disabled resident is first denied a reasonable accommodation, irrespective of the remedies granted in subsequent proceedings.") (citation and internal quotation marks omitted).

It is also undisputed that the Association refused to grant requests made by L.L. and A.M. In the case of L.L., the Association refused even to consider her request because L.L. was not a current resident.  SUF at ¶ 112.  Similarly, the Association acknowledges that it refused to decide A.M.'s request after she filed a complaint with the City of Philadelphia.  SUF at ¶¶ 89-90.  The

---

[4] The Association granted the Hs' request only after United States filed this lawsuit. Until the United States filed this action, the Association had not granted a single accommodation.

Association had no basis for refusing to consider these justified requests.  *See Castellano v.*

*Access Premier Realty, Inc.*, 181 F. Supp. 3d 798, 808 (E.D. Cal. 2016) (stating that "[i]f an

accommodation is required under the FHA, the reason for the denial is irrelevant in establishing

that a violation occurred.").

**B.  THE ASSOCIATION IMPOSED DISCRIMINATORY RESTRICTIONS AND CONDITIONS ON PERSONS WITH DISABILITIES IN VIOLATION OF THE FAIR HOUSING ACT, 42 U.S.C. § 3604(f)(2)**

The FHA prohibits imposing discriminatory "terms, conditions, or privileges of sale or

rental of a dwelling, or in the provision of services or facilities in connection with such dwelling,

because of a [disability]" on a current or prospective resident.  42 U.S.C. § 3604(f)(2).

Here, the Association imposed discriminatory terms and conditions on persons with

assistance animals that it did not impose on other residents.  Its policies explicitly require that

persons accompanied by assistance animals (1) use the service elevator, (2) use the back entrance

to enter and leave the building, (3) obtain a $1 million insurance policy naming the Association

as an additional insured, and (4) avoid entering, using, occupying or enjoying common areas

such as fire stairwells, the pool area, gym or garage.[5]  *See* SUF at ¶ 21 (requiring residents to

"escort the[ir] Assistance Animal in and out of the Dorchester exclusively from the freight

elevator through the rear entrance and never through the front entrance or the lobby area, unless

the rear entrance is locked, and cannot be opened by the Dorchester staff"); SUF at ¶ 27

(explaining that the insurance coverage required of residents generally was $25,000); SUF at ¶

23 (prohibiting assistance animals from "any of the common elements including but not limited

to common hallways, fire stairwells, pool area, gym, garage and amenities.").  These restrictions

explicitly subject persons with disabilities to terms and conditions that are different than those

---

[5] While the elevator and rear door restrictions do not appear in the policy's 2020 version, it remains listed in the building's "Community Rules and Regulations."  SUF at ¶ 22.

imposed on other persons, and thereby violate the FHA.  *See Curto v. A Country Place Condo. Ass'n*, 921 F.3d 405, 410 (3d Cir. 2019) (stating that "[w]here a regulation or policy facially discriminates on the basis of the protected trait, in certain circumstances it may constitute per se or explicit discrimination because the protected trait by definition plays a role in the decision-making process.") (internal citations omitted); *see also Corey v. Sec'y, U.S. Dep't of Hous. & Urb. Dev. ex rel. Walker*, 719 F.3d 322, 324-325, 328 (4th Cir. 2013) (holding that defendant could not justify discriminatory conditions imposed, such as requiring plaintiff "to obtain a renter's insurance policy with $1 million in liability," since they were "based … on unsubstantiated stereotypes about autistic people in general.").

On multiple occasions the Association imposed discriminatory terms and conditions on persons requesting reasonable accommodations for assistance animals.  *See* SUF at ¶ 68 (Association asked the Hs to use the freight elevator when entering or exiting the building as a condition of their "tentative" approval); SUF at ¶ 23 (the Dorchester made clear to resident requesting reasonable accommodation that the requirement that persons accompanied by assistance animals use the freight elevator or stay out of common areas was strictly enforced and that failure to comply would result in the immediate termination of a lease).

The Association also imposed discriminatory conditions on L.L.'s prospective tenancy on the basis of her disability.  To start, the Association verbally discouraged her from applying by telling her that she would risk the anger and displeasure of her neighbors by having a dog and asking her to explain why she desired to be the first person in the Dorchester with a dog when buildings nearby allowed dogs.  SUF at ¶¶ 107, 112.  In fact, the Association encouraged L.L. to live elsewhere.  SUF at ¶ 107.  When that discouragement failed to deter L.L., the Association told her that it would not consider her request, because it had decided "to postpone any

consideration of requests … by non-owners/non-residents to introduce new animals into the Dorchester building until the pandemic has run its course or its impact has been fully assessed." SUF at ¶¶ 112.  And almost a year later, this policy was still in effect.  SUF at ¶ 26.

This admission alone supports finding that the Association imposed more burdensome application procedures on prospective residents with disabilities.  The FHA explicitly prohibits refusing to make a reasonable accommodation for persons with disabilities who are "residing in or *intending to reside in* that dwelling after it is so sold, rented, or made available".  42 U.S.C. § 3604(f)(2)(B) (emphasis added).  Nothing in the text of the FHA supports Defendant's categorical refusal to consider requests for accommodations from prospective residents, such as L.L.'s request.

And, as illustrated by its action in response to A.M.'s request, the Association also imposed discriminatory terms on a current resident who reported the Association's discriminatory housing practices to a government agency.  SUF at ¶¶ 89-90  (both Dorchester staff and the Fed. R. Civ. P. 30(b)(6) designee explained that the Association did not act on A.M.'s request because she filed a complaint with the City of Philadelphia).  Nothing in the text of the FHA allows a condominium association to refuse to consider a reasonable accommodation request because the requester has complained to a government agency about the association's failure to grant the request.  In fact, the FHA explicitly prohibits such retaliation.  *See* 42 U.S.C. § 3617 (making it unlawful to "interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed … any right granted or protected by [the FHA]"); *see also Lloyd*, 251 F. Supp. 3d at 904.

**C.    THE ASSOCIATION HAS ENGAGED IN A PATTERN OR PRACTICE OF DISCRIMINATION AND/OR DENIED RIGHTS TO A GROUP OF PERSONS IN VIOLATION OF 42 U.S.C. § 3614(a)**

The Attorney General may file suit in federal court whenever he "has reasonable cause to believe that [1] [a defendant] is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by [the FHA], or [2] that any group of persons has been denied any of the rights granted by [the FHA] and such denial raises an issue of general public importance."  42 U.S.C. § 3614(a); *see also* U.S. Compl. ¶¶ 55(a)-(b).  If the United States establishes a pattern or practice of discrimination or a denial of rights to a group of persons, the Court may award monetary damages to persons harmed by a defendant's discriminatory practices, civil penalties, and appropriate equitable relief.  *See* 42 U.S.C. § 3614(d); *see also United States v. Balistrieri*, 981 F.2d 916, 934-936 (7th Cir. 1992) (holding that in a case brought pursuant to 42 U.S.C. § 3614(a) the United States may obtain damages for persons who were harmed by the defendants' discriminatory practices).  As explained below, the United States has established that it is entitled to relief under both prongs of Section 3614(a).

**1.  The Association has engaged in a pattern or practice of discrimination.**

The United States can establish a pattern or practice of discrimination where the alleged violations are more than isolated or sporadic discriminatory acts but represent "the regular rather than the unusual practice."  *Int'l Brotherhood. of Teamsters v. United States*, 431 U.S. 324, 336 (1977).  "A plaintiff can prove a pattern or practice of discrimination by the existence of an express discriminatory policy, or by numerous instances of discrimination and anecdotal evidence from which a discriminatory pattern or practice can be inferred."  *United States v. Nobel Learning Communities*, 676 F. Supp. 2d 379, 383 (E.D. Pa. 2009).

To start, the Association adopted an express discriminatory policy when it imposed terms and conditions on persons with assistance animals that it did not impose on other residents of the Dorchester. *See supra* Part III.B. The Association openly declared discriminatory terms and conditions in the Dorchester's community rules and regulations. SUF at ¶¶ 13, 21-27. An express policy is sufficient to confer liability. *See, e.g.*, *United States v. Bd. of Educ. for the Sch. Dist. of Philadelphia*, 911 F.2d 882, 892 (3d Cir. 1990) (stating that plaintiff need not show that a defendant discriminated against specific individuals in applying the policy since openly declaring the unlawful policy alone is sufficient to confer liability) (Title VII); *see also United States v. Garden Homes Mgmt. Corp.*, 156 F. Supp. 2d 413, 423 (D.N.J. 2001) ("Proof that a party adopted a discriminatory policy satisfies the Fair Housing Act's pattern and practice requirement.").

While an express policy is sufficient to confer liability, the Association also enforced its discriminatory policies, namely (1) restricting B.H.'s use of the passenger elevator when accompanied by his assistance animal; (2) applying its policy of not considering requests for assistance animal accommodations by prospective residents against L.L.; and (3) applying the practice of not considering requests from persons who have submitted housing discrimination complaints to government agencies against A.M. *See* SUF at ¶¶ 68, 112, 89-89 (respectively). The United States has therefore established that the Association has engaged in a pattern or practice of discrimination by maintaining and enforcing express discriminatory policies on persons with disabilities who require assistance animals.

In addition, the United States can establish a pattern or practice through individual instances in which the defendant unlawfully discriminated. *Nobel Learning Communities*, 676 F. Supp. 2d at 383. In the context of the FHA, there is no minimum number of incidents that the

United States must prove to establish a pattern or practice of discrimination. *See, e.g.*, *Garden Homes Mgmt.*, 156 F. Supp. 2d at 420 (observing that "there is no threshold number of incidents that must occur before the Government may initiate litigation.").[6] Nor need the United States show that the defendant always discriminates. *See United States v. Landsdowne Swim Club*, 894 F.2d 83, 89 (3d Cir. 1990) (stating that "we need not find that [the defendant] always discriminated to find that it engaged in such a pattern or practice"). The number of examples of discriminatory incidents need not be great to establish a pattern or practice, and courts have held that as few as two to four instances of discriminatory conduct can suffice to establish a pattern or practice.[7]

Here, the evidence establishes that the Association failed to grant requests for accommodations submitted by three different households and failed to grant any such requests for anyone until after the government brought this lawsuit. SUF at ¶¶ 28-30, 46, 62, 64, 88, 113 The government ignored two separate requests made by the Hs for approximately 18 months. SUF at ¶¶ 38-62. It has still not granted the request submitted by A.M. in January 2019. SUF at ¶ 88. And it refused to consider L.L.'s request after attempting to discourage her from pursuing it. SUF at ¶ 112.

Furthermore, the Association has applied discriminatory restrictions to persons who need assistance animals. It refuses to consider requests from prospective residents, and enforced that

---

[6] *See also J.Ste. Marie v. E. R.R. Ass'n*, 650 F.2d 395, 406 (2d Cir.1981) (noting that "the definition of a pattern or practice is not capable of a precise mathematical formulation"); *United States v. Bob Lawrence Realty, Inc.*, 474 F.2d 115, 124 (5th Cir.1973) ("The number of [FHA violations] … is not determinative …. [N]o mathematical formula is workable, nor was any intended. Each case must turn on its own facts.")(citation omitted).

[7] *See, e.g., United States v. Hurt*, 676 F.3d 649, 654 (8th Cir. 2012) (concluding that credible testimony of four victims was sufficient to establish that United States' allegations of a pattern or practice of sexual harassment were substantially justified); *United States v. W. Peachtree Tenth Corp.*, 437 F.2d 221, 227-28 (5th Cir. 1971) (relying substantially on two rejected rental applications, in addition to other evidence, to conclude that there was a pattern or practice of denying rentals to black applicants); *United States v. E. River Hous. Corp.*, 90 F. Supp. 3d 118, 155-159 (S.D.N.Y. 2015) (holding that allegations that defendant failed to grant accommodations requested by three different persons with disabilities sufficiently alleged a pattern or practice of discrimination).

policy against L.L. SUF at ¶¶ 25-26, 112. It refused to consider A.M.'s request after she filed a housing discrimination complaint against the Dorchester. SUF at ¶¶ 89-90. And even after it finally allowed the Hs to live with their assistance animal, it attempted to delay their occupancy and required the Hs to use the service elevator when accompanied by their dog. SUF at ¶ 68. These multiple instances of discrimination and enforcement of discriminatory policies over more than two-and-a-half years establishes that the Dorchester has engaged in a pattern or practice of resistance to the rights protected by the FHA. *See Ste. Marie v. E.R.R. Ass'n*, 650 F.2d 395, 406 (2d Cir. 1981) (stating that while "more than two acts will ordinarily be required," if individual incidents are accompanied by evidence of a policy of discrimination, "perhaps two or even one confirmatory act would be enough" to establish a pattern or practice).

## 2. The Association has denied rights to a group of persons raising an issue of general importance.

Even in the absence of a pattern or practice, the United States can also prevail if it establishes that the Dorchester has denied rights to a group of persons raising an issue of general public importance. *See* 42 U.S.C. 3614(a). The United States can show that the Association has denied rights to a "group" of persons by establishing that the defendant has denied rights to more than one individual. *See, e.g.*, *United States v. City of Parma*, 494 F. Supp. 1049, 1095 (N.D. Ohio 1980), *aff'd*, 661 F.2d 562 (6th Cir. 1981). That group of persons need not be subjected to a pattern or practice of discrimination; even an isolated discriminatory act is sufficient to justify relief. *Id*.; *United States v. Hunter*, 459 F.2d 205, 217-18 (4th Cir. 1972). While the statute also requires that the denial raise an issue of general public importance, courts typically defer to the Attorney General's determination regarding whether a matter raises an issue of general public importance. *See, e.g.*, *United States v. City of Philadelphia*, 838 F. Supp. 223, 227 (E.D. Pa. 1993) ("It is well settled that the reasonableness of the Attorney General's belief is not subject to

judicial review.").  Regardless of whether deference is owed, however, there is no question but that refusing necessary accommodations to a group of persons with disabilities over a period of more than two-and-a-half years is a matter of general public importance.

## IV.  CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court grant partial summary judgment on the United States' claims.  Specifically, the Court should rule that the Association has violated the rights of the H's, A.M., and L.L. in violation of 42 U.S.C. § (f)(2) and (f)(3)(B), and that its conduct constitutes a pattern or practice of discrimination and a denial of rights to a group of persons under 42 U.S.C. § 3614(a).

Respectfully submitted on this <u>30th</u> day of June 2021.

*For the United States of America:*

JENNIFER ARBITTIER WILLIAMS
Acting United States Attorney
For the Eastern District of Pennsylvania


ELIZABETH L. COYNE
Assistant United States Attorney
Eastern District of Pennsylvania
615 Chestnut Street, Ste. 1250
Philadelphia, PA 19106
Phone: (215) 861-8447
Elizabeth.Coyne@usdoj.gov

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division
U.S. Department of Justice


<u>/s/ *Yenisey Rodríguez*</u>
SAMEENA SHINA MAJEED
Chief
TIMOTHY J. MORAN
Deputy Chief
MAZEN M. BASRAWI
JAMES FLETCHER
YENISEY RODRIGUEZ
Trial Attorneys
Housing and Civil Enforcement
Section / Disability Rights Section
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, D.C. 20530
Phone: (202) 598-5799
Yenisey.Rodriguez@usdoj.gov