UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA


THE UNITED STATES OF AMERICA and )
LOUISE HAMBURG,                   )
                                  )
        Plaintiff/Intervenor,     )
                                  )   20-CV-1396
    vs.                           )
                                  )   Philadelphia, PA
DORCHESTER OWNERS ASSOCIATION,    )   October 6, 2022
                                  )   8:59 a.m.
        Defendant.                )


TRANSCRIPT OF DAMAGES TRIAL - DAY 2
BEFORE THE HONORABLE MICHAEL M. BAYLSON
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:        NOAH SACKS, ESQUIRE
                          DEPARTMENT OF JUSTICE
                          150 M St. NE, Suite 8.1202
                          Washington, D.C. 20530

                          SAMANTHA ONDRADE, ESQUIRE
                          TIMOTHY J. MORAN, ESQUIRE
                          DEPARTMENT OF JUSTICE
                          950 Pennsylvania Avenue
                          Washington, D.C.  20530

For the Defendant:        PAUL TROY, ESQUIRE
                          THOMAS J. ZIMMERMAN, ESQUIRE
                          KANE, PUGH, KNOELL & DRISCOLL, LLP
                          510 Swede Street
                          Norristown, PA  19401

                          FRANCIS P. DEVINE, III, ESQUIRE
                          TROUTMAN PEPPER
                          3000 Two Logan Square
                          Philadelphia, PA  19103

Audio Operator:           LORI DiSANTI

Transcribed by:          DIANA DOMAN TRANSCRIBING, LLC
                         P.O. Box 129
                         Gibbsboro, New Jersey  08026-0129
                         Office:  (856) 435-7172
                         Fax:     (856) 435-7124
                         Email:   dianadoman@comcast.net


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

                          I N D E X

ARGUMENT:                                    PAGE

RE: PUNITIVE DAMAGES

By Mr. Troy                                   78

RE: MOTION IN LIMINE

By Mr. Troy                                   82

RULING:

RE: MOTION IN LIMINE

By the Court                                  83

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE GOVERNMENT: | | | | |
| CYNTHIA HALPERN | -- | -- | 8 | 26 |
| CASEY HALPERN | 36 | 44 | -- | -- |
| BERNARD HALPERN | 46 | 64 | -- | -- |
| FOR THE DEFENSE: | | | | |
| DAVID SMITH | 84 | 88 | 103 | -- |
| KYLE MALONEY | 106 | 130 | 158 | -- |
| FRANCIS P. DEVINE | 165 | 175 | 188 | -- |
| REBUTTAL | | | | |
| AMANDA BAILEY | 191 | 192 | -- | -- |

| EXHIBITS | IDENT. | EVID. |
|---|---|---|
| P-67 - 8/25/18 email | 9 | 10 |
| P-44 - 6/25/19 email | 10 | 10 |
| P-55A- 7/27/19 email | 11 | 11 |

1             I N D E X

2    EXHIBITS              IDENT.        EVID.

3    P-47 - 7/8/19 email      14           14

4    P-30 - 5/4/20 email      16           17

5    P-21 - 5/20/20 email     17           18

6    P-227 - 4/27/18 email    38           38

7    P-228 - Map/OC to Phila.  49          50

8    P-22 - 6/8 - 6/10 email  92           92

9    P-18 - Rules/Regulations  94          94

10   P-70 - 1/3/19 email      137          161

11   P- 225 - key fob log     148          161

12   D-229 - Photographs      101          --

13   D-306 - DOA policy       178          188

14

15

16

17

18

19

20

21

22

23

24

25

1          (The following was heard in open court at 8:59 a.m.)

2          (Beginning moments of audio not recorded.)

3          MR. SACKS:  Good morning, Your Honor.  This is Noah

4     Sacks.

5          THE COURT:  All right.  Good morning.

6          MR. SACKS:  I am here on behalf of the United

7     States, as well.

8          THE COURT:  All right.  Is defense counsel there

9     yet?

10         MR. TROY:  Yes, Your Honor, good morning.  This is

11    Paul Troy and Thomas Zimmerman is with me, on behalf of the

12    Dorchester owners.

13         THE COURT:  All right.  Are we ready to start?

14         MS. ONDRADE:  Your Honor, before we begin with our

15    witnesses, the United States filed a motion in limine, ECF

16    number 260.

17         THE COURT:  Yes, yes.

18         MS. ONDRADE:  We're requesting a ruling.

19         THE COURT:  Yes, I read that.  I'd like to finish

20    with Ms. Halpern's testimony, and then I'll turn to that.

21    Okay?

22         MS. ONDRADE:  Okay.  And just one housekeeping

23    matter, Your Honor.  Thursday is --

24         THE COURT:  Yes?

25         MS. ONDRADE:  -- one of Dr. Halpern's neurosurgery

1   days.  The last time we were in court was a Thursday, as well,

2   so similarly, his schedule is just as tight as it was before.

3   He had a surgery this morning.  We expect him around 9:20, and

4   he will need to go to another surgery around 11:00 a.m.  So

5   with the Court's indulgence, we would request that we could

6   put Dr. Halpern on, perhaps, after we finish the redirect of

7   Ms. Halpern?

8               THE COURT:  Yes, sure.  Absolutely.

9               MS. ONDRADE:  Okay.  Thank you.

10              THE COURT:  Well, I'm -- his -- okay.  Yes.  Is it

11  -- you're going to call him right now?

12              MS. ONDRADE:  He hasn't gotten here yet, because he

13  has a morning surgery.  The last time we were here on

14  Thursday, we started at 9:30, and today, we're starting at

15  9:00, so --

16              THE COURT:  Okay.  Are you recalling him, is that

17  the idea?

18              MS. ONDRADE:  I haven't finished my direct

19  examination of him.  I estimate it would take ten minutes.

20  And then he needs to be subject to cross, as well.

21              THE COURT:  Okay.  All right.  Okay.

22              MS. ONDRADE:  Okay.  Thanks, Your Honor.

23              MR. SACKS:  Your Honor, we're going to --

24              THE COURT:  Fine.  Just -- yes?

25              MR. SACKS:  -- we're going to call Ms. Halpern for

1    her redirect.

2            THE COURT:  Yes, so I'm just going to excuse myself

3    for 20 seconds, but you can take the stand, and then we'll

4    proceed.  Thank you.

5            MS. ONDRADE:  Okay.

6            (Judge off the bench.)

7            COURTROOM DEPUTY:  Please raise your right hand.

8            C Y N T H I A  H A L P E R N, PLAINTIFF, SWORN

9            COURTROOM DEPUTY:  And could you please speak into

10   the microphone and state your full name for the record?

11           THE WITNESS:  Cynthia Halpern.

12           (Judge on the bench.)

13           MS. ONDRADE:  Your Honor, the witness is sworn and

14   ready.

15           THE COURT:  Okay.  All right.

16           Ladies and gentlemen, let me just say, just by way

17   of introduction, the Court is now open for resumption of the

18   trial that has been -- was interrupted in the case of the

19   United States versus the Dorchester Association.  When the

20   case was interrupted because of a lot of scheduling issues,

21   Ms. Halpern, who is one of the aggrieved persons, who has a

22   claim for damages against the Dorchester, had not yet

23   concluded her testimony, and we agreed to resume this morning.

24           In the interim, I had contacted COVID, and have

25   tested -- although I am feeling fine, I am testing positive,

1    and so I advised counsel yesterday by email that I did not

2    feel I should come into the courthouse, but since everybody

3    had put today aside, I thought the hearing should go forward,

4    and I would participate by Zoom.

5              By Deputy Clerk, Ms. DiSanti, has been, as usual,

6    very industrious and creative and has enabled this to proceed

7    by Zoom this morning, with me being at home.  My law clerk is

8    in her place, and we are ready to proceed.

9              Ms. Halpern, please state your name for the record,

10   your full name.

11             THE WITNESS:  Cynthia Halpern.

12             THE COURT:  Okay.  You are still under oath.

13             All right.  This will be redirect.

14             Mr. Sacks, proceed.

15             MR. SACKS:  Thank you, Your Honor.

16                        REDIRECT EXAMINATION

17   BY MR. SACKS:

18   Q    Good morning, Ms. Halpern.

19   A    Good morning, Mr. Sacks.

20   Q    So the Court asked us to put together a time line about

21   the events surrounding your accommodation requests.  So

22   there's a few documents relevant to that time line that I

23   would like to ask you about this morning.

24   A    Okay.

25   Q    Ms. Halpern, I am now showing you what has been marked as

1    Plaintiff's Exhibit 67.  Ms. Halpern, do you see that email on

2    your screen?

3    A    I do.  If we could make that a little larger, please?

4            Thank you.

5    Q    Ms. Halpern, what is the date of this email?

6    A    It is August 25th, 2018.

7    Q    And who did you send this email to?

8    A    I sent it to Mr. Kyle Maloney.

9    Q    And in this email, you state, "I am still awaiting those

10   forms you mentioned that need to be completed and approved in

11   order to bring our emotional support dog with us to the

12   Dorchester.  Please advise."

13   A    That's correct.

14   Q    Was this email a follow-up to your August 14th email?

15   A    Yes, it was, because we were still awaiting.

16   Q    And you were waiting for forms?

17   A    Yes.

18   Q    Did Mr. Maloney ever respond to this email?

19   A    Not to my recollection.

20   Q    Did Mr. Maloney forward this -- if you look at the top of

21   this email, did Mr. Maloney forward this email to anyone?

22   A    Oh.  It was forwarded to Pat Yonekawa.

23   Q    Okay.

24   A    The manager of the Dorchester at the time.

25   Q    Thank you, Ms. Halpern.  I'm now going to show you what

1    has been marked as Plaintiff's Exhibit 44.  And I'd like to

2    turn your attention -- I'd like to turn your attention to the

3    bottom email.  What is the date of this email?

4    A    It is June 25th, 2019.

5          MR. SACKS:  Ms. Halpern, before I forget, the United

6    States moves Exhibit Plaintiff's 67 into evidence.

7          THE COURT:  So admitted.

8    BY MR. SACKS:

9    Q    Turning back, now, to Plaintiff's 44, you said this email

10   was dated June 25th, 2019?

11   A    Yes, June 25th, 2019.

12   Q    And you sent this email to Kyle Maloney?

13   A    I did.

14         MR. SACKS:  Your Honor, we move Plaintiff's 44 into

15   evidence.

16         THE COURT:  Admitted.

17   BY MR. SACKS:

18   Q    Now, in this email, you state, "Please let us know when

19   you hear back from HUD regarding our dog, Gracie."

20         Was this another follow-up on your October 24th,

21   2018 accommodation request?

22   A    Yes, it was.

23   Q    Now, in this email, you also say, "Bernie and I had moved

24   our things into our unit, but have not been at the condo to

25   unpack because Bernie and our dog, Gracie, are enjoying each

1    other's company at the beach."

2          Why couldn't Bernie and Gracie enjoy each other's

3    company at the Dorchester?

4    A    Because Gracie was not approved.  We were still awaiting

5    approval.

6    Q    Did you want to be at your unit to unpack?

7    A    Yes.

8    Q    In this email, you also said, "When we took the condo

9    last May, over a year ago" -- and you made reference to paying

10   condo fees, what were you -- what was that about?

11   A    I just wanted to make it clear that we were still paying

12   condo fees and all the other fees that come with the condo,

13   garage and Wi-Fi, and that were not able to use the unit.

14   Q    Ms. Halpern, now, I'm going to show you what has been

15   marked as Plaintiff's 55A.

16          (Pause in proceedings)

17   Q    Did you receive this email from Mr. Maloney?

18   A    I did.  On June 27, 2019.

19   Q    So this email, you received two days after you hd sent

20   the prior email that we just discussed?

21   A    That's correct.

22          MR. SACKS:  Your Honor, we move Plaintiff's 55A into

23   evidence.

24          THE COURT:  Admitted.

25   BY MR. SACKS:

1  Q    Now, in this form, Mr. Maloney mentions a set of "updated

2  forms".  What forms was he talking about?

3  A    He just said that there's updated forms that need to be

4  completed regarding the approval.  He says that we are

5  apparently very close to an approval, "but she's asked me" --

6  Pat Yonekawa -- "to provide you with a set of updated forms

7  for you to complete."

8  Q    Are these forms, updated forms, are these forms for you

9  and your husband to apply for an emotional support animal?

10 A    Yes.  He says, "I know that you've already completed a

11 set, but we need this updated set at this time, and this way

12 we can fast-track everything, as soon as it is approved."

13 Q    So in this email, Mr. Maloney is asking you -- in this

14 June 27th, 2019 email --

15 A    That's correct.

16 Q    -- Mr. Maloney is asking you to complete a second set of

17 forms for your reasonable accommodation request for an

18 emotional support animal?

19 A    That's correct and sort of saying fast -- we could fast-

20 track it, so it makes us really want to do it.

21 Q    What do you think he meant by fast-track?

22 A    I have no idea, but it was like a carrot -- I felt like

23 it was a carrot, I better do it or it's not going to --

24      MR. TROY:  Objection, Your Honor, as to what Mr.

25 Maloney meant.  It's speculative.

1    THE COURT:  Overruled.

2    BY MR. SACKS:

3    Q    Ms. Halpern, you mentioned a carrot.  What did you mean

4    by -- I think you said, dangling a carrot.  What did you mean

5    by a carrot?

6    A    Well, you know, like if you say that you're going -- it's

7    a fast-track, and you're close to approval, those are, like,

8    sort of saying, just do what we're asking, and if you do what

9    we're asking, which is complete the second set, you may be

10   fast-tracked to approval.

11   Q    How did that make you feel to be asked to fill out a

12   second set of forms eight or nine months after you had already

13   completed the first set?

14   A    Frustrated.

15   Q    Now, this email also refers to Bernie's voicemail.  Do

16   you know -- do you know what voicemail this refers to?

17   A    Well, I know that Bernie was extremely frustrated and

18   would probably leave messages for Mr. Maloney -- Kyle -- yes.

19   Q    So your husband left a frustrated voicemail for Mr.

20   Maloney?

21   A    Yes.  It was probably quite rude.  He was not well.

22   Q    Is it typical for your husband to leave voicemails like

23   that?

24   A    No.  My husband is usually a very upbeat person and very

25   polite, but he was very frustrated at this point.

1    Q    What made him frustrated?

2    A    The delay.

3    Q    Ms. Halpern, now, I'm going to show you what had been

4    marked as Plaintiff's Exhibit 47.  And I'd like to call your

5    attention to the bottom email.  Did you send that email to Mr.

6    Maloney?

7    A    Yes, on July 8th, 2019.

8              MR. SACKS:  Your Honor, the United States enters

9    Plaintiff's 47 into evidence.

10             THE COURT:  Admitted.

11   BY MR. SACKS:

12   Q    Now, this email says, near the beginning, it says, "We

13   are at HUP and must return to NJ."

14             What is HUP?

15   A    Hospital of the University of Pennsylvania in

16   Philadelphia.

17   Q    And you were at the hospital --

18   A    Yes.

19   Q    -- at the University of Pennsylvania that day?

20   A    Yes.  And we had to return to New Jersey because we

21   couldn't use the Dorchester.

22   Q    Now, HUP, is that a hospital in Philadelphia?

23   A    Yes.

24   Q    And why did you have to return to New Jersey that day?

25   A    Because we had not been approved.

1    Q    So why not stay at your unit?

2    A    We were afraid to stay.

3    Q    I would like to call your attention to the line where you

4    say, "It is important that you receive the envelope we gave to

5    Mack at the front day today."

6    A    Right.

7    Q    So had you been at the Dorchester earlier that day?

8    A    We dropped the application at the front desk to be sure

9    that they received it.

10   Q    But you didn't stay at the Dorchester that day?

11   A    No, no.

12   Q    So you were just at the Dorchester for a day?

13   A    Just wanted to make sure that they got it.  If I put it

14   in the mail, it could get lost or --

15   Q    The email also says, "We have begun the process of filing

16   a complaint with HUD since we feel discriminated."

17   A    Yes, I wrote that.

18   Q    And why did you feel discriminated?

19   A    Because of the long delay and lack of response.

20   Q    And why file a complaint with HUD?

21   A    Because that's where I understood our frustration might

22   be heard.

23   Q    Now, in the email, you also said, "We have paid our condo

24   fees, parking and Wi-Fi for a year and have not been able to

25   live there."

1          In response, did Mr. Maloney offer to give you a

2   break on your condo fees?

3   A    No, he did not.

4   Q    Did he offer that you could stop paying your garage fees?

5   A    No, he did not.

6   Q    And what would happen if you stopped paying your garage

7   fees?

8   A    I really don't know.  Potentially, I know that garage

9   spaces in all of Philadelphia, especially in high rises is a

10  coveted thing.  I was afraid of losing it.

11  Q    Ms. Halpern, I'm now going to show you what has been

12  marked as Plaintiff's Exhibit 30.  Is this an email chain

13  between you and David Smith?

14  A    Yes.

15  Q    And I would like to turn your attention to the top email.

16  What is the date of the email on top?

17  A    I can't read it very well.

18          MR. SACKS:  Could you please enlarge the header on

19  the top?

20          THE WITNESS:  It says May 4th, 2019.

21  BY MR. SACKS:

22  Q    Does that say 2020?

23  A    Yeah, 2020.

24  Q    May 4th, 2020?

25  A    2020, yes.

1   Q    And is this -- this is --

2   A    Sorry.

3   Q    Is this a copy of an email you send to David Smith?

4   A    Yes.  David Smith is the replacement of Pat Yonekawa as

5   the manager.

6   Q    He's the general manager of the Dorchester?

7   A    That's correct.

8           MR. SACKS:  Your Honor, we move Plaintiff's Exhibit

9   30 into evidence.

10          THE COURT:  All right.  Admitted.

11  BY MR. SACKS:

12  Q    Now, in this email you say, "My husband's emotional

13  support dog has died."

14          Is this email the first time that you told the

15  Dorchester that Gracie had passed away?

16  A    Yes.

17  Q    Ms. Halpern, I am now going to show you what has been

18  marked as Plaintiff's Exhibit 21.  Turning your attention to

19  the -- or is this an email chain between you and David Smith?

20  A    Yes, it is.

21  Q    And, because it might be hard to see the date, is this

22  email dated May 20th, 2020?

23  A    Yes, it is.

24          MR. SACKS:  Your Honor, we move to admit Plaintiff's

25  Exhibit 21.

1          THE COURT:  Admitted.

2    BY MR. SACKS:

3    Q    Now, what -- Ms. Halpern, what is this email chain about?

4    A    It's about a Zoom meeting.

5    Q    Is this the Zoom meeting that you previously testified

6    about concerning a meeting with the Dorchester counsel about

7    your emotional support animal?

8    A    Yes.

9    Q    Now, you state, "Bernie and I are uncomfortable meeting

10   with the Dorchester's counsel without the DOJ attorneys

11   present."

12          Why were you uncomfortable meeting with the

13   Dorchester counsel without DOJ attorneys present?

14   A    Well, in his -- in David Smith's email, he just says that

15   the counsel -- the Dorchester counsel did not believe that the

16   DOJ lawyers had been helpful, so that, in of itself, made me

17   concerned.  I just didn't think anything was moving along

18   without the DOJ.

19   Q    Did you find the DOJ attorneys helpful?

20   A    Very helpful.

21          THE COURT:  Am I -- counsel, am I correct that by

22   May 20th, 2020, that the United States had filed its

23   complaint?

24          MR. SACKS:  Yes, Your Honor.  We filed it in March

25   of 2020.

1    THE COURT:  Yes, okay.  Go ahead.

2   BY MR. SACKS:

3   Q    Now, Ms. Halpern, I'd like to ask you some questions

4   about this -- in this email, you used the phrase, you say,

5   "would you please clarify what you meant what you said on the

6   phone on Monday, May 18th, that we had received tentative

7   approval by the Dorchester's counsel."

8        Heading into the meeting, the Zoom meeting that you

9   had, what was your understanding of the status of your

10  application for a reasonable accommodation for an emotional

11  support animal?

12  A    That it was tentative.

13  Q    Did you think that -- heading into the meeting, did you

14  think that it was a foregone conclusion that you would receive

15  permanent approval?

16  A    No.  I was anxious to have the meeting and to learn that

17  it was a tentative approval or an approval.  I did not have

18  any idea.

19  Q    Now, you previously testified that at this meeting, Mr.

20  Devine, the president of the DOA Council asked you and your

21  husband to use the freight elevator and the rear entrance when

22  coming and going with your dog --

23  A    That's correct.

24  Q    -- with your emotional support animal, Angie?

25  A    That's correct.

1  Q    When he made those requests, did you think you could say

2  no?

3  A    No.  Those were, like, the terms and the conditions that

4  they were laying out for us to bring the dog in, that we had

5  to use the freight elevator and the rear entrance, and he also

6  asked us to, sort of, stay away for as long as possible,

7  because he was afraid for other residents, how they might feel

8  with an animal there?

9          MR. SACKS:  Thank you, Katie.  Can you take this

10  exhibit down?

11  BY MR. SACKS:

12  Q    Ms. Halpern, you previously expressed that you and your

13  husband had concerns about using the freight elevator during

14  COVID?

15  A    Yes.

16  Q    Now, during your cross-examination, which took place on

17  September 8th, 2022, Mr. Troy stated, "You all suffered that

18  indignity together, didn't you, having to use the freight

19  elevator for the gym?"

20          Now, Ms. Halpern, during COVID, what, if anything,

21  did the Dorchester do with the gym?

22  A    I believe it was closed.  I mean, we certainly never used

23  it during COVID, I mean, when COVID was raging.

24  Q    So the Dorchester closed the gym --

25  A    I think --

1    Q    -- during COVID?

2    A    -- I think they closed it, yes.  Yes.

3    Q    What, if anything, did the Dorchester do with the pool

4    during COVID?

5    A    I never signed up for the pool.  My daughter-in-law did,

6    but I wasn't a part of that decision.  I never used the pool.

7    I believe they also closed the pool during COVID.

8    Q    So the Dorchester closed down the gym and the pool during

9    COVID, but made you take the freight elevator when coming and

10   going with Angie?

11   A    That's correct.

12        MR. SACKS:  Katie, could you, please, put up Defense

13   Exhibit 212.0013?  Maybe the next page.  No, the prior page.

14   All right.  Let's try the prior page.  One more.

15        THE WITNESS:  There you go.

16        MR. SACKS:  There we go.  Thank you.

17        THE WITNESS:  Oh, there you go.

18   BY MR. SACKS:

19   Q    I'm now showing you what has been marked as Defendant's

20   Exhibit 212.0011.  Now, Ms. Halpern, on cross, Mr. Troy

21   asked you about this picture, and you said that you felt

22   "targeted and violated".  Now, you know that the Dorchester

23   had cameras --

24   A    Yes.

25   Q    -- so why did seeing this printed surveillance photo of

1    your husband and the email of Kyle Maloney where he forward

2    that picture to David Smith, why did that make you feel

3    targeted and violated?

4    A    Well, it felt that the Dorchester was gathering evidence

5    against us, printing it.

6    Q    So, you feel violated, now, knowing that the Dorchester

7    was, in fact, gathering evidence against you and your husband

8    regarding your application for an emotional support animal?

9    A    That's correct.

10   Q    Now, Ms. Halpern --

11              MR. SACKS:  Katie, can you take this down, please?

12   BY MR. SACKS:

13   Q    Now, Ms. Halpern, the Court asked us to put together a

14   calendar of when you were at the Dorchester or someplace else.

15   So I'm now going to show the plaintiff's calendar exhibit.

16              MR. SACKS:  And, Katie, could you scroll to the

17   calendar exhibit, please?

18              (Pause in proceedings)

19              MR. SACKS:  Okay, turn to the next page, Katie.

20   BY MR. SACKS:

21   Q    All right, Ms. Halpern, I'm now showing you what is

22   marked as the Halpern's location calendar, and it's ECF-261-1,

23   and right now, we're looking at page two of five, which is the

24   year 2019.

25              Do you recognize this calendar exhibit?

1    A    Yes.

2    Q    Now, let's scroll to 2020?  Please take a look at that.

3    Do you recognize this page?

4    A    Yes.

5    Q    Let's scroll to 2021?  Do you recognize this page?

6    A    Yes.

7    Q    Okay, and page 2022?

8    A    Yes.

9    Q    Is this -- does this calendar -- did you review this

10   calendar?

11   A    Yes, I did.

12   Q    And is this calendar accurate to the best of your

13   recollection?

14   A    To the best of my recollection, yes.

15          MR. SACKS:  Now, Katie, I'd like to turn back to

16   2019?

17   BY MR. SACKS:

18   Q    And, here, on the calendar, there is a circle around --

19   there's two separate circle features.  One is called single-

20   day visits to the Dorchester pre-June 2020?

21   A    Right.

22   Q    Do you see those red circles?

23   A    The red circles, yes.

24   Q    And what are those red circles?

25   A    Those red circles are days that we came to the Dorchester

1    for something that we had to do, but then turned around and

2    had to go back to New Jersey.

3    Q    So the red circle represents days that you traveled from

4    New Jersey to Philadelphia and went to the Dorchester and then

5    went back to New Jersey?

6    A    That's correct, and there were, like, 20 of those.

7    Q    Okay.  And there is also another feature, a circle

8    feature, called single-day visits to Philadelphia area, pre-

9    June, 2020, and that's a black circle on the calendar?

10   A    Yes.

11   Q    Do you see those?

12   A    Yes, I do.

13   Q    What does that circle represent?

14   A    It means that we had to come to the Philadelphia area,

15   not necessarily the Dorchester, but something else, maybe in

16   Radnor or something, that we had to come to, and that we also

17   had to turn around and go back to New Jersey, because we

18   couldn't go to the Dorchester.

19   Q    Okay.  So the circled black days are days that you

20   traveled from Ocean City to somewhere in Philadelphia, but not

21   necessarily the Dorchester?

22   A    That's correct.

23   Q    Okay.  And then you drove back to New Jersey?

24   A    Correct.

25   Q    So each -- so --

1  A     There's, like, ten of those.

2  Q     Okay.  So either a black circle or a red circle

3  represents a round trip between -- essentially, between New

4  Jersey, your Ocean City home, and Philadelphia or the

5  Dorchester?

6  A     That's correct.

7  Q     Now, I'd like to call your attention to a series of

8  circles that -- black circles that took place at the end of

9  October, 2019, from approximately October 24th to October

10  29th.

11        What -- what are those -- what happened during those

12  black circles?

13  A     My mother fell in Chesterbrook, Devon, Pennsylvania, and

14  we were in New Jersey.  And she was admitted to the Paoli

15  Memorial Hospital.  That was the closest hospital to where she

16  lived, and she was kept there for a few days.  And then she

17  was moved to Powerback in Westchester, which is, really,

18  actually closer to Coatesville.  It's a rehab facility.

19  Q     And were you -- these circles, were you visiting your mom

20  every day from Ocean City?

21  A     Yes.

22  Q     And driving home back to Ocean City?

23  A     Yes.  I am my mother's only child.  My brother died many,

24  many years ago, so it's just me.

25  Q     And why not stay at the Dorchester?

1  A    We were not approved.

2  Q    Okay.  So these circled dates that are on this calendar,

3  there's close to 30 of them, maybe more, would you have made

4  those, if you had been granted permission to live at the

5  Dorchester with your emotional support animal?

6  A    No.  We had the emotional support animal in the car with

7  us when we would drive there, and I remember saying, well, you

8  stay in the car with her, and then I'll go back, and then we

9  switched places.  I remember it being very stressful.

10  Q    No further questions, Ms. Halpern.

11  A    Thank you.

12          THE COURT:  Okay.  Anything, Mr. Troy?  Recross?

13          MR. TROY:  Yes, thank you, Your Honor.  Sorry, I was

14  moving to the podium here.

15          THE COURT:  Okay, the cross will be limited to the

16  redirect that just took place.  All right.

17          MR. TROY:  Understood, yes.  Same -- same topics.

18          THE COURT:  So go ahead.

19          MR. TROY:  Yes.

20          THE COURT:  Yes, go ahead.

21                    RECROSS-EXAMINATION

22  BY MR. TROY:

23  Q    Ms. Halpern, you were asked about the lawsuit that the

24  DOJ had filed.  Were you aware, in March of 2020, that the DOJ

25  was filing this lawsuit?

1    A    I don't remember the exact date, but I do remember that

2    there was a lawsuit filed.  I don't remember the exact date.

3    Q    Okay.  I'd like to show you a paragraph of that lawsuit.

4    This is the complaint that was filed, and for Mr. Perry, it's

5    Defense Exhibit 194, and if you go to page 17 of that

6    document?  And I want to focus on paragraph 46.

7         Now, there is a paragraph here -- you were not named

8    in this lawsuit, correct?

9    A    I don't know.

10    Q    Okay.

11    A    I've never actually seen this document.

12         THE COURT:  Well, we all she was named in the

13    lawsuit.  Next question.

14         MR. TROY:  Okay.  Next question.

15    BY MR. TROY:

16    Q    The end of this paragraph says -- it refers to other

17    people who applied for an accommodation, and it ends by

18    saying, "However, without explanation from the DOA, their

19    request has not been granted" -- this was as of March 12th,

20    2020 -- "and they have been forced to live elsewhere in the

21    meantime."

22         Do you see that?

23    A    I see that, yes.

24    Q    Okay.  But in point of fact, as your own time line shows,

25    by March of 2020, you had already lived in the Dorchester for

1    months, correct?

2         THE COURT:  Well, wait, just a moment.  Mr. Tory, I

3    don't think it's appropriate to tie her factual testimony to

4    what's in the Government's complaint.  So rephrase the

5    question as to when she went back to live at the Dorchester?

6         MR. TROY:  Okay.  I'll say --

7         THE COURT:  You can argue -- you can argue this, but

8    it's not fair -- she had nothing to do with drafting that

9    complaint, so you can't ask her questions about it.  Now,

10   rephrase the question.

11        MR. TROY:  Okay.  That's okay, Your Honor.  I'll

12   move on.

13   BY MR. TROY:

14   Q    Ms. Halpern, have you and your husband, both -- these

15   units that you own in the Dorchester that are the subject of

16   your testimony this morning, what are -- they're two units

17   combined into one, correct?

18   A    Yes, my son and daughter-in-law had done that when they

19   moved in, yes.

20   Q    And the two units are what numbers?

21   A    1614 and 1615B, as in boy.

22   Q    Okay.  And it is -- the economic claims that were

23   referenced this morning, condo fees, et cetera, it is the

24   condo fees for 1614 and 1615, correct?

25   A    B.

1    Q    B, yes.

2    A    There's also a 1615A.  I just want to --

3    Q    Okay.

4    A    -- make sure it's accurate.

5    Q    Now, if the Office of Property Assessment Records for

6    Philadelphia County, if they reflect that the owner of 1615B

7    is a Maria Bashian --

8    A    Bashian.

9    Q    -- who is Maria Bashian?

10   A    Well, she's now Maria Halpern.  Maria Bashian was her

11   maiden name, my daughter-in-law.

12   Q    Okay.  And if the City of Philadelphia, Office of

13   Property Assessment Records reflect that Maria Bashian is, in

14   fact, the owner of 1615B, is that accurate?

15   A    Well, it's a shared -- we share it.  I mean, it's not

16   like she's the owner, and she pays the fees, and then I'm the

17   owner, and then we pay these fees.  We have assumed it,

18   because we're, like, one family.

19   Q    Okay.  I guess what I want to be -- have either you or

20   your husband, at any point, today, in your testimony, ever

21   told the Court that one of these two units is, in fact, owned

22   by someone else?

23   A    I'm not sure I understand the question.

24           THE COURT:  Well, that's not -- rephrase the

25   question.  It's not relevant -- I don't know if she was ever

1   asked during this case, so just rephrase the question as to

2   who the owner is -- if she knows who the owner of record is or

3   whether she or her husband use it?

4           MR. TROY:  Thank you.

5   BY MR. TROY:

6   Q    Is Maria Bashian, in fact, the owner of unit -- the legal

7   owner of Unit 1615B?

8   A    It's a Halpern unit, the Halpern units.  We own them

9   together.

10  Q    Does Maria Halpern own B and you own -- you and your

11  husband own 1614?

12  A    She's on the deed.

13  Q    Okay.  All right.  With regard to the freight elevator,

14  the -- the -- is the freight elevator closer to your apartment

15  on your floor than the other elevators?

16  A    Maybe by four or five steps.

17  Q    Okay.  You were shown the photo that was taken of your

18  husband and the dog, Gracie.  After that photo was taken, did

19  anyone from the Dorchester Owner's Association evict you and

20  your husband from your unit?

21  A    No.

22  Q    Did anyone from the Dorchester Owner's Association fine

23  you and your husband after taking those photos?

24  A    No.

25  Q    Okay.

1    A     But we were still very happening about those happening.

2    Q     Okay.  You were nervous as you lived in the unit with

3    your husband and the dog for all of the months that are

4    reflected on the time line?

5    A     I'd have to see the time line that you are referring to,

6    but there were times, like, for example, my mother's death at

7    the Lombard, during -- she was moved from Paoli.  I moved her

8    from Paoli to Jefferson and then from Jefferson to ACE at

9    Presbyterian, the Acute Care for Elders Unit, where they

10   recommended that she go to Lombard for hospice.

11          And during that time, and then after she died, I had

12   a service for my mom.  I was there to clean out her apartment

13   309 that we were renting, so that was that period of time that

14   we were there, yes, I had no choice.

15   Q     Okay.

16          MR. TROY:  Could we go put up, again, the

17   plaintiff's time line that was referenced on the redirect exam

18   this morning?  And I want to focus in on the October, 2019

19   black circles that were just raised.  And if you can enlarge

20   the bottom row of that?  Okay.

21   BY MR. TROY:

22   Q     Now, did you just testify on redirect exam that you did

23   not stay at the Dorchester on October 24 through 29 because

24   the approval request had not yet been granted?

25   A     No, we stayed at the Dorchester.

1   Q    The black circle days?  It was represented that the black

2   circle days, October 24th through the 29th --

3   A    Oh, that's correct.  That's correct.

4   Q    -- that you went out and back to Ocean City --

5   A    Correct.  That's correct.

6   Q    -- with the dog?

7   A    Yes.

8   Q    Okay.  So that the blue blocks on here that you -- that

9   the DOJ has submitted are days where you did stay overnight at

10  the Dorchester?

11  A    If I could see the key?  I forget what the blue blocks

12  were.

13  Q    Sure.  We can agree to move this along, the blue blocks

14  -- well, it's up top.

15  A    Oh, the Dorchester, yes.

16  Q    The Dorchester.  Okay.  So if we go back to October --

17  A    Yes, so you can see there.  Yes.

18  Q    Is it your testimony that you did feel able to stay at

19  the Dorchester for most of the first few weeks of October, but

20  you did not feel able to stay at the Dorchester from the 24th

21  through the 29th?

22  A    That's what the chart looks like, yes.

23  Q    Oh, I know that's what the chart looks like, yes.  But my

24  question is, you stated on the redirect exam a moment ago that

25  you returned to Ocean City on the 24th --

1   A    Right.

2   Q    -- through the 29th --

3   A    Right.

4   Q    -- because you didn't feel you could stay at the

5   Dorchester?

6   A    Correct.

7   Q    Why did you feel you could not stay there on the 24th

8   through the 29th when, in fact, you had stayed there most of

9   the month already?

10  A    Because on the 24th, my Mom was, probably, at that point,

11  at the Powerback at Coatesville, and it was just too far for

12  us to drive.

13  Q    Okay.  So that from Coatesville wasn't as convenient for

14  you to just drive down the shore and drive South as it was --

15  A    No.  No, no, no.  Coatesville is -- Philadelphia is

16  closer to Coatesville than it is to Ocean City.

17  Q    I agree.  Now, that being the case, can you -- I'll ask

18  the question again.  Why go to Ocean City from the 24th

19  through the 29th, rather than driving to the Dorchester to

20  say, as you had stayed there most of the month?

21  A    I felt we had to go there, because it was just -- it was

22  probably the other dates were more pressing.  Whenever we felt

23  that we had no choice we would stay at the Dorchester, because

24  we had not received approval, but on dates that we could move

25  back and forth, we did.  Even if it was difficult, we did.

1    Q    Okay.  So your testimony is that from -- with the

2    exception of three days, that from October 2 to October 23 --

3    A    Right, well my mother -- my mother hadn't fallen yet.

4    Q    No, no, I understand.  All I'm asking -- well, let me

5    reask the question.

6    A    Okay.

7    Q    Is it your testimony that from October 2 to October 23,

8    most of those days, you felt you -- you felt able to stay at

9    the Dorchester, but you did not feel able to stay at the

10   Dorchester from the 24th through the 29th?

11   A    That's correct.

12   Q    Okay.

13          MR. TROY:  Thank you, Your Honor, that's all the

14   questions I have.

15          MR. SACKS:  Your Honor, I just have a few brief --

16          THE COURT:  No, let me -- let me just follow -- Mrs.

17   Halpern, let me just follow-up on the last question.

18          Can you explain why you were willing to stay at the

19   Dorchester from October 2nd to October 23rd of 2019, even

20   though you had not yet gotten the approval for the emotional

21   support animal?

22          THE WITNESS:  We stayed there because that was the

23   period of time when my mother needed me most.

24          THE COURT:  Okay.  Did you stay there with or

25   without the emotional support animal?

1          THE WITNESS:  We stayed there with the animal.  The

2    animal was always with my husband and me.

3          THE COURT:  Okay.  So you didn't have approval, but

4    you stayed there with the animal --

5          THE WITNESS:  Right.

6          THE COURT:  -- is that correct?

7          THE WITNESS:  That's correct, because my mother, at

8    that point, needed me the most.

9          THE COURT:  Right.  Okay.  Thank you.

10         MR. SACKS:  Your Honor, I just have a few questions

11   to address some of the --

12         MR. TROY:  Your Honor, I'd object.  There's no re-

13   redirect.

14         THE COURT:  Now, just a minute.  We've had redirect.

15   We've had recross.  I asked one question.  If either counsel

16   has one question related to the question I just asked about

17   the fact that Mrs. Halpern and her husband stayed at the

18   Dorchester between October 2nd and the 23rd with their animal,

19   even though they hadn't been approved, I'll allow each of you

20   to ask one question, if you want.

21         Mr. Sacks, do you have one question on that topic?

22         MR. SACKS:  No, Your Honor.

23         THE COURT:  All right.  Mr. Troy, do you have one

24   question on that topic?

25         MR. TROY:  I do not, Your Honor.  Thank you.

1           THE COURT:  All right.  That's the end.

2           Ms. Halpern, thank you very much for your testimony.

3           THE WITNESS:  Thank you.

4           (Witness excused)

5           THE COURT:  Okay.  Has Dr. Halpern arrived yet?

6           MS. ONDRADE:  Dr. Halpern has arrived, Your Honor.

7   The United States calls Dr. Casey Halpern.

8           THE COURT:  All right.  Dr. Halpern, good morning.

9   I'm not there, but --

10          THE WITNESS:  Good morning, Judge.

11          THE COURT:  -- I'm here by Zoom.  Can you see me?

12          THE WITNESS:  I see you in two places, sir.

13          THE COURT:  All right.  State your name for the

14  record.

15          THE WITNESS:  Casey Halpern.

16          THE COURT:  All right.  You are still under oath.

17  You may proceed, Counsel.

18          THE WITNESS:  Thank you.

19       CASEY HALPERN, PREVIOUSLY SWORN, RESUMES

20                  DIRECT EXAMINATION

21  BY MS. ONDRADE:

22  Q    Good morning, Dr. Halpern.  Thank you for joining us.

23  Just as a refresher, could you remind the Court how you know

24  Bernard and Cynthia Halpern?

25  A    I'm their son.

1    Q    Okay.  And you're a co-owner of the unit in the

2    Dorchester condominium that your parents reside in?

3    A    Yes.

4    Q    Is your wife also a co-owner?

5    A    Yes.

6    Q    What's her name?

7    A    Maria Halpern, although when she purchased it, I believe

8    it was in her maiden name, Maria Bashian.

9    Q    Okay.  Do you and your wife pay any of the fees

10   associated with the unit?

11   A    Currently?

12   Q    Yes.

13   A    Currently, my parents have been paying for the condo

14   fees.

15   Q    Okay.  How long have they been paying for the condo fees

16   associated with the unit?

17   A    I'd have to review the records, but it's been some time,

18   definitely since they moved in, if -- pardon me -- if not,

19   prior.

20   Q    Okay.  Now, you testified on the first day of this trial

21   that you rented-out the unit to tenants, correct?

22   A    That is correct.

23   Q    And the last tenant that lived in the unit left in April

24   or May of 2018?

25   A    That sounds right.

1   Q    Okay.  There's an email from that time period that I'd

2   like to show you.

3        MS. ONDRADE:  Katie, could you, please, pull up

4   Plaintiff's Exhibit 227?

5   BY MS. ONDRADE:

6   Q    Dr. Halpern, just take a moment to examine the document

7   and let me know when you're ready.  I think it's just this one

8   page.

9        (Pause in proceedings)

10  A    Okay, yes.

11  Q    Do you recognize the document?

12  A    I do.

13  Q    What is it?

14  A    It's an email from April of 2018, where Kyle Maloney had

15  offered to facilitate a garage parking spot for my mother in

16  consummate with their moving in and my acknowledgment.

17  Q    Okay.

18       MS. ONDRADE:  Your Honor, I'd like to move this

19  exhibit into evidence.

20       THE COURT:  Admitted.

21  BY MS. ONDRADE:

22  Q    So let's look at the email together.  What's the date of

23  the email?

24  A    April 27th, 2018.

25  Q    And who is on the email chain?

1    A    It's Kyle Maloney, myself and my mother.

2    Q    And I'm going to ask you to read aloud for us, Dr.

3    Halpern, if that's okay.  Could you read the part that starts,

4    from Kyle Maloney, that says, "I've copied Casey on this

5    email"?

6    A    Yes.  "I've copied Casey on this email.  Casey, if you

7    could just email me back, confirming your mother and father

8    are moving into the unit, I'd appreciate it.  If you have any

9    other questions, please let me know."

10   Q    Okay.  And then what did you respond, Dr. Halpern?

11   A    "Yes.  Thank you, Kyle."

12   Q    Okay.  What was the purpose of this email that you sent

13   between you and Kyle?

14   A    Mostly to confirm that they were moving in.

15   Q    Okay.  And that's in April of 2018?

16   A    That's right.

17   Q    Okay.

18        MS. ONDRADE:  You can take down this exhibit.  Thank

19   you.

20   BY MS. ONDRADE:

21   Q    Did you parents take steps to move into the Dorchester in

22   2018?

23   A    Yes.  They -- they -- from their home in Radnor, they had

24   large furniture, armoires and bureaus, things like that, so

25   they wanted to confirm that they were able to fit their

1  furniture in the bedroom and the living room, so they were

2  coordinating with me and the tenant to make measurements,

3  things of that nature.

4  Q    Okay.  Did you ever happen to visit the unit around this

5  time period of April to the Fall of 2022?

6  A    In April, I was in California, however, I did visit the

7  unit in the Fall.

8  Q    Okay.  What did you notice or observe about the unit?

9  A    In the Fall, I have to confirm the dates, I believe it

10  was November of 2018, I was visiting to give a lecture at the

11  University of Pennsylvania, where I now work, and my parents

12  offered for me to stay at the unit.

13  Q    And what did you notice about the unit?

14  A    Oh, I -- well, I stayed there for a few days.  My parents

15  had made it very homey.  It had furniture, a couch, two beds.

16  My parents offered for me to stay in my original bedroom, but

17  that was now their planned, you know, master bedroom, so I

18  opted to stay in the guestroom, and it was, although with

19  different furniture, very much how I remembered it.

20  Q    Okay.  As a former resident of the Dorchester, can you

21  describe what the freight elevator is like at the Dorchester?

22  A    The freight elevator is how I would access the laundry

23  room and the gym.  It's in the back of the building.  I often

24  was on the elevator with construction workers, some

25  maintenance men, and when the -- and it's access is through a

1   door where the garage is located.

2   Q    Okay.  Well, what's the front entrance to the Dorchester

3   like?

4   A    The front entrance of the Dorchester is beautiful.  It's

5   actually a wonderful entry.  I think management has done a

6   terrific job maintaining it, and it's always been -- it's

7   transitioned a little bit since I lived there, and it's now a

8   different style, but it's beautiful, very welcoming and

9   comfortable, safe, well-protected with the doormen, who are

10  friendly and helpful, both to my parents and to the other

11  residents, and masks are available for those who don't have a

12  mask for COVID purposes.

13  Q    Did you ever use the freight elevator and back entrance

14  as your main entrance into and out of the Dorchester when you

15  were living there?

16  A    No.

17  Q    Okay.  Did you ever observe other residents using the

18  freight elevator and back entrance as their main entrance?

19  A    Perhaps, rarely, and, yeah, I certainly used it on rare

20  occasion, but it was not my main entrance.  You know, it was

21  really an access point for movers, construction workers and

22  some of the maintenance folks.  It really -- often, the

23  elevator was very slow because construction workers and people

24  doing maintenance in the building would be working, it almost

25  seemed like floor to floor.

1        And so even when I was on the elevator to get to the

2   gym, it was kind of frustrating, because the only way to get

3   to the gym, unless I took 16 flights of stairs, would be the

4   elevator, and it would always take a lot of time to get there,

5   true, also, for the laundry room.  So it really doesn't serve

6   a purpose to be an appropriate main entry or main access

7   point.

8   Q    Okay.  You testified on the first day of trial that your

9   parents experienced with the Dorchester and the delay on the

10  ESA application was "the primary focus of their

11  conversations."  Did you ever see your parents, Bernie or

12  Cindy, did they ever cry to you about the delay?

13  A    Yes, they cried in the context of pretty severe

14  frustration.  You know, I think that they didn't really

15  understand why it would take so much time to get something so,

16  somewhat straightforward to approve, why it would take that

17  time to get approved.  And I don't think they're used to that

18  kind of, what seemed to them and probably to most, like a

19  runaround.  So I think that they kind of felt like they were

20  being taken advantage of and, certainly, you know, they were

21  in tears and emotional when conveying that to me.

22  Q    Okay.  And at that first trial, you talked about your

23  Mom, Cindy's, emotional state when she would talk about how

24  the Dorchester was treating her.

25        What about your Dad's emotional state?  What was it

1   like when he would talk about the Dorchester and the delay?

2   A    Yeah, he was similar to my mother, who I think, mostly,

3   just, if the right word is infringed on, I think that she just

4   felt that, you know, the emotional support animal was so

5   important to my father, and I think he -- the reason she felt

6   that way was because he felt, you know, that way.  You know,

7   they're sort of the kind of people that, sort of, do

8   everything together.

9         You know, my parents are always together.  They have

10  an amazing marriage.  It's something I've always emulated.

11  They tend to kind follow in each other's feelings, emotions.

12  They share their concerns with each other.  So I think the

13  same feelings my mother had, my father had, although my

14  father, you know, he -- he went to New York Military Academy.

15  He was ROTC, sort of a -- a, you know, a Division 1 basketball

16  player.  I mean, he definitely has a bit more of a stoic

17  approach to things, I suppose.

18        But in his, perhaps, mentally weakened condition,

19  associated with some of the issues he was going through

20  medically, I think he had already felt a bit vulnerable, and,

21  you know, I think for a man at his age, with that type of

22  upbringing, feeling like you need an emotional support animal

23  is a hard enough need to acknowledge, and such a simple one

24  that really helped him, sort of, manage his stress and anxiety

25  associated with these problems.

1          So I think, for him, not being able to have it,

2     which he kind of felt was just a basic right, was really --

3     was really troubling.

4     Q     Thank you, Dr. Halpern.  I have no further questions for

5     you.

6     A     My pleasure.

7               THE COURT:  All right, cross?  Cross-examine?

8               MR. TROY:  Thank you.

9                           CROSS-EXAMINATION

10    BY MR. TROY:

11    Q     Hello, Dr. Halpern.  My name is Paul Troy, and I

12    represent the Dorchester Owner's Association.

13    A     Hi.

14    Q     When you testified in September, you had testified, I am

15    not an expert in these areas at all, I am just speaking to

16    this as his son, do you recall that?

17    A     Yes.

18    Q     And you stand by that today?

19    A     For the most part, yeah.

20    Q     Thank you.

21              MR. TROY:  I don't have any other questions, Your

22    Honor.

23              THE COURT:  Okay.  Thank you, Dr. Halpern.  You're

24    excused.

25              THE WITNESS:  All right.

1              (Witness excused)

2              THE COURT:  Does the Government have any other

3    witnesses?

4              MR. SACKS:  Yes, Your Honor.  The United States

5    calls Bernard Halpern to the stand.

6              THE COURT:  All right.  Mr. Sacks, about how long is

7    your direct going to be?

8              MR. SACKS:  I would say in the order of 25 minutes,

9    Your Honor.

10             THE COURT:  Okay.  Can we take, just, a two-minute

11   recess, here, please?

12             MR. SACKS:  Yes, Your Honor.

13             THE COURT:  All right.  I'll be right back.

14             (Recess, 9:50 a.m. to 9:53 a.m.)

15             THE COURT:  Okay.  Ms. DiSanti, please swear in the

16   witness?

17             COURTROOM DEPUTY:  Okay, we're still waiting on

18   Government's counsel to come back in.

19             THE COURT:  Oh, okay.

20             (Pause in proceedings)

21             COURTROOM DEPUTY:  If you could remain standing, Mr.

22   Halpern?

23             THE WITNESS:  Thank you.

24             COURTROOM DEPUTY:  Please state your full name for

25   the record?

1          THE WITNESS:  Bernard Halpern.

2          COURTROOM DEPUTY:  And please raise your right hand?

3      BERNARD HALPERN, GOVERNMENT'S WITNESS, SWORN

4          COURTROOM DEPUTY:  Please be seated.

5                    <u>DIRECT EXAMINATION</u>

6  BY MR. SACKS:

7  Q    Good morning, Mr. Halpern.

8  A    Good morning, sir.

9  Q    Mr. Halpern, are you aware that the jury found that the

10 Dorchester Owner's Association made housing unavailable to you

11 and your wife?

12 A    Yes, I do.

13 Q    And are you aware that the jury found that the Dorchester

14 Owner's Association imposed different terms and conditions on

15 you and your wife than on other residents?

16 A    Yes, I do.

17 Q    And are you aware that the jury found that the Dorchester

18 Owner's Association unreasonably delayed granting your request

19 for an accommodation for an emotional support animal?

20 A    I do.

21 Q    Do you feel that you were injured by the Dorchester

22 Owner's Association's violations of the Fair Housing Act?

23 A    Yes.  The delay caused the whole problem.

24 Q    Now, Mr. Halpern, you previously testified that you

25 submitted your first application for a reasonable

1  accommodation on or around October 24th, 2018.  When did you

2  expect to hear back from the Dorchester?

3  A    The paperwork said 30 days later we should have heard.

4  Q    Did you hear back within 30 days?

5  A    No, no.

6  Q    Mr. Halpern, did you ever leave any voicemails for the

7  Dorchester regarding your request for an accommodation for an

8  emotional support animal?

9  A    I remember one when I was a little -- a little angry at

10  Kyle.  I left him a nasty voicemail.

11  Q    Do you remember another voicemail that you left in

12  January of 2019?

13  A    It had to be for where's the result of our application.

14  Q    Do you remember when you left that voicemail?

15  A    Not a chance.  I can't remember that.

16  Q    Would anything help refresh your recollection?

17  A    Tell me the date of the email.

18  Q    Okay.  Would you like to see an email?

19  A    Yeah.

20  Q    Okay.

21        MR. SACKS:  Katie, could you please put Plaintiff's

22  70 for Mr. Halpern?

23        THE WITNESS:  A little larger.

24  BY MR. SACKS:

25  Q    And, Mr. Halpern, I want you to look at that email and

1   let me know if that refreshes your recollection about leaving

2   a voicemail for Mr. Maloney and the date?

3   A    Yes, yes.

4   Q    Okay.

5        MR. SACKS:  Let's take the exhibit down.

6   BY MR. SACKS:

7   Q    Okay, Mr. Halpern, do you remember when you left that

8   voicemail?

9   A    January, I think.

10  Q    Okay.  Of 2019?

11  A    '19.

12  Q    Did you ever heard back -- did you ever get a call back

13  from Mr. Maloney?

14  A    No.

15  Q    Now, Mr. Halpern, we've heard testimony about selling

16  your home in Radnor, Pennsylvania?

17  A    Okay.

18  Q    Were you able to live at the Dorchester following the

19  sale of your home in Radnor?

20  A    Not -- no, the dog was not approved.

21  Q    Okay.  Where did you live instead?

22  A    We stayed in Ocean City, our home in Ocean City.

23  Q    Okay.  Now, was living in Ocean City, for you and Ms.

24  Halpern, was that less convenient than living in the

25  Dorchester?

1   A    Of course.  It's an hour's drive from Philadelphia, an

2   hour and a half.

3   Q    Okay.  And did you have -- did you have reasons to be in

4   Philadelphia?

5   A    At that time, I had doctors and health issues, so I was

6   seeing a doctor very, very, very often.

7   Q    Okay.  Now, from that period, when you sold your home in

8   Radnor to June, 2020, approximately how many trips did you

9   make from Ocean City to Philadelphia?

10   A    At least 30.  At least 30.

11   Q    And these are 30 round trips between these two cities?

12   A    If we came in, we had to go out.

13   Q    Now, how did you and Ms. Halpern get between Ocean City

14   and Philadelphia?

15   A    We drove.  I drove usually.

16   Q    Mr. Halpern, I am now going to show you Plaintiff's 228.

17          (Pause in proceedings)

18   A    Yeah.

19   Q    Mr. Halpern, do you recognize this document?

20   A    Yes.

21   Q    Okay.

22   A    Yes.

23   Q    What is this document?

24   A    It's a map from Philadelphia to 5 West Dundee, our home

25   in Ocean City.

1    Q    All right.  Now, there's a blue line on this map.

2         Do you see that?

3    A    Yes.

4    Q    Okay.  Does that blue line represent the route that you

5    and your wife drove between your home in Ocean City and the

6    Dorchester?

7    A    Yes.

8    Q    Is this map a fair and accurate representation of that

9    route?

10   A    It is the route, yeah.

11        MR. SACKS:  And, Your Honor, we'd move Plaintiff's

12   228 into evidence.

13        THE COURT:  Admitted.

14   BY MR. SACKS:

15   Q    Now, Mr. Halpern, you said that -- you mentioned that you

16   did most of the driving?

17   A    Yeah.

18   Q    What was driving like for you?

19   A    I went through a period where I was told I couldn't drive

20   for awhile, so I had to take a re-evaluation test, so I was

21   really driving when I shouldn't be, so I got to 42, and I

22   would go out of my mind.

23   Q    Why did you do the driving and not your wife?

24   A    Since she lost the vision in her eye, so -- for a period

25   of time, so she couldn't drive at all.

1    Q    So were the --

2    A    The only driver, yeah.

3    Q    I'm sorry.  So you did most of the driving?

4    A    I did all of the driving.  Cindy couldn't see from her

5    left eye.

6    Q    And in this Exhibit 228, it says that the -- well, what

7    is the distance -- according to this map, what is the distance

8    between your home in Ocean City and the Dorchester?

9    A    A little less than 70 miles.

10   Q    And how long did this route take you?

11   A    It would take about an hour and a half.

12            MR. SACKS:  Katie, can you take this exhibit down,

13   please?

14   BY MR. SACKS:

15   Q    Now, you testified you did this drive 30 times?

16   A    At least.

17   Q    And that's before your application was approved in June

18   of '22?

19   A    Yes.

20   Q    Would you have made less trips from Ocean City to

21   Philadelphia if the Dorchester had approved your October, 2018

22   application?

23   A    Of course.  All my doctors are at Penn, so we're there

24   all the time.

25   Q    And you would have been staying at the Dorchester --

1   A    Yes.

2   Q    -- instead?

3   A    We only stayed at the Dorchester when it was an

4   emergency.  If I had to meet my doctor at 6:00 in the morning,

5   I couldn't do it from Ocean City, so I'd have to stay at the

6   Dorchester.

7   Q    Mr. Halpern, you previously testified that you filled out

8   three separate applications for an accommodation for an

9   assistance animal.  And earlier today, we saw an email dated

10  June 25th, 2019 where the Dorchester requested that you fill

11  out a second application.

12        When you learned that you had to fill out a second

13  application eight or nine months after your first application,

14  how did that make you feel?

15  A    Really annoyed.  We had to go to the doctor and get

16  another letter from the doctor, and there was no response to

17  the first application.  They didn't say us a notice saying,

18  well, it wasn't good enough or X, X, X, so it didn't say a

19  word about it; just said another application is necessary.

20  It's like we're dealing with children.  I don't understand it.

21  Q    Now, you also testified that you received a second letter

22  from Dr. Wieman, which you included in your --

23  A    Yeah.

24  Q    -- your July, 2019 application, your second application.

25  When you saw Dr. Wieman in June of 2019, did you discuss with

1  him how the Dorchester had responded to your first request?

2  A    Yeah.  He was -- he was shocked that we hadn't heard, so

3  it was very embarrassing to tell him, well, they didn't

4  respond yet.  It's only been a year.  They must be very busy.

5  Q    Mr. Halpern, you previously testified that there were

6  occasions when you and Ms. Halpern stayed at the Dorchester --

7  A    Yes.

8  Q    -- during this 19 month period --

9  A    Yes.

10 Q    -- when your applications were pending.  During those

11 stays, did you feel welcome at the Dorchester?

12 A    Not at all.  We stayed because we had to stay.  We felt

13 like someone was going to knock at the door, the cops were

14 going to come.  We carried our papers all the time about our

15 Angie, so --

16 Q    What did you do -- what did you think might happen if you

17 -- if you were caught?

18 A    I didn't really know.  I thought they might fine me or

19 something.  We had no idea.  But we had no -- the only time we

20 stayed was when we had an appointment at the doctor, and I had

21 to see him.

22 Q    Because of this fear of being caught and reprimanded, did

23 you try to minimize your impact at the Dorchester?

24 A    Yeah, we sort of stayed in the house; didn't go out much

25 at all.

1   Q    Did you and your wife, sort of, change your normal

2   behavior?

3   A    Yeah, we stayed -- usually, we walk every day.  We didn't

4   walk that much.  We stayed inside, kept out of vision of -- we

5   knew they saw us.  The cameras are all over the place, so we

6   were -- there was nothing we could do.  We had to stay there,

7   so -- but I don't understand why it took so long to respond.

8   Aggravating.

9   Q    How did you deal with your emotional support animal

10  having to use the bathroom?

11  A    We had pee-pee pads, and we put them on the patio, and

12  then we threw them in the garbage.

13  Q    What was that like?

14  A    Difficult.  Very difficult and a little bit embarrassing.

15  The dog needs exercise, and we couldn't take her out.  We

16  didn't want to take her out to cause more trouble.

17  Q    If you had approval, would you have been taking Gracie

18  out more?

19  A    No question, yeah.

20  Q    And did you share your concerns about -- when you were

21  sneaking around, did you share your concerns about sneaking

22  around the Dorchester without permission, did you share those

23  concerns with anyone?

24  A    My son, a couple of friends of ours, Jimmy Reed.  It was

25  very upsetting.  A lot of lawyer friends of mine, we would

1    talk about it all the time.

2    Q    What was it like, that, sort of, telling your family

3    about the situation?

4    A    They would say, why are you staying there?  Why are you

5    trying?  Go somewhere else.  But we liked the building.

6              MR. SACKS:  Katie, could you please put up Defense

7    Exhibit 212.0011 for Mr. Halpern?

8    BY MR. SACKS:

9    Q    Mr. Halpern, did you know that while you were sneaking

10   around to stay in your own unit at the Dorchester, the

11   Dorchester was capturing surveillance photos of you with your

12   emotional support animal?

13   A    Very upsetting.  I think classless, really.  Those

14   cameras are set to, really, pick up the crooks, somebody

15   sneaking in the back door to rob, not me.

16   Q    Did you know that --

17   A    Idiotic.  It was really, really upsetting.

18             MR. SACKS:  Katie, turn to the next page, please?

19             THE WITNESS:  Every time I see it, it pisses me off

20   more.

21   BY MR. SACKS:

22   Q    Now, do you see this email here?

23   A    Yeah.

24   Q    This is an email where Maloney is --

25   A    I see it.

1    Q    -- sending that picture to David Smith.

2    A    David Smith.

3    Q    Did you know that Mr. Maloney was emailing these pictures

4    to David Smith?

5    A    I had no idea.

6    Q    How does it feel to know that the management of your

7    building was gathering evidence against you and your emotional

8    support animal, while your application for accommodation was

9    pending?

10   A    I don't want to say what I think.  It's disgusting.  It's

11   really a nasty trick.  We see the cameras.  We know they're

12   taking pictures.  I don't need to see it.

13   Q    Now, between October 18 -- between October, 2018, when

14   you first applied for an accommodation and June of 2020 when

15   you received written approval from the Dorchester, do you feel

16   that you were able to fully enjoy living at your unit at the

17   Dorchester?

18   A    Not at all.  We couldn't enjoy it, because we were

19   waiting for a knock at the door to say, hey, guys, you're not

20   supposed to be here.

21   Q    Do you think this 19-month delay had an impact on your

22   mental well being?

23   A    No question.  It was upsetting.  It was disappointing.

24   We had sleepless nights.  We didn't know, do we move, go look

25   somewhere else, start building over again?  But we were in it,

1   and we did it, so we waited.

2   Q    Now, did you observe this delay have an impact on your

3   wife?

4   A    Oh, no question.  Cindy didn't sleep.  She walked around

5   all the time.  Will they accept the dog, not accept the dog?

6   Accept the dog, not accept the dog?  Until the DOJ got in, we

7   had no chance of getting an approval.  It could have gone on

8   for another three years.

9   Q    Mr. Halpern, you previously testified that at the May,

10  2020 meeting with Dorchester management, where you were given

11  tentative approval of your accommodation request, Mr. Devine

12  had told you that you had to use the service elevator and the

13  rear entrance when you were with your emotional support

14  animal.

15          Now, from June of 2020, when you received approval,

16  to January of 2022, when your wife emailed Mr. Maloney and

17  requested that you no longer use the service elevator, had you

18  been using the freight elevator and the rear entrance when

19  coming and going with Angie?

20  A    Yes, every time.

21  Q    And what was it like for you to have to use the freight

22  elevator and the rear entrance, at the request of Mr. Devine?

23  A    It smelled.  It was dirty.  There are these huge trash

24  containers outside.  There were trucks double-parked all over

25  the place, running, engines running.  They couldn't see us,

1    they were so high.  It was dangerous.

2    Q    When you say it smelled, you're talking about the --

3    A    The garbage.

4    Q    -- the rear entrance?

5    A    The garbage, yeah.

6    Q    In your previous testimony --

7    A    And there are so many trucks back there, it's insane.

8    Someone is going to get hit.  It's just a matter of time.

9    Q    Now, you previously testified that using the freight

10   elevator during COVID gave you health concerns.  Can you

11   please elaborate on that?

12   A    The freight elevator, in the morning, workmen come up, no

13   masks.  Usually, they have large equipment, so we're pushed,

14   stuffed in the elevator, and the guys don't have masks on, and

15   most of them are smoking.

16   Q    Did it make you feel less safe to use the freight

17   elevator?

18   A    Of course.  It was like COVID-central, just a matter of

19   time until one of us got sick.

20   Q    How did it make you feel to use the freight elevator in

21   this way when people weren't following COVID guidelines while

22   on them?

23   A    I don't blame them.  You know, they didn't wear the

24   masks, they don't work there.  We live there; we live the

25   masks, so it's upsetting, very upsetting.

1    Q    Are you aware of residents without emotional support

2    animals that were required to use the service elevator and the

3    rear entrance?

4    A    No.

5    Q    So you're now allowed to use the front entrance?

6    A    Yes.

7    Q    Does that -- how does using the front entrance compare to

8    using the rear entrance with Angie?

9    A    Oh, it's like driving a Mercedes not a car with dents all

10   over it; it's very pleasant.  We wear our masks and go up and

11   down; very easy.

12   Q    Now, after -- after you were granted approval in June of

13   2020, did Mr. Devine's freight elevator and rear entrance

14   requirements, did that discourage you from wanting to say and

15   live at your unit?

16   A    Repeat that one?  I missed it.

17   Q    Sure.  In June of 2020, after you were given approval,

18   but when you were given conditions by Mr. Devine that you had

19   to use the freight elevator and the rear entrance, did those

20   conditions make you want to not stay at your unit?

21   A    We were --

22            MR. TROY:  Objection, leading.

23            THE WITNESS:  -- we were so excited --

24            MR. SACKS:  Hold on, Mr. Halpern.

25            THE WITNESS:  Oh, I'm sorry.

1          THE COURT:  Overruled.

2          THE WITNESS:  We were so excited to just get the

3    approval, we would have jumped off the roof, so it was okay,

4    and then COVID caused the problems, so we got worried, and

5    that's why we contacted Kyle to use the main elevators.

6    BY MR. SACKS:

7    Q    Mr. Halpern, do you think it's fair that you had to pay

8    your condo and garage fees for the period that the Dorchester

9    refused to grant your accommodation?

10   A    I don't think it makes any sense.  What we should have

11   done, if we thought about it, is give it to an attorney to

12   hold in escrow, but we didn't think it would take that long.

13   We thought we'd hear in 30 days, so it just got 18 months

14   later, so unfair -- very unfair.

15   Q    Why is it unfair?

16   A    Why pay for something you can't enjoy?  It's not just

17   living there and sleeping there, you have to enjoy being

18   there, and when you know somebody is policing you, you don't

19   enjoy it.  And taking pictures of me, without permission.

20   Q    Now -- now from the period of June, 2020 to January of

21   2022, did you pay your condo and garage fees?

22   A    Of course.  If they were due, we paid them, yeah.

23   Q    And it was you and your wife who were paying the condo

24   fees?

25   A    Cindy pays them all.

1    Q    Okay.  It wasn't -- it wasn't your son and your daughter-

2    in-law?

3    A    No, just Cindy.

4    Q    Okay.  Now, from the period after you received approval

5    in June of 2020 to January of 2022 when the service elevator

6    condition was listed, do you think that you should have to pay

7    your condo fees for that period?

8    A    When the -- as long as we got approval, I think condo

9    fees should be paid.

10   Q    When you say approval, do you mean approval without

11   conditions?

12   A    Exactly.

13   Q    Okay.  So when -- when you were given approval with

14   conditions, do you think you should have to pay those condo

15   fees?

16   A    No, not until the conditions are gone.

17   Q    Okay.  And why not?

18   A    Because we're not utilizing what we want to do.  We don't

19   want to come in the back door.

20   Q    Now, Mr. Halpern, I believe I heard you mention that you

21   lost sleep over this?

22   A    Yes.

23   Q    Can you -- can you elaborate?

24   A    Yeah, just we're very organized.  When you apply for

25   something, you expect to get a return.  Call us and tell us

1    there is something wrong with the application. Let us know

2    that we need X, X, X. Nothing. No conversation whatsoever.

3    No response. And, now, remember, we needed to get the

4    approval for my dog. We needed to live there. We had no

5    other home except the Ocean City. And so we paid it every day

6    and usually a week ahead of time.

7    Q    Mr. Halpern, have you experienced anxiety over the

8    Dorchester towards you and your wife?

9    A    Sleepless nights, many sleepless nights.

10   Q    How about feelings of anger?

11   A    Yes, upsetting, very upsetting. We're not -- we're not

12   dealing with children. You get an application, you respond to

13   the application. These are adults. These aren't children.

14   They're acting like children.

15   Q    Feelings of humiliation?

16   A    Yeah. They treated us like a meter maid. They have

17   power, and they think they have power. And they do. So --

18   Q    Did you feel humiliated by this?

19   A    Yes, upsetting -- very upset. You can hear it in my

20   voice. It's disgusting.

21   Q    Despite the jury's verdict, the Dorchester Owner's

22   Association continues to deny that it did anything wrong. How

23   does that make you feel?

24   A    It makes me --

25            THE COURT: Well, no, I don't think that's an

1    appropriate question.  He's not here to comment on the jury's

2    verdict.  You can rephrase it.  You wonder if they are still

3    -- he still has any claim even though he has final approval.

4    Do you understand my objection to your question?

5              MR. SACKS:  Yes, Your Honor.

6              THE COURT:  Yes, just rephrase it.

7    BY MR. SACKS:

8    Q    Moving forward, do you have any concerns that this

9    conflict might occur again?

10   A    I'm worried if there isn't any penalty they'll just do it

11   again to the next person who applies.  That person could be

12   blind, I don't know.  They have to know the reason for the

13   dog.  If they were sitting in my chair, they might realize the

14   real need for the dog.

15             THE COURT:  I really think questions about what's

16   going to happen from today forward aren't really relevant,

17   because nobody, including myself, is sure.  I haven't made any

18   final decisions.  The case is not over.  If they appeal, this

19   case could go on for three more years, believe it or not.

20   Maybe none of you want it to go on for three more years, but

21   the way it's been going, it may, so let's limit the questions

22   to --

23             THE WITNESS:  I'll be dead.

24             THE COURT:  -- his experience up until today when he

25   is testifying.  Okay.

1      MR. SACKS:  I have no further questions, Mr.

2  Halpern.

3           Thank you.

4           THE COURT:  All right.  Okay.

5           Cross-examine?

6                    CROSS-EXAMINATION

7  BY MR. TROY:

8  Q    Good morning, Mr. Halpern.

9  A    Good morning, sir.

10  Q    If I heard your testimony correctly, you think that the

11  -- when the Dorchester gets an email, they should respond to

12  the email, right?

13  A    I would think so.

14  Q    Okay.  And similarly --

15  A    And when the Dorchester gets an application, they should

16  respond to the application.

17  Q    Sure.  And --

18  A    You agree?

19  Q    -- can we agree that --

20  A    Do you agree?

21  Q    -- that's a two-way street and -- you can't ask me

22  questions, sir.  It's one of the luxuries of being a lawyer.

23  We don't have to answer them.

24           But can we also agree that when the Dorchester sends

25  an applicant an email, the applicant should respond to the

1   email?

2   A    Yes, I agree.

3   Q    Okay.

4           MR. TROY:  Let's put up, please, Exhibit D-295?  And

5   if we can enlarge this.

6   BY MR. TROY:

7   Q    This is the email after the second application was

8   received.

9   A    I remember, yes.

10  Q    July 25 of 2019 from Pat Yonekawa with 11 questions.  Do

11  you see that?

12  A    Yes.

13  Q    Okay.  Now, sir, the evidence has shown that neither you

14  nor your wife --

15  A    Responded.

16  Q    -- ever responded to this email.

17  A    Of course.  Read question number ten.

18  Q    I see question number ten, but you never responded to

19  questions one through nine either.

20  A    But why would I -- they didn't look at our application.

21  How do I respond to nonsense?  We sent the application in, Mr.

22  Troy, and they ask us questions about the application.  Are

23  they morons?

24  Q    My question to you is, did you and your wife ever --

25  A    No, we did not respond.

1    Q    Did you ever, verbally or otherwise get back to the

2    Dorchester and say, we're not going to respond to you?

3    A    Did they get back to me, and tell me they're not going to

4    respond to my application?

5    Q    Listen --

6    A    It's exactly the same question.

7    Q    Mr. Halpern, just listen to my question.

8         THE COURT:  Well, no, Mr. Halpern, the question is,

9    did you ever respond?

10        THE WITNESS:  No.

11        MR. TROY:  Okay.

12        THE WITNESS:  But there's a reason I didn't respond.

13   Why don't you finish -- let me answer my question.  Let me

14   answer the thing.

15        MR. TROY:  You have answered the question.

16        THE WITNESS:  No, not at all.  Number ten --

17        THE COURT:  Well, Mr. Halpern, just a minute.  Mr.

18   Troy doesn't -- he's not asking you for your reasons.  Your

19   lawyer on redirect -- Mr. Sacks, on redirect, can ask you your

20   reasons.  Okay.  That's how we have to go.

21        Okay.  Next question?

22   BY MR. TROY:

23   Q    And I'll address that, though.

24   A    Please.

25   Q    Even if you didn't -- even if you thought the questions

1    were inappropriate, did you or your wife ever tell the

2    Dorchester, we don't think these questions are appropriate,

3    we're not going to answer?

4    A    I think so.  I'm not sure.  I'm thinking.  I don't know.

5    I don't do the emails.  My wife does them.

6    Q    Okay.  Sir, I want to show you Exhibit D-299, which has

7    been admitted before.  And after the Zoom meeting, you and

8    your wife wanted a written confirmation --

9    A    Yes.

10   Q    -- about the approval, correct?

11   A    Yes.

12   Q    Okay.  Because you knew that you wanted a -- after, you

13   wanted a written confirmation so the terms would be laid out,

14   right?

15   A    No.  We were more concerned about -- my application was

16   accepted.  I don't know why.  I remember, we were thinking,

17   what did he mean by this.  We don't know what he meant by

18   that.

19   Q    Okay.

20   A    So that's why we asked for something in writing.

21   Q    And what was provided to you in writing in June of 2020

22   by David Smith simply said in the first sentence -- well, the

23   only substantive sentence, "The Dorchester Owner's Association

24   has approved Bernie's request."

25   A    That concerned us.  What request?  A request to repair

1    our screen or the request for me to have a dog.  That's what

2    concerned us, so we asked for something a little more exact.

3    That concerned us.

4    Q    This was the final approval, the email, after --

5    A    Oh, I'm not saying it wasn't, but "The Dorchester Owner's

6    Association has approved Bernie's request."

7            What request?  Request for the dog or the request

8    for the repair bill?  Nobody -- we thought it needed a little

9    more to answer that question.  That's why we --

10           THE COURT:  What's the next question?

11           MR. TROY:  Sure.  Let's scroll down to the bottom of

12    this email.

13    BY MR. TROY:

14    Q    The bottom of the email, just so you have the context,

15    asked -- this was at 8:48 on June 8th -- "Good morning, David.

16    We wonder why we haven't heard anything from the Dorchester

17    Council regarding formal approval of Bernie's ESA, Angie?"

18    A    Yes.

19    Q    And just to give you the context, sir, so you know --

20    then let's go up to Mr. Smith's responsive email later that

21    email, three hours later, at 11:57.

22           He confirmed that --

23    A    No, June 8th.  That was June 8th, a different date.

24    Q    Yes, and let's go down to your wife's email.

25    A    Was it June 8th?

1   Q    It's also --

2   A    It was June 8th.

3   Q    -- June 8th.

4   A    Got it.

5   Q    Okay, sir, so three hours later, just so we're clear,

6   David Smith got back to you and your wife, when your wife

7   asked about the emotional support animal request and said,

8   it's been approved, right?

9   A    You say that.  You interpret it that way.  I don't.

10  "Bernie's request has been approved."  What request?  It

11  didn't say Bernie's ESA has been approved.

12            THE COURT:  Okay, next question.  Okay, Mr. Troy,

13  look, that's his answer.  You can't argue with him.  What's

14  the next question?

15            MR. TROY:  Okay.

16  BY MR. TROY:

17  Q    Was there any indication in Mr. Smith's email of any

18  restrictions or conditions or need to use --

19  A    No.

20  Q    -- the freight elevator?

21  A    No.  Not in this, no.

22  Q    Okay.  Okay.  Now, you mentioned the freight elevator, on

23  direct exam this morning, as being dirty and sometimes a bad

24  odor or something?

25  A    I'm talking about, not the freight elevator, the walking

1  out the back door by the garbage cans.

2  Q    Okay.

3  A    There's a coffee shop there, and they put all the garbage

4  cans along the side, and along the side of the walls, and the

5  place is full of garbage.  They don't clean it, ever.  They

6  don't powerwash the floor.  So it was difficult with us with

7  our dog.

8  Q    In fact, sir, you and your wife still use the freight

9  elevator --

10  A    Yes, we do.

11  Q    -- from time to time?

12  A    Sometimes, it's faster than the regular elevators, yes.

13  Q    You used it last night?

14  A    We used it, possibly, this morning.  We don't want to

15  have to use it though.

16  Q    Okay.

17  A    But the elevators are that slow, and a lot of time, you

18  get an elevator and you press the button, and a family is

19  there, they really don't want the dog, so, then, okay, let's

20  go to the service elevator.  It's not our first preference,

21  but we do use it.

22  Q    Okay.  Sir, both you and your wife testified, at the

23  initial phase of this trial in June, correct?

24  A    Yes.

25  Q    Okay.  And at that time in June, when testifying about

1   taking the dog out or the things you did when you lived at the

2   Dorchester in 2019 and 2020 before the approval, neither one

3   of you ever mentioned any pee pads for the dog, as you did

4   this morning, did you?

5   A    I think -- I really don't remember, but I think I did.

6   Q    Okay.

7   A    If we don't take the dog out, we have to have something

8   like that.

9   Q    Okay.

10        MR. TROY:  Well, let's go to, if we can pull up, Mr.

11   Perry, the trial testimony from June, page --

12        THE COURT:  No, no, we're not going to do that.

13   That's not probative.  You can cite it in your argument, but

14   you're not going to ask him about it.  The testimony speaks

15   for itself.

16        MR. TROY:  Okay.  So I am clear, Your Honor.  I

17   cannot confront this witness with his prior testimony?

18        THE COURT:  No, but you can argue it that he may

19   have said something differently.

20        MR. TROY:  Okay.  Let me go to the Plaintiff's time

21   line exhibit.

22        MR. SACKS:  Objection, Your Honor.  This is outside

23   the scope of direct.

24        MR. TROY:  Your Honor, the direct --

25        THE COURT:  No, overruled.  This is relevant.  I

1  requested these, and these were recently filed.  Overruled.

2  Go ahead.

3  BY MR. TROY:

4  Q    Mr. Halpern, this is an exhibit your wife testified this

5  morning that she had played a role in preparing as to when you

6  and your wife were at one place or another.  Do you remember

7  that?

8  A    I know nothing about it, so ask me the questions, I'll do

9  the best I can.  I heard it, but I don't waste time on

10  nonsense.

11  Q    Okay.  But you did tell us, this morning, that you and

12  your wife rented a place for her mother --

13  A    Yes.

14  Q    -- when she fell ill?

15  A    Yes.

16  Q    Okay.  And that was in the Fall of 2019?

17  A    Sounds correct.

18  Q    Okay.  Whenever it was, you and your wife could have

19  chosen, in theory, anywhere to -- to get --

20  A    Yes, to rent.  Yes.

21  Q    -- a room for her mother, and the place you chose was the

22  Dorchester?

23  A    Yes.

24  Q    Correct?  Okay.

25  A    Very convenient for us to come downstairs and feed her or

1   whatever.  It was easy.

2   Q    Okay.  And you also testified this morning, on direct

3   exam, your exact words were, "The only time you stayed at the

4   Dorchester was when you had to see the doctor", correct?

5   A    There was more.  If I had to see the doctor or an

6   emergency.  My mother-in-law's being sick, taking care of her,

7   we had to be with her.  When we had no other option, we

8   stayed.

9   Q    Okay.  So when you say, no other option --

10           MR. TROY:  -- if we can enlarge October of 2019?

11  BY MR. TROY:

12  Q    And, sir, to move this along, I'll represent to you that

13  the blue squares represent days that you stayed at the

14  Dorchester overnight, do you understand that?

15  A    Okay.  I'm not disagreeing.

16  Q    And the black circle days represent days when you drove

17  to and from Pennsylvania from Ocean City.

18  A    Got it, okay.

19  Q    Okay.  And let's go back to October -- well, actually, we

20  can do it just as it is here.  You can see October, November,

21  December, you stayed nearly every day and night at the

22  Dorchester --

23  A    Yes.

24  Q    -- correct?

25  A    Correct.

1    Q      Okay.  And --

2    A      That was when Cindy's mother was very ill.  We had no

3    option.

4    Q      Okay.  Well --

5    A      Because we were the night caregivers.

6    Q      Okay.

7    A      We couldn't afford round-the-clock care.

8    Q      And yet there were other days, such as they're shown in

9    green or with the black circle in October where you went back

10   and forth --

11   A      Okay.

12   Q      -- to Ocean City?  Okay.

13          And then let's go into 2020.  And if we look at the

14   top row of months, you and your wife -- and just to give you

15   some sense of the dates here, Gracie passed away, according to

16   the time line that's been submitted, January 23 of 2020?

17   A      Okay.

18   Q      Correct?

19   A      Cindy's mother passed away, also, in the same time

20   period.

21   Q      Correct.  January 29 --

22   A      That's the reason --

23   Q      -- of 2020?

24   A      -- we were staying there every day.

25   Q      I'm sorry?

1    A    That's the reason we were there every day.

2    Q    I understand.

3    A    And then we had the service at the church, so that was

4    it.

5    Q    And after Cindy's mother had passed away and Gracie had

6    passed away, and you had no emotional support animal --

7    A    Right.

8    Q    -- or no more mother-in-law to take care of, the two of

9    you stayed every day at the Dorchester, correct?

10   A    That's what this says, yes.

11   Q    Okay.  And then if we can go back to the key.  There's a

12   key for a yellow box, if we can blow this up, and that

13   indicates --

14   A    Out of state?

15   Q    -- out of state?

16   A    Okay.

17   Q    Okay.  And let's go back, then, to February of 2020.  And

18   this is -- yeah, this works.  You were then out of state from

19   February 19th until March 4, correct?

20   A    Okay.  That's what this says, yeah.

21   Q    Okay.  And then the two of you were back in the

22   Dorchester until -- for most of the dates.  I realize there's

23   a couple.  There's a brown day and a purple day here and

24   there, but you were there until the last blue square is March

25   13 of 2020, correct?

1   A    Got it.  Yeah, I see it.

2   Q    And if we go back to enlarge all of 2020, sir, I'll

3   represent to you March 13 of 2020, my phrase would be, that's

4   the day the world shut down with COVID?

5   A    Yeah.  But the blue boxes were when Cindy's Mom was sick,

6   we had to be there.  As I said earlier, if we had to be there,

7   we had to be there, no option.

8   Q    Yes.  But you don't disagree with your own chart, even

9   after she passed, you were there for a few more weeks --

10  A    Tell me -- I don't remember when she passed.

11  Q    January 29 of 2020.

12  A    Yeah, but then we had the church service, and the kids

13  came in and had lunch a couple of nights, so we had to clean

14  out her apartment in order to avoid paying rent --

15  Q    Okay.

16  A    -- so that was the reason we stayed during that period.

17  Q    Okay.

18  A    We had no other option.

19  Q    And, sir, then you returned in March of 2020 for a series

20  of overnights, correct?

21  A    That's what the calendar says, yeah.

22  Q    Yes.  And then after March 13th --

23  A    It had to be doctor's appointments in March.

24  Q    Okay.  After March 13th, though, looking at all the rest

25  of the dates there, the rest of the year, and let's go over to

1    2021 --

2    A    We were not there.

3    Q    Yeah.

4    A    Yeah.

5    Q    It was COVID, yeah.

6    A    Understood.

7    Q    You guys -- you took Ocean City over Philadelphia because

8    of COVID.

9    A    Exactly.  And the with the restrictions in the building,

10   it was easier to stay in Ocean City, much easier.

11   Q    Yeah, understood.  And that was, even though you got the

12   Zoom approval in May of '20 and the email from Mr. Smith in

13   June of 2020?

14   A    Yeah.

15   Q    Okay.  Thank you, sir.  Those are all the questions I

16   have.

17              THE COURT:  Any redirect?

18              MR. SACKS:  No redirect, Your Honor.

19              THE COURT:  All right.  Thank you, Mr. Halpern.  You

20   may step down.

21              (Witness excused)

22              THE COURT:  All right.  Does the Government have any

23   other witnesses?

24              MS. ONDRADE:  No, Your Honor, we do not.

25              THE COURT:  Okay.  So the Government rests its case

1    on damages, correct?

2            MS. ONDRADE:  That is correct, but we'd like to

3    reserve rebuttal.

4            THE COURT:  Right.  Okay.  All right.

5            Mr. Troy, do you briefly want to make any motions

6    now that the Government has completed its case on damages?

7            MR. TROY:  Yes, Your Honor, two.  One partial and

8    one full, and if I may -- I'll do this -- I'll do them both at

9    the same time, if it's clear.

10           First, the Government has sought punitive damages in

11   this case, and there is no finding, at any time, of anything

12   rising to the level of punitive damages under Pennsylvania law

13   for the Dorchester.  That is plain and obvious.  Your Honor

14   has the full bulk of the testimony of the Dorchester's efforts

15   to get advice from the Government as to their policy

16   throughout this time, and what they were struggling with the

17   Hamberg claim and the Government action, and that the

18   Government would never respond to their request for advice as

19   to an appropriate --

20           THE COURT:  Okay.  I understand your motion, but I'm

21   not asking you for argument right now.

22           MR. TROY:  Okay.

23           THE COURT:  So your first argument is that there is

24   no case for punitive damages?  What's the --

25           MR. TROY:  Yes.

1          THE COURT:  -- second motion?

2          MR. TROY:  The second argument here is that,

3    overall, the Halperns have failed to meet their burden of

4    proof as to damages because their own evidence, their own time

5    line has demonstrated that when they wanted or needed to stay

6    in the Dorchester, approval or no, they did.  And when they

7    didn't want to or need to, they did not.

8          That is abundantly clear from the DOJ's time line

9    submission and the testimony that's before you.

10         THE COURT:  All right.  I'll take both motions under

11   advisement.  Okay.  One question I want to raise, but I don't

12   want an answer.  I just want you to think about it.  This is a

13   purely procedural question which is that this proceeding is

14   going to end with a damage award in favor of the Halperns.

15   The question I have is, since they have not intervened

16   formally and when it comes time to enter a judgment, how

17   should I phrase that?

18         I'm not sure I can enter a judgment in favor of two

19   individuals, Mr. and Mrs. Halpern, who are not parties, and

20   the question in my mind is whether, procedurally, they should

21   be allowed to intervene at this time in this case even though

22   all of the testimony has been completed, almost all, pending

23   the completion of the Dorchester damages evidence.  So just

24   think about this in terms of post-trial proceedings.

25         Okay.  Mr. Troy, I am going to take a five or ten

1    minute recess.  Are you ready to proceed with your case?

2         MR. TROY:  I am, Your Honor, and also, to address

3    the question you just asked, unless you wish me to wait.

4         THE COURT:  Well, you can, briefly, if you want to

5    tell me what you think should happen.  Yes, go ahead.

6         MR. TROY:  Sure.  They absolutely should not be

7    permitted to intervene at this time.  Had they been

8    intervenors from the beginning, that would have entirely

9    changed our manner of discovery and our approach to the

10   defense of the --

11        THE COURT:  All right.  Well, if I -- I'm going to

12   award damages.  How do I phrase that?

13        MR. TROY:  Well, Your Honor, that has been an issue

14   we have had and have made motions on in this past, this entire

15   case, is that there has been an inherent conflict between the

16   interests of the Department of Justice and the interest of the

17   Halperns through this case.

18        THE COURT:  Right.  Okay.  Well, look, if this a

19   dispute, and we may have to have briefing, but we're not going

20   to -- I don't want to pause to have argument on it right now.

21        Okay.  Let me have a five-minute recess, and then

22   we'll -- is that enough time for you, Mr. Troy, to get ready?

23        MR. TROY:  It is, Your Honor.  We're ready to go.

24        THE COURT:  Okay.  Five-minute recess, and then

25   we'll proceed.  I'd like your witnesses sequestered so they

1    are not in the courtroom when the other one is testifying.

2              Okay.  I'll be back in five minutes.

3              MR. TROY:  Okay.

4              (Recess, 10:35 a.m. to 10:42 a.m.)

5              THE COURT:  Okay.  I'm ready to proceed.  Mr. Troy,

6    are you there?

7              MS. ONDRADE:  They're not here yet, Your Honor.

8    I'll go gather them.

9              THE COURT:  Okay.  That's all right.  Actually, I'll

10   take another one minute.

11             (Pause in proceedings)

12             THE COURT:  All right.  Mr. Troy?

13             MS. ONDRADE:  Your Honor, I'm wondering if before

14   Mr. Troy begins his case, if it would be possible for the

15   Court to resolve the outstanding motion in limine to exclude

16   evidence, given that they might use it.

17             THE COURT:  All right.  Yes, thank you for reminding

18   me.

19             MS. ONDRADE:  Sure.

20             THE COURT:  Mr. Troy?  Mr. Troy?

21             MR. TROY:  Yes, Your Honor.

22             THE COURT:  The first thing is, I want to amend what

23   I said about sequestration.  You've had Mr. Devine in the

24   courtroom throughout the trial as your courtroom

25   representative, so he can stay in the courtroom when the

1    others are testifying, and I know he's also going to testify,

2    so you can -- if you want to, you can have him as your last

3    witness, and he can be in the courtroom.  Okay?

4              MR. TROY:  Okay.  Thank you, Your Honor.  We'll go

5    -- he's coming in, now, so, good.  Thank you.

6              THE COURT:  All right.  So, secondly, I will address

7    the Government's motion.  I looked at that document, and it

8    looks like a settlement document to me.  What's the reason --

9    what's the defendant's reason why it would be admissible?

10             MR. TROY:  Sure, Your Honor.  Among the host of

11   different types of damages they are trying to seek, the DOJ is

12   trying to seek civil penalties for, among other things, this

13   policy somehow not complying.

14             The tragic irony throughout this whole case, Your

15   Honor, is that the defendants were asking the Government over

16   and over again, and as you pointed out, the Government never

17   called any witnesses to the contrary.  As they made revision

18   after revision with each new change in the law over this time

19   period, they kept asking the Government, is this policy okay.

20   We could never get a response from the Government.

21             THE COURT:  Okay.

22             MR. TROY:  Now, the same plaintiff who is accusing

23   us of having --

24             THE COURT:  Okay.  I understand your argument, but

25   this is a damages trial about an award to the Halperns.  I

1  don't think that document has any bearing on that, and I'm not

2  here -- this proceeding has nothing to do with whether there

3  is going to be a civil penalty or not.

4          So you can reserve your argument about that.  You

5  can, at the appropriate time, make a motion to add that to the

6  record, if you want, and we may have more proceedings on that

7  aspect of the case.  But right now, we're talking about the

8  award of damages for the Halperns, and I'm going to exclude

9  the exhibit.

10          So I am going to grant the Government's motion to

11  exclude that document --

12              MS. ONDRADE:  Thank you.

13              THE COURT:  -- for present purposes.  Okay.

14          All right.  Now, we're ready to proceed with your

15  first witness, is that correct?

16              MR. TROY:  We are, Your Honor.  Thank you.

17              THE COURT:  All right.  And Mr. Devine is in the

18  courtroom?

19              MR. TROY:  He is, Your Honor.

20              THE COURT:  Okay, that's fine.  All right.  Go

21  ahead.

22              MR. TROY:  Okay.  Mr. Smith --

23              THE COURT:  Swear the witness, please?

24              COURTROOM DEPUTY:  Please stand.  Please state and

25  spell your full name for the record?

1          THE WITNESS:  David Smith, D-A-V-I-D, S-M-I-T-H.

2          COURTROOM DEPUTY:  And, please, raise your right

3    hand.

4          DAVID SMITH, DEFENSE WITNESS, SWORN

5                    DIRECT EXAMINATION

6    BY MR. TROY:

7    Q    Mr. Smith, can you -- are you the general manage at the

8    Dorchester?

9    A    Yes.

10   Q    And have you been employed as the general manager at the

11   Dorchester during all the years that we have been discussing

12   throughout this trial?

13   A    No.

14   Q    Okay.  Tell us when you became general manager and what

15   your job was previously?

16   A    I became general manager of the Dorchester Owner's

17   Association in August of 2019.  I've worked in residential

18   property management throughout the City of Philadelphia for 25

19   years.

20   Q    Okay.  So beginning in August of 2019, could you explain

21   to the Court where your office is in the Dorchester and what

22   it overlooks?

23   A    My office faces the loading dock and the garage entrance.

24   I have windows that look out there, as well as a door to get

25   out from my office to the loading dock and garage entrance.

1    Q    Okay.  And we've marked some photographs as Exhibit D-

2    299, if we can --

3              (Pause in proceedings)

4    Q    Do you recognize this photo?

5    A    Yes.

6    Q    Okay.  And is this the -- you were present for the trial

7    testimony, some of in June, but then in September, correct?

8    A    Yes.

9    Q    Okay.  And is this the, what was referred to as, a heavy

10   door?

11   A    Yes.

12   Q    Okay.  Leading to the garage.

13             And let's go to the next photo?  And what is this

14   photo showing?

15   A    That is the main level of the parking garage.

16   Q    Okay, and if we go down one more photo, what does that

17   show?

18   A    That is the entrance to the main level of the parking

19   garage from the laundry level.

20   Q    Okay.  And is that the ramp that was described in the

21   testimony you heard from Mr. and Mrs. Halpern as being this

22   slippery ramp they had to use all the time?

23   A    I think so.

24   Q    Okay.  Do you use that ramp?

25   A    I go up and down that ramp and those steps frequently.

1   Q    Is it a slippery, hazardous ramp?

2   A    No.

3   Q    Okay.  Now, from your -- my question for you is, once you

4   started your job in August of 2019, and the Court has the time

5   line of when the Halperns stayed there in late 2019 and stayed

6   there in the beginning of 2020, did you -- are you in your

7   office most of your day at the Dorchester?

8   A    Yes.

9   Q    Okay.  Did you ever see the Halperns go over the ramp and

10  this route that is shown in this picture?

11  A    No.  I haven't seen them -- well, I wouldn't see them

12  there.  I would see them through my office windows, which are

13  on the loading dock --

14  Q    Okay.

15  A    -- and the garage entrance from the rear of the building.

16  Q    Okay.  And did you ever, during that time period, late

17  '19 or early '20, see the Halperns using that -- using that

18  area that's visible outside your window?

19  A    No, I did not.

20  Q    Okay.  The -- I also wanted to ask you about the -- there

21  has been testimony about a Zoom meeting in May of 2020

22  concerning the approval of the emotional support animal, do

23  you remember that?

24  A    Yes.

25  Q    And were you involved in that Zoom meeting?

1   A    Yes.

2   Q    Okay.  And if there has been testimony to the Court that

3   at that Zoom meeting, Mr. Devine placed conditions such as, I

4   believe it was a muzzle and that she can only use the freight

5   elevator at the time of that approval, was that testimony

6   accurate?

7   A    No.  The Zoom meeting was a conversation where we

8   informed the Halperns of their tentative approval for their

9   reasonable accommodation request.  It was an almost

10  celebratory conversation.  The Halperns were excited that they

11  were granted this approval, and that's what I remember from

12  the meeting.

13  Q    Okay.  And the Court has already seen your email from

14  June 8th this morning, but did you place -- you or anyone else

15  on behalf of the Dorchester, place any conditions on that

16  approval in your email or at any time subsequent to that?

17  A    There were no restrictions, no.

18  Q    Okay.  Finally, sir, were you here in Court on the day we

19  were here in September at the time that I was cross-examining

20  Mrs. Halpern?

21  A    Yes, I was.

22  Q    And did you have opportunity to hear a statement that Mr.

23  Halpern made while I was cross-examining Mrs. Halpern?

24  A    Yes.  During your cross-examination, Mr. Halpern said

25  that you were a "fucking asshole", and he said it loud in the

1    courtroom.

2    Q    Okay.

3           MR. TROY:  And those are all of the questions I

4    have, Your Honor.

5           THE COURT:  Okay. Cross-examine?

6                    CROSS-EXAMINATION

7    BY MS. ONDRADE:

8    Q    Good morning, Mr. Smith.  My name is Sam Ondrade.  I

9    don't think we've met before.  Thank you for joining us.

10          You testified you've been the general manager at the

11   Dorchester since August of 2019?

12   A    That's right.

13   Q    And the person who had the position before you, as

14   general manager, was someone named Pat Yonekawa?

15   A    That's right.

16   Q    Okay.  And, Mr. Smith, have you met with Mr. Zimmerman

17   before about this case?

18   A    Yes.

19   Q    How many times would you say --

20          MR. TROY:  Objection, Your Honor.

21          THE COURT:  Sustained.  It's not relevant.

22   BY MS. ONDRADE:

23   Q    Have you -- you said you were aware that there was a

24   trial in June in this case?

25   A    Yes.

1    THE COURT:  I think he was present.  I think he was

2  in the courtroom.  Next question.

3  BY MS. ONDRADE:

4  Q    Have you discussed that trial with Mr. Frank Devine?

5            MR. TROY:  Objection, Your Honor.

6            THE COURT:  No, that's not -- no.  Sustained.

7            MS. ONDRADE:  Okay.  I'll move on, Your Honor.

8  BY MS. ONDRADE:

9  Q    You testified with Mr. Troy about the Zoom meeting with

10  the Halperns that you had, that you attended, about the

11  request for an emotional support animal.  That meeting was on

12  May 29th, 2020?

13  A    I think that's right.

14  Q    You were at this meeting on a Zoom link?

15  A    Yes.

16  Q    Was Mr. Frank Devine there?

17  A    Yes.

18  Q    Was Joe Weiss there?

19  A    Yes.

20  Q    Were there representatives from the Department of Justice

21  there?

22  A    Yes.

23  Q    And that included Amanda Bailey?

24  A    Yes.

25  Q    And Mazen Basrawi?

1    A    Yes.

2    Q    And during this May 29th, 2020 meeting, you told the

3    Halperns that the DOA would provide a formal approval of their

4    emotional support animal following the DOA Council's upcoming

5    June meeting?

6    A    Yes.

7    Q    And during the May 29th, 2020 meeting, Mr. Devine

8    requested that the Halperns use the freight elevator when they

9    were with their emotional support animal?

10   A    No.

11   Q    Your testimony is that Mr. Devine never mentioned to the

12   Halperns, during this May 29th meeting, he never mentioned the

13   Halperns using the freight elevator?

14   A    Correct.

15   Q    Okay.  You understand you are under oath, Mr. Smith?

16   A    Yes.

17   Q    Okay.  During this meeting, Mr. Devine also requested

18   that the Halperns wait until after the COVID pandemic was over

19   to bring their emotional support animal into the building?

20   A    I don't remember that, no.

21   Q    Okay.  Your testimony is that Mr. Devine never requested

22   that they wait until the end of the pandemic?

23          THE COURT:  No, he said he doesn't -- he doesn't

24   remember.  That's not an outright denial that it was said.

25          THE WITNESS:  No, it was not said.

1   BY MS. ONDRADE:

2   Q    And you understand you are under oath at this time?

3   A    I understand I am under oath.

4            THE COURT:  Well, wait -- well, Mr. Smith, is it --

5   do you deny that Mr. Devine said it or you just don't remember

6   whether he did or he didn't?

7            THE WITNESS:  No, he did not say it.

8   BY MS. ONDRADE:

9   Q    Mr. Smith, during this May 29th meeting, did any -- you

10  mentioned Mr. Weiss was there.  You also were there

11  representing the Dorchester.  Did anyone from the Dorchester

12  discuss the use of the freight elevators with the Halperns'

13  emotional support animal?

14  A    No.

15  Q    During this May 29th meeting, did anyone from the

16  Dorchester, yourself or Mr. Weiss and Mr. Devine discuss the

17  waiting until after the COVID pandemic was over --

18  A    No.

19  Q    -- bring in the emotional support animal?

20  A    No.

21  Q    After that May 29th, 2020 meeting, the Halperns'

22  application received formal approval?

23  A    Yes.

24           MS. ONDRADE:  Could you please pull up Plaintiff's

25  Exhibit 22?

1    BY MS. ONDRADE:

2    Q    And, Mr. Smith, please take a moment to review this.  I

3    think there is only one page.

4    A    All right.

5    Q    Just let me know when you are ready.

6              (Pause in proceedings)

7    A    I'm ready.

8    Q    So this is an email chain between you and Ms. Cynthia

9    Halpern, correct?

10   A    That's right.

11   Q    And the dates of the emails are June 8th, 2020 and June

12   10th, 2020?

13   A    That's right.

14             MS. ONDRADE:  Your Honor, I would like to offer this

15   exhibit into evidence.

16             THE COURT:  It's admitted.

17   BY MR. ONDRADE:

18   Q    Let's start at the bottom of the email chain.  Ms.

19   Halpern emails you on June 8th, and she writes, "I wonder why

20   we haven't heard anything from the Dorchester Council

21   regarding formal approval of Bernie's ESA, Angie?"

22             Is that correct?

23   A    I don't see that part of the email on this screen.

24   Q    It's the email at the very bottom of the screen.

25   A    Now, I can see it, I think.  Yes, I see it.

1    Q    Okay.  Sorry about that, Mr. Smith.

2              Did I read that correctly?

3    A    Yes.

4    Q    Okay.  And if we go to the email above that from you, you

5    state --

6              MS. ONDRADE:  -- if we could blow up the middle

7    email?

8    BY MS. ONDRADE:

9    Q    You state that the Council's June 3rd, 2020 Zoom meeting

10   had to be cancelled and rescheduled?

11   A    Yes.

12   Q    And then you state the DOA has approved Bernie's request?

13   A    Yes.

14   Q    This is the formal approval of the Halperns' request for

15   an ESA?

16   A    Yes.

17   Q    Okay.

18             MS. ONDRADE:  You can take this exhibit down.  Thank

19   you.

20   BY MS. ONDRADE:

21   Q    Mr. Smith, you testified, with Mr. Troy, that there were

22   no restrictions on the Halperns based on their emotional

23   support animal, is that right?

24   A    That's right.

25   Q    Let's take a look a the community rules and regulations

1    at the Dorchester.

2              MS. ONDRADE:  If you could, please, pull up Exhibit

3    18, plaintiff's?

4    BY MS. ONDRADE:

5    Q    And if you could just kind of scroll through some of the

6    pages.  As, you know, Mr. Smith, this is a long document.

7              (Pause in proceedings)

8    Q    Is this a document that is familiar to you, Mr. Smith?

9    A    Yes.

10              MS. ONDRADE:  Can we go to the first page, please,

11    Katie?

12              And, Your Honor, I would like to offer this exhibit

13    into evidence.

14              THE COURT:  Admitted.

15    BY MS. ONDRADE:

16    Q    On the first page, the title of this document is

17    "Community Rules and Regulations," right?

18    A    Yes.

19    Q    And on the bottom left there, it says, "Rev. 6/5/2019"?

20    A    Yes.

21    Q    And that means that this document is dated June 5th of

22    2019?

23    A    That's what's written on the document.

24    Q    Okay.  These are the existing rules at the Dorchester,

25    correct?

1    A    The current rules?

2    Q    Yes.

3    A    I believe so.

4    Q    Okay.  Now, on the first page, at the bottom, I want to

5    point your attention to something.

6         MS. ONDRADE:  And if you could blow that up, Katie,

7    the paragraph at the very bottom?

8    BY MS. ONDRADE:

9    Q    It reads, "It is, of course, our hope that legal action

10   against an owner or other party will never be necessary, but

11   it is important to remember that the Council has the power,

12   the ability, the resources and the will to strictly enforce

13   the rules."

14        Did I read that portion correctly?

15   A    You did.

16   Q    And you have testified that these rules and regulations,

17   they're provided to owners at the Dorchester, if they request

18   it?

19   A    Yes.

20   Q    And these rules and regulations, they're also included as

21   part of a move-in packet when there is a new owner or a renter

22   who moves into the Dorchester?

23   A    That's right.

24        MS. ONDRADE:  Katie, could we, please, turn to page

25   18 of this exhibit?  And I'm hoping -- oh, I'm sorry, page

1    seven.  And if you could blow up the part, Section 2,

2    Elevators?

3    BY MS. ONDRADE:

4    Q    Section 2, Elevators, this part -- Part A, reads, "No

5    animals shall be taken on the main passenger elevators.

6    Animals that are specifically trained assist animals and

7    properly registered with the Association shall be restricted,

8    at all times, to the freight elevators, and when opened, to

9    ingress or egress only from the back door."

10              Did I read that portion correctly?

11   A    You did.

12   Q    And, Mr. Smith, it's not a coincidence that these are the

13   conditions and restrictions that the Halperns were subjected

14   to when they had their emotional support animal, is it?

15   A    I don't understand the question.

16   Q    The restrictions that were placed on the Halperns at the

17   May 29th meeting, to use the freight elevator and back

18   entrance, are consistent with this requirement in the rules

19   and regulations, aren't they?

20   A    There were no restrictions placed on the Halperns during

21   the Zoom meeting on May 29th.

22   Q    Okay.  You testified today -- is this -- is this rule in

23   effect?

24   A    The rule that you have on the screen here?

25   Q    Hmm-hmm.

1    A    It is not enforced.

2    Q    And what does enforced mean?

3    A    Owners or residents with emotional support animals are

4    not required to use freight elevators or the rear entrance.

5    They are permitted to use any entrance or exit or elevator

6    that they choose.

7    Q    But you've never informed any owners or residents who

8    have emotional support animals at the Dorchester that this

9    rule isn't enforced, have you?

10   A    We have.

11   Q    When did you do that?

12   A    I don't remember exact dates.

13   Q    Okay.  Well, that's not what you said during your

14   deposition, isn't that right?

15   A    I don't remember.

16   Q    Okay.  We can pull up -- you were deposed in this matter,

17   right, Mr. Smith?

18   A    I was.

19   Q    Okay.  And that deposition was in May, 2021?

20   A    I don't remember the date of the deposition, I'm sorry.

21   Q    That's okay.  We can look that up, as well.

22        MS. ONDRADE:  Can we, please, pull up Mr. Smith's

23   deposition?

24   BY MS. ONDRADE:

25   Q    Mr. Smith, this is a copy of your deposition, and if we

1    could turn to the second page?

2              (Transcriber change.)

3              THE COURT:  Just go -- why don't you go right to the

4    question where you believe he testified about the freight

5    elevator.

6              MS. ONDRADE:  Sure, Your Honor, but I'd just like to

7    establish the date because he wasn't certain.

8    BY MS. ONDRADE:

9    Q    On the second page of the deposition, it says that --

10             MS. ONDRADE:  If you can go back, Katie.

11   Q    -- it says that your deposition was taken remotely on May

12   18th, 2021.  Does that refresh your recollection?

13   A    Sure.

14   Q    Okay.  And the question I had asked was whether you had

15   informed any owners who have emotional support animals that

16   the rule is not in effect.

17             MS. ONDRADE:  If we could go to page 61 of Mr.

18   Smith's deposition?

19   BY MS. ONDRADE:

20   Q    And I'm going to read from line 7 to 13.  "So how have

21   you informed the individuals who have approved animals that

22   this rule is not being enforced with respect to them?"  And

23   your response, Mr. Smith, is, "Well, I've never met with the

24   three emotional support animal owners and reviewed this

25   section with them, and the owners have used the passenger

1    elevators and exit through the lobby and have not contacted --

2    been contacted to discuss it any point."

3         Mr. Smith, your testimony today, though, is that you have

4    informed the owners of emotional support animals that they do

5    not -- that this rule is not in effect, is that right?

6    A    They use the passenger elevators.  They use the freight

7    elevators.  They use the main entrance and the rear entrance.

8              THE COURT:  The question is, you know, have you

9    informed Dorchester owners about that?  The question is, do

10   you stand by your testimony at your deposition or is there

11   something different?

12             THE WITNESS:  I think since the deposition, we've

13   informed owners or residents that have these emotional support

14   animals that they are permitted to use any elevator they want.

15   BY MS. ONDRADE:

16   Q    Who -- who have you informed?

17   A    I don't remember specifically.  I --

18   Q    Well, there aren't many people with emotional support

19   animals at the Dorchester, are there, Mr. Smith?

20   A    There are, I believe, six emotional support animals in

21   the building now approved --

22   Q    Of the six emotional support animals in the Dorchester,

23   which owners of those emotional support animals have you

24   informed that this rule is not being enforced against them?

25   A    I don't remember, I'm sorry.

1    Q    So since May 2021 to today, you don't remember which of

2    the six owners of emotional support animals at the Dorchester

3    that you've informed that this particular rule doesn't apply

4    to them?

5    A    Specifically inform them, no, I'm sorry, I don't

6    remember.

7    Q    Okay.

8          MS. ONDRADE:  You can take his deposition down.

9    BY MR. ONDRADE:

10   Q    Well, you, Mr. Smith, have never informed Mr. and Mrs.

11   Halpern that this rule doesn't apply to them, is that correct?

12   A    I have not discussed this with them, no.

13   Q    Okay.

14         MS. ONDRADE:  And if we could go back to Plaintiff's

15   Exhibit 18 --

16   A    I do believe that Kyle Maloney has.

17         MS. ONDRADE:  If we could go back to Plaintiff's

18   Exhibit 18 and then look at page 12.  And I think it runs over

19   onto 13.  So if you could just highlight item 12, it reads

20   Association business.  That's the overarching header to this

21   section.  Association business.  And then if we could go to

22   page 13 and look at item I.  If you could blow that up,

23   please.

24   BY MS. ONDRADE:

25   Q    Now, there it states, Mr. Smith, "The failure of the

1    Association or management to enforce any rule for any reason

2    whatsoever shall not be considered a waiver of such rule and

3    such rule may therefore be enforced at any time."

4           Did I read that correctly?

5    A    Yes.

6    Q    So under this provision of the Community Rules and

7    Regulations, which you have testified are still in effect at

8    the Dorchester today, any rule in it may be enforced at any

9    time, even if it hasn't been enforced in the past by the

10   Association or management?

11   A    That's what it says.

12   Q    Okay.  And just to be clear, this is part of the

13   Community Rules and Regulations?

14   A    Yes.

15          MS. ONDRADE:  Okay.  You can take this down.

16          Okay.  I'd like to pull up a series of photos that

17   you testified about with Mr. Troy.  Could you please pull up

18   Plaintiff's Exhibit 229?  Just to clear something up.  If you

19   could go to the -- maybe it's the third photo.

20   BY MS. ONDRADE:

21   Q    Okay.  This third photo here, you testified with Mr. Troy

22   that this was the ramp the Halperns were referring to when

23   they said it was slippery?

24   A    I think so.

25   Q    Okay.  And you said that this ramp is not slippery?

1   A    Correct.

2   Q    Okay.

3          MS. ONDRADE:  And if we could go to I think the

4   fifth photo.  Yep.  I'm sorry, it's 229-007.

5   BY MS. ONDRADE:

6   Q    You can see that, Mr. Smith, with the dumpsters.  Isn't

7   this actually what the Halperns were talking about when they

8   said that there was a slippery ramp?

9   A    I don't know which one they were talking about.  I

10  thought it was the other one.

11  Q    Okay.  So you -- you take back your testimony before that

12  you were aware of what ramp they were referring to?

13  A    I thought they were speaking of the other one.

14  Q    Okay.  And just to be clear, since you're looking at this

15  now, this ramp is outdoors, correct?

16  A    That ramp at the top, there's two pictures that I'm

17  looking at, but the top picture is a ramp outside, yes.

18  Q    Okay.  Which means it would be subject to all kinds of

19  weather conditions?

20  A    It is -- yeah, it's outside.

21  Q    Okay.

22  A    It's an outside ramp.

23  Q    It gets wet when it rains?

24  A    It does.

25  Q    Okay.

1          MS. ONDRADE:  I have no further questions for this

2     witness.  Thank you.

3          THE COURT:  Any redirect?

4          MR. TROY:  There is, Your Honor.

5          THE COURT:  Go ahead.

6          MR. TROY:  If -- if we can pull up those photos from

7     Exhibit 229.  And let's go down, I think it's photo seven or

8     eight that you were just shown.  And keep going.  Keep going.

9     All right, stop there, if we can.

10                      REDIRECT EXAMINATION

11    BY MR. TROY:

12    Q    And Ms. Ondrade is correct, rather than the view I showed

13    previously, do these two photos show the view or at least the

14    bottom photo show the view from outside your window?

15    A    Yes.  The windows to the right are my office and my door.

16    Q    Okay.  And there's been reference to a back door that

17    people have to go out to use.  Can you describe, using these

18    photos, for the Judge, and we can scroll them up or down,

19    where is this back door in relation to your office?

20    A    Sure.  The top picture is about 20 feet or so from my --

21    my windows, and I see every day could be a hundred people, a

22    hundred owners and residents from the building coming and

23    going using the back entrance of our -- of our building.

24          Anyone who's going to the restaurants that are on

25    20th Street, the 7-Eleven that is 50 feet from there, the bus

1    stop that's 50 feet from there, the church that's 100 feet

2    from there, anyone walking to work, who works west of our

3    building or going to the hospital of the University of

4    Pennsylvania, or the grad students that live in our building

5    that go to school there and walk, use that back entrance

6    because it saves five minutes, as opposed to going through the

7    front entrance of the building.

8    Q    And so I'm clear, Mr. Smith, are you telling this Court

9    that other residents of the Dorchester, whether they have

10   support animals or not, deal with the freight elevator, the

11   cameras, the back door, and the back entrance day in and day

12   out at the Dorchester?

13   A    Every day.

14   Q    Of their own free will?

15   A    As I said, it's a significant shortcut for -- as opposed

16   to going all the way around the building, which is -- it's a

17   big building.  It runs the whole block.  So it's used -- it is

18   used very, very often.

19   Q    Okay.  And going back to your deposition testimony in May

20   of 2021, did -- and I don't have to put it up again, but did

21   you say then in that testimony that you saw people as of May

22   of '21 taking emotional support animals on all the different

23   elevators?

24   A    That's right.

25   Q    Okay.  And at the -- you were asked about your email of

1    June 8th.  You were in court previously where a photo was

2    taken of Mr. Halpern over that prior winter of him and the dog

3    Gracie?

4    A    Yes.

5    Q    Okay.  And then Kyle had provided you with that photo?

6    A    Yes.

7    Q    Okay.  So at the time you sent your note of June 8, 2020,

8    you already knew the dog had been in the building, correct?

9    A    That's right.

10   Q    Okay.  And in response to that -- seeing that photo that

11   had been taken that Mr. Maloney sent you, did you or anybody

12   at the Dorchester evict, suspend, fine, or take any discipline

13   whatsoever against the Halperns?

14   A    No.

15              MR. TROY:  Okay.  Thank you.  That's all the

16   questions I have, Your Honor.

17              MS. ONDRADE:  I have nothing further.

18              THE COURT:  Okay.  All right.  Thank you, Mr. Smith.

19   All right.  Next -- next witness, please.

20              MR. TROY:  Yes, we have to go get Mr. Maloney, Your

21   Honor.  He's sequestered.  He's coming in, in just a moment.

22              THE COURT:  I'll be 30 seconds.

23              (Pause in proceedings)

24              THE COURT:  Okay.  Swear the witness, please.

25              THE CLERK:  Please state your full name for the

1    record and spell your last name.

2              THE WITNESS:  Kyle Maloney, M-A-L-O-N-E-Y.

3              THE CLERK:  And please raise your right hand.

4         KYLE MALONEY, DEFENSE WITNESS, SWORN

5              THE CLERK:  You can be seated.

6              THE WITNESS:  Thank you.

7              MR. TROY:  Okay.  Thank you.

8                       DIRECT EXAMINATION

9    BY MR. TROY:

10   Q    Mr. Maloney, could you remind the Court of your position

11   at the Dorchester?

12   A    Yes, I'm the Director of Resident Services.

13   Q    Okay.  And what is your role as Director of Resident

14   Services?

15   A    I handle a lot of the day-to-day tasks and inquiries by

16   residents moving in, moving out, amenity questions, and unit

17   service questions.  That sort of thing.

18   Q    Okay.  Initially, I want to ask you a question about

19   ownership of what has been referred to as the two Halpern

20   units.  First, were you in the courtroom this morning when

21   Mrs. Halpern testified?

22   A    Yes, I was.

23   Q    Okay.  And did you yourself check records for the Office

24   of Property Assessment as to who owned what I'll call the B

25   Unit that the Halperns have represented they own?

1   A    Yes, I did.

2   Q    And was that owned by their daughter-in-law?

3   A    Yes.

4   Q    And it still is?

5   A    According to the City of Philadelphia, yes.

6   Q    Okay.

7           MR. TROY:  Next, if we can put up Exhibit 229, which

8   we showed with the prior witness.  And if we can scroll down

9   to the maybe eight pictures.  Okay.  That's fine.

10  BY MR. TROY:

11  Q    Are you familiar with this area of the Dorchester?

12  A    Yes, I am.

13  Q    Okay.  And there -- if there has been testimony that this

14  area of the Dorchester is filled with trash, stinky, slippery,

15  dangerous, is that the case?

16  A    Not as described, no.

17  Q    Okay.  Can you describe what this area is like?

18  A    Yes.  So these pictures show our loading dock, which

19  serves multiple functions.  So primarily it's a place for

20  moves to take place; moving trucks will back in next to those

21  stairs in that upper picture.  I think there's some movers

22  actually pictured there.

23          Obviously, this is where we keep the trash.  To the

24  left of those bins is a compacting room, so all the trash and

25  recycling is kept there.

1    And then the lower pictures shows basically a 180

2    turn from the upper picture and that's the entrance to our

3    garage, which has up to 215 of our residents who park in there

4    monthly.  So there's a lot of times when people would pass

5    through this area.

6    The package room is also right in there where one

7    would pick up packages that were delivered by Amazon or UPS or

8    FedEx.

9    Q    Okay.  And do residents of the Dorchester, well, did they

10   in 2018 right through today, use this back entrance?

11   A    Yeah.  Many residents use the back entrance, as they do

12   the front entrance.  It may just depend on where they're

13   going.  This entrance is closer to 20th & Locust.  The front

14   entrance is on the other -- almost a whole city block away on

15   West Rittenhouse Square.

16   So if anyone were to want to go to the 7-Eleven

17   that's right around the corner, the -- I think it's the 17 bus

18   at 20th & Locust, or whichever bus that is, to pick up the bus

19   or was just walking to anywhere along 20th Street or west of

20   the building, they may exit out the -- the loading dock door

21   because it's much quicker.

22   Q    Okay.  Were you the main point of contact for the

23   Halperns and questions that they had of the Dorchester?

24   A    Yes, as I am for most residents.

25   Q    Okay.  I want to ask you -- and the Court's been given a

1    time line by the plaintiffs, but I'll try to do it without the

2    time line -- do you recall when it was the Halperns had sold

3    their home in Radnor?

4    A    July of 2019.

5    Q    Okay.  And over 2018 and 2019, to your knowledge, were

6    the Halperns making any modifications to their unit?

7    A    They were definitely doing some work in the apartment.  I

8    think that they replaced a bunch of the doors.  They made some

9    small repairs.  They painted the apartment.  It had been

10   occupied by three sets of tenants for the last -- the prior

11   four years, so if they were going to occupy it as their

12   primary residence or secondary residence, I think that they

13   would want to make some -- some repairs.

14   Q    Okay.  And do you recall the name of the contractor who

15   did those repairs?

16   A    It was Nick Meli Jr. Contracting.

17   Q    Okay.  And do you know when it was that Mr. Meli

18   completed his work?

19   A    The summer of 2019.

20   Q    Okay.  And the -- now, as to the -- the summers, whether

21   it's 2019, 2018, or any other summer, did you know in your --

22   in your role where it was that the Halperns lived during the

23   warmer months of the year?

24   A    So I knew that they had a beach house, a summer home in

25   Ocean City, so I figured they lived there, as one would do if

1    they had access to a summer home on the shore.

2    Q    Okay.  I want to show you some of -- it's been -- if

3    there has been testimony that the Halperns sent in

4    applications for support animals and never heard anything from

5    the Dorchester, is that accurate?

6    A    No.

7    Q    And why do you say so?

8    A    Because I responded to them frequently and often, as I do

9    with all residents who have inquiries about things.

10   Q    Okay.

11        MR. TROY:  Let's look at Exhibit D-280.

12   BY MR. TROY:

13   Q    And do you recognize this email and what is it?

14   A    Yeah, this is an email from August of 2018.  Cindy was

15   following up on a request for the forms, and I replied to her

16   and told her that I followed up with our general manager and

17   attorney, and then she thanked me.

18   Q    Okay.  Now, why were you following up with an attorney

19   about this issue?

20   A    Because it was my understanding that we were waiting for

21   some edits or feedback or anything from the government about

22   our current policy at the time.

23   Q    Okay.

24        MR. TROY:  Let's go next to D-282.

25   BY MR. TROY:

1    Q    And was Ms. -- Mrs. Halpern again asking about the forms

2    for the application?

3    A    Yes, she was.

4    Q    Okay.  And did you respond to her?

5    A    Yes.  I responded to her, it looks like the same day, and

6    I said that I was able to get the forms and I provided them to

7    her.

8    Q    Okay.

9         MR. TROY:  Then let's go to Exhibit D-286.  We're

10   now on November 2, 2018.  We can go down to the bottom.

11   Sorry, keep going.  Okay.  I'm sorry, we can go back up to the

12   top.  And I just wanted that for context.

13   BY MR. TROY:

14   Q    Up at the top, admittedly an email about a different

15   topic, did Mrs. Halpern thank you for your responsiveness?

16   A    Yes, she did.

17   Q    Okay.

18        MR. TROY:  Then if we go to Exhibit D-287.  This is

19   November 28, 2018.

20   BY MR. TROY:

21   Q    Was Mrs. Halpern again asking for word about the

22   assistance animal?

23   A    It doesn't look like it.  I -- oh, I'm sorry, yeah, I

24   responded to her on November 28th saying, "I know the

25   paperwork was submitted to our attorney.  Apparently,

1   Pennsylvania has recently" -- I remember Pennsylvania had made

2   a change to their law about emotional support animals and

3   service animals, so our attorney was working that into and

4   updating our policy.

5   Q    Okay.

6           MR. TROY:  Then let's go to -- let's get into 2019

7   and move it along.  Let's go to Exhibit 291.

8   BY MR. TROY:

9   Q    And at this point in June of 2019, can you describe who

10  were you communicating with here?

11  A    So, Pat Yonekawa, the then general manger, had emailed

12  Frank Devine and copied me, talking about the application for

13  the emotional support dog for the Halperns.

14  Q    Okay.  And was it around this time, June of 2019 was

15  around the time that they were selling their house in Radnor

16  or almost the time they sold their house in Radnor?

17  A    That's right, almost.  This was the month before they

18  sold it.  They sold it in July of 2019.

19  Q    Okay.  And does this email indicate that you were also

20  communicating with Mrs. Halpern by phone?

21  A    Yeah.  I told Pat and Frank that Mrs. Halpern did let me

22  know over the phone prior to her move-in, that they had found

23  other accommodations for their dog while their application was

24  under review.

25  Q    Okay.  And then let's go a month later to -- now, at this

1    time we're in the summer of 2019, correct?

2    A    That's right.

3    Q    And this is the time traditionally, and the time lines

4    bear it out, that before approval or since approval, the

5    Halperns live in Ocean City?

6    A    That's right.

7    Q    Okay.

8            MR. TROY:  Then if we go to Exhibit 293.

9    BY MR. TROY:

10   Q    If you look at the top email, at that time, a month later

11   while still living in Ocean City, did Mrs. Halpern make you

12   aware that they were going to be filing a complaint with

13   Housing and Urban Development?

14   A    Yes, she did.

15   Q    Okay.

16           MR. TROY:  Let's go then to Exhibit 295.

17   BY MR. TROY:

18   Q    And like the other emails we've shown that have been

19   admitted into evidence, was this a response from Ms. Yonekawa

20   to Mrs. Halpern concerning the application -- the second

21   application they had submitted?

22   A    Yeah.  Pat sent this, it looks like, on July 25th of 2019

23   in response to the July 8, 2019 request.

24   Q    Okay.  Now, having been -- having been put on notice of a

25   HUD complaint a month earlier by the Halperns, did -- did the

1   Halperns respond to you or anyone at the Dorchester, to your

2   knowledge, about these questions?

3   A      No.

4   Q      Did they ever tell you that they were not willing to

5   answer these questions?

6   A      No.

7   Q      Okay.  Okay.

8              MR. TROY:  Let's go then to the next month, Exhibit

9   D-296.

10  BY MR. TROY:

11  Q      This is another email between yourself and Ms. Yonekawa,

12  and what were you relating to her here?

13  A      That Cindy Halpern had told me that she and Bernie would

14  be spending their time -- rather their summertime at their

15  shore house.

16  Q      Okay. And I want to -- we can leave that up -- but just

17  go back one moment.  From that July 2019 email with the

18  questions about the doctor from the Internet, Anne Miller,

19  from the time of those questions in July of 2019 until the

20  time the Halperns reapplied in May of 2020, did the Halperns

21  ever respond to those questions?

22  A      No.

23  Q      Okay.  And now we're in August and at this time had Mrs.

24  Halpern told you that they were spending their time at the

25  shore for the summer?

1    A    Yes, she did.

2    Q    Okay.  Now, I want to go to the -- well, let me ask -- I

3    guess I'll stay in chronological order.  We've seen the

4    picture from the camera that was taken of Mr. Halpern and the

5    dog, Gracie.  Did you provide that picture to the general

6    manager, Mr. Smith?

7    A    Yes.

8    Q    Okay.  Having provided that to him, did -- did you or

9    anyone else from the Dorchester discipline, fine, or evict or

10   do anything to -- issue a warning or do anything to the

11   Halperns?

12   A    No, we didn't.

13   Q    Okay.  And I won't go to the point of showing you the

14   time line, but if I represent to you that the plaintiffs' own

15   time line shows the Halperns living at the Dorchester most

16   days from October -- September, October of 2019 right through

17   March 13 of 2020, do you have any reason to disagree with

18   that?

19   A    No, I don't.

20   Q    Okay.  Would you see the Halperns from time to time

21   during those days?

22   A    Yes.

23   Q    Okay.  And where would you see the Halperns during those

24   days?

25   A    In the lobby, perhaps.

1    Q    The lobby in the -- you mean the front entrance?

2    A    Yeah.

3    Q    Okay.

4    A    I mean by the front desk.  The lobby's a space where a

5    lot of residents walk through on a daily basis.

6    Q    Did you ever reprimand them and say, get you and your dog

7    to the back door?

8    A    No.

9    Q    Okay.

10        MR. TROY:  I want to go next to Exhibit D-297.

11   BY MR. TROY:

12   Q    Can you tell the Judge what this email exchange is?

13   A    Yeah.  So it looks like Cindy emailed me on May 6, 2020

14   asking for information on when the council meeting would take

15   place, and I responded to her the following day.  She had sent

16   that email to me in the evening.  And I told her when the

17   council meeting would take place, which was the first

18   Wednesday in June.

19   Q    Okay.  And was that for -- the dog Gracie had passed away

20   in the end of January of 2020?

21   A    It's my understanding that that's the case, yeah.

22   Q    Okay.  And now this was a new dog that they had purchased

23   that month or were they about to purchase the dog?

24   A    I don't know when they got Angie, but I know that that --

25   Angie was the dog that they were applying for with this

1   request, from --

2   Q    Okay.

3   A    -- from May of 2020.

4   Q    Okay.  All right.  And did this -- did this May 6th of

5   2020 application that was submitted, was that the one that the

6   Dorchester approved later that month verbally and then June

7   8th in the email from David Smith?

8   A    That's right, yes.

9   Q    Okay.  And has there been any restriction or any -- have

10  you since that approval in May of 2020 -- let me ask you this,

11  do you remember getting an email in 2022, we saw earlier,

12  where they were asking if they could use any elevator?

13  A    Yeah, I remember that.

14  Q    Okay.  And what did you tell them?

15  A    I told them, of course they can, there's no restriction.

16  Q    Okay.  And did you say that there's -- what was your

17  rationale for saying -- let me ask you this -- for saying

18  there's no restriction?

19  A    Because there wasn't any restriction put in place at any

20  time for them.

21  Q    Okay.  So that even if the Dorchester had existing rules

22  and regulations that said -- from years earlier that said you

23  need to use a freight elevator with an animal, that was not a

24  restriction placed on the Halperns?

25  A    That's right.  I mean, in fact, I remember a couple -- a

1   handful of times in 2020 -- or rather 2021, I guess, running

2   into, you know, Bernie and Cindy in the lobby and they would

3   apologize to me for being in the lobby with the dog using the

4   -- the passenger elevators, and I -- I looked at them, you

5   know, confused because I couldn't understand what the apology

6   was for.

7   Q    Okay.  And at any time in '20 or -- '19, '20, or '21 that

8   you saw the dog in the front lobby with either one of the

9   Halperns, did you ever reprimand them in any way?

10  A    No, of course not.

11  Q    Okay.  The -- we saw in June key fob records.  Were you

12  the one who generated those records?

13  A    Yes.  I pulled the reports from our access control

14  system.

15  Q    Okay.  And at the time you pulled those, did those

16  records only go back so far?

17  A    That's right.  They're not saved forever, so I think they

18  went back sometime in -- to May of 2019, if I remember

19  correctly.

20  Q    Okay.  Got it.  There were --

21       MR. TROY:  If we can pull up Exhibit 305A.

22  BY MR. TROY:

23  Q    Can you explain this exhibit to His Honor?

24  A    Sure.  So this shows a summary of the number of days in

25  each calendar month that the Halperns used their fobs in the

1   elevators and separately the garage door, the overhead door,

2   to pull their car into the garage each month.  And it's color

3   coded on a gradient, so the green and yellowish colors are

4   higher use, whereas the orange and red colors are low or no

5   usage.

6   Q    And I wanted to ask you some questions about these key

7   fobs, and specifically from the front lobby is there an

8   elevator down to the parking garage?

9   A    There is, yes.

10  Q    Okay.  And can -- does it -- does someone need a key fob

11  to access that elevator from the front lobby?

12  A    No.  So that's the only elevator in the building that

13  doesn't require a key fob.  It only goes from the ground level

14  in the lobby to the -- to the garage.

15  Q    Okay.  So in theory, even if someone was accustomed to or

16  liked to use the back entrance to walk outside and down the

17  ramp into the garage, could they on a wet day or snowy day or

18  any other day they wanted, go through the front lobby and hit

19  the button for the elevator and take it down to the garage?

20  A    Yes.

21  Q    But because there's no key fob for that garage elevator,

22  we have no data whatsoever knowing how often the Halperns or

23  any resident used the garage elevator in any time from 2018 to

24  the present, do we?

25  A    That's right.

1    Q    Okay.  I wanted to ask you specifically about the

2    elevators.  From the Halperns' unit, is the freight elevator

3    closer to their unit than the passenger elevator?

4    A    Yes, it is.

5    Q    Okay.  Do -- from 2018 to the present, have not just the

6    Halperns, but residents, any of the 1200 or 1300 people, if I

7    recall, that live in the Dorchester, do they use both

8    passenger elevators and freight elevators?

9    A    Yeah, they do.

10   Q    Okay.  At the -- are the freight elevators the elevators

11   people -- everyone needs to use if they want to go to the

12   laundry room, the gym, or the pool?

13   A    That's right.

14   Q    Okay.  And if someone has a package delivered from Amazon

15   or, well, any e-commerce site whatsoever, is that in the area

16   right at the bottom of the freight elevator?

17   A    Yeah.  So the freight elevators are directly adjacent to

18   the package room.  The passenger elevators open up into the

19   main lobby.  I mean you have access either way, but many

20   residents find it easier to just take the freight elevator

21   down, hop out, get their package and then go back upstairs.

22   Q    Okay.  And the Court's seen many times this picture of

23   Mr. Halpern with the dog, and I'm not saying he was grabbing a

24   package at that time, but my question is, that area where he's

25   seen in the picture with the dog, is that the area by the

1  freight elevator where the packages are kept?

2  A    Yes, you can see that room behind him, behind the glass

3  is full of packages.  That's -- that's the package room where

4  the packages are stored.

5  Q    Okay.  Now, just to outline or give the Court a sense of

6  the -- the Dorchester, where is the laundry room located?

7  A    In the basement level.

8  Q    Okay.  And where is the gym located?

9  A    In the sub-basement level, below the laundry room.

10 Q    Okay.  And where is the pool located?

11 A    On the roof.

12 Q    Okay.  But you need to necessarily use the freight

13 elevator -- whether you have a dog or not, do you have to use

14 that elevator to get to those three places?

15 A    That's right.  The passenger elevators only service the

16 residential floors.  They don't go to the roof or to the

17 basement levels.

18 Q    Okay.  Now, His Honor heard this afternoon or this

19 morning that the gym was closed during COVID.  My question for

20 you is, prior to COVID, did the Halperns use the gym, like

21 other residents?

22 A    Yes, they did.

23 Q    Okay.  And in order to use that gym, whether they had

24 Gracie or not, would they need to use the freight elevator?

25 A    Yes.

1  Q    Okay.  Are -- is a key fob necessary to access the gym?

2  A    To access the gym, yeah.

3  Q    Okay.  And -- okay.  And did the Halperns ever complain

4  to you at any time that the key fob records -- or that they

5  were using the gym, did they ever complain to you that they

6  had to use the freight elevators to get to the gym?

7  A    No.

8  Q    Okay.  Did the Halperns ever complain to you that, we

9  went down to get a package and it's dirty and stinky down

10 there?

11 A    No.

12 Q    Did they ever complain to you that there's cameras on the

13 elevator and/or in the package area and we feel violated by

14 these cameras?

15 A    No.

16 Q    Okay.  Did they ever complain to you about the area

17 outside the back door, either leading out to the street or

18 leading to the garage?

19 A    No.

20 Q    Okay.  Do other residents of the Dorchester use the

21 laundry room?

22 A    Yeah.  About 60 percent of the building uses the laundry

23 room because 60 percent of the apartments don't have in-unit

24 washer/dryers.

25 Q    And those 60 percent of the people have had to suffer the

1  alleged indignity of using the freight elevator?

2  A    I wouldn't call it an indignity.  The freight elevators

3  are brightly lit.  They are kept clean.  They're well used by

4  most members of the -- of the Dorchester.

5  Q    Okay.  How many Dorchester residents use the pool?

6  A    So, as with most things, there's pre-COVID and today's

7  world.  So pre-COVID, we would get about 225, 250 members a

8  year.  We closed the pool in 2020 and reopened in '21 and also

9  '22 and we saw about half the number, maybe 100 members.

10 Q    Okay.

11           MR. TROY:  If we can put 305A back up again.

12 BY MR. TROY:

13 Q    Does -- did you prepare this exhibit?

14 A    I did, yes.

15 Q    Okay.  And -- and was this -- I think you had testified

16 to this, but was this based on your study of the key fob

17 records?

18 A    Yes, that's right.

19 Q    Okay.  And did the key fob records and this exhibit show

20 that the Halperns rarely used their key fobs in any year

21 during the warm months?

22 A    That's right.

23 Q    Okay.  And is that consistent with what Mrs. Halpern told

24 you about their use of their shore home?

25 A    Yes.

1    Q    Okay.  From October '19 to January of 2020, according to

2    the key fob records, were they using the key fobs frequently?

3    A    They were.  Almost every day, if not every day.

4    Q    Okay.

5              THE COURT:  What time period is that again?

6              MR. TROY:  Sure.  October of 2019, Your Honor, to

7    January of 2020.

8              THE COURT:  Right.  Okay.  Thank you.

9              MR. TROY:  Okay.

10   BY MR. TROY:

11   Q    From your review of the key fob records, if Mr. Halpern

12   has testified, or if he testified in June specifically, that

13   what they used to do was drive into the city, do their thing

14   and leave; that they would sneak in with the dog, but would

15   not stay overnight because it was not comfortable and the dog

16   was not wanted, so they would drive back to the shore, if that

17   was his testimony as of June, is that borne out by the key fob

18   records?

19   A    Yeah, I think so.  I mean it shows that in November,

20   December of 2019 and then January of 2020, that there was

21   daily key fob usage on the elevators.  As a reminder, you need

22   to use the key fob in order to get upstairs to any of the

23   residential floors.

24             And then the garage entries, you know, there's

25   regular use of the -- of the garage, but only 20 days in

1    December, 16 in January, so they weren't taking the car out

2    every day.  So if they were driving back and forth every day,

3    it -- that's not what this is showing.

4    Q    Okay.  In fact, was what it was showing that they were

5    staying over?

6    A    That's right, yes.

7    Q    Okay.  Now, subsequent to you preparing this exhibit for

8    -- for our trial, subsequent to the June testimony about the

9    commuting and you preparing this exhibit, which we provided

10   for the September trial, the Court asked both sides to create

11   time lines for this day in October.

12           MR. TROY:  And if we can put up the plaintiff's time

13   line, please.  And if we go to the bottom row in 2019, I think

14   this will take less time than using the key fob records, but

15   if this bottom row from 2019 -- and is there a way we can also

16   put up the top row from 2020?

17   BY MR. TROY:

18   Q    And again these are the plaintiff's time line, but

19   they've represented that all of the solid blue days, they

20   stayed overnight at the Dorchester.  Did -- does that comport

21   with -- does that -- is that what your key fob data was also

22   showing, that they were staying overnight at the Dorchester

23   most nights from late September of 2019 until at least

24   February 18 of 2020?

25   A    Yes.  They're -- my chart that I made from the key fob

1    records and the calendar that the plaintiff submitted are in

2    agreement.

3    Q    Okay.

4              MR. TROY:  And let's go back to your other chart, if

5    we can, 305B.

6    BY MR. TROY:

7    Q    And as they're pulling that up, so I'm clear, during

8    those months, whether it was late 2019 or early 2020, if you

9    saw the Halperns and their dog in the front lobby, did you do

10   anything about it?

11   A    No.

12   Q    Okay.  Did you greet them as you would greet any other

13   resident?

14   A    Yeah, if I saw them.

15   Q    Okay.  Can you explain to the Court, did you prepare this

16   exhibit and what does it show?

17   A    Yes.  So the data on here is the same as the 305A.  The

18   highlights are different.  So the orange-tan color is the

19   period of time prior to the approval of the ESA in June -- or

20   rather May of 2020, and it shows that over an 11-month period,

21   the Halperns were in the building 156 days.  And then the

22   green shading is for the 16-month period after they were

23   provided the reasonable accommodation, and they were only at

24   the Dorchester 30 days.

25   Q    Okay.

1          MR. TROY:  And if we can go back to the plaintiff's

2    time line.  And if we can go to 2020.

3    BY MR. TROY:

4    Q    The top row of 2020 reflects that in -- after March 13,

5    and we can go to 2021 as well, that the Halperns barely spent

6    any time in the Dorchester for the rest of 2020 and the

7    majority of 2021?

8    A    That's correct.

9    Q    Okay.  And did the Dorchester have less residents in it

10   during the active times of the COVID pandemic?

11   A    Yes, we did.

12   Q    Okay.  With -- have -- has the Dorchester received

13   complaints about the Halperns' dog?

14   A    We've received a complaint, yeah.

15   Q    Okay.  And when was that and what was the complaint?

16   A    In June of 2021, a neighbor on the 16th floor emailed I

17   think me and complained about the dog -- a dog barking for

18   long periods of time.

19   Q    Okay.  And did -- what did you do in response to that

20   complaint?

21   A    I sent Cindy Halpern an email, just letting her know that

22   we had received a complaint about the dog barking for a long

23   time -- long periods of time and asked if they would make

24   efforts to control the barking.

25   Q    Okay.  And was that the end of it?

1   A    She replied and she seemed confused.  She said that it

2   wasn't her dog or probably wasn't her dog and that there must

3   be another dog on the 16th floor or nearby.

4   Q    Okay.  Did the Dorchester Owners Association, to your

5   knowledge, either before the formal approval in June of 2020

6   when they lived there with the dogs or after the formal

7   approval, ever require the Halperns specifically to use the

8   freight elevator or back door?

9   A    No.

10  Q    If there has been testimony by the Halperns that the

11  freight elevators take inordinate amount of times to arrive,

12  is that accurate?

13  A    No, not inordinate amount of times.  The freight

14  elevators are sometimes somewhat slower than the passenger

15  elevators, but we're talking a five or six-minute wait, as

16  opposed to like a 45-second to one-minute wait.

17  Q    Okay.  Did Casey Halpern or his wife ever complaint about

18  the freight elevators?

19  A    No.

20  Q    Did any of the Halperns' tenants ever complaint about the

21  freight elevators?

22  A    No.

23  Q    Has any DOA owner, resident, or guest ever complained to

24  you about the cleanliness or condition of the freight

25  elevators?

1   A    No.

2   Q    Are there -- do most residents use the freight elevators

3   to go about their daily business as needed or as convenient?

4   A    Yeah, many of them do.

5   Q    Okay.  Other than seeing the Halperns this morning, did

6   you also happen to see them yesterday evening?

7   A    Yes, I did.

8   Q    And can you describe to His Honor how it is that you came

9   to see them and where it is that you saw them?

10  A    Yes.  I was preparing to leave for the day.  It was

11  around 5:30.  I was in the freight elevator coming down and

12  the elevator stopped at the 16th floor, and both the Halperns

13  and their dog were there and got on the elevator and we rode

14  down together and departed, and they, you know, sort of

15  followed me out into the lobby 'cause they were exiting out

16  through the front door.

17  Q    Okay.  So they came down the freight elevator with their

18  dog and then walked out the lobby and the front door?

19  A    That's right.

20  Q    Okay.  Did -- if -- if a dog owner is going to take a dog

21  to a patch of grass, is the front door headed out to the park

22  the nearest patch of grass?

23  A    That's right, yes.

24  Q    Okay.  If someone is heading out to the streets behind

25  the Dorchester, is the back entrance the quickest way to get

1    there?

2    A    Yes.

3    Q    Okay.  And do residents use both entrances, depending on

4    where they're heading?

5    A    Yes.  I have witnessed them -- many residents use the

6    front door, obviously, and many of them use the back door.  It

7    just depends on where they're going and what they have in mind

8    that day.

9    Q    Okay.  Thank you.

10            MR. TROY:  I have no other questions, Your Honor.

11            THE COURT:  Okay.  Cross-examine.  I'm going to say

12   that having lived in Philadelphia all my life, I'm very

13   familiar with Rittenhouse Square.  I don't think I've ever

14   been inside the Dorchester, but I know where it is.  I know

15   where the back door is.  I know what's on 20th Street.  But I

16   don't mind making this part of the record, so when this case

17   gets to the Third Circuit or possibly the Supreme Court, some

18   of the judges or justices who aren't as familiar with

19   Philadelphia as I am will understand completely what the setup

20   is.

21            Okay.  Cross-examine.

22                        CROSS-EXAMINATION

23   BY MR. SACKS:

24   Q    Good almost afternoon, Mr. Maloney.

25   A    Good morning.  Yeah, I was checking, too.

1   Q    So good morning to you.

2   A    You too.

3   Q    You weren't at the May 29th, 2020 Zoom meeting that we've

4   been hearing about, were you?

5   A    I was not there, no.

6   Q    Okay.  So you don't know if Frank Devine requested that

7   the Halperns take the freight elevator and rear entrance, do

8   you?

9   A    I don't.

10  Q    Cindy and Bernie Halpern, they pay the condo fees for --

11  for Unit 1614 and 1615A, right?

12  A    B, but --

13  Q    B.

14  A    -- yes.

15  Q    Okay.  So they're the ones who are paying the condo fees?

16  A    That's right.

17  Q    It's not the -- it's not their daughter-in-law?

18  A    No.

19  Q    Or their son?

20  A    No.

21  Q    Okay.  So in your position, you report to David Smith?

22  A    The general manager, yes.

23  Q    And before that, you reported to Pat Yonekawa?

24  A    Yes.

25  Q    Okay.  The Dorchester's, to use your own words, "Like a

1    small government unto itself."

2    A    Sure.

3    Q    And the Dorchester has its own rules and regulations?

4    A    Yes.

5    Q    And it's got its own policies?

6    A    Just like every other building like us, yes.

7    Q    And the rules and regulations are, quote, according to

8    you, akin to a constitution?

9    A    So not the rules and regulations, the declaration of

10   condominium.

11   Q    So the rules and regulations aren't -- aren't -- aren't

12   part of the governing documents of the Dorchester?

13   A    There's the declaration of condo; there's a code of

14   regulations.  Those are recorded documents with the City of

15   Philadelphia.  The rules and regulations are sort of

16   supplementary documents.

17   Q    So those don't matter, is that what you're saying?

18   A    That's not what I'm saying.

19   Q    So the rules and regulations set the -- the rules and

20   regulations the -- the residents of the Dorchester have to

21   follow?

22   A    That's right, yes.

23   Q    And one of your duties is to know those rules and

24   regulations?

25   A    Yes.

1    Q    And one of your -- your duties is to help enforce those

2    rules and regulations, --

3    A    That's right.

4    Q    -- right?  And one of your roles is also to help enforce

5    the Dorchester's policies and rules pertaining to emotional

6    support animals?

7    A    Yes.

8    Q    And service animals?

9    A    Yes.

10   Q    And you also help enforce the rule against bringing pets

11   into the building?

12   A    I help to enforce all of the rules and that's one of

13   them, yes.

14        MR. SACKS:  Katie, could you please put up

15   Plaintiff's 18 for Mr. Maloney.

16        THE COURT:  Is that -- is that the rules and

17   regulations?

18        MR. SACKS:  Yes, sir.

19        THE COURT:  All right.  We're not going to go

20   through those again.  If -- they're part of the record.  18

21   was not asked about those on direct examination.  He was asked

22   about what he did day-to-day and his experience in the

23   Dorchester with the freight elevator and the Halperns.  So you

24   gotta go to those topics.  We're not gonna go through the

25   rules and regulations again.

1          MR. SACKS:  Okay, Your Honor.  Thank you.

2          THE COURT:  That's my rule.  Next -- next question.

3          MR. SACKS:  Katie, could you please put up

4   Plaintiff's 196 for Mr. Maloney.

5   BY MR. SACKS:

6   Q    Now, Mr. Maloney, this is an email that you sent to Ed

7   Kurland, the then-president of the Dorchester on September 26

8   of 2016.

9          THE COURT:  What year?

10         MR. SACKS:  2016.

11         MR. TROY:  Your Honor, I would object.

12         THE COURT:  Wait.  This is the -- just a minute.

13  This is beyond the scope of direct.  This was not brought up

14  on his direct.

15         MR. SACKS:  Your Honor, I understood Mr. Maloney to

16  testify that they don't enforce a rule regarding service

17  animals and emotional support animals on the freight elevators

18  and this -- this --

19         THE COURT:  Look, the facts of this case --

20         MR. SACKS:  -- this email and the letter actually

21  dispute that and it shows that the Dorchester does in fact

22  make residents use the freight elevator.

23         THE COURT:  As far as I'm concerned, the facts of

24  this case start in 2018.  So move on.  You can't -- I'm going

25  to -- there was no objection, but I'm going to --

1          MR. TROY:  I'm sorry, there was an objection, Your

2    Honor, but I tried not --

3          THE COURT:  All right.  Sustained.

4          MR. TROY:  -- to interrupt you.

5          THE COURT:  Sustained.  This witness testified with

6    significant personal knowledge of what was happening in the

7    Dorchester pertaining the testimony of the Halperns.  Okay?

8    In some respects he corroborated it, and some respects he

9    contradicted it.  And I urge you, Mr. Sacks, to limit your

10   cross to what was discussed on direct.

11         MR. SACKS:  Understood, Your Honor.  Thank you.

12         Katie, could you please put up Plaintiff's 50.

13   BY MR. SACKS:

14   Q    Now, on August 4th -- sorry, August 14th, 2018, Cindy

15   Halpern emailed you that, "My husband and I are preparing to

16   move into Unit 1614 soon."

17   A    Okay.

18   Q    And she stated that, "They were shooting for January to

19   begin to sell our home, but are planning to spend nights in

20   the unit come fall."

21   A    Is that a question?

22   Q    I'm asking you is that what the email states?

23   A    Yes, it does.

24   Q    And she also stated that, "We will be moving into the

25   unit with an emotional support dog.  I am happy to forward

1    documentation, if you require it."  Right?

2    A     It does say that, yes.

3    Q     And your email also talked about moving sofa beds into

4    their unit?

5    A     Right.

6    Q     And you told her that the ESA application is, "Fairly

7    comprehensive," and that, "Until the process is complete and

8    the dog receives approval, the dog may not enter the

9    building."

10   A     Yes.

11   Q     And what you told her, that was consistent with your

12   understanding of the Dorchester's emotional support animal

13   policy?

14   A     Yeah, it was.  I mean we want to vet each -- each request

15   and treat them individually.  It's not something that someone

16   can just buy a letter off of the Internet like, you know, then

17   secretary Ben Carson had said, which are worthless.  So we do

18   take each request seriously.

19   Q     Now, after this August 24th -- sorry, August 14th, 2018

20   email, there was a series of emails and voicemails that the

21   Halperns sent and left for you regarding their -- their ESA

22   application?

23   A     So there were many emails between me and Cindy, sometimes

24   about the application, sometimes about logistics moving in,

25   having repairs made.  I only really remember one voicemail,

1  which I received from Bernie Halpern where he called me and

2  all of my colleagues idiots, and I responded to that via

3  email.  But, yeah.

4  Q    Okay.  Let's --

5         MR. SACKS:  Katie, could you please put up

6  Plaintiff's 70 for Mr. Maloney.

7  BY MR. SACKS:

8  Q    So, Mr. Maloney, this is a January 3rd, 2019 email where

9  you inform Pat Yonekawa, your boss, that Mr. Halpern had left

10 a voicemail following up about his emotional support animal

11 request, is that right?

12 A    Yes.

13 Q    Okay.  And you never -- you never called him back, did

14 you?

15 A    I did not, but I forwarded that information on to Pat, my

16 boss.

17 Q    And you don't know if she called him back either, do you?

18 A    I think you would have to ask her.

19 Q    So there was at least two voicemails, right?  There's

20 this January 3rd, 2019 voicemail that Mr. Maloney -- that Mr.

21 Halpern left that you didn't return, and there's also the one

22 in the summer of 2019.

23 A    Okay.  So in a six-month period, there were two

24 voicemails left for me?  Yes.

25 Q    Now, we've seen some emails, and I don't want to go

1   through them with you, but they followed up again in late

2   August, right, regarding their forms?

3   A    Okay.

4   Q    And they followed up again in the beginning of October,

5   2018?

6   A    Right.

7   Q    And then they applied on October 24th, 2018, right?

8   A    Yep.

9   Q    And the forms that they filled out, those said that they

10  would get an answer within 30 days?

11  A    It said that the council would attempt to respond within

12  30 days.

13  Q    Attempt to respond?

14  A    It does say that.

15  Q    It uses the word attempt?

16  A    Yes.

17  Q    And then a month after, they -- they applied about

18  October 24th, 2018, right?

19  A    Sure.

20  Q    And then about a month later, at the end of November,

21  they email you again and they ask what's the status of our

22  application, is that right?

23  A    Sounds right.

24  Q    And then as we just -- we just saw, Mr. Halpern left you

25  a voicemail on January 3rd, 2019?

1    A    Right.

2    Q    Okay.  Now, on -- on June 25th, 2019, Ms. Halpern emails

3    you and asks about the status of their ESA application.  Do

4    you remember that?

5    A    Sure.

6    Q    Okay.  And then two days later, on or about -- or on June

7    27, 2019, Bernie Halpern left you an angry voicemail about the

8    ESA application?

9    A    Yeah.  I think so.

10   Q    Okay.  And let's go back.  You said the Association will

11   attempt to -- I believe that was your testimony, the

12   Association will attempt to answer their request, is that what

13   you're saying the form says?

14   A    The form that they originally received in 2018 says

15   that.

16   Q    Okay.

17        MR. SACKS:  Katie, could you please put up

18   Plaintiff's 66 for Mr. Maloney.

19   BY MR. SACKS:

20   Q    And, Mr. Maloney, do you see this is the -- this is the

21   form that they sent to you or left for you on October -- on or

22   about October 24th, 2018.

23        MR. SACKS:  Katie, you can scroll to the next page.

24   And I think there's -- scroll to the next page.  One more.

25   Q    And do you see the date here?

1   A    Yeah, October 24th of 2018.

2   Q    Okay.

3        MR. SACKS:  Next page, please.  All right.  Let's go

4   to the first page.  I think that's where we have the language

5   we're looking for.

6   BY MR. SACKS:

7   Q    All right.  So I'm going to call your attention to the

8   third paragraph down.  I'd like you to read the line that

9   starts with the Association will answer.

10  A    Right.  So the Association will answer this request in

11  writing within 30 days.  But this is Addendum B to -- of a

12  larger policy, and in the beginning of the actual policy, not

13  in the application itself, it says the word attempt.

14  Q    Okay.  So here it doesn't say attempt, right?

15  A    No.

16  Q    And this is the one they had to fill out and put their

17  name on and they had to sign, right?

18  A    It's all part of the same thing, but, yeah.

19  Q    But, no, but this is like the thing that they filled out

20  and gave to you?

21  A    This is the piece of paper that they wrote on.

22  Q    Okay.  And this thing says the Association will answer

23  this request in writing within 30 days?

24  A    That's what it says, yes.

25  Q    Okay.

1    THE COURT:  Mr. Sacks, I don't want to stop you from

2    your cross-examination, but the jury has already found it was

3    undue delay in granting the application.  So I -- I don't know

4    what you're accomplishing by reestablishing what the jury

5    already found.  I really would rather you go to the essence of

6    his direct testimony of what actually happened between the

7    Halperns and the Dorchester with his personal knowledge.

8                 MR. SACKS:  Understood, Your Honor.

9                 THE COURT:  On the dates that are relevant.

10                MR. SACKS:  Okay.  Thank you.

11                THE COURT:  Okay?

12   BY MR. SACKS:

13   Q    So you asked the Halperns to fill out the second set of

14   forms on June 27th, 2019?

15   A    That's right.  We had updated the forms in April of 2019

16   and the council had wanted them to have the most up-to-date

17   forms and policy in hand.

18   Q    So the -- the council had updated the forms in April of

19   2019, but you didn't send the forms to the Halperns for about

20   three months, until the end of June of 2019?

21                THE COURT:  Okay.  Mr. Sacks, I'm going to interrupt

22   this.  I don't want to repeat myself.  The issue here is what

23   happened -- the direct testimony of this witness in my view is

24   very relevant; it's what actually happened between the

25   Halperns and the Dorchester with regard to their ESA and when

1    they stayed there or they didn't stay there.  That's what he

2    testified to on direct.  But I'm not going to allow any more

3    questions about the application process because the jury

4    already found there was undue dely.

5            Now, your next question has to deal with something

6    he said on direct examination.  Please.  Thank you.

7            MR. SACKS:  Thank you, Your Honor.

8    BY MR. SACKS:

9    Q    Now, we talked about the freight elevator on your direct

10   exam, is that right?

11   A    That's right.

12   Q    Okay.  The freight elevator is used by maintenance

13   workers to move about the building, is that right?

14   A    It's used by a lot of people, including maintenance

15   workers, residents who are accessing the pool, the gym, the

16   laundry room, movers, people who are going to get packages

17   from the package room.

18   Q    You mentioned -- you mentioned movers.  So sometimes the

19   freight elevator is -- is booked for moving, is that right?

20   A    Well, there are two freight elevators, so sometimes we

21   lock off one of the two freight elevators to facilitate a

22   move.

23   Q    Okay.  So if you lock off one freight elevator, does --

24   that's gotta cause a delay on the elevator?

25   A    Sure.  So like I said, you know, I think the perception

1   of time sometimes gets a little bit skewed, so when you're

2   waiting for an elevator or a train or a bus, five minutes can

3   feel like 30 minutes.  But, in fact, with everything running

4   normally, even with one elevator locked off, the wait time is

5   no more than five minutes for -- for one.

6   Q    Now, during -- during COVID, the Dorchester imposed

7   health-related restrictions on the common areas of the

8   building?

9   A    That's right.  We adopted a lot of policies to help to

10  prevent the spread of COVID, to protect our residents and our

11  employees.

12  Q    Okay.  The Dorchester shut down the gym during COVID, is

13  that right?

14  A    That's right.

15  Q    And you shut down the -- the pool as well?

16  A    That's right.

17  Q    Now, on your direct exam, you mentioned meeting the

18  Halperns in the lobby and they apologized to you for having

19  their dog in the lobby.  Is that your testimony?

20  A    Yeah, that's right.

21  Q    You didn't tell them at that time that they didn't have

22  to apologize for being in the lobby with their emotional

23  support animal, did you?

24  A    So, like I said, you know, two or three times over the

25  course of like that year, 2021, I would walk through the lobby

1    and -- and see them waiting for the passenger elevators and

2    Bernie would look at me and -- and say, we're sorry, the --

3    you know, we can't wait for the freight elevators, and I would

4    say it's no problem, it's -- it's -- you know, I didn't know

5    what he was talking about.

6    Q    But you -- it sounds like you understood that the

7    Halperns thought that they had to be using the freight

8    elevator, right?

9    A    I don't know that I understood that.  I just didn't

10   understand why they were telling me that they couldn't use

11   them.

12   Q    Well, they were apologizing for using the passenger

13   elevators, right?

14   A    Yes.

15   Q    Okay.  And you didn't say, hey, it's no problem, you

16   know, you're -- you're allowed to use the -- the passenger

17   elevator?

18   A    Well, my understanding was that was understood.

19   Q    Even though they were apologizing for using it?

20   A    Again, I was confused as to why they were apologizing to

21   me.  It didn't make any sense.

22   Q    So, like I said, it appeared that the Halperns were under

23   the understanding that they had to use the freight elevators?

24   A    I don't know.

25           MR. TROY:  Objection.  Speculation as to what the

1    Halperns thought.

2              THE COURT:  Sustained.  And it's argumentative.

3    Next question.

4    BY MR. SACKS:

5    Q    The Halperns' key fob account, that had more than just

6    Ms. and Mr. and Mrs. Halpern assigned to it, isn't that right?

7    A    No.

8    Q    Casey Halpern didn't have a fob?

9    A    Not to my knowledge.  The key fobs are issued to people.

10   So whenever Cindy Halpern used her key fob, that's why it

11   showed her name.  I also issued a second key fob in her name

12   to Bernie at her request, or my understanding of her request.

13              (Pause in proceedings)

14   BY MR. SACKS:

15   Q    So it's your testimony that you never issued a key fob to

16   Casey Halpern at the request of Ms. Halpern?

17   A    If I issued one to him, then I issued it in his name.

18   And so if he used it, it would say Casey Halpern.  But I think

19   you're not understanding how the key fobs are issued.

20   Q    If Casey Halpern was no longer living at the unit, you

21   would have issued a key fob to him, even though it was to

22   access to Mrs. Halpern's unit?

23   A    Well, the key fobs aren't to access a unit.  The units

24   are private and have doors with locks that they have keys to.

25   We issue a key fob to a person.  So if Casey Halpern had or

1    has a key fob, it is issued to Casey Halpern, not to Cynthia

2    Halpern.

3    Q    Ms. Halpern had -- had key fobs assigned from her account

4    to nurses that were helping her mom in October of 2019, isn't

5    that right?

6    A    It's very possible.

7    Q    Okay.  So those fobs would have been under -- under

8    Cynthia Halpern's name?

9    A    No.

10         MR. TROY:  Objection.  Go ahead.

11   A    So again I don't know that --

12         THE COURT:  Overruled.

13   A    Okay.

14         THE COURT:  Overruled.  You can answer that.

15   A    Right.  So again I don't know that you're understanding

16   that they're issued to people.  So if someone says -- you

17   know, if someone's a tenant or a -- or an owner says, I need a

18   key fob, we issue it to that person.  If there is another

19   person associated with that unit, like Casey Halpern, he would

20   have a key fob that says Casey Halpern.

21         If there was an aide or a nurse or someone else who

22   needs regular daily access, we would have issued it to either

23   their name or I might have put, you know, 309 aide or

24   something like that, so that when that person uses that key

25   fob, it shows up as that person.

1    Q    You don't need a -- you don't need to swipe the key fob

2    to go up in a passenger elevator, right?

3    A    Of course you do.

4    Q    You need it to up?

5    A    Well, so the way that it works is that the elevator

6    panels are basically locked, all except for the ground floor.

7    So no matter where you are, you can always push ground and

8    it'll bring you there.  But whether you're on the ground floor

9    or on any of the residential floors and want to visit any of

10   the residential floors, you need to present a key fob, swipe

11   it, and then you can push the floor you want to go to.

12   Q    The key fob reader doesn't always work, though, does it?

13   A    Of course it does.

14   Q    It always works?

15   A    Yes.

16   Q    So if a resident -- so you're saying every time that a

17   resident uses an elevator and they swipe, it -- it works?  It

18   doesn't -- doesn't not -- doesn't not collect the information?

19   A    Yeah, that's what I'm saying.

20   Q    Sometimes there's doors that are propped open that would

21   normally need a key fob, is that right?

22   A    Sometimes.  It's not all the time, but occasionally.

23   Q    And sometimes the key fob records record multiple events

24   around the single use?

25   A    So I think you're referring to when someone pulls up to

1    the garage door, the overhead reader will, you know, read it

2    because it's set to read automatically every like second or

3    two so that it doesn't delay anybody from getting into the

4    garage.  So if somebody's car is sitting there for 30 seconds,

5    it may read it, you know, five or six times.  But they're all

6    recorded by the hour, the minute and the second, and they're

7    all in order.  You can see that it was one entry.

8            MR. SACKS:  Katie, could you please put up

9    Plaintiff's 225.

10   BY MR. SACKS:

11   Q    And, Mr. Maloney, I'm showing you Plaintiff's 225 here.

12   And you stated you're familiar with the Halperns' key fob log.

13   So according to the data that the Dorchester provided us, the

14   key fob log shows 16 single day events between May of 2019 and

15   June 8th of 2020.

16   A    Okay.

17   Q    Do you have any reason to believe that this chart doesn't

18   accurately represent what the key fob data shows?

19           MR. TROY:  Objection, Your Honor.  There's no

20   evidence been introduced that this witness created this chart.

21           MR. SACKS:  Your Honor, this witness has testified

22   that he's reviewed the key fob log records.

23           THE COURT:  Well, I -- what is this chart?  I can't

24   -- obviously, I can't see it.  What is --

25           MR. SACKS:  This chart shows --

1          THE COURT:  What is the (inaudible - audio cuts out)

2     225?

3          MR. SACKS:  Plaintiff's 225 shows dates where the

4     Halperns are shown using the key fob -- or shown as data being

5     recorded for the key fob data from May 2019 through March of

6     2020.  And it shows 16 days for which there is only one day of

7     data and there's no data on either side of it.

8          THE COURT:  Who prepared 225?

9          MR. TROY:  And -- and, Your Honor, my objection is,

10    this witness has prepared two exhibits marked 305 as to his

11    work in reviewing key fob logs.

12         THE COURT:  Yes.

13         MR. TROY:  This is a document the Government created

14    and he's been asked without simultaneously being shown the key

15    fob logs is this --

16         THE COURT:  Well, let me ask this --

17         MR. TROY:  -- does this accurately reflect those

18    logs, and it's not his exhibit.

19         THE COURT:  Well, Mr. Maloney, do you see -- Mr.

20    Maloney, do you see 225 there?

21         THE WITNESS:  Yes, I do see it.

22         THE COURT:  Have you ever seen that before?

23         THE WITNESS:  Yes, I have.

24         THE COURT:  When did you see it before?

25         THE WITNESS:  I don't specifically remember, but it

1    looks familiar.

2             THE COURT:  Did you review this at all in -- and

3    compare it at all to your key fob data that you've testified

4    to on direct examination?

5             THE WITNESS:  I remember reviewing a different

6    exhibit, 226, but not this one.

7             THE COURT:  All right.  Well, then I'm not going to

8    allow you to cross-examine him on 225.  It's -- because I --

9    doesn't your -- it looks to me like you're asking him to

10   compare apples and oranges.

11            MR. SACKS:  Okay.  Your Honor, if you --

12            THE COURT:  You can certainly -- you can currently

13   cross-examine him on the exhibit that he prepared.

14            MR. SACKS:  Okay.  Well, let's -- I'm going to

15   examine him on the key fob -- the key fob log records

16   themselves.  Is that okay, Your Honor?

17            THE COURT:  Well, one question at a time.  Probably.

18            MR. SACKS:  Okay.  Katie, could you please pull up

19   Defense Exhibit 212.

20   BY MR. SACKS:

21   Q    Okay.  And let's start at -- it is --

22            THE COURT:  Okay.  Well, there's two charts on the

23   screen.

24   Q    Yeah, and let's -- let's --

25            THE COURT:  Mr. Maloney -- what is 212, Mr. Sacks?

1        MR. SACKS:  212 is Mr. Maloney's declaration from

2   summary judgment where he attached the records for Cindy

3   Halpern to the -- to his declaration.  And these are the

4   records upon which the Dorchester has based all of its

5   exhibits regarding the Halperns' use of the Dorchester.

6        THE COURT:  All right.  Mr. Maloney, are you

7   familiar with Exhibit 212 that's on the screen?

8            THE WITNESS:  Yes, I am.

9        THE COURT:  Okay.  What's the question.

10       MR. SACKS:  All right.  Katie, if you could turn to

11  page 31 of 31 of Exhibit 1B.  Keep going.  Keep going.  One

12  more.  We want to see the records for May of 2019.

13           (Pause in proceedings)

14       MR. SACKS:  Stop right there, Katie.  Thank you.  So

15  for the record, we're on page D-212/44.

16  BY MR. SACKS:

17  Q    And, Mr. Maloney, I'd like to draw your attention to the

18  -- the dates for 5/17/2019.  Do you see that?

19  A    I do see it, yes.

20  Q    Okay.  And you'll notice that after the entry for

21  5/17/2019 at 14:06:48, the next entry is for 5/21/2019 at

22  13:18:39.  Do you see that?

23  A    I do see it.

24  Q    Okay.  So do you believe -- well, this -- this shows a --

25  this shows a single day use of the Dorchester, right?  On May

1  17th, the Halperns were there for a day, is that right?

2  A    Well, we don't have records from before the 17th, so I

3  don't know if they were there on the 16th.

4  Q    Okay.  But there's no records here for the 17th, and you

5  said that the -- the Dorchester's records went back to, I

6  think you said, May of 2019 -- of 20 -- yeah, 2019, right?

7  A    Yes.

8  Q    So if she was there on the 16th, it would show up on this

9  record, right?

10  A    No, not necessarily.  This is as far back as it went.  I

11  ran a report for as much history as I could and it terminated

12  at May 17, 2019 at 11:25 a.m.

13  Q    Okay.  Well, if she's not there -- okay.  So -- so maybe

14  -- I guess it's conceivable she's there on the 6th -- on May

15  16th.  That's not something that you or the Dorchester has

16  said, but she's not there on the 18th, right?

17  A    The records don't reflect that, no.

18  Q    Okay.  And she's not there on the 19th?

19  A    No.

20  Q    Or the 20th?

21  A    No.

22  Q    But she's there on the 21st, right?  And there's one

23  entry for Cindy Halpern using the parking garage on the 21st,

24  right?

25  A    That is correct.

1    Q    Okay.  And then the next entry, it jumps right to May

2    23rd, 2019, is that right?

3    A    That's right.

4    Q    Right.  So that -- she was there for one day on the 21st?

5    A    Okay.

6    Q    I mean that's what the records show, Mr. Maloney, right?

7    A    Yeah.  I think that we're all in agreement of that,

8    though.

9    Q    Okay.  And what I'm saying is that Plaintiff's Exhibit

10   225, this shows all the instances where she was there or Mr.

11   Halpern were there for one day.

12   A    Okay.

13   Q    So -- and do you have any reason to dispute that that's

14   what these records show?

15   A    No.

16   Q    Okay.  I mean we could go on and establish all 16 of

17   these days, but I don't want to take up the Court's time with

18   that.

19   A    Okay.

20   Q    So the key fob records do show that the Halperns were

21   there for a number of single day uses?

22   A    Yes.

23   Q    Okay.  And this period that we're looking at now, you

24   know, between May of 2019 and June of 2020, that's the period

25   when their applications were pending?

1    A    Repeat those dates.

2    Q    Between May of 2019 and June of 2020.

3    A    Okay.

4    Q    Now, we've heard some testimony about this picture that

5    you captured of Mr. Halpern.

6            MR. SACKS:  Katie, could you please bring up

7    Defendant's 212, page 11.

8    BY MR. SACKS:

9    Q    Now, on October 10th, 2019, you capture this -- this

10   still photo of Mr. Halpern with his ESA from the Dorchester's

11   surveillance cameras?

12   A    That is correct.

13   Q    Okay.  And you emailed it to David Smith?

14   A    Yes.

15   Q    Did someone ask you to email this picture to David Smith?

16   A    I'm not sure.  I can't remember.  I remember somebody on

17   our staff telling us that they saw someone with a dog enter

18   the building, and I reviewed the cameras and saw that it was

19   Mr. Halpern, and so I snapped, you know, a snapshot of it

20   and --

21   Q    You've -- you've captured single photos of other

22   residents at the Dorchester bringing in animals, haven't you?

23   A    I think so.

24   Q    And in fact you use those pictures to fine them or to

25   reprimand them for violating the no pets policy, right?

1   A    So we use the video camera system for a lot of things.

2   If somebody moves a piece of furniture out through the lobby,

3   I would do the same.  But, yes.

4   Q    So -- so gathering this -- this photo is consistent with

5   your practice of gathering evidence of someone violating the

6   Dorchester's policies?

7   A    It's one step.

8   Q    Mr. Maloney, you testified about the -- and maybe the

9   Judge is familiar with this -- you testified about the -- the

10  -- some residents like the rear door and some residents like

11  the front door, is that right?

12  A    That's right.

13  Q    So the front door of the Dorchester is near Rittenhouse

14  Square?

15  A    Yes.  It's on West Rittenhouse Square, which is directly

16  across from the southwest entrance to the park.

17  Q    And a lot of people walk their dogs at Rittenhouse

18  Square?

19  A    Yeah, they do.

20  Q    All right.  So it would be more convenient to leave from

21  the front of the building with a dog, if you wanted to -- to

22  walk it at -- at Rittenhouse Square than it would be to leave

23  out the back of the building?

24  A    I mean I suppose it depends on who you're asking.  If

25  you're going to bring the dog out simply to go to the

1    bathroom, the square makes the most sense.  But if you wanted

2    to go walk on the riverwalk, which is west of the building,

3    you might exit out through the back door.

4    Q    And you don't -- you don't require residents to use the

5    rear entrance, do you?

6    A    We don't require any residents to use any particular

7    entrance.

8    Q    Now, you mentioned also that the Halperns had some work

9    done on their unit.  They -- they had work done on their unit

10   in the fall of 2018, right?

11   A    It was spread over a long period of time.  I remember

12   that there was work done, I think it started, she engaged --

13   by she I mean Cindy engaged with Nick Meli Contracting I think

14   in like November of 2018 or something like that, and then they

15   didn't finish until June, late June of 2019.

16            MR. SACKS:  Could we pull up Defendant's 296, Katie.

17   BY MR. SACKS:

18   Q    Now, this is the -- the tidbit email that you sent in

19   August of 2019, is that right?

20   A    That is correct.

21   Q    But you're actually recounting a conversation you had in

22   June?

23   A    Okay.

24   Q    Right?

25   A    I'm recounting a conversation that I had with Cindy a

couple months ago.  I don't know if it was June, but, sure.

Q    I mean a couple months before August is June, right?

A    Okay.

Q    And here she says that -- or here you say, "Cindy said she and Bernie would be spending most of their time during the summer at their shore house, which she mentioned was fortunate since they weren't allowed to bring their dog into the building yet."

A    Right.

Q    Right.  So she's -- she's stating that she wasn't allowed to bring the dog into the building in this email, right?

A    Right.  I mean she said it was fortunate.  I took that as it was fortunate that their plans were already to spend their time at the Ocean City house, since their application was still pending in August of 2019.

Q    Ms. Halpern's a polite woman, isn't she?

A    Yes.

Q    Now, you mentioned a complaint in June of 2021. Following that complaint, the Halperns addressed it, right?

A    I didn't receive any further complaints.  I didn't get, from the email that Cindy sent me, that she was going to really change any sort of behavior or -- or actions on their part, but --

Q    You didn't hear again from the complaining party, though, right?

1    A    Well, we have.  I mean he stopped complaining about it

2    because it's pretty regular, from what I understand.  It

3    disrupts his workday; he works from home, like many people do.

4    But he's not made any further formal complaints because he

5    doesn't want to cause any issues on the floor.

6    Q    So he hasn't demanded that you do something about it?

7    A    That's right.

8    Q    Okay.

9              MR. SACKS:  No further questions.

10             THE COURT:  Okay.  Any redirect?

11             MR. TROY:  Yes, Your Honor.

12             If we can pull up again an exhibit you were shown,

13   D-212, and I think it was page 44.  It was the key fob log

14   from May 17th.

15                    REDIRECT EXAMINATION

16   BY MR. TROY:

17   Q    And to be clear, Mr. Maloney, is this the beginning,

18   meaning the earliest, when you went and did it, that the key

19   fob log entries went back?

20   A    That's right, yes.  So, as I said, I ran like an open

21   sort of report.  I didn't put a date on it, and the system

22   generated as many entries as it could.  And as with video

23   surveillance and other sort of things, you know, you can't

24   store an indefinite amount of data, so it does overwrite

25   itself at some point, and this is just the date -- the last

1    entry that it had.

2    Q    Okay.  And with regard to the fact that there's an entry

3    for garage in, do you need the key fob to get out of the

4    garage?

5    A    No.  It only registers going in.  The out is a motion

6    sensor.

7    Q    Okay.  So in theory someone could use the key fob to go

8    in, but then it would not -- the key fob -- this log would not

9    tell us when they left the garage, whether it was the same day

10   or a different day?

11   A    That's correct.

12   Q    Okay.

13              MR. TROY:  With -- I want -- I guess I'll expedite

14   it this way.  If we can put up the plaintiff's own time line.

15   Now, if we go to the May 2019, the entry that corresponds with

16   the key log.  We can just put up May of 2019.  And I think His

17   Honor has a copy.

18   BY MR. TROY:

19   Q    So that first day that --

20              THE COURT:  Well, I don't -- I -- this was filed

21   last night.  I don't have it in front of me.  I looked at it,

22   but go ahead.

23              MR. TROY:  Okay.

24   Q    The -- there's a red circle around May 17, correct?

25   A    That's right.

1   Q     Okay.

2           MR. TROY:  Now, if we -- we can put that back so we

3   can see the entire screen.

4   BY MR. TROY:

5   Q     May 17 being the first day that -- the farthest back you

6   were able to go, does the plaintiff's time line show any day

7   at the Dorchester in 2019 before that May 17 day that the --

8   that the key fob record showed?

9   A     No, it does not.

10  Q     And if we go back on the plaintiff's time line to 2018,

11  does it show stays at any day at the Dorchester in 2018 in its

12  entirety, other than two days in October of 2018?

13  A     It does not.

14  Q     Okay.  So that other than the days that you were able to

15  provide the Court and all of us with data proving that they

16  stayed at the Dorchester, the Halperns themselves have only

17  admitted to being at the Dorchester twice, any time from

18  January of 2018 all the way up until the time that the key fob

19  logs begin?

20  A     That's right.

21  Q     Okay.  Thank you.

22          MR. TROY:  That's all the questions I have.

23          THE COURT:  All right.  Any recross?

24          MR. SACKS:  Your Honor, we move -- plaintiff moves

25  Plaintiff 225 and Plaintiff 70 into evidence.

1              THE COURT:  Admitted.

2              MR. SACKS:  Thank you.

3              THE COURT:  All right.  How about any recross?

4              MR. TROY:  I'm sorry, Your Honor.  As to 225, that

5   was the -- the exhibit you didn't let the witness refer to

6   because --

7              THE COURT:  No, but I'll admit it into evidence, but

8   I didn't allow him to -- allow him to testify.  But it can be

9   marked as part of the record.

10             MR. TROY:  Okay.

11             THE COURT:  All right.  Any recross?

12             MR. SACKS:  No, Your Honor.

13             THE COURT:  All right.  Thank you, Mr. Maloney.

14             THE WITNESS:  Thank you.

15             THE COURT:  Okay.  Now, Mr. Troy, do I understand

16  you have one more witness and that's Mr. Devine?

17             MR. TROY:  That's correct, Your Honor.

18             THE COURT:  All right.  About how long is his

19  direct?

20             MR. TROY:  I think it'll be 30 to 45 minutes, Your

21  Honor.  I --

22             THE COURT:  All right.

23             MR. TROY:  -- I hope it'll be less, but we'll see.

24             THE COURT:  Well, I don't want to limit you.  I'd

25  rather -- I'd rather have a short recess rather than -- and

1  finish the testimony, you know.  At the moment, that's your

2  last witness, correct, for the Dorchester?

3        MR. TROY:  It is.  And on behalf of the defense,

4  we're all for plowing ahead, Your Honor, yes.  Whenever -- as

5  quickly as you want to do it.

6        THE COURT:  All right.  Okay.  Yeah, okay.  Mr.

7  Sacks, at the moment, do you have any rebuttal?  Do you know?

8        MS. ONDRADE:  Your Honor, we will call someone for

9  rebuttal, Your Honor.

10        THE COURT:  Who do you want to call for rebuttal?

11  It's got -- it can't be -- it can't be repetitive of anything

12  that took place earlier.

13        MS. ONDRADE:  Understood, Your Honor.  We would like

14  to reserve the time for rebuttal.  A lot of it depends on Mr.

15  Devine's testimony.  We may call someone.

16        THE COURT:  All right.  Fair enough.  Let's take --

17  I'll tell you what, we'll take a five-minute recess now, and

18  then we'll go ahead with Mr. Devine's testimony, if that's all

19  right with you.  Do you need a -- anybody want a longer break

20  or 10 or 15 minutes?  That's okay with me.

21        MR. TROY:  Sure.  If we could do 15, Your Honor.

22  I've been asked if we can do that.

23        THE COURT:  All right.

24        MS. ONDRADE:  And, Your Honor, before we go on

25  break, --

1           THE COURT:  Yes.

2           MS. ONDRADE:  -- the United States would like to

3   request the opportunity to give closing argument.

4           THE COURT:  Maybe, but not today.  And the reason

5   for that, that, you know, I'm not in the courtroom.  I -- I

6   think I want to review my notes.  I will give you closing

7   argument, but it's not going to be today.  It'll be back --

8   when I'm back.  I hope I'll be back next week and I'll be

9   happy to schedule oral argument.  It may -- I may be willing

10  to do it by Zoom to save you the trouble of traveling up to

11  Philadelphia again.  But let's talk about that when we're done

12  the testimony because there are a couple of other things I

13  want to have happen as well.

14          MS. ONDRADE:  Sure.

15          THE COURT:  Okay?

16          MS. ONDRADE:  Sure.  Yes, Your Honor.

17          THE COURT:  Okay.  All right.  15-minute recess.  So

18  I now have about 20 of.  We'll resume at five minutes to one.

19  Okay with everyone?

20          MR. SACKS:  Thank you, Your Honor.

21          THE COURT:  All right.  Mr. DiSanti, is that all

22  right with you?

23          MR. TROY:  I'm sorry, Your Honor.  It's Paul Troy.

24  It's fine with me.  I'm not sure who are you --

25          MR. SACKS:  It's fine with the United States as

1    well, Your Honor.

2         THE COURT:  My deputy clerk, Ms. DiSanti.  That's

3    all right with her to have a 15-minute recess.  Can we just

4    stay on the line?

5         THE CLERK:  Yes.

6         THE COURT:  Stay on the Zoom?

7         THE CLERK:  Yes.

8         THE COURT:  Okay.

9         THE CLERK:  No problem.

10        THE COURT:  All right.  All right.  Thank you very

11   much.  All right.  15-minute recess.

12             (Recess at 12:37 p.m. to 12:56 p.m.)

13             (Transcriber change)

14        THE COURT:  Okay.  Are we ready to resume?

15        MR. TROY:  As fate would have it, Your Honor, the

16   witness just ran to the men's room, but he'll be back in a

17   moment, and --

18        THE COURT:  Okay.  Thank you.

19        MR. TROY:  -- yes.

20             (Pause in proceedings)

21        MR. TROY:  All right.  Your Honor, Mr. Devine has

22   returned, so whenever you're ready.

23        THE COURT:  Yes.  All right.  Please take the stand.

24   Okay.  Please swear the witness.

25        COURTROOM DEPUTY:  Please state your full name for

1    the record.

2              THE WITNESS:  Francis P. Devine, III.

3              FRANCIS P. DEVINE, III, DEFENDANT'S WITNESS, SWORN

4                        DIRECT EXAMINATION

5    BY MR. TROY:

6    Q    Okay.  Mr. Devine, I'll cut to it.  As the Court I'm sure

7    recalls your prior testimony, I want to ask you first about

8    the decision in May of 2020 to allow the Halperns to have

9    Angie as an emotional support animal?

10             Did the Department of Justice play any role in

11   counsel's decision to allow the Halperns to have Angie as a

12   emotional support animal?

13   A    None whatsoever.  We -- the Halperns had requested their

14   dog, Gracie, who I believe was 13 years old, weighed 53 pounds

15   and had lived with the family for all the years of Gracie's

16   life, as an emotional support animal.  To many of us it seemed

17   that the Halperns just wanted to maintain custody of their

18   dog.  Their son had moved to California.  And that they just

19   wanted to find a new spot to have their dog.

20             When we learned that Gracie died and we learned that

21   they had acquired a new dog, it gave a lot more substance to

22   their claim that it was an emotional support animal or why

23   would they have gone to the trouble of hiring a new dog and

24   asking for an emotional support animal.

25             So when we totaled up that evidence, that body of

1    evidence, we came to the -- we came to the view that we should

2    allow them to have Angie as an emotional support animal.

3    Q    Okay.  Mr. Devine, other than being in Court today, when

4    did you last see the Halperns?

5    A    I last saw the Halperns I think it was -- well, it was

6    one day last week -- I think it was Monday of last week.

7              I, like many people in the Dorchester, use the

8    freight elevator because almost all -- well, not almost all --

9    but because my church is on 20th Street, St. Patrick's Church.

10   The bus I take is the 17 bus, I took the 17 bus down here

11   today.  It is on the corner of 20th and Locust.  The 7-Eleven

12   it out there, and I take the freight elevator very regularly.

13             On this occasion last week, I was on the freight

14   elevator.  The freight elevator went down.  I saw Bernie,

15   stopped at their floor.  Bernie got on the freight elevator

16   with me.  Next on the freight elevator was their dog, Angie,

17   who ran onto the elevator, was on a leash, and jumped up on my

18   legs and in came Cynthia after that.

19             I remarked to them -- they were packed up -- I says,

20   it looks like you're heading to Ocean City, and she said --

21   Cynthia said yes, we're going out now for a couple days.  I

22   wished them well and off they went.

23             But what I took out of that was, they knew full well

24   at that point that they could take any elevator in the

25   Dorchester that they wanted to, because they sat through the

1    trial, and they have taken it and Kyle's told them, and yet

2    they were still using the freight elevator.

3         And then, of course, Kyle ran into them, I think he

4    said last night, once again on the freight elevator.  So

5    despite their testimony in court about how they despised and

6    felt like second class citizens because they used the freight

7    elevator, they nonetheless used it the last time I encountered

8    them and the last time that Kyle encountered them.

9    Q    Understood.  How often do you use the freight elevator?

10   A    Regularly, I use it almost every day.

11   Q    Okay.  And for what purpose?

12   A    As I say, my church is St. Patrick's on 20th Street.  I

13   go there three or four times a week.  There's a shoemaker

14   there.  There is a breakfast place there, the coffee shop that

15   I go to is Vibrant, which is right outside the back entrance

16   of the Dorchester.  There are a number of restaurants along

17   that line.  There are sandwich shops along -- along that row

18   as well.

19        And I like to walk -- while many people like to walk

20   in Rittenhouse Square, I prefer to walk toward the river walk

21   which is down by the Schuylkill River, and that's my

22   destination of choosing where I want to take a walk, go that

23   direction rather than Rittenhouse Square.

24        And as David or somebody said, the Dorchester's a

25   block long.  So if you want to get to the -- where the rear

1    entrance takes you, you can either go out the rear entrance

2    and take I'm going to say 50 steps or you can take -- you can

3    go out the lobby of the Dorchester, which is about a block

4    long, then you can turn left and go half a block, which gets

5    you to Locust Street.  And then you can go up Locust Street to

6    get in about 500 steps where you would get with 20 steps going

7    out the rear entrance.

8          So that's why I use the rear entrance.  That's why

9    many other people do as well.  And unlike the testimony that

10   you've heard in court, many, many people use the rear entrance

11   daily.

12   Q    Okay.  And I want to show photos of what I'll call the

13   rear entrance and ask you some follow-up questions about them.

14   This is Exhibit D-229.  And can you just describe -- we'll go

15   photo by photo.  Can you describe to the Judge what this photo

16   shows?

17   A    These are photographs that Cynthia testified that she

18   took right before the last hearing -- I think it was September

19   8th, I might have that date wrong, but around that time.  And

20   this shows the big heavy door that she testified about that

21   you need a fob to be able to enter into, and that's the ramp

22   that leads down to the garage.

23   Q    Okay.

24   A    That's the route that Cynthia says that, you know, they

25   were forced to take, but it's not the preferred route.

1    Q    Okay.  And what's the preferred route?

2    A    If you go on with these photographs, please.

3    Q    We will.  Let's go to the next picture.

4    A    Rather than going outside and confronting rain and snow

5    and ice and sleet and wind and all that, you can go right down

6    on the freight elevator to the garage level which is -- the

7    garage abuts the laundry room -- the laundry level.  So if you

8    take the freight elevator down to -- can you show the bottom

9    picture here --

10   Q    Yes, let's -- yes.

11   A    -- the one with the blue -- if you take the freight

12   elevator down where that ladder appears right now, the freight

13   elevators are right next -- right in that area, right next to

14   the ladder.  So you can get off the freight elevator, walk up

15   those three steps, walk down that I'm going to say 35-foot

16   walkway.

17        Do you see where there's that drop cloth there now?

18   Your Honor, you may not be able to see it, but at the end of

19   this picture is a drop cloth.

20        THE COURT:  I can't see it, but I can imagine it.

21        THE WITNESS:  Okay.  It is there -- it was there

22   when Cynthia took these pictures because when Cynthia took

23   those pictures, we were doing renovations to the garage and

24   that drop cloth was up so that the dust would not come in.

25   But immediately behind -- and that renovation work started

1    within the last six months.  So throughout the period up until

2    six months ago in 2022, up until March of 2022, you could exit

3    right through there.

4         The drop cloth wasn't there.  And what you would see

5    if you're standing here is you're looking at the garage.  You

6    see parked cars there.  So that is the main level of the

7    garage.  No need to go outside, no need to go up or down

8    slopes, no need to confront wind or rain or anything else.

9    You go down to the laundry level, you go up three steps, you

10   walk 50 feet and you're in the garage on the main level where

11   you check in your cars and the valets take it to park.

12   BY MR. TROY:

13   Q    Okay.  So to be clear then and for the benefit of His

14   Honor who can't see the photos, a resident of the Dorchester

15   over all the time period that we've discussed, if they wanted

16   indoor access to the garage, they could either take the

17   freight elevator down to the laundry room level and walk

18   across to the garage or they could go to the lobby and take

19   the passenger elevator down to the garage?

20   A    Exactly correct.

21   Q    Okay.  And to use that passenger elevator, they didn't

22   need a key fob, so there would be no record of it?

23   A    Correct.

24   Q    Okay.  And let's go further through these pictures just

25   so when His Honor can see them.  What is this showing here?

A     That is showing the same walkway area, that blue -- see

the -- isn't that blue machine there the same thing that was

there?  And, again, all this equipment is there now because

we're doing renovations on the garage.  If the renovations on

the garage weren't being done, and I say they started about

March, this equipment would not be there, so it's a clear

walkway through.

Q     Okay.  And let's go to the next photo.

A     This is the -- these are the photos that Cynthia

presented to show the way in which she would access the

garage, and that's the rear entrance.  And so I come out this

door when I come out the rear entrance, go down those three

steps.  I turn left and 50 feet away is Locust, turn left on

Locust and I'm heading west on Locust and 20th Street.

Q     Understood.

A     Another 25 feet up is the -- is the 7-Eleven.  Another --

another 100 steps beyond that is St. Patrick's Church.

Q     Okay.

A     And this ramp over here that's going down, you'll see it

probably better in another photograph -- yeah, you can see,

there's the ramp that goes down.  You know, most people don't

walk down that ramp.  They walk down the steps that are there.

The ramp is really for people who are, you know, pushing --

you know, we have luggage carts where people come out and they

unload their cars.  They push their luggage carts up or, you

1    know, other personnel, moving personnel, may have things on

2    their racks that they move.

3            If you keep going up, there's the --

4    Q    Yes.

5    A    -- there's the -- there's the dumpsters.

6    Q    And this shows that they have a choice in this photo of

7    stairs or ramp?

8    A    As a matter of fact, there's one of the luggage racks I'm

9    talking about, you can see in this photograph?

10   Q    Yes.

11   A    So, obviously, they didn't go up the steps to get the

12   luggage rack up there.  They went up the ramp to get the

13   luggage rack up -- rack up there, and you can see that there

14   are people moving materials into the -- right inside that door

15   is the mail room where all -- as you've pointed out before --

16   all the Amazon deliveries are stored.

17           We have a great system.  When an Amazon delivery

18   gets in, it's carted in, and in building link, you get a

19   notice, you've got an Amazon, you got a UPS delivery, you got

20   whatever you got.  Please come down and get it, and that's

21   where you pick it up right inside that door.

22   Q    Okay.

23   A    But if you show the next photograph, you can't quite see

24   it well, but there's a walkway between this Pullman truck

25   there -- that's the name of the company that's doing the

garage renovations -- and the building, there's a walkway

there.  The first windows that you see there are David Smith's

office.  The next windows that you see there are Kyle's

offices.

          David's office is there and the general manager's

office has always been there so the general manager can have a

good view of what is going on in that area.  If you walk down

that walkway, your head and shoulders are obvious to David

Smith sitting in his office there.

Q    Okay.  Understood.  And if we go down a little further?

A    This is inside the garage coming down the way that

Cynthia described.  You go past David's office, you get to the

heavy door that she talked about at length, and you go down

this ramp here and you turn right down there, and that's where

the valet office is, right to the right of what you can't see.

There's a black car down the bottom there.  If you turn right,

that's where the valet parking office is.  You can get to that

valet parking office by going through the -- the walkway I

showed you from the laundry room to walk past on the other

side of this wall and you get to the valet parking spot.

Q    Okay.

A    These cones, those ladders, they all have something to do

with the renovation that was going on at the time Cynthia took

these pictures.

Q    Sure.  And just I'll conclude this.  We can go up a few

1    photos to the one that shows the stairs and the ramp outside.

2    Again, hypothetically, if any resident chose to use the

3    shortcut to go outside, they would, in theory, have the choice

4    of walking down the ramp which is open to the sky or walking

5    down the stairs that have a ceiling above them and are right

6    next to the ramp?

7    A    You're correct.

8    Q    Okay.  And once they walk down those stairs, then once

9    they get outside into the parking area, they're walking on

10   pavement just like any other city street or sidewalk in the

11   weather?

12   A    Correct.

13   Q    Okay.  I want to switch gears now.  There were questions

14   earlier this morning about -- of Mr. Smith I believe -- about

15   rules that had been renovated I think as of June of 2019.  Do

16   you -- you were here for that questioning?

17   A    Yeah.

18   Q    Okay.  Besides those rules, has the Dorchester Owners

19   Association in recent years had different versions of

20   emotional support animal policies?

21   A    Yes.  As I testified at the -- you know, when I was here

22   at the original trial, in 2015 I guess it was, I researched

23   emotional support animal policies, although we didn't -- I

24   didn't call them emotional support animal policies at the

25   time.  I called them -- I forget what I called them to tell

1    you the truth.  But we generated a policy.

2    Q    And we can -- as you're --

3              MR. TROY:  To keep things going, Mr. Perry, as he's

4    testifying, if you can pull up Plaintiff's Exhibit 37.

5    BY MR. TROY:

6    Q    -- but I don't want to interrupt you, Mr. Devine.

7    A    No, that's okay.  And then as somebody said -- I think I

8    said in my original testimony -- I think Kyle might have said

9    it today -- in October, 2018, the Pennsylvania Legislature

10   changed the disclosure rules on what had to be disclosed and

11   what you could ask for when investigating requests for

12   emotional support animals.  So I sent off -- and that took

13   effect December 31st, 2018.

14   Q    And I will interrupt you here, Mr. Levine.  It's that

15   same month of October, '18, I believe the same day, that that

16   was passed, that the first application was submitted by the

17   Halperns?

18   A    Well, you could -- I don't remember that, but --

19   Q    Okay.  But it was October of 2018 they sent in their

20   application.

21   A    Exactly, exactly.

22   Q    Okay.  I'm sorry.  Continue.

23   A    So then I had to go back and amend the emotional support

24   policy to incorporate the new requirements and allowances of

25   the Pennsylvania Legislature which I did as soon as I learned

1    about the change in the law by the Pennsylvania Legislature,

2    and we as a group adopted the new one -- the new policy, I

3    believe effective April 3rd, 2019.

4         Around April 3rd, 2019, we sent that off to -- to

5    HUD and to -- and asked for their feedback on it.  Then

6    again --

7              MS. ONDRADE:  Objection, Your Honor.  Relevance.

8              MR. TROY:  Your Honor --

9              THE COURT:  You object?

10             MS. ONDRADE:  Yes, to the relevance of Mr. Devine

11   rehashing the history with HUD in a trial about the Halperns'

12   damages.

13             THE COURT:  Yes.  I don't think -- Mr. Troy, I don't

14   think we need to go through that.  That was covered in the

15   first trial.

16             MR. TROY:  Okay.

17   BY MR. TROY:

18   Q    Let me ask you then, Mr. Devine, with regard to emotional

19   support animals and what owners of emotional support animals

20   could do or not do around the Dorchester, what took

21   precedence, the emotional -- the emotional support animal

22   policy or service animal policy or those rules?

23   A    It's like any time when you have policies and you have

24   procedures.  The policy for emotional support animals is

25   specifically designed to deal with emotional support animals.

1    The community rules and regulations were written way

2    back when, and they've been modified from time-to-time to

3    time-to-time.  And the modification that happened -- I think

4    you said it was June, 2019?

5    Q    Yes.

6    A    The only modification that was made in June of 2019 was

7    something about the swimming pool and membership in the

8    swimming pool.  But the policy that governs emotional support

9    animals is the emotional support animal policy that we give

10   the existing version of that to anybody that wants to apply

11   for an emotional support animal.  And that is what governs the

12   relationship between an emotional support animal owner and the

13   Dorchester.

14   Q    And did anything in that policy, P-37, which is marked

15   here, restrict them to using the back door or the freight

16   elevators or anything of the like?

17   A    The -- no, you're looking at the -- at the third version

18   of the emotional support animal, and it does not.

19   Q    Okay.

20   A    And that was created by me after HUD came out with its

21   new guidelines, I think it was January 28, 2020.

22   Q    It's in the title.  And I want to move forward to Exhibit

23   D-306, and this again appears to be a policy.  When was this

24   policy created and why?

25   A    You might recall at the first trial we talked about

1  trying to get feedback from Mazen Basrawi who promised us he

2  would provide feedback.  Mazen is --

3           MS. ONDRADE:  Objection, Your Honor.  Relevance once

4  again.

5           MR. TROY:  Your Honor, there were -- there were

6  questions asked --

7           THE COURT:  I don't see on the -- on the damages to

8  the Halperns for delay.

9           MR. TROY:  Yes.  Your Honor, one of the areas

10 they've indicated is that the rules somehow prohibited them

11 even after the approval from fully enjoying the facility, and

12 we need to get into these --

13          THE COURT:  But they -- but your witnesses have

14 testified that the rules weren't enforced.  It's obvious they

15 haven't been enforced.

16          MR. TROY:  Agreed.  But where we're going is what

17 actually governed those things which are the emotional support

18 policies.

19          THE WITNESS:  I think His Honor's got the point.

20          MR. TROY:  Okay.  All right.  Thank you.

21          MS. ONDRADE:  Is my objection sustained, Your Honor?

22          THE COURT:  Yes.  Yes, sustain the objection.  But I

23 want to really focus on the Halperns' testimony and what

24 actually happened between the Halperns and the Dorchester.

25 Thank you.

1          MR. TROY:  Okay.  Your Honor, that's actually my

2    last question for Mr. Devine.  Thank you.

3                    CROSS-EXAMINATION

4    BY MS. ONDRADE:

5    Q    Good afternoon, Mr. Devine.

6    A    Hello.  How are you?

7    Q    I'm good.  How are you?

8    A    Great.

9    Q    Mr. Devine, the entire DOA Council decides whether to

10   grant an application for an assistance animal, right?

11   A    Correct.

12   Q    Okay.  And this is rehashing -- but you've been President

13   of the DOA Council since 2020?

14   A    Or 2019, I don't remember when, but --

15   Q    And was your predecessor Ed Kurland?

16   A    Yes, he was.

17   Q    Okay.  And was Mr. Kurland President of the DOA Council

18   from at least 2018 until you took over the position?

19   A    He was my immediate predecessor.

20   Q    Okay.  And you've been a member of the DOA Council since

21   2014?

22   A    That -- that sounds about right.

23   Q    Okay.  And in the time that you were a member of the

24   Council from 2014 until you became President in 2019 or 2020,

25   was Mr. Kurland the President of the Council?

1   A    I think I said that, yes.

2   Q    Okay.  You testified about how frequently you used the

3   freight elevators at the Dorchester?

4   A    Right.

5   Q    Just to be clear, Mr. Devine, no one ever told you that

6   you were restricted to using the freight elevators and the

7   back entrance as your primary means of ingress and egress to

8   the Dorchester, is that right?

9   A    That's right.

10          THE COURT:  That is -- that is really not an

11  appropriate question.  That is argumentative from the

12  beginning to the end.  Next question.  Nobody's ever suggested

13  such a thing.

14  BY MS. ONDRADE:

15  Q    You've also testified, Mr. Devine, that the ESA policies

16  supersede the community rules and regulations when it comes to

17  governing emotional support animals?

18  A    I don't think I said that.  I think I said that the

19  policy that governs emotional support animal owners is the

20  emotional support animal policy.

21  Q    Okay.  And are --

22          THE COURT:  And let's -- let's make it -- I just

23  want to make it clear.  Mr. Devine did not -- never used the

24  word supersede.  You know, you have pointed out that there may

25  be some conflict at some point in time between what the actual

1    practice was and what the rules and regulations were.

2            You know, that goes on all over the world in high-

3    rises and also in courthouses.  You know, the U.S. Attorney

4    and Judges have to deal with the GSA, and I don't know if you

5    have to deal with them in Washington but we deal with them at

6    6th and Market all the time.  And they're very inconsistent

7    all the time, too, and we have arguments back and forth about

8    what those rules require.  It has to do with things -- whether

9    the elevators are running and so forth.

10           I don't find this as a useful topic for cross-

11   examination.  Next question.

12   BY MS. ONDRADE:

13   Q    Mr. Devine, you met with the Halperns on a Zoom call in

14   May, 2020?

15           MR. TROY:  Objection.  Beyond the scope of direct.

16           MS. ONDRADE:  Your Honor, they discussed the

17   approval of the Halperns' application.

18           THE COURT:  Well, I'll -- I'll allow that.  What's

19   the question again?

20           MS. ONDRADE:  I'd like to ask about the Zoom call.

21   Present on the call were representatives --

22           THE COURT:  Yes, you -- was Mr. Devine on the call?

23   He can respond.

24           THE WITNESS:  Yes.

25           THE COURT:  All right.  Go ahead.

1  BY MS. ONDRADE:

2  Q    Was Amanda Bailey on the call?

3  A    Yes.

4  Q    Was Mazen Basrawi from the Department of Justice on the

5  call?

6  A    Yes.

7  Q    And was Joe Weiss from the Dorchester on the call?

8  A    I believe so.

9  Q    And David Smith?

10 A    Yes.

11 Q    And during this meeting, you discussed the Halperns'

12 request for an emotional support animal?

13 A    Yes, we did.

14 Q    And at that point it was in late May, 2020, is that

15 right?

16 A    Yes.

17 Q    Okay.  The DOA Council had not yet approved the Halperns'

18 request?

19 A    You are correct.

20 Q    And that's because the DOA Council approved the Halperns'

21 request in June of 2020?

22 A    You are correct.

23 Q    And you provided formal approval of the Halperns' request

24 in June?

25            THE COURT:  Well, once again, you're dealing with

1    the question of delay.  The jury has found in the Government's

2    -- in the Halperns' favor that there was an undue delay.  Next

3    question.

4            MS. ONDRADE:  Your Honor, there's been a lot of

5    wordsmithing on the part of the defendant about when approval

6    was provided to the Halperns.  They continue to assert that it

7    was May, and I think I've just established with Mr. Devine

8    that it was June.

9            THE COURT:  It isn't -- right.  It's not going to

10   make any difference to me whatsoever whether it was May or

11   June.

12           MS. ONDRADE:  It adds on to the delay, Your Honor.

13   BY MS. ONDRADE:

14   Q    Mr. Devine, did you tell the Halperns to use the freight

15   elevator with their emotional support animal?

16   A    No.

17   Q    And your -- so your testimony is that you never mentioned

18   the freight elevator and their use of it with their emotional

19   support animal during that May 29th, 2020, Zoom meeting?

20   A    Could you repeat that question?

21   Q    Did you ever mention the Halperns' use of the freight

22   elevator with their emotional support animal during that May

23   29th Zoom meeting?

24   A    I probably said they were welcome to use whatever

25   elevators they wanted including the passenger elevators or

1   freight elevators or any other elevators.

2   Q    So you did mention the freight elevators?

3   A    I don't remember mentioning the freight elevators.   If

4   the subject came up, I'm sure I told them they could use

5   whatever elevators they wanted.

6   Q    You don't remember, Mr. Devine?

7   A    Don't remember what?

8   Q    You don't remember if the subject of whether to use the

9   freight elevator with their emotional support animals came up

10  during that May 29th, 2020, Zoom meeting?

11  A    We talked about a lot of different things.   I don't

12  remember any specific conversation about the freight

13  elevators, no.

14       Q    Did you mention the Halperns using the rear entrance

15  to the Dorchester with their emotional support animal during

16  that May, 2020, Zoom meeting?

17  A    I'm sure I told them they could use any entrance that

18  they wanted to use.

19  Q    Do you recall telling the Halperns they should use the

20  back -- rear entrance to the Dorchester with their emotional

21  support animal during that meeting?

22  A    I suspect and think I recall that I told them they could

23  use whatever entrance and exit they wanted to use.

24       We had just written a policy that in 2020 eliminated

25  the language that had been in the predecessor policy saying

1    that people were restricted from using those -- the passenger

2    elevators and in the common areas.  So that was done March 4th

3    I'm going to say.

4          So I wouldn't have told them anything differently

5    having researched and written a policy that eliminated that

6    language.

7    Q    You've never told the Halperns that they could use the

8    front lobby and main entrance with their emotional support

9    animal, have you?

10   A    I've seen them use the front lobby with their emotional

11   support animal.  I've seen them meet Casey and his wife at the

12   front door and use it, so there was no need for me to tell

13   them that because they knew it.

14   Q    Is the answer to my question no, you haven't told them?

15   A    The answer is I haven't told them because they knew it,

16   and they used the front --

17   Q    Mr. Devine --

18   A    -- they used the front entrance.

19   Q    -- Mr. Devine, at one point, the DOA Council decided to

20   increase the fine for people who brought unauthorized dogs

21   into the building from $150 to $1,000, is that right?

22   A    You've asked --

23          MR. TROY:  Objection.  Relevance, Your Honor, if

24   it's not emotional support animal.

25          THE COURT:  It's -- you can answer the question.

1           THE WITNESS:  You asked me that at the first trial

2     and my answer was yes, we made that change in 2015.

3     BY MS. ONDRADE:

4     Q    I'd like to bring up Plaintiff's Exhibit 187.  What you

5     have in front of you, Mr. Devine, are the redacted minutes of

6     the DOA Council dated December 2nd, 2015.  And on the --

7           THE COURT:  No, no, no, we're not going back to

8     2015.

9           MS. ONDRADE:  Okay.

10          THE COURT:  No, no.  Next question.

11    BY MS. ONDRADE:

12    Q    Okay.  Well, your testimony, Mr. Devine, was that that

13    increase happened in 2015?

14          THE COURT:  No.  Next question.  I made a mistake.

15    I didn't mean to open the door for 2015.  We're not going

16    there.  We had some testimony about that in the first trial.

17    It's not relevant to how much the Halperns are due for

18    damages.

19          MS. ONDRADE:  Understood, Your Honor.

20    BY MS. ONDRADE:

21    Q    Mr. Devine, when Mr. Troy and Mr. Zimmerman file

22    documents on the docket in this case, they do so on behalf of

23    the Dorchester Owners Association, is that correct?

24    A    Could you repeat that question?

25    Q    Sure.  When counsel for the Dorchester Owners

1    Association, when they file documents with the Court, they're

2    doing so on behalf of their client, the Dorchester Owners

3    Association?

4              THE COURT:  First -- well, I think -- yes, they are.

5    As a matter of law, they are.  Next question.

6              MS. ONDRADE:  I have to set up my questions, Your

7    Honor.  Can we pull up -- can we pull up a recent filing, ECF

8    229-2?

9              THE COURT:  Which document is that?

10             MS. ONDRADE:  This is the defendant's brief in

11   support of its motion for judgment as a matter of law, and I'd

12   like to direct Mr. Devine's attention to page 12.

13             MR. TROY:  Your Honor, I object.  This is not -- it

14   can't be used to cross-examine Mr. Devine.

15             THE COURT:  It's beyond the -- it's not cross-

16   examination.  This is a document that the witness wrote or

17   prepared?

18   BY MS. ONDRADE:

19   Q    Did you write or prepare this document, Mr. Devine?

20   A    It's a writing that was filed by counsel you said, right?

21   Q    Yes.

22             THE COURT:  Yes, yes.

23             THE WITNESS:  I didn't write it.

24   BY MS. ONDRADE:

25   Q    Is the answer no?

1       THE COURT:  Objection's sustained.  Next question.

2       MS. ONDRADE:  I have no further questions, Your

3  Honor.  Thank you, Mr. Devine.

4       THE COURT:  Any redirect?

5       MR. TROY:  Very briefly, Your Honor, just for

6  context.

7                      REDIRECT EXAMINATION

8  BY MR. TROY:

9  Q    The exhibit I showed you, P-37, is that the policy that

10 you -- you passed in March of 2020?

11      MR. TROY:  You can put it up again, P-37.

12 BY MR. TROY:

13 Q    Is that the March, 2020, policy that you referenced --

14 A    Yes.

15 Q    -- on cross-examination?

16 A    Yes.

17 Q    Okay.

18      MR. TROY:  Your Honor, I don't have any other

19 questions.  I think P-37's already been admitted, but I would

20 also move to admit D-306.

21      THE COURT:  306?  All right.  Admitted.  Okay.  All

22 right.  That concludes Mr. Devine's testimony.  Thank you.

23      All right.  Does the Dorchester have any other

24 witnesses?

25      MR. TROY:  We do not, Your Honor.

 1                    (Transcriber change)

 2                    THE COURT:  All right.  Do the plaintiffs have any

 3      rebuttal?

 4                    MS. ONDRADE:  Yes, Your Honor, we'd like to call

 5      Amanda Bailey.

 6                    MR. TROY:  Your Honor --

 7                    THE COURT:  Well, what's the --

 8                    MR. TROY:  I'm sorry, Your Honor.

 9                    THE COURT:  -- what's an offer of proof?

10                    MS. ONDRADE:  Your Honor, Mr. Devine and Mr. Smith

11      have now testified that during the May 29th, 2020 Zoom

12      meeting, at which Ms. Bailey was present, did not impose

13      restrictions on the Halperns to use the back entrance and the

14      freight elevator as their main points of ingress and egress

15      with their emotional support animal.

16                    Ms. Bailey was present at this Zoom meeting and will

17      testify to the opposite.

18                    MR. TROY:  And, Your Honor, I already --

19                    THE COURT:  All right.

20                    MR. TROY:  I'm sorry.  Go ahead, Your Honor.

21                    THE COURT:  No, go ahead.  What's your position?

22                    MR. TROY:  Yes, Your Honor, I oppose the rebuttal

23      testimony in that the point has already been rebutted by Mr.

24      and Mrs. Halpern who stated that, and to have an employee of

25      the Department of Justice, who is the plaintiff in this case,

1  offer testimony as to what she heard is of no probative value,

2  and --

3         THE COURT:  Well, I'll let her put it on the record.

4  I recognize there is a conflict of recollection here of what

5  happened here, but I will let her put it on the record.  I

6  overrule the objection.  Go ahead.

7         MS. ONDRADE:  And, Your Honor, if I can say, any

8  instance of bias on the part of Ms. Bailey goes to the weight

9  of her testimony, not to the relevance.

10         THE COURT:  All right.  She can testify.  Okay.

11         MS. ONDRADE:  Thank you, Your Honor.

12         The United States calls Ms. Amanda Bailey.

13         COURTROOM DEPUTY:  Please remain standing.

14         Can you state your full name and spell your last

15  name for the record?

16         THE WITNESS:  Amanda Bailey, B-A-I-L-E-Y.

17         COURTROOM DEPUTY:  And raise your right hand.

18      AMANDA BAILEY, GOVERNMENT'S WITNESS, SWORN

19         COURTROOM DEPUTY:  Please be seated.

20         THE COURT:  Okay.  I understand her background and

21  her position, so get right to the point about what happened at

22  this meeting according to her recollection.

23                    DIRECT EXAMINATION

24  BY MS. ONDRADE:

25  Q   Ms. Bailey, did you attend a May 29th, 2020 Zoom meeting

1   with the Halperns?

2   A    I did.

3   Q    And in what context were you attending?

4   A    I was there as a paralegal reader for the Department of

5   Justice.

6   Q    What's a paralegal reader?

7   A    I am a paralegal, and I am also assigned to a blind

8   attorney in our office, Mazen Basrawi.

9   Q    Okay.  And can you describe for the Court what happened

10  during that meeting?

11  A    Yes, so it was --

12       THE COURT:  No, I want to get right to the point

13  about the elevator and the back entrance.

14       MS. ONDRADE:  Okay.

15  BY MS. ONDRADE:

16  Q    Did Mr. Frank Devine mention the freight elevators to the

17  Halperns during this meeting?

18  A    Yes, he did.

19  Q    And what did he say?

20  A    He asked the Halperns to use the freight elevator and the

21  back entrance when they were coming in and out of the building

22  with their dog, Angie.

23  Q    Did anyone else from the Dorchester mention freight

24  elevators or back entrances?

25  A    I don't believe so.

1    Q    Okay.  And Mr. Smith was present on the call, is that

2    right?

3    A    Yes.

4    Q    And do you know of any reason why Mr. Smith wouldn't have

5    heard what Mr. Devine said?

6    A    No.

7              MS. ONDRADE:  I have no further questions, Your

8    Honor.

9              THE COURT:  Cross-examine.

10                        CROSS-EXAMINATION

11   BY MR. TROY:

12   Q    Ms. Bailey, at the time of that Zoom meeting in May of

13   2020, were the Halperns in their unit at the Dorchester or

14   were they in Ocean City?

15   A    I don't know for sure.

16   Q    Okay.  Let's show the plaintiff's time line, please?

17             MS. ONDRADE:  It's outside the scope, Your Honor.

18             THE COURT:  No.  This has to do with the

19   recollection.  Overruled.

20             MR. TROY:  And if we can go to May of 2020 when this

21   meeting occurred.

22   BY MR. TROY:

23   Q    And if you look at May of 2020, the second line of this

24   time line that the plaintiff's created, this indicates that

25   they were in Ocean City and had been for the entire month of

1    May of 2020.

2          Do you have any reason to disagree with the

3    plaintiff's representation?

4    A    No, I don't.

5    Q    Okay.  Does that in any way refresh your recollection as

6    to where they were?

7    A    Yes.

8    Q    And where were they?

9    A    Ocean City.

10   Q    Okay.  And if the remainder of the chart indicates that

11   but for three days that they were in the Dorchester the rest

12   of --

13          THE COURT:  Mr. Troy, now, you're getting --

14          MS. ONDRADE:  Your Honor, I don't --

15          THE COURT:  Now, you're getting beyond direct.

16   Sustained.

17          MR. TROY:  All right.  Thank you.  That's all I

18   have, Your Honor.

19          THE COURT:  All right.  Thank you, Ms. Bailey.

20          THE WITNESS:  Thank you.

21      (Witness excused)

22          MS. ONDRADE:  No, Your Honor, the United States

23   rests.

24          THE COURT:  Okay.  That closes the testimony on this

25   issue of damages with the Halperns.

1          All right.  Now, let me say what I would like to

2     about where we're going from here.  The first thing is, I

3     would like the United States to file, along with consultation

4     with the records of this proceeding and the Halperns, a list

5     of their out-of-pocket expenses, that is what they claim as

6     damages for out-of-pocket expenses.  This does not include

7     delay.  It includes things like the condo fees and the garage,

8     if they want to make any claims for excessive mileage on their

9     car or things of that nature or any other expenses that they

10    believe they had to spend their money for something that they

11    believe would be part of their damages in this case.

12         Mr. Sacks, how -- do you understand what I'm -- I'd

13    like you to file it, and then I'll give the Dorchester a week

14    or so to respond.  How much time do you need to file that?

15         MR. SACKS:  Your Honor, we filed -- yesterday, we

16    filed a statement of damages with respect to claims on behalf

17    of Bernie and Cynthia Halpern, and it does include the out-of-

18    pocket expenses, including the condo and the garage fees, as

19    well as the mileage that they had to --

20              THE COURT:  Okay.

21         MR. SACKS:  -- that they had to travel.

22              THE COURT:  Okay.  I didn't know that.  I haven't

23    reviewed that yet.

24         MR. SACKS:  And that's ECF-261.

25              THE COURT:  So, Mr. Troy, you need to respond to

1    that.

2         MR. TROY:  I'm sorry, Your Honor, I couldn't hear

3    you.

4         THE COURT:  How much time do you need to respond to

5    what the United States filed for the out-of-pocket expenses?

6         MR. TROY:  One week, Your Honor.

7         THE COURT:  That's fine.  Okay.

8         The next thing I would like the Government to file

9    is an answer to the question I stated this morning about what

10   form the verdict should take and how that should be -- and

11   maybe you have experience from other cases where you have had

12   so-called aggrieved persons who were not actual parties, and

13   just like you would -- it doesn't have to be very long.  I

14   would just like to have a statement that you file in what form

15   my decision should take.  Should it be a verdict?  Should I be

16   entering judgment?  I am tending towards scheduling argument

17   and then issuing one final opinion and order on the entire

18   case.

19        That is, making the order to the Halperns and

20   deciding the other pending motions.  So how much -- well, you

21   can file that whenever you like, Mr. Sacks.  I won't put a

22   deadline on you.

23        MR. SACKS:  Thank you, Your Honor.

24        THE COURT:  Now, as I said before, I will have oral

25   argument, but I think I'll have -- what I would like to do is

1  go through my notes from the prior proceedings, because I

2  haven't been -- I was away before I contracted COVID, and

3  haven't been in chambers for a couple of weeks now.

4          So I want to go back and make a list of the topics

5  on which I want to have oral argument.  I have no intention of

6  just having oral argument without giving you specific

7  questions I have about the case, so it will take me a week or

8  so to formulate that, and then I will probably send out an

9  email about some possible dates and pick a date that's

10 convenient for everybody.  I hope to do this within the month

11 of October.  I don't want to delay this unnecessarily.

12         Okay.  But I don't want to start having discussions

13 about the date right now until I get back to you with a list

14 of these topics for argument.  Okay.  All right.

15         Now, I have not -- maybe I should give hope that

16 there is any prospect of a settlement of the Halpern's case if

17 not the whole case, but I want to make some concluding

18 remarks, because obviously, you have not settled yet, and from

19 the proceedings here, I'm not sure you've had any serious

20 discussions about it.

21         But I want to put on the record here, I know I sent

22 you all a letter after the last hearing about a number of

23 reasons for settlement, and I'm not going to repeat what's in

24 there.  But if I have to decide what is going to happen, I

25 will do so, and I will do it as fairly and as appropriately as

1   I can do it.

2          But let me say a couple of things.  First of all,

3   this is fundamentally a case about living together, and the

4   Halperns have chosen to live at the Dorchester.  They ran into

5   this issue.  They were delayed in getting their ESA.  They

6   jury found that, and I accept that, so they are entitled to

7   some damages.  Okay.

8          I do not see punitive damages arising in this case,

9   but at the same time, I think the Halperns are due more than

10  anything that could be called nominal damages, so I think you

11  have to come up with a damages number that is fair but it's

12  not punitive.  And where that is, I am not going to tell you.

13  But I want to add some things here that are, in my view, very

14  relevant, and I did say a couple of these before.

15         Because the Halperns are not represented by any

16  counsel specifically, whatever the damages are, they get to

17  keep the entire amount.  They don't have to pay taxes on it.

18  Fundamentally, they now have, and they have their ESA, their

19  animal, in their apartment and they have had for a significant

20  period of time compared to the totality of their living

21  together in the Dorchester with the other tenants there.

22         They did not have it for a period of time that they

23  should have had it.  That's why they are entitled to be paid.

24  But I don't -- but that's what their damages are for.  They're

25  for the delay in getting their ESA animal, and I have to

1    consider in the fact, and the fact of it is, that their first

2    dog died.  They didn't have a dog at all for a period of five

3    months, and that can't be blamed on the Dorchester.

4           And then the pandemic came, and apparently, they

5    elected not to live in the Dorchester for a lengthy period of

6    time, and many people with second homes did the same thing.

7    They didn't want to live in a high rise apartment because of

8    the pandemic, and they were lucky, along with many other

9    Americans, who have two homes, that they were able to leave

10   the Dorchester and live in Ocean City.  And I thought, I can't

11   -- I can't blame the Dorchester for that period of delay.

12          Of course, the record shows, at least, the

13   Dorchester's argument is that that was after but basically

14   coincided with their getting approval to have the dog, that

15   they didn't want to have the dog because of the pandemic.  At

16   least, that's one possible interpretation.  And I'm not asking

17   questions right now.  I'm just giving you my reaction.

18          Secondly, the pandemic slowed everything down, okay?

19   So a lot of things that should have happened in the pandemic,

20   and that's true in the courthouse and all of our lives, so

21   that's another factor here that can't be blamed on the

22   Dorchester.  But there is a period of time during which the

23   Halperns are entitled to damages because there was delays.

24   The jury said it.  And everybody has to be realistic about

25   what that should mean in terms of their damages.

1            It appears to me that the Halperns are both healthy,

2    thank God, that they are -- they have post-pandemic and post-

3    these problems with the Dorchester, they now have achieved a

4    living mode that is acceptable to them and pleasurable to

5    them, and there are no continuing damages as we have in many

6    cases that come into court, where people have very serious

7    permanent damage with injuries for which they are entitled to

8    have damages fixed that will extend to protect them into the

9    future.

10           They can thank whoever they deal with, whether God

11   or someone else, that that is their situation, and they are

12   only entitled to damages, as I said before, for the delay.

13           And I say to the Department of Justice -- I was part

14   of it for four years and four months with great pleasure --

15   that you do outstanding work.  But this is a case where we're

16   dealing with past events, and they're over.  And in my view,

17   the Dorchester has very strong arguments that they are, now,

18   fully compliant with whatever the law requires, and they have

19   been for a period of time.

20           They're stuck with this jury verdict that they had

21   delay, and they should pay for it.  But this is not a case of

22   ongoing racial discrimination or voting rights discrimination

23   that we are confronting in our country that are very serious.

24   You're dealing here with things that took place in the past,

25   and they're over.  And it's time -- and I have listened to

1    this testimony very carefully, and I want to tell you that I

2    think, basically, all of the testimony, all of the witnesses

3    were credible.  I don't think any witness who testified here

4    testified falsely.

5          I know there are some differences in the testimony

6    about what happened in a meeting that took place two and a

7    half years ago.  Believe me, I am not going to make a finding

8    of fact about who was telling the truth about what happened at

9    that meeting because it's not relevant.  The jury said there

10   was delay.  Okay.  And the delay stopped at some point in

11   time.  And then the pandemic kicked in.

12         So a lot of this testimony, with all due respect --

13   you're all very good lawyers -- is really a great deal of

14   detail about something that, as far as the decider here, is

15   not really very important at all.  So I urge you to go back

16   again and see if you can settle this case, rather than spend

17   more -- at least settle the Halperns' part of it.

18         And I once again ask Judge Strawbridge to give you a

19   number that he thinks would be fair.  I'm not going to give

20   him any suggestions about it, and I'm not going to know what

21   he tells you, if anything, or what you do about it.  Okay.

22         So that's all I want to say.  I want to thank you

23   for coming in today.  I'm sorry I couldn't be there in person,

24   but I have listened carefully, and I will review the

25   testimony.  I will review the exhibits that have been

1    presented, and I will come up with the questions.  And we'll

2    set a date for oral argument.

3              Court is adjourned.  Thank you very much.

4              MR. SACKS:  Go ahead.

5              MS. ONDRADE:  One more question from the Department

6    is the opportunity to present a formal closing argument.

7    Your Honor just named a number of issues, and the jury found

8    -- made three findings with respect to the Halperns, not just

9    the unreasonable delay.

10             THE COURT:  I know.  I already said we're going to

11   have oral argument.

12             MS. ONDRADE:  Okay.

13             THE COURT:  I said it two times, but I put it --

14             MS. ONDRADE:  Okay.  Well, as well as the -- as --

15             THE COURT:  -- and you will -- I'll give you a list

16   of questions about what I want to have as the topic of the

17   argument.

18             MS. ONDRADE:  Well, one issue, in particular, Your

19   Honor, is the availability of the punitive damages.  I

20   understand Your Honor has not ruled on that, but we have not

21   been able to express our argument as to that, and if Your

22   Honor doesn't provide a question about it, we wouldn't be able

23   to address is on the record.

24             THE COURT:  You're right.  And I'm not going to hear

25   oral argument on every issue in the case.  I will let you know

1   the issues that are important to me.  That's how I proceed in

2   all cases.

3            Thank you very much for coming in.

4            MR. TROY:  Thank you, Your Honor.

5            MS. ONDRADE:  Thank you, Your Honor.

6            MR. TROY:  I'm sorry, it's Paul Troy with just one

7   point.

8            THE COURT:  Yes, sir?

9            MR. TROY:  And believe me, I'm not going to mention

10  any numbers, Your Honor, but you mentioned we would be going

11  back to Judge Strawbridge.  And this issue came up in

12  discussions you presided over in the trial in June.  And my

13  question is this, when I reference a potential conflict

14  between negotiating with DOJ counsel and the Halperns, it is

15  possible that the Halperns would be willing to negotiate a

16  confidential settlement.  I don't know that.  But a settlement

17  that would be confidential.

18           My understanding is the DOJ is opposed to any

19  confidentiality.  And how -- how can we move forward with

20  Judge Strawbridge in negotiating with the Halperns?  I don't

21  know why the Halperns would --

22           THE COURT:  Well, I'm sorry, I said in my letter --

23  I think I -- well, I don't have my letter in front of me.  I

24  thought I said in my letter that the settlement with the

25  Halperns could be confidential, and I still believe that.  And

1    if you want a formal ruling about that, then you ought to file

2    a motion.

3          But I want to know if, you know, there is -- you

4    know, I'd like to have an agreement that you are agreed on a

5    number, but that the Halperns are willing to have it as

6    confidential, and the Dorchester is, but the Government is

7    refusing.

8          And if that's the case, I think you should file a

9    motion to that effect, and I will rule.  And I think I have

10   the right to rule that it can be confidential, if that is the

11   agreement with the Halperns and the Dorchester.  So I am

12   prepared to overrule any objection.  Unless the Department

13   comes up with some Third Circuit or Supreme Court decision

14   that I can't do this, I believe that a confidential settlement

15   would be in the interests of justice.

16         MR. TROY:  Okay.  Thank you, Your Honor.  We'll

17   address that with Judge Strawbridge when he --

18         THE COURT:  All right.

19         MR. TROY:  -- ever approaches us.

20         THE COURT:  All right.  Okay.

21         MR. SACKS:  Your Honor, I think -- this is Noah

22   Sacks from the United States -- there are rules and policies

23   that prevent the United States from agreeing to a confidential

24   settlement, so that is the source of, I think, the --

25         THE COURT:  Well --

1       MR. SACKS:  -- the question about confidentiality

2  for a settlement.

3       THE COURT:  -- well, if there is a Supreme Court or

4  Third Circuit case that would bind me, I will, of course,

5  follow it, but I'm not sure I am bound by a DOJ, like, rule or

6  regulation.  But you can object, and I can overrule it, and if

7  I -- if I --

8       MR. TROY:  And the DOJ's part of the case, Your

9  Honor, you're going to make a ruling on all of those things.

10  I understood we are supposed to be negotiating just with Mr.

11  and Mrs. Halpern and their interests, not the DOJ's interests.

12       THE COURT:  Well, to make it clear, I wanted to be

13  sure that if the Halperns were prepared to settle that the

14  negotiations about their settlement would be separate from any

15  other negotiations, and that the Department was not insisting

16  on a global settlement.  I got that assurance the last time

17  around, if I recall correctly.

18       MR. SACKS:  We are -- we have submitted to Judge

19  Strawbridge a settlement that is specific to the Halperns and

20  is not global, and we did not hear back from Judge Strawbridge

21  or the Dorchester regarding that offer.

22       MR. TROY:  No, that's incorrect.

23       THE COURT:  Well, I'll follow-up with Judge

24  Strawbridge about that next week.

25       MR. SACKS:  Okay.

1          THE COURT:  Maybe this week.

2          MR. TROY:  Thank you, Your Honor.

3          MR. SACKS:  Thank you, Your Honor.

4          THE COURT:  All right.  Thank you very much.

5          MS. ONDRADE:  Stay well, Your Honor.

6          MR. SACKS:  Thank you, Your Honor.

7          THE COURT:  All right.  Close the record.

8          (Proceedings concluded at 1:52 p.m.)

9                         * * * * *

1    **C E R T I F I C A T I O N**

2        WE, JACQUELINE MULLICA, ROXANNE GALANTI and LOIS

3    VITARELLI court approved transcribers, certify that the

4    foregoing is a correct transcript from the official electronic

5    sound recording of the proceedings in the above-entitled

6    matter held on October 6, 2022 from 8:59 a.m. to 1:52 p.m. and

7    to the best of our ability.

8

9        _/s/Jacqueline Mullica_          October 9, 2022

10   JACQUELINE MULLICA

11   DIANA DOMAN TRANSCRIBING, LLC

12

13       _/s/Roxanne Galanti_            October 9, 2022

14   ROXANNE GALANTI

15   DIANA DOMAN TRANSCRIBING, LLC

16

17       _/s/Lois Vitarelli_             October 9, 2022

18   LOIS VITARELLI

19   DIANA DOMAN TRANSCRIBING, LLC

20

21

22

23

24

25