```
 1                      UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF PENNSYLVANIA
 2

 3   UNITED STATES OF AMERICA      :Case No. 20-cv-1396-MMB
                                   :
 4             Plaintiff,          :
     v                             :
 5                                 :
     THE DORCHESTER OWNERS         :
 6   ASSOCIATION                   :
               Defendant.          :Philadelphia, Pennsylvania
 7                                 :November 3, 2022 at 10:06 a.m.
                                   :
 8   . . . . . . . . . . . . . . .

 9             TRANSCRIPT OF ORAL ARGUMENT re: Damages
               BEFORE THE HONORABLE MICHAEL M. BAYLSON
10                UNITED STATES DISTRICT COURT JUDGE

11    APPEARANCES:

12    FOR THE PLAINTIFF

13    USA:                 NOAH SACKS, ESQ.
                           DOJ-CRT
14                         Civil Rights Division - HCE
                           4con
15                         150 Main  Street NE Suite 8.1202
                           Washington, DC 20530
16                         202-598-6366
                           Email: noah.sacks@usdoj.gov
17
                           SAMANTHA ONDRADE
18                         DOJ-CRT
                           950 Pennsylvania Avenue NW 4con
19                         Washington, DC 20530
                           202-514-4713
20                         Email: samantha.ondrade@usdoj.gov

21    FOR THE DEFENDANT

22    THE DORCHESTER
      OWNERS ASSOCIATION:    PAUL C. TROY
23                           KANE PUGH KNOELL AND DRISCOLL,L.L.P.
                             510 Swede Street
24                           Norristown, Pennsylvania 19401-4886
                             610-275-2000
25                           Email: ptroy@kanepugh.com
```

**Associated Reporters Int'l., Inc.   518-465-8029**

```
1  FOR THE DEFENDANT: (Cont'g.)
                            THOMAS J. ZIMMERMAN
2                           KANE PUGH KNOELL TROY & KRAMER LLP
                            510 Swede Street
3                           Norristown, Pennsylvania 19401
                            610-215-2000
4                           Email: tzimmerman@kanepugh.com

5
   ALSO PRESENT:
6
   TIMOTHY MORAN ESQ. (Plaintiff)
7
   FRANK DEVIN, ESQ. (Counsel for the Homeowner Council)
8

9
   Court Recorder:  Lori DiSanti
10
   Transcription Service:  Associated Reporters Int'l., Inc.
   10 River Drive
11 Massena, New York 13662

12
   Proceedings recorded by electronic sound recording;
13
   transcript produced by transcription service.
14

15

16

17

18

19

20

21

22

23

24

25
```

1                    (On-the-record)

2               THE COURT:  Good morning everyone.

3               MR. SACKS:  Good morning, Your Honor.

4               THE COURT:  Please be seated.  Okay.  We are

5     here this morning for a hearing in a long-running case in

6     this Court, United States versus Louise Hamburg et al

7     versus the -- United States and Louise Hamburg versus the

8     Dorchester Owners Association, Civil Action 20-1396.

9               Present for the United States is Noah Sacks,

10    good morning to you.  Samantha Ondrade, good morning to

11    you.

12              MS. ONDRADE:  Good morning, Your Honor.

13              THE COURT:  And Timothy Moran.

14              MR. MORAN:  Good morning, Your Honor.

15              THE COURT:  Good morning to you.  Present for

16    the Dorchester, Paul Troy and Thomas Zimmerman, good

17    morning to you.

18              MR. TROY:  Good morning, Your Honor.

19              MR. ZIMMERMAN:  Good morning, Your Honor.

20              THE COURT:  Okay.  I just want to tell you that

21    I've set aside two hours this morning for this hearing

22    and I will give you a list of topics that I intend to

23    cover.  But I'm happy to add other ones and I want to

24    make sure that we cover of -- any issues that counsel

25    believe are outstanding.  And -- but I have to adjourn at

1      -- at noon or very close to noon because we have today

2      visiting us a group of judges on the Federal Circuit.

3      And we have arranged a lunch in their honor and I want to

4      be part of that.  So I think two hours should be

5      sufficient.  And I may take a very short break in the

6      middle if -- then at any time any counsel need a break,

7      okay?

8                  You know, here are the topics that I want to go

9      over.  First of all, I want to respond to the questions

10     that the government raised in a communication yesterday

11     when you requested a telephone conference concerning

12     what's going to happen today.  And I want to respond to

13     that.  I was unable to accommodate you.  I was out of

14     town at a judicial conference and traveling, and it was

15     just not feasible to have a last minute telephone call,

16     nor did I think it was necessary.

17                 The second question -- the second issue that I

18     want to go over relates to the Halperns' claim and

19     considering the timeline.  I appreciate the government's

20     memorandum yesterday that if the Halperns and the

21     Dorchester agree to keep -- agree to a settlement and

22     agree to keep it confidential, the government will not

23     stand in the way or attempt to prevent that from taking

24     place.

25                 Third, I would like to have some discussion of

1   the -- of some of the issues pertaining to the pending

2   motions.  And well, let me turn to Mr. Sacks, this is

3   your letter yesterday that -- and by the way, I'm also

4   going to cover the questions that were in my letter of

5   October 20th that I sent out to what would be -- the --

6   that's obviously included, okay.

7     All right.  This is Document 275 that's filed

8   yesterday, November 2nd entitled, The United States

9   motion for telephone conference and clarification of the

10   Court's November 1st, 2022, order E.C.F. 274.  All right.

11   Question Number One and I may not read this verbatim;

12   this returns to after the jury verdict, the Court entered

13   a favor -- judgment favor of Defendant Dorchester on all

14   claims brought by or on behalf of Plaintiff of Hamburg.

15   What remains in claim or defense in this matter does the

16   Court's chronology events and the statements pertain to.

17     Okay.  Louise Hamburg was a party.  This is

18   partially and also -- also an answer to your question --

19   your last question about Louise Hamburg.  Louise Hamburg

20   was a party in the first trial.  The jury's verdict was

21   adverse to her.  The record does not -- the record is

22   clear that she did not file any post-trial motion of any

23   kind, although she could have.  She was represented by a

24   counsel.

25     So I -- in my view, the law requires me to say

1       that she is no longer a party and she doesn't have any

2       rights.  Now, that -- that's how I answer that.  But your

3       answer -- your question Mr. Sacks is broader than that.

4       It's what remaining claim or defense?  Well,

5       specifically, the Dorchester has an outstanding post-

6       trial motion for, I think, both new trial and judgment

7       notwithstanding the verdict.  Is that right, Mr. Troy?

8               MR. TROY:  That is correct, Your Honor.

9               THE COURT:  Okay.  And those have not been real

10      -- ruled on and we will turn to those motions before the

11      morning is over, I assure you.

12              Question Number Two, does the Court contemplate

13      making findings of fact for purpose pursuant to the

14      Federal rule of Civil Procedure 52A on the entries in the

15      chronology.  Okay.  The -- let me just say why I

16      developed this chronology.  At one of our prior hearings

17      Mr. Sacks, right, and I can't point to which specifically

18      in the record right now.  I had posed some questions to

19      counsel and one of the questions, started out was, when

20      certain things happened.  And the government never

21      answered them.

22              And as far as I believe, as far as the post-

23      trial is concerned, the government has not specified

24      certain dates, one which that I think are important, on

25      which certain events did or did not happen.  And that is

1    why in my letter of October 20th which is on the agenda

2    for today, one of the questions is, you know, what is

3    your position as to when certain things took place.

4         Now, so to the extent that the record shows the

5    -- the trial record, that contains either testimony or

6    exhibits that were admitted into evidence.  I think I can

7    rely on those without making any findings of fact.  And

8    there are certain -- and there are certain documents that

9    I believe are in the nature of public records that I am

10   not sure were admitted into evidence.  And so the

11   question is to what extent can I rely on those or not.

12        The -- but if something is -- is in the record,

13   I don't see a need for me to make findings of fact.  I

14   can just say this is an, you know, an exhibit that was

15   admitted.  And I can rely on general legal principles as

16   to what impact it may have on the post-trial motions.

17   But that -- but having had a jury trial and having had

18   the jury return a verdict, I don't think the Judge has

19   any right to make findings of fact that go beyond what

20   the jury's verdict was.  So that's my -- but in my view,

21   but having said that, in my view the fact that the jury

22   decided against Louise Hamburg and in favor of the

23   Dorchester does carry with it a number of conclusions.

24   And we can talk about some of those today or have a

25   briefing about it.

1               So your last question -- your next question was

2        -- is what legal standard or evidentiary standard governs

3        the Court's chronology and the parties additions or

4        revisions to the chronology.  Well, first of all, I want

5        the chronology here to be accurate, okay?  So if I have

6        put the date here that either or both of you think is

7        wrong, you know, I want to know about it.

8               Secondly, if I have included -- and -- but by

9        the way, we did some research and I thought most of the -

10       - and I thought all of the dates here were accurate.  And

11       also the discussion that I sent to you was this -- that

12       was a summary but I also thought it was inaccurate.  But

13       you're -- and I welcome your comments on that.

14              And I have sources for each of these entries.

15       But I don't intend to give those to counsel.  I want

16       counsel to yourselves do whatever research is necessary

17       and -- and that's why I said in my order that I will

18       allow time after this hearing for you to complete the

19       record on that point.

20              So the standard that I'm going to use is that

21       developed by the Third Circuit and on by the -- by Rule

22       52 in other Courts as to what a Judge can consider on

23       post-trial motions and I'll have more to say about that

24       before the -- before the morning is over.  But I -- I

25       don't -- I mean I intend to rely on established legal

1      standards and  -- and so forth.  But I have to say that

2      having reviewed some of this in some detail, I believe

3      Rule 11 may take -- may play a role in the post-trial

4      proceedings that we are going to have here.

5            All right.  The next question is as follows.

6      Are the existing entries in the chronology, as well as

7      any additions or revisions made by the parties limited to

8      testimony presented at trial and trial exhibits admitted

9      in as evidence during the June 6-10, 2022, jury trial in

10     this matter.

11           The -- the basic answer to that is yes, that I

12     intend to be limited to something that is in the trial

13     record either testimony or an exhibit that was admitted.

14     However, there are some documents that in the chronology

15     or some entries in the chronology for which I could not

16     find a -- or have not yet found a -- an evidentiary

17     exhibit that was admitted.  And I'll -- I'll come back to

18     that when we get to the chronology.  And -- and -- but

19     some of them may qualify as public records, particularly

20     if they're HUD documents.

21           Okay.  The next question, can the Court

22     supplement the chronology to indicate the admitted trial

23     exhibit and trial transcript page numbers to which the

24     entries refer.  I will -- I will be -- and I will do that

25     after counsel submit their own view of what the facts are

1 in the chronology.  All right.  And -- but one question,

2 and maybe you did intend this, is why did I develop a

3 chronology.  Well, as I said before, and Mr. Sacks, the

4 primary reason is that I had previously asked the

5 government when certain things took place and I didn't

6 get an answer.  So that's why that's on the list for

7 today.  But I -- we've been spending some time on this

8 and I wanted to give counsel the benefit of the

9 chronology that I had come up with that I -- I think is

10 accurate.

11    Okay.  Last question, should plaintiff-

12 intervener, Louise Hamburg, and/or her legal counsel

13 participate in preparing or submit a response to the

14 Courts order E.C.F. 274, well, I just answered that.

15 Okay.  But in my view under the rules, she's no longer a

16 party since she did not file any post-trial motions.

17    Okay.  Now -- all right.  Now we're going to

18 turn to my letter of -- just a minute.  All right.  My

19 letter of October 30 -- 20, excuse me.  October 20th,

20 2022, re: oral argument questions in the U.S. versus

21 Dorchester case, all right.  And that pertains to this

22 hearing.

23    So the first question relates to the Halperns'

24 claim.  And as you recall, I had asked each party to

25 prepare timelines and then go over the timelines with

1          each other to try and come up with a joint timeline.  And

2          I gather, Mr. Troy you have not -- you've been unable to

3          do that so far?

4                    MR. TROY:  It -- there is a not a joint

5          timeline, Your Honor.  I think we each submitted

6          different but very similar --.

7                    THE COURT:  Yes.

8                    MR. TROY:  Because of the key fob records.  It

9          forced everybody's hand.  That's --.

10                   THE COURT:  Okay.  Well, Mr. Sacks, what's your

11         view?  I mean, your -- the base -- and look, I have not

12         studied your -- your -- your individual timelines to be

13         honest.  But I -- well, I know you did submit them.

14                   MR. SACKS:  Yep.

15                   THE COURT:  So do you -- is there a -- a lost

16         hope that I -- you could agree on a single document?

17                   MR. SACKS:  Your Honor, I don't -- I don't

18         believe we're going to be able to agree on -- on a single

19         document.  We submitted our timeline and cites to the

20         record and to the transcript.  And I -- I think

21         Dorchester disputes some of that.  So I don't -- I don't

22         feel that there is a way for us to reconcile that.

23                   MR. TROY:  Your Honor, I would say I don't

24         think to the extent there's differences.  I don't know

25         that there are differences that are going to be very

1   material.  And I say that only because the Dorchester

2   could only respond and do a timeline as to what the key

3   fob records showed.  The Halperns' timeline included

4   things in their personal knowledge before there were key

5   fob records available.

6              THE COURT:  Okay.

7              MR. TROY:  Yeah.

8              THE COURT:  All right.

9              MR. SACKS:  Your Honor, the -- the Dorchester

10  disputes that and even told the Halperns that they had to

11  use the freight elevator in the rear entrance when the

12  evidence clearly shows that this happened.  I -- there's

13  a -- there's a factual dispute I don't think we're going

14  to be able to come up with the -- a joint statement on

15  those.

16             THE COURT:  All right.  Okay.  All right.

17  Well, all right.  I have -- okay.  But I do want to know

18  what you -- what you -- what Mr. Troy you believe is the

19  -- the -- well, strike that.

20             I'd like to know, Mr. Troy, can you tell me the

21  first date that you believe that's damage to -- the

22  Halperns were damaged.  Not on the map but just as of a

23  date, that they -- the first time they suffered some

24  damage by reason of the Dorchester's action either the

25  Dorchester refusing to discuss, or meet, or -- or issue

```
 1        any order or otherwise.

 2                  MR. TROY:  Your Honor, because --

 3                  THE COURT:  Can you give us a date?

 4                  MR. TROY:  I -- I cannot give you a date when I

 5        would concede -- I do not concede at all that the

 6        Halpern's were ever damaged.

 7                  THE COURT:  All right.  Okay.

 8                  MR. TROY:  Or -- .

 9                  THE COURT:  Okay.  That's a -- I know, that's a

10        -- right.

11                  MR. TROY:  Yeah.

12                  THE COURT:  What's the government's first date?

13                  MR. SACKS:  December 1st, Your Honor.

14                  THE COURT:  December 1st?

15                  MR. SACKS:  December 1st, 2018.

16                  THE COURT:  20 -- September.

17                  MR. SACKS:  December 1st, 2018.  December, Your

18        Honor.

19                  THE COURT:  Okay.

20                  MR. SACKS:  That's thirty days after the

21        Halperns -- approximately thirty days after the Halperns

22        first filed their first request for a reasonable

23        accommodation.

24                  THE COURT:  Okay.

25                  MR. SACKS:  That document -- in that document
```

1          Dorchester promised in writing that they would respond

2          within thirty days.

3                    THE COURT:  Right.  Okay.

4                    MR. SACKS:  And they did not do so.

5                    THE COURT:  All right.  What is the date on

6          which you would agree that the damage with the Halp --

7          the damages to the Halperns terminated if, or is it still

8          going on?

9                    MR. SACKS:  Regarding economic damages?

10                   THE COURT:  Yes.

11                   MR. SACKS:  The date is January 11th, 2022, and

12         that's the date --.

13                   THE COURT:  January 11th, 2022?

14                   MR. SACKS:  January 11th, 2022, Your Honor.

15                   THE COURT:  All right.

16                   MR. SACKS:  And that's the date that Dorchester

17         finally release the Halperns from a discriminatory terms

18         and condition that it imposed --

19                   THE COURT:  Okay.

20                   MR. SACKS:  -- in -- in May of 2021, granted

21         their accommodation.

22                   THE COURT:  Okay.  All right.  That's helpful.

23         All right, now, I appreciate, as I said before that the

24         government does not concede.  Now, Judge -- as I have

25         said before, I believe Judge Roberts has -- is willing to

1       try and be helpful in this regard.  But as I looked at

2       some recent correspondence, has the Dorchester made any

3       specific monetary -- I don't want to know the number.

4       But has Dorchester made a specific offer of damages.

5               MR. TROY:  We have, Your Honor.

6               THE COURT:  Okay.  And did you make that

7       directly to Mr. and Mrs. Halpern?

8               MR. TROY:  No.  No, Your Honor.  And to be

9       clear, there was the email that you saw.

10              THE COURT:  Yeah.

11              MR. TROY:  But there was still the

12      confidentiality issue was unresolved because, Your Honor,

13      will recall that the government's position in June and

14      when we were here last --

15              THE COURT:  Yeah.

16              MR. TROY:  -- was you can't do confidentiality.

17      But --.

18              THE COURT:  All right.  Well, now they've

19      relaxed that.

20              MR. TROY:  Yes.

21              THE COURT:  Okay.

22              MR. TROY:  And I -- I had called --

23              THE COURT:  And I -- I told Judge Strawbridge

24      that I think -- I thought it was likely the government

25      would do that.

1          MR. TROY:  Yeah.  I didn't know.  I tried -- I

2     called Mr. Moran last Thursday to try to get into that.

3     I didn't get a response and I -- and we didn't know the

4     government's position on that until they just filed late

5     yesterday saying --

6          THE COURT:  All right.

7          MR. TROY:  -- confidentiality was okay.

8          THE COURT:  Well, now you know.

9          MR. MORAN:  Well I ended up -- you could have -

10    - I -- I did not know that you called me.  I did not.  I

11    was out of town and I didn't get any message from you.

12         THE COURT:  Okay.  Well --.

13         MR. TROY:  Right.

14         THE COURT:  What are the prospects of that

15    happening today of your making a confidential settlement

16    offer verbally to the Halperns?

17         MR. TROY:  Sure.  Mr. -- Mr. Devine though,

18    he's out with COVID today.  And he's available and that

19    is --

20         THE COURT:  Well, I don't see him here.  He --.

21         MR. TROY:  -- right?  Anything is possible now

22    that confidentiality is -- if confidential settlement is

23    a possibility.

24         THE COURT:  All right.  All right.

25         MR. SACKS:  Your Honor, when you say

1          confidential settlement, do you mean a settlement that

2          the Dorchester offers the Halperns that the Halperns are

3          not free to discuss with the United States?

4                    THE COURT:  Well, look, I don't want to get

5          dragged into a dispute here.  If --.

6                    MR. SACKS:  I don't believe the Halperns were

7          interested in -- in getting a -- an oral offer that

8          they're not allowed to discuss with us.  Now, if you

9          want, we can -- we can talk to them and we can make that

10         clear.  But our understanding is that they don't want --

11         they don't want to be left alone in the lurch talking to

12         the Dorchester without -- without our assistance.

13                   THE COURT:  Well, the -- the question I had for

14         you is if that -- say Mr. Devine makes it directly to Mr.

15         and Mrs. Halpern, okay?  If -- if you're -- if you, the

16         government are okay that they discuss it with you and

17         they want it to remain confidential, that you would honor

18         that.  That is if your position is that if they tell you

19         what the amount is, you're -- you're going to tell them

20         that you object to it being -- you object to it because

21         of being confidential.  In my view, they have the right

22         to settle themselves.  They don't need your approval.

23         That's my view of the law.

24                   MR. SACKS:  That's correct, Your Honor, but I

25         don't believe that they're comfortable going this alone

1      without our assistance after two years of working with

2      us.  That's my understanding.

3              THE COURT:  Okay.  Well, I'll tell -- and I'll

4      tell you what.  We're -- and let's -- I'm going to drop

5      this topic angle and we've going to discuss it at sidebar

6      with the Halperns, okay.  That's what we'll do.  And

7      let's go to some other issues and we'll come back to

8      that, all right.

9              MR. SACKS:  Very good.

10             THE COURT:  All right.  All right.  But I -- I

11     don't want to get into -- well, the -- I'll stop talking

12     about it right now.  All right.  Now, the next question

13     is something that we've discussed before.  Has the

14     statutory requirement that a pattern or practice can only

15     be found if there was wrongdoing as to a group -- "group"

16     and how should this Court rule under the absence of any

17     Supreme Court or Third Circuit authority.

18             Now, I believe that this has been briefed by

19     both of you, okay?  Are any of you were aware since the

20     last time we talked about this of any new Third Circuit

21     or other authority you would cite as to whether a -- the

22     requirement -- the statutory requirement of group is

23     satisfied by the evidence of this -- in this case.

24             MR. SACKS:  Your Honor, the question -- I

25     believe the question conflates two separate claims that

```
1          the United States brought and prevailed on.  We brought a

2          pattern or practice claim under 3614(a).  That statute

3          also authorizes a separate theory of liability called the

4          group of person's theory.  We brought that claim as well

5          and the jury -- the jury was charged on that claim and

6          the jury found liability as to the Dorchester on that

7          claim.  Those are two separate theories of liability.

8          And I just wanted to -- to point that out to the Court.

9                    THE COURT:  Well, what's the first one?

10                   MR. SACKS:  The first one is a pattern or

11         practice.

12                   THE COURT:  Yes.

13                   MR. SACKS:  And violating Fair Housing Act.

14         And there is guidance from the Supreme Court and the

15         Third Circuit on what that means.  We know from --.

16                   THE COURT:  So when you say it's a pattern or

17         practice and it doesn't require any group to be injured.

18         Is that right?

19                   MR. SACKS:  That's correct.  The pattern or

20         practice does not have the word group in it and it does

21         not have group as an element of -- of that claim.

22                   THE COURT:  All right.  Right.  Mr. Troy,

23         what's your position as to that?

24                   MR. TROY:  I think plain English fails there,

25         Your Honor.  How can there be a pattern or practice if
```

1    there isn't more than one -- more than one person.  There

2    necessarily has to be a group.

3              THE COURT:  Right.

4              MR. TROY:  And to be clear, Your Honor, there -

5    - the evidence before you, there -- and there -- and

6    there's a difference.  There is what was heard in June

7    and there was what you heard after that which was very

8    important evidence including the timelines that you saw.

9    There is no group of persons who was been impacted by any

10   alleged discriminatory activity.

11             The Halperns' claim is the only one properly

12   before this Court, the Minkovich claim, because the

13   government wasn't involved in negotiations, resolved

14   confidentially and peacefully so it's not before you.

15   The Plaintiff's pattern or practice claims, the case they

16   gave you were all based on racial discrimination in which

17   an entire class were deprived of public accommodation or

18   housing going back decades.

19             The evidence that you heard in this case is

20   that the Dorchester Owner's Association and there is

21   several members of unit owners here today.  They've

22   allowed six emotional support animals into the building.

23   The only one that was denied was Louise Hamburg and the

24   verdict reflects that is correct.

25             The only pattern or practice, now that you've

1    heard all the evidence by the Dorchester is one of

2    inclusion, not discrimination in any way.

3         THE COURT:  Okay.  All right.  Well -- all

4    right.  Of the -- Mr. Sacks, if I were to say that the

5    requirement of a group was required -- that the statutory

6    reference to a group is part of this case.  The first

7    question is can I consider Louise Hamburg as being part

8    of a group in view of the jury verdict against her?

9         MR. SACKS:  Yes, Your Honor.  You may consider

10    Ms. Hamburg as part of the group that was discriminated

11    against.

12         THE COURT:  Why?  How could I do that if the

13    jury decided against her on liability.

14         MR. SACKS:  Because the only claim that was

15    brought on behalf of Ms. Hamburg individually was a

16    reasonable accommodation claim.  And the evidence shows

17    that even though the jury found that she -- she wasn't

18    due a reasonable accommodation for -- for notice reasons

19    to the Dorchester, found that she had a disability, and

20    the  -- that the jury were shown evidence that the

21    Dorchester nonetheless discriminated against her in other

22    ways in terms of the terms and conditions --

23         THE COURT:  Yeah, yeah.  You -- you -- no

24    question you introduced some evidence that's trying to

25    show that.  But the fact of the matter is that the jury

1       found that -- and I've got the verdict sheet right here.

2       Just give me one minute.

3                   MR. SACKS:  And, Your Honor, you --

4                   THE COURT:  All right.

5                   MR. SACKS:  -- if you --  even putting Ms.

6       Hamburg aside, if you want to turn back to the group

7       question, we have guidance from the Supreme Court on --

8       on that as well.

9                   THE COURT:  What's that, please?

10                  MR. SACKS:  And that's the -- if a statute has

11      a term that's not defined, then we use the common sense

12      meaning.  And the common sense meaning involves turning

13      to the dictionary for example and I -- in the recent case

14      called Tanveer versus Tanveer, that's exactly what the

15      Supreme Court did.  It turned to the Merriam Webster --.

16                  THE COURT:  Do you have a -- do you have a cite

17      for that please?

18                  MR. SACKS:  Yes.  Tanveer versus -- versus

19      Tanveer is 141 Supreme Court 486 at Page 491.  And there,

20      the Supreme Court had to define the term appropriate and

21      there was no statutory definition.

22                  So it turned to the Merriam Webster dictionary

23      and used that definition.  And here, Courts are - or

24      Courts constantly look at dictionaries to define what

25      terms mean.  And here, if you turn to the Merriam

1     Webster, the definition of a group is "two or more

2     figures, forming a complete unit in a composition."  I'll

3     repeat that, two or more figures forming a complete unit

4     and a composition.  And that is consistent.  That is

5     exactly consistent with the Court's instruction to the

6     jury where at trial the Court instructed the jury to "use

7     your everyday common sense meanings as to what is meant

8     by a group.  And that's at -- that's at June 10, the

9     transcript 1.2.

10              THE COURT:  Well, that's -- we got some of the

11    jury -- as I recall, the jury asked the question and that

12    was my answer.

13              MR. TROY:  That's right.  And then you went

14    further on to state that a group obviously is more than

15    one.  And that's exactly right.  A group is more -- a

16    group is more than one.

17              THE COURT:  Okay.  Well, let me ask you this.

18    So you believe, and, you know, I've got the verdict sheet

19    here.  So the jury found a question -- the first question

20    they found that Louise Hamburg had a mental -- mental

21    impairment that substantially limited one or more  -- one

22    or more of her major life activities.  But then in

23    question 1A, she -- and they answered no to the question

24    of whether Plaintiffs had proof that the Dorchester was

25    informed of and reasonably should have known Louise

1      Hamburg had a disability and needed an E.S.A. because of

2      her disability.  And the answer there clearly was no,

3      okay?  And that was the end of Louise Hamburg.  Now, can

4      I consider Louise Hamburg was part of the group?

5                MR. SACKS:  Well, even putting Louise Hamburg

6      aside, you have Bernie Halpern, you had Cindy Halpern.

7                THE COURT:  Well that's my -- my next question.

8                MR. SACKS:  Anna Minkovich.  You have David

9      Michigan.

10               THE COURT:  You think -- you think a married

11     couple is a group standing alone?

12               MR. SACKS:  Absolutely.  Both have standing to

13     bring claims of the Fair Housing Act, both were injured

14     by the Defendant's discriminatory conduct.  We heard from

15     them for two days in addition to the trial about how

16     terrible things were for them because of the Defendant's

17     discriminatory conduct.  They both are aggrieved persons

18     under the Fair Housing Act and therefore they're both

19     members of a group.

20               THE COURT:  Okay.  All right.  And -- all

21     right.  Mr. Troy, what's your position about that?

22               MR. TROY:  Ab -- absolutely not.

23               THE COURT:  But are you familiar with this

24     case, the Stanford?

25               MR. TROY:  I'm sorry.

```
1                    THE COURT:  The Stanford case.

2                    MR. TROY:  The one that they just mentioned?

3                    THE COURT:  That Mr. Sacks, yeah.

4                    MR. TROY:  Yeah.  That -- well, that was -- so

5         he was defining the -- the word appropriate apparently.

6         Your Honor, I am completely comfortable with you using

7         plain English on pattern, practice, or group, and -- and

8         you should, and that's the point.  There is no group

9         here.  There is no -- nothing.  And -- and remember that

10        when that verdict was rendered, all the jury had heard

11        was the little bit from the Halperns and the trial in

12        which we spent ninety-nine percent of our time on Louise

13        Hamburg.  And it was only -- what they heard from the

14        Halperns on direct exam was they had to commute back and

15        forth from Ocean City.  They weren't able to stay at the

16        Dorchester or barely -- .

17                    THE COURT:  Don't go -- don't go all over the

18        evidence, please.

19                    MR. TROY:  Okay.  But the point being you

20        learned, this Court learned subsequent to that because of

21        the timelines we both submitted, because the key fob

22        records compelled the Hamburgs and the governments to

23        truthfully represent that they spent -- that they

24        returned to the Dorchester at their usual time in

25        October.
```

1              THE COURT:  Wait -- wait a minute.  I think you

2       are going too far.  I don't know -- the jury found in

3       favor of the Halperns, okay?  The same verdict that --

4       sheet that I'm looking at.

5              MR. TROY:  Yes.

6              THE COURT:  So -- but that was this to -- in my

7       view, that was primarily as to their individual claim of

8       delay, would you agree?

9              MR. TROY:  That -- yes.  With the evidence the

10      jury had then which is not everything you had subsequent

11      to that.

12             THE COURT:  Well, you know, the evidence --

13             MR. TROY:  They submitted --

14             THE COURT:  --  at the trial was the evidence

15      of the trial.  On the issue of damages, we had some

16      additional evidence but the -- the question -- here's the

17      question that I have for you.  The way -- the way the

18      verdict form was submitted which was without objection if

19      I recall that because they found against Louise Hamburg,

20      they didn't consider any questions for -- related to her.

21             Then question number two related to the

22      Halperns specifically and they answered yes, okay?  And

23      so Two A as well then -- and Two B and they answered yes

24      to all four questions pertaining to the Halperns.  Then

25      they -- I asked the question number three, as to whether

1     they -- the jury found that the D.O.A. unreasonably --

2     unreasonably delayed responding to Anna Minkovich, okay?

3     And they said yes to that, okay.

4            Then question number four and question number

5     five, did not use the word group.  And the jury answered

6     yes to the -- to the -- do you find that plaintiffs prove

7     by a preponderance of the evidence that the D.O.A. made

8     dwellings at the Dorchester unavailable to people with

9     disabilities who made it ASA's because of the disability.

10    Yes.  No reference to group there.

11           Question number five is the saying they're

12    people with disabilities and they answered yes to that

13    without any question as to group.

14           Question number six is -- it also related to

15    the difference between abled, and disabled, and non-

16    disabled people.  And the jury answered yes to that.

17           Question number seven, do you find that

18    Plaintiffs proved by a preponderance of the evidence that

19    the D.O.A. and, you know, in the pattern or practice of

20    resistance to permit people of disabilities who needed

21    A.S.A.s because of the disabilities to fully enjoy the

22    rights granted to them  by the Fair Housing Act.  Answer

23    yes.

24           Okay.  Question eight is the only question that

25    included the word group.  Do you find that Plaintiffs

1    proved by a preponderance of the evidence the D.O.A.

2    denied a group of people the rights that are granted to

3    them by the Fair Housing Act.

4              So does that support Mr. Sacks' argument that

5    the -- in view of the jury's answers to those questions?

6    Questions four -- four, five, six, and seven that that

7    was a finding -- in favor of the United States as the

8    pattern or practice without regard to the requirement of

9    a group and that's my question.

10             MR. TROY:  And -- and my answer is no, Your

11   Honor.  And I want to briefly explain why.  Number one,

12   we had objected to the inclusion of Anna Minkovich on --

13   on the -- the verdict sheet.

14             THE COURT:  Yeah.  You -- you did.  But it's

15   on.

16             MR. TROY:  I know.

17             THE COURT:  The fact that Anna Minkovich is in

18   question number three.

19             MR. TROY:  Yeah.

20             THE COURT:  My question relates to four, five,

21   six, and seven.

22             MR. TROY:  Yes.  And the -- and -- and -- but

23   the issue becomes you know, with Anna Minkovich is, even

24   though her claim was settled and done, her inclusion on

25   the sheet, you know, it caused the problem that we feared

 1      when we raised the objection.  But another -- another key

 2      word in that verdict sheet, Your Honor, is unavailable.

 3      That the -- that the -- that the unit was unavailable.

 4      Because Your Honor tried to split this difficult hair of

 5      what is liability and what is damages in this case.  The

 6      way that went is the Halperns were allowed to testify,

 7      that they -- they couldn't use their unit and they had to

 8      travel to and from the shore.  It wasn't until we got

 9      into the phase before Your Honor, that there was evidence

10      solicited and finally admitted to because they didn't

11      have any choice from the Halperns that they lived

12      overnight in this unit for -- for five plus months.

13              THE COURT:  No, I understand.  You're talking

14      about the Halperns --

15              MR. TROY:  And even though the D.O.A. knew if

16      they were there, but they didn't.

17              THE COURT:  Okay.  For -- for whatever reason -

18      -

19              MR. TROY:  Yeah.

20              THE COURT:  -- we had specific interrogatories

21      about Louise Hamburg, and the Halpern, and Anna

22      Minkovich, okay?  And I thought that was necessary in

23      view of the legal issues that you had raised to have

24      separate verdicts, okay?

25              So if regard to what I -- questions five --

1          when you let me straighten.  With regards to questions

2          four, five, and six, and seven, it did not revert --

3          refer to Hamburg or Halpern or -- or Minkovich.  And also

4          didn't use the word group.  What is your response as to

5          why Mr. Sacks' argument is not correct?  That the -- to

6          the extent the statute would allow a finding of a pattern

7          or practice, just existing without any specific

8          consequences on either the individuals or a group.  So

9          why is that insufficient under the -- under the law?

10              MR. TROY:  Sure.  Two -- two points there Your

11         Honor.  First, if you're going to have a pattern or

12         practice and I'm all for adapting plain English as the

13         Supreme Court did in this case with the word appropriate.

14         How can you have a pattern or practice without a number

15         of -- a pattern applies to a number of such events;

16         practice implies a regular practice of doing things.

17              More over, within those questions was the word

18         available, whereas not -- unavailable, where as what the

19         evidence have shown by the Halperns own admission before

20         you, the unit was -- was available to them, and they used

21         it, and the Dorchester knew the dog was there and they

22         let them use it.  And they had a photo and everything and

23         they let them use it.

24              THE COURT:  Well said.  Okay.  Those -- those

25         are your -- all right.  I hear you and I understand your

1        arguments.  But is it possible that Congress intended

2        that there would be liability against the apartment house

3        for having a pattern or practice without showing specific

4        injury of any particular individual or group?

5                MR. TROY:  No.  But you would need, by the

6        plain English of the statute for there to be a pattern.

7        Yeah, well that --.

8                THE COURT:  Okay.  Well that -- that is a legal

9        issue that I'm not sure you've briefed yet and I think

10       you should -- I'm going to give both sides an opportunity

11       to submit briefs, okay, after this hearing.  But that is

12       a lingering question here that I think deserve some

13       research.  Now you -- it's -- if you have -- and I said

14       before that a lot of these or many, if not most, of these

15       cases involve racial discrimination, all right, which is

16       not involved in this case.

17               MR. TROY:  Yeah.

18               THE COURT:  But I think there is a legal issue

19       here whether Congress was entitled to allow a jury to

20       make findings of a pattern or practice without the

21       government having to show injury to any specific

22       individual or group of individual.  Is that your

23       position, Mr. Sacks?

24               MR. SACKS:  Your Honor, I don't think we need

25       to reach that question the evidence shows that the

1    Dorchester's pattern or practice did hurt many people in

2    this case.  It hurt Mr. Halpern.  It hurt Mrs. Halpern.

3    It hurt Anna Minkovich.

4            THE COURT:  But when you say many, you're

5    getting into the --

6            MR. SACKS:  And they -- and you heard David

7    Michigan.

8            THE COURT:  -- the same problem I have with

9    that group, you know?  The Dorchester or the evidence has

10   like thirteen hundred or fourteen hundred residents,

11   okay.  The people about whom we heard were Ms. Hamburg

12   who the jury found against and presumably disbelieved,

13   the Halperns in whom they found in favor of, and Ms.

14   Minkovich who dropped -- did not really want to pursue

15   her claim and there was no -- had no allegations of

16   damages.  So when you come back to that, you know, I have

17   a problem with saying its many or a group.  If your

18   position was that Congress intended this to -- up to

19   allow a -- a jury and a judge to make findings against a

20   -- an apartment house in this case, there could be a

21   hotel or anything without showing specific injury to any

22   -- any individual, I'd like to know that.  But you said

23   that's not your argument.

24           MR. SACKS:  I think we're -- I think we're sort

25   of running -- running far from the standard that we

```
1      understand that we're here on.  We're on the Rule 50
2      Motion and under that standard, the Courts -- the Courts
3      have to construe the evidence in the light most favorable
4      to the -- to the non-moving party, to the winner, to the
5      United States in this case.  And if the record contains
6      even that minimum quantity of evidence from which the
7      jury might reasonable afford relief, the jury's verdict
8      must sustained, and that's a Third Circuit case in the
9      Relington Home for the Aged.
10              THE COURT:  Well you're -- you're -- you're
11     right about that.  That's the Third Circuit rule that
12     allowed --.
13              MR. SACKS:  The record has that evidence, Your
14     Honor.  It's that --.
15              THE COURT:  Right.
16              MR. SACKS:  Ms. Minkovich was here.  She
17     testified that the Dorchester made her cry because rather
18     than granting her accommodation, it asked her to sell her
19     unit.  The jury assigned liability based on that.
20              THE COURT:  Okay.
21              MR. SACKS:  They found that the Dorchester's
22     actions were reprehensible and they found that she was
23     injured by it and the same thing with the Halperns, Your
24     Honor.
25              THE COURT:  All right.  Okay.  The next
```

1          question I have is Question E, and this is going back to

2          my letter of October 20th.  And this again is another

3          reason why I prepared the chronology.  When did Louise

4          Hamburg make any untrue statement of facts separately to

5          A, the Dorchester, B, the Department of Housing and Urban

6          Development, or C, the Department of Justice.  And I

7          asked you to provide specific dates for those.  Can you

8          do that now?

9                    MR. SACKS:  Your Honor, Court's indulgence.

10         Your Honor, can we take a short five-minute recess,

11         please?

12                   THE COURT:  Yeah.  But I -- I'd like to -- I'd

13         really would like answers to those questions.  Yes.

14         We'll -- but I wonder the -- you need a bathroom break or

15         you just want to confer with them.

16                   MR. SACKS:  I need to confer with my

17         supervisor.

18                   THE COURT:  All right.  Well, okay.  All right.

19         We'll take a five-minute recess right now.  Thank you.

20         But please, look at Question C.  I would like specific

21         dates from the government.

22                   (Side Bar One Under

23                   Separate Cover)

24                   THE COURT:  Okay.  Back on the record.  Okay.

25         So Question C One, when did Louise Hamburg make any

1      untrue statements of fact separately to Sub-A to

2      Dorchester?

3              MR. SACKS:  Okay.  Your Honor, I need to

4      correct what the Court -- what I believe the Court

5      started with which is that we did not answer the Court's

6      questions regarding Ms. Hamburg.  We did respond in -- in

7      our response to the Dorchester's motion for, you know,

8      post-trial directed verdict.  That's E.C.F. 335 and pages

9      nineteen through twenty-two where we responded to the

10     Court's questions at that time.  The questions that the

11     Court are asking now are -- are phrased differently than

12     the Court phrased them earlier.

13              THE COURT:  Yeah.

14              MR. SACKS:  Regarding when Ms. Hamburg made any

15     untrue statements to the United States, it's United

16     States' position that she never made any untrue

17     statements to the United States.

18              THE COURT:  Well, what about her statement that

19     she was seen by a licensed psychologist referring to

20     Carla Black who is -- agreed is -- was not licensed?

21              MR. SACKS:  Your Honor, the Court's question

22     uses the phrase untrue statement and we simply do not

23     know what the Court means by that.  Is the Court talking

24     -- is the Court talking about Rule 11 which is the first

25     time we've heard of that, is the Court talking about the

1     Defendant's post-trial motion for leave which the

2     evidence or standard standards of statement to the United

3     States.

4             THE COURT:  Mr. -- Mr. Sacks, we're getting

5     into semantics, okay?  Louise Hamburg is quoted -- is in

6     many documents that she submitted to HUD.  And which you

7     repeated in your complaint here that she had been seen by

8     a licensed psychologist, or a licensed -- let me get the

9     word exactly.  Hold it.  Just one second.  Where is that?

10    It's here.  Okay.

11            All right.  The -- I'm now looking at the

12    housing discrimination complaint filed by Louise Hamburg.

13    This is Exhibit 125 that was admitted into evidence

14    signed by her on 4/26.  She's the complainant and this

15    was under paragraph eight.  And the third paragraph read

16    as follows, verbatim.  On December 25th, 2017,

17    complainant emailed Respondents a letter from a license

18    mental health professional prescribing her E.S.A. and

19    indicated that she would be bringing the E.S.A. to the

20    condo.  The record is clear, Mr. Sacks, that she was

21    referring to Carla Black and there's -- I don't think

22    there's any dispute in this case that Carla Black was not

23    a licensed mental health professional.

24            MR. SACKS:  Your Honor, we -- we dispute that.

25    We disagreed though.  The evidence was that Ms. Hamburg

```
 1        was a licensed therapist.  She had a license from the

 2        State of California.

 3                    THE COURT:  Carla Black did?

 4                    MR. SACKS:  Yes.

 5                    THE COURT:  You -- did any -- was that ever in

 6        evidence?

 7                    MR. SACKS:  Yes.  I believe so.  I believe Ms.

 8        --

 9                    THE COURT:  How -- how?

10                    MR. SACKS:  -- Hamburg testified that at the

11        time that she received a letter from Carla Black, she

12        understood Ms. Black was a licensed therapist.

13                    THE COURT:  A list -- Ms. Hamburg may have said

14        that but she later admitted that she was not a licensed.

15        That she was not licensed.

16                    MR. SACKS:  I think it's on Ms. Black's letter

17        as well, Your Honor.  Yes, here we go.  I can refer to

18        the May 17th, 2017, letter, that's D11 -- that

19        Defendant's 115.

20                    THE COURT:  125?

21                    MR. SACKS:  115.

22                    THE COURT:  115.

23                    MR. SACKS:  Yes.  And at top of that letter it

24        says, License Number 44511 California issued 4/30/07.

25                    THE COURT:  She also said that -- and Ms.
```

1     Hamburg also said that she had been treated by and

2     evaluated by Carla Black.  Is that correct?  And that was

3     all -- or that was untrue?

4              MR. SACKS:  What -- when did she say it?  I

5     think that's -- I believe that's correct, Your Honor, she

6     had been evaluated by Carla Black.  Carla Black did --

7     Ms. Hamburg did in fact fill out a long questionnaire

8     that she testified about, and based on that evaluation,

9     Ms. Black wrote a letter for her.  Regarding, you know,

10    her -- her claim that she's been treated by, she did

11    received help from Ms. Black.  She got this letter, and

12    that letter allowed her to fly on planes and live in

13    buildings that she was entitled to live in, but couldn't

14    otherwise do because she needed her emotional support

15    animal.  So --

16             THE COURT:  But when Ms. --?

17             MR. SACKS:  -- and Ms. Hamburg said she did get

18    that.

19             THE COURT:  But -- but when Ms. Hamburg

20    testified at the trial, didn't she admit that she had

21    made misstatements to her?

22             MR. SACKS:  No, Your Honor.  She admitted that

23    she had -- had -- she -- she described her word verbiage

24    as -- as -- as an oversight and she testified that -- I

25    believe she said that rather than saying "my therapist",

```
 1        she should have said, "by the therapist that evaluated

 2        me" which is -- which is a very -- I guess it's different

 3        but it's -- it is a far cry from the sort of false

 4        statement or -- or untrue statements that I -- I

 5        understand the Dorchester to be accusing her of -- of

 6        doing.

 7                  THE COURT:  All right.  All right.  Just one

 8        second.  All right.  Now, let me ask you about HUD.  So

 9        we know that HUD filed a complaint against the

10        Dorchester.  Is that correct?

11                  MR. SACKS:  Yes, Your Honor.

12                  THE COURT:  Okay.  Now, I am not sure if that

13        complaint --.

14                  MR. SACKS:  I got a -- I'm sorry.  HUD -- she

15        filed the complaint with HUD against the Dorchester.  I

16        don't believe HUD -- HUD didn't file a complaint with the

17        Dorchester.  HUD might have informed the Dorchester that

18        Ms. Hamburg -- that Ms. Hamburg had filed the complaint

19        but they do not filed the complaint.

20                  THE COURT:  No.  But they -- well -- remember,

21        this was an issue at trial because I raised and

22        complained about the fact that the government had never

23        introduced any HUD regulations or any other addition --

24        or any other evidence of what HUD did.  But there is a

25        public record that HUD had -- did file a complaint
```

 1    against the Dorchester on July 8th, 2019.  As I sit here,

 2    I'm not sure if that was ever admitted into the record.

 3    Let me just finish.  No, I'm going to -- let me finish

 4    and then you can speak, all right?

 5              This is -- this complaint by HUD, it's on the

 6    letterhead of U.S. Department of Housing and Urban

 7    Development, they filled -- filled off the office.  And

 8    it was addressed to Stephen Williams and a law firm in

 9    Harrisburg who was then counsel for the Dorchester.  And

10    it was sent by Cheryl Johnson, Regional Counsel.  And it

11    is entitled a -- and a determination of reasonable cause

12    and charge of discrimination.  And that has a number of

13    statements in it about Ms. Hamburg's background and the

14    complaints that she made -- and the complaint she made,

15    and in paragraph seventeen it says as follows.

16              In 2016 and 2017, complainant completed online

17    questionnaires on a website.  The questionnaires were

18    evaluated by a licensed psychotherapist who concluded the

19    complainant needed an assistance animal.  The

20    psychotherapist wrote a letter dated May 17, 2017, saying

21    that complainant's assistance animal is necessary for

22    emotional and mental health because its presence helps

23    mitigate the "symptoms she experiences".

24              Now I'm not aware of anything in the record to

25    this case that Carla Black was a licensed

1      psychotherapist.  Are you?

2              MR. SACKS:  Yes, I am, Your Honor.  AS I

3      mentioned, miss  -- Ms. Black was licensed

4      psychotherapist and that's apparent from the -- the

5      letter that was submitted into evidence.  That's D11 --

6      D115 which I'll again refer to which says -- which has

7      Ms. -- Ms. -- it has Ms. Black's license number at the

8      top of the page.  And then also -- I also note that the -

9      - the HUD's -- HUD's charge was filed only after they

10     received evidence that Dr. McClymons (phonetic spelling)

11     had evaluated Ms. Hamburg in person, you know, with a

12     two-hour evaluation   --.

13              THE COURT:  We'll -- we'll come back to that.

14              MR. TROY:  I'm not sure about that.

15              THE COURT:  Yes, you're right.  I bet you're

16     correct about that.  But Mr. Troy, let me just say this,

17     what your position is about Carla Black.

18              MR. TROY:  Yes, and thank you, Your Honor.  And

19     I -- I will go over this very specifically.  The -- as to

20     the Dorchester, the first time that -- as to the Dorch --

21     starting Christmas day of 2017 continuing through January

22     and February of 2018 and culminating by the Court

23     complaint, there were repeated false statements by Ms.

24     Hamburg.  The first time she acknowledged to the

25     Dorchester directly that she never treated with Carla

1    Black was in her deposition which I took in February of

2    2021.

3              As to your threshold question of what did the

4    U.S.A. know and when did they know it.  As to HUD, they

5    were aware and I have -- Mr. Perry can pull up the

6    Exhibit 138.  They were aware July 9 --.

7              THE COURT:  Who's - who's they?

8              MR. TROY:  HUD.

9              THE COURT:  Okay.  Go ahead.

10             MR. TROY:  At the latest July 9, 2018, that

11   Hamburg had lied about her relationship with Carla Black.

12   The -- if we are able to pull that up.

13             THE COURT:  All right.  Well, do you concede

14   that Carla Black was a licensed psychotherapist?

15             MR. TROY:  I don't know.  I know that her

16   letter says she has a license.  But the point was when I

17   went over and it's laid out in the -- in the cross

18   examination of Ms. Hamburg is that -- that -- that she

19   never actually treated or saw the lady and she was

20   representing to the contrary.  And the way she was

21   representing to the contrary was in her emails and they

22   were Exhibit 40 to the -- the Dorchester.  She was

23   referring to my licensed therapist, and in the letter,

24   Carla Black said, I'm helping her with her, Exhibit

25   Forty, the Carla Black letter Page 4.  I'm a licensed

1     mental health professional who is helping Louise Hamburg

2     with her emotional, mental-health condition.  And Louise

3     Hamburg you'll remember testified and we went over edits

4     she made.

5          THE COURT:  Yes.

6          MR. TROY:  And she edited lots of things in

7     Carla Black's letter or McClymons' letter.  But she let

8     that stand that Carla Black was somehow her treating

9     therapist.  And she was never getting treatment.  And,

10     Your Honor, the key point is that HUD knew that because

11     in Exhibit 138 before, Your Honor, when asked in -- in

12     July of 2018, how are you originally connected with

13     Black, and this is Exhibit D138, page seven.  She stated

14     that complainant stated through the website doctor.net

15     and the website connected her to Ms. Black and went on

16     further to be questioned at page nine finally admitted to

17     HUD.

18          Complainant stated in 2016, she filled out a

19     questionnaire, which Carla Black evaluated and in 2017,

20     she filled out another questionnaire.  When asked if in

21     either instance, Ms. Black followed up her evaluation

22     with a telephone -- telephone interview, complainant

23     stated she did not.  Complainant stated Carla Black is

24     not treating her and she has someone new.  And this is so

25     important, Your Honor because how did the Dorchester get

1    that HUD record which is Exhibit 138 before you.  We got

2    it from the Department of Justice in discovery.  And this

3    is where the chronology is important.  And, Your Honor,

4    you asked for dates.

5         The Department of Justice presumably -- well, I

6    can tell you that the D.O.A. and Louise Hamburg, HUD's

7    findings were July 8th, 2019.  There was then an election

8    made by Ms. Hamburg and the Dorchester to have the case

9    heard in Federal Court, that were both in July of 2019.

10   On that same date, HUD referred the matter to the

11   Department of Justice.  This triggered the Department of

12   Justice's involvement in this case eight months before

13   this lawsuit was filed.

14        Now our office's first contact with D.O.J. was

15   with Mr. Bazwari --.

16        THE COURT:  Well your -- your particular firm -

17   - firm was retained with the connection with this

18   litigation.

19        MR. TROY:  Yes.

20        THE COURT:  All right.  So when -- you don't

21   need to go there.

22        MR. TROY:  Okay.  But I want to -- Your Honor

23   if I can just made it clear on the timeline with Carla

24   Black.  So the D.O.J. would have HUD's file in 2019, they

25   would have the same information that's in Exhibit 139.

 1                    THE COURT:  Right.

 2                    MR. TROY:  And yet they proceed with the case

 3          and moreover in the complaint in this case in paragraph

 4          twenty-six.

 5                    THE COURT:  Yeah.  I have that here.

 6                    MR. TROY:  Yeah.  They state in there that it

 7          was, you know, through Carla Black's website.  No, it was

 8          the third party website the doctor.net.  They put that in

 9          their complaint despite having the information that HUD

10          --.

11                    THE COURT:  Well, wait -- wait, wait a minute.

12          Okay.  So Mr. Sacks, yep.  So I'd like you to cover that

13          in -- whatever you'd like to say because Paragraphs 26

14          and 20 -- Paragraph 26 of your complaint but -- it says,

15          quote --.

16                    MR. SACKS:  And I -- I would, Your Honor.  But

17          I --.

18                    THE COURT:  Just a minute.  Just a minute.

19                    MR. SACKS:  Okay.

20                    THE COURT:  "Attached to her email," her being

21          -- her referring to Louise Hamburg.  "Attached to her

22          email was a May 17, 2017, letter from Carla Black, a

23          clinical psychotherapist, which Ms. Hamburg obtained

24          through Ms. Black's website."  And then Paragraph 27

25          continues, "the May 17, 2017, letter states that Ms.

1      Black is a licensed mental health professional who is

2      helping Louise Hamburg with her emotional, mental health

3      condition and that she is familiar -- and she is familiar

4      with the functional limitations that are enclosed by this

5      ill -- illness."  Then it cites further from the letter.

6      All right.  Now, what would you like to say?

7              MR. SACKS:  There's several things.  First is,

8      Counsel is just reading from an exhibit that you excluded

9      from trial.  So again we don't --.

10              THE COURT:  So true.

11              MR. SACKS:  No.

12              MR. TROY:  We're not sure what standard we're

13      using here to determine any of these.

14              THE COURT:  But wasn't that given and admitted

15      to trial?

16              MR. SACKS:  It was not.  It was excluded.

17              MR. TROY:  Yes, 138 was admitted.

18              MR. SACKS:  It was not, Your Honor.  And I can

19      read you the -- I can show you the transcript where --

20      where you've excluded it because the Defendant's tried to

21      get it through Ms. Hamburg.  And Ms. Hamburg didn't

22      recognize it because she didn't -- she didn't check.  And

23      Your Honor said, okay, she doesn't know it, like stop

24      asking her questions about it.  And that's at -- look at

25      -- I believe it's transcript -- yes.  It's the -- the

1     June 7th transcript, 2022, at pages 209 to 210.

2             THE COURT:  I know.  Let me just repeat that

3     again.  June --.

4             MR. SACKS:  Sure.  June 7, 2022.

5             THE COURT:  Yeah.

6             MR. SACKS:  At two -- pages two zero nine to

7     pages two ten.

8             THE COURT:  And I have this notebook, Mr. Troy

9     that the -- that the Plaintiff's submitted or Plaintiff's

10    submitted trial exhibit and then 138 is not included

11    there.  Do you know where --?

12            MR. TROY:  Not in the Plaintiff's notebook.

13            THE COURT:  Well, did you admit it?

14            MR. TROY:  Yeah.  We -- we had --.

15            THE COURT:  Did I admit it when you offered it?

16            MR. TROY:  That's my -- my recollection, Your

17    Honor.  I'm still --.

18            THE COURT:  Well, you'll need to do some

19    research into the record.

20            MR. TROY:  Yeah.  And I'll say, Your Honor,

21    regardless if -- if -- if counsel is correct and I don't

22    have the transcript in front of me.  Your question is

23    what did the -- what did the government know and when did

24    they know it.  Whether or not the jury heard it, they had

25    this.  They admit to that.

```
 1                    THE COURT:  What are you holding up?

 2                    MR. TROY:  This is Exhibit 138, the -- the HUD

 3          records.  It was referred to them eight months before

 4          they filed suit.

 5                    THE COURT:  Okay.  All right.

 6                    MR. TROY:  And, Your Honor, more importantly,

 7          you know, they -- they -- being aware of her false

 8          statements, they filed the complaint they filed.  And

 9          you'll remember that they tried to keep Carla Black out

10          of evidence, stuff about Carla Black before the trial

11          began.

12                    THE COURT:  Right.

13                    MR. TROY:  Now if -- they -- now they want to

14          keep the HUD record they had out of evidence and the --

15          the false statements, they decided to prosecute the case

16          using her as their main witness.

17                    THE COURT:  Okay.

18                    MR. TROY:  Moreover, as to Carla Black, Your

19          Honor, the articles about her were a public record

20          available to anyone with an internet connection.  And

21          this suit began March 12 of 2020.  The State of

22          California had already commenced its investigation in May

23          of 2018 and had suspended her in May of 2019 for

24          providing fraudulent E.S.A. letters to persons with whom

25          she has never treated.
```

```
 1              MR. SACKS:  So she was licensed, Your Honor.
 2    The Defendant has just acknowledged that she was a
 3    licensed psychotherapist when she saw Ms. Hamburg.
 4              MR. TROY:  Yeah.  They suspended -- the
 5    question wasn't didn't she ever have a license.  I mean,
 6    I don't know that.  But they suspended her in May of
 7    2019.
 8              MR. SACKS:  Ms. Hamburg didn't know that.
 9              MR. TROY:  Almost a year before they filed this
10    lawsuit.
11              MR. SACKS:  Ms. Hamburg had no idea about any
12    of this, Your Honor.
13              THE COURT:  Well, here -- here --.
14              MR. TROY:  You knew about --.
15              THE COURT:  This is the question  -- these are
16    the questions that I have, okay?  First question is I'd
17    like to know if it's clear -- what is clear to me and
18    really undisputed is that Louise Hamburg first went to
19    HUD, okay, which is entirely appropriate.  Nobody can say
20    -- she's a citizen,  she has a right to make a complaint.
21    She went to HUD, okay?  The first question is, were there
22    any, you say false -- I -- I put false statements in my
23    letter, you know, untrue, I made untrue statements.
24    Untrue is a broad term which we -- we don't have to talk
25    about what it means, okay?  But there is some indication
```

1      in -- in the overall record of this case that Louise

2      Hamburg had reason to know that Carla Black was not the

3      type of person that the statute is referring to when it

4      really -- the statute here requires that someone go to --

5      where's the exact language of that, Caroline.  The --

6      what's in the statute?  What?

7              THE REPORTER:  You are referring to where it

8      says a licensed medical doctor.

9              THE COURT:  A licensed medical professional.

10     That's what --.

11             THE REPORTER:  Mental health doctor, licensed

12     for mental health.

13             THE COURT:  Licensed mental, okay.

14             MR. SACKS:  Your Honor, I -- I have to object

15     here.  You're making inferences about the knowledge of --

16     of a woman --

17             THE COURT:  No, no.

18             MR. SACKS:  -- who is not even here to -- to

19     tell you about it.

20             THE COURT:  Yeah.  Well, the record is clear

21     though when -- when she was being cross-examined at trial

22     that she had gone back and forth with Carla Black, trying

23     to get Carla Black to make changes to the letter that

24     Carla Black had submitted, isn't that correct?

25             MR. SACKS:  That is and there's nothing --

```
1        there's nothing wrong about having --

2                THE COURT:  Okay.

3                MR. SACKS:  -- having specific language put

4        into the letter so that what you know that the letter

5        says the right things and to do what you believe you're

6        entitled to do.

7                THE COURT:  Okay.  Okay.  Okay.  But the point

8        is that -- so assuming you're right that Carla Black was

9        licensed, okay?  Let's cross that bridge, okay?  That she

10       still -- Louise  Ham -- the jury could have concluded

11       that Louise Hamburg did not testify truthfully about her

12       relationship with Carla Black because -- let me just

13       finish, because -- I promise you I'll give you your

14       chance, because there was testimony that she was not

15       happy with the Carla Black letter.  She knew that she had

16       gotten to Carla Black through this website and then she

17       knew she was never really evaluated by Carla Black.  She

18       never saw Carla Black.  There's nothing in the record to

19       show there was any treatment by Carla Black of Louise

20       Hamburg.  At least I think the jury could have concluded

21       that.  So if that's -- if the jury could have concluded

22       that and if that could have been reason why the jury

23       decided against Louise Hamburg, where does that leave me

24       on the post trial motions.

25                And the question I have is this, and the
```

1   importance is that HUD knew some of these facts.  And the

2   record is not clear what HUD knew or didn't know because

3   nobody from HUD ever testified at the trial.  And you may

4   recall, I was critical of the government, but you never

5   introduced any of the HUD regulations, or any of the HUD

6   background, or the HUD complaint.  That means it's not in

7   the record.  Now, so the one question that I have and I'd

8   like you to include in your response is what the relation

9   or how does the Department of Justice view its

10   relationship with HUD.  Is HUD a client?  Is HUD a – it's

11   another agency within the executive branch of government,

12   of our Federal Government.  Do you -- does D.O.J. have

13   some responsibility when you bring a complaint like this

14   and sign it, that you are attesting, and making the

15   representations including the Rule 11 that you have

16   checked these things, that you've done an investigation.

17   Did D.O.J. do any independent investigation or did it

18   rely completely on HUD?

19           MR. SACKS:  That's --.

20           THE COURT:  Did DO -- I'm not done yet.

21           MR. SACKS:  All right.

22           THE COURT:  Did D.O.J. get HUD's file from it

23   and review it?  Is that relevant at all?  There's nothing

24   in the trial testimony about that.  But if I am -- but I

25   am interested in Rule 11 because I think I have to and

1          now I'm not blaming any individual lawyer.  But Rule 11

2          applies to parties as well lawyers by its terms.  So I

3          have these -- these are substantial questions that I have

4          that I think are relevant on the Dorchester J.N.O.V.

5          motion.  Go ahead.  Now go ahead.

6                    MR. SACKS:  Oops.  Okay.  Great.  I appreciate

7          the -- the questions, Your Honor.

8                    THE COURT:  Go ahead.

9                    MR. SACKS:  Let's -- I think I have a few

10         things to say here.  Let's start with the -- the recent

11         question about the relationship between HUD and D.O.J.

12         and what we do.  And what we're allowed to do under the

13         statute before we file a claim pursuant to 3612(O) which

14         is the statute that requires that the Attorney General

15         shall file and maintain, and I believe that's the

16         language a -- a claim that HUD is charged for which

17         either party has elected to be determined in Federal

18         Court.  When that happens, the Department's -- the

19         Department's consideration is whether or not the facts

20         presented in the charge and in the evidence that is

21         before the United States substantiate a claim for, in

22         this case the deniable of reasonable accommodation, okay.

23         That -- that is our -- that is our only consideration is

24         whether or not the facts before us substantiate -- if,

25         you know, we can prove them, substantiate or even the

 1       facts before us, if -- if they can substantiate it, they

 2       satisfy all the elements of a reasonable accommodation

 3       claim.

 4              And here, the answer is yes, and even you said

 5       this, Your Honor, when you denied the Defendant's motion

 6       for summary judgment in March.  The Defendant's made the

 7       exact same arguments they are making today.  They argue

 8       that you can't believe this woman.  She lied on all these

 9       forms and she used Carla Black who is a fraud and a

10       huckster.  And Your Honor wisely looked at the record and

11       determined that based on in the McClymons' letter that

12       the elements for a reasonable accommodation denial were

13       all there.  And that is exactly what the United States

14       did, Your Honor.  We looked at all the evidence before

15       us.  And we knew that Ms. Hamburg had seen Dr. McClymons

16       in person for a two-hour evaluation and we had his

17       records.  And we knew that -- that we knew that -- that

18       he gave her a battery, three separate tests to evaluate

19       her, and it all came back that she had a generalized

20       anxiety disorder.  And that she needed her assistance

21       animal in order to basically get by with her life, and

22       just live, and be a productive citizen like all of us

23       want to do.  So we knew all that and that is the basis

24       for our bringing the complaint today.  And I -- I --

25       that's the basis for HUD bringing their charge as well.

1    They knew all this to be true.  And they -- they knew

2    that -- I mean, they had -- you know, they knew that she

3    went to Carla Black.  But that didn't -- that wasn't

4    material because at the end of the day, she had seen Dr.

5    McClymons who evaluated her in person and that -- that

6    satisfies any standard including the one that you applied

7    at summary judgment, Your Honor.

8                THE COURT:  Okay.  Thank you.  All right.  Now

9    Mike, do you view HUD as a client, or not or you don't,

10   or would you rather not have to answer that?

11               MR. SACKS:  I don't know if I can answer that

12   question, Your Honor.

13               THE COURT:  All right.

14               MR. TROY:  Not a client.

15               MR. SACKS:  Not my client.

16               THE COURT:  Well, did -- the next question, did

17   D.O.J. do any independent investigation or just rely on a

18   file and -- and I'd like to know if there was -- if the

19   D. -- if the D.O.J. ever specifically talked to Louise

20   Hamburg.  Now look, you -- if -- if -- and -- look, HUD

21   is a client, then your communications with them are

22   privileged and I don't have any right to know.  So -- but

23   I'd like to know if -- did you ever -- did any D.O.J.

24   personnel aside from HUD ever talk to Louise Hamburg?

25   Did they ever review the HUD file in detail?

```
1                 MR. SACKS:  Yes, Your Honor.  We spoke with

2       Louise Hamburg and we reviewed the HUD file in detail.

3                 THE COURT:  Okay.

4                 MR. SACKS:  And --

5                 THE COURT:  All right.

6                 MR. SACKS:  -- we conducted our own

7       investigation to determine that --

8                 THE COURT:  Okay.  All right.

9                 MR. SACKS:  -- the facts supporting a denial of

10      a reasonable accommodation claim as charge by HUD were

11      there.

12                THE COURT:  All right.

13                MR. SACKS:  And under 3612(O), we're required

14      to file that complaint.

15                THE COURT:  All right.  Yeah.  Go ahead.

16                MR. TROY:  Now, Your Honor, that clears it up.

17      So we finally learned and to be fair in the trial, we

18      could never get into the work product or what D.O. -- the

19      government investigated or didn't investigate.

20                THE COURT:  Right.

21                MR. TROY:  Rule 11 is obviously different.  So

22      the HUD file, you -- we'll make sure you have this as

23      part of the -- the brief.  But the key issue, Your Honor,

24      was not whether she had been ever had a license or not.

25      The issue on her cross was that the letter from Carla
```

1    Black which the government now says wasn't material but

2    which they nonetheless included and referenced in their

3    complaint said, I am a licensed mental health

4    professional who is helping Louise Hamburg with her

5    emotional, mental health condition.  She claimed to be a

6    treating therapist and Louise Hamburg adopted that, ran

7    with it at all times until, you know, and it was -- it

8    was outright a -- a fraudulent representation.  It was

9    inaccurate and the government knew it.  It's because if

10    they had the HUD file as was just said, they knew it.  We

11    met December of '19 with Mr. Bazwari (phonetic spelling)

12    and Mr. Romero trying to see if there was any chance of

13    resolving this.  And nobody from the -- the -- this

14    District's office ended up doing any of the prosecution

15    of this case.  And instead they -- they bring this

16    despite knowing what the jury was able to figure out

17    easily, the -- the fraud that was Ms. Hamburg.

18       THE COURT:  Okay.  All right.

19       MR. SACKS:  Your Honor, I have --

20       THE COURT:  Yes.

21       MR. SACKS:   -- Judge, can I add two more

22    things.

23       THE COURT:  Yes.

24       MR. SACKS:  That's in response to your

25    questions.

1                    THE COURT:  Yeah.

2                    MR. SACKS:  You had asked about why we included

3          those paragraphs in the complaint.

4                    THE COURT:  Yeah.

5                    MR. SACKS:  And I think it's obvious that if we

6          didn't include those paragraphs in the complaint that

7          Dorchester would have accused us of hiding something.

8          And we'd be back at the same place we are now.  And so in

9          the interest of sort of, you know, having all the facts

10         in the complaint, that's what we did.  We included all

11         the facts in there including the Carla Black stuff.

12                   THE COURT:  Well, yeah.  But you -- you didn't

13         introduce anything about HUD in the trial.  And -- and --

14         and could -- could I make an inference that your reasons

15         for not doing that were that there was a lot of material

16         there.  There's factual material that would have perhaps

17         made your case less strong because of the problems that -

18         - that Louise Hamburg and the Carl -- and Carla -- and

19         relationship with Carla Black raised.

20                   MR. SACKS:  I'll say two things and it'll --

21         it'll bring us back to where we started with the standard

22         in this case which is as far as we're aware, we're still

23         here on a Rule 50 motion where the Defendants are arguing

24         that the evidence is insufficient to support the pattern

25         or practice and the group of persons' claim.  And somehow

```
 1            we're dealing with -- with the Carla Black business at
 2            the same time.
 3                 MR. TROY:  No.
 4                 MR. SACKS:  If that's -- if that's the case and
 5            the Court is considering is in -- in a guise, the Court
 6            has got to make all reasonable inferences in favor of the
 7            non-moving party which is us.  And so to the extent that
 8            the -- and also the Court is not allowed to make
 9            credibility determinations in a Rule 50 motion.
10                 THE COURT:  You're right.
11                 MR. SACKS:  So like, you know, like, this was
12            given to the jury.  The jury -- the jury was given all
13            this evidence and the jury still found that the -- that
14            Dorchester engaged in a pattern or practice and that they
15            violated the -- the group -- the right to a group of
16            persons.  And then the -- the -- the other -- the other
17            issue was that this -- this entire argument that the
18            Dorchester has made has been waived.  During trial, you
19            were very specific when it came for the Defendant to make
20            their post -- their -- their motion for a directed
21            verdict and you said, Third Circuit says you got to be
22            specific.
23                 THE COURT:  Right.
24                 MR. SACKS:  And they got there and they made
25            objections.  And none of them involved, you know, the --
```

1      the trials in the firm because Ms. -- Ms. Hamburg made

2      false statements or allegedly made untrue statements to

3      the United States.  So as a matter of law, the Court is

4      without jurisdiction to consider this in the guise of a

5      Rule 50 motion.

6              THE COURT:  All right.  Well, if you recall,

7      Mr. Sacks, after the charge and the jury deliberated, I

8      made some statements on the record about my concerns of

9      just the things that we are raising here.  And Rule 11

10     now clearly allows a Judge or his or her own motion to

11     inquire into these things.  And they're of concern to me

12     because the depart -- the Department of Justice is the

13     epitome of justice for our country.  And there are

14     questions that are in this case involving how the case

15     was prepared and how you relied on when we take Ms.

16     Hamburg.  And, you know, as far as I'm concerned and I'll

17     say on the record.  I believe that to some degree Ms.

18     Hamburg made inaccurate statements.  And that inaccurate

19     is a generic term and whether it's the same as false or

20     not.  But she clearly made inaccurate statements to HUD

21     and -- and -- and also the jury, okay?  And I can't avoid

22     that fact.  Now you made at a point earlier about how HUD

23     waited until Ms. Hamburg saw Dr. McClymons.  Did I

24     pronounce that correctly?

25              MR. SACKS:  Yes.

 1                    THE COURT:  All right.  And so -- and there's

 2          no question that he actually treated Ms. Hamburg and was

 3          a licensed mental health professional.  No question about

 4          that.  No, no, I'm not done yet.  I mean, the question is

 5          though, does -- does Ms. Hamburg going to Dr. McClymons

 6          and the government then introducing him as a witness in

 7          the trial, does that sort of remove any taint that comes

 8          from Ms. Hamburg having made inaccurate statements to

 9          HUD, presumably the D.O.J., and also to the jury or does

10          the fact that the government proceeded to trial with Ms.

11          Hamburg and her inaccurate in part background contaminate

12          the record.  In fact, that I can't just say it was all

13          wiped clean because whatever defects were in the record

14          as to the relationship between Carla Black and Louise

15          Hamburg were some -- some -- somewhat cleaned up when she

16          went to Dr. McClymons who had better credentials and

17          actually treated her.  So what's your answer to that?

18          And then we'll have Mr. Troy respond.

19                    MR. SACKS:  Your Honor, this -- that's the

20          second time you've mentioned Rule 11 today.  And that's

21          in fact why we filed our motion for clarification

22          yesterday because we wanted to know --.

23                    THE COURT:  Well, here, I'm clarifying it.

24                    MR. SACKS:  So if the -- if this -- if this now

25          -- not -- no longer a post trial motion where -- where

1     Rule 50 applies and we're talking now about Rule 11, I'm

2     not sure that we can answer all these -- these questions

3     because I think the -- the source of Rule 11 is like it

4     has to do with -- with the -- the intricacies of what was

5     said.  And it does -- you do have to parse statements.

6     And if Your Honor doesn't want to parse statements like

7     we tried to do, then I don't know how to respond to

8     claims that Ms. -- Ms. -- Hamburg made untrue statements.

9     And the second thing is that --.

10             THE COURT:  Well, wait a minute.  No.  The --

11    here you go.

12             MR. SACKS:  I didn't even know its standard --.

13             THE COURT:  Do you think -- wait, wait.  Do you

14    think because the -- the jury -- what inferences can I

15    draw from the fact that the jury decided against Ms.

16    Hamburg if any?

17             MR. SACKS:  No.  Your Honor, there's no --

18    there's no procedure under which the Court is allowed to

19    draw inferences from a verdict against Ms. Hamburg.  Rule

20    50 does not allow the Court to draw negative inferences

21    from a Plaintiff interviews a verdict against her.  She's

22    no longer part of the case.  She's not here, her attorney

23    is not here, and I --.

24             THE COURT:  No.  I understand that.

25             MR. SACKS:  So how -- there is no --.

```
1              THE COURT:  She's -- she is not -- she is not
2         here anymore.
3              MR. SACKS:  We're not aware of any doctrine
4         under which the Court --.
5              THE COURT:  But the -- but -- but the
6         Department of the Justice is not an ordinary Plaintiff.
7         The Department of Justice represents the interest of the
8         United States and its citizens.  And you do a great job
9         in many, many, many cases, and I -- and I was proud to be
10        part of the Department of Justice for a while and I'm
11        still proud of our Department of Justice because I think
12        you seek the truth and you seek justice for people.  And
13        you have a very important role to play under the -- our
14        laws and our constitution.  So I have -- but you have a
15        high burden.  And the question in this case which I think
16        I -- I can consider because I raised it while the jury
17        was deliberating, I raised these issues.  This is nothing
18        new.  I raised the issues when -- before the verdict came
19        in.  And if the jury had found in favor of Ms. Hamburg, I
20        don't think I would have these questions anymore.  But
21        because they found against her, even though she had been
22        treated by Dr. McClymons who came in and testified at the
23        trial.  That I think gives me some license to inquire
24        about the fact that the Department of Justice and its --
25        its ideals and its principles were compromised when
```

 1        knowing what you knew about the Hamburg/Carla Black

 2        relationship, you nonetheless brought the case with her

 3        as complainant, called her as your major witness, and

 4        that's the question I have.

 5                MR. SACKS:  So, Your Honor, we get -- we get

 6        all sorts of complainants at the Department of Justice.

 7                THE COURT:  Right.

 8                MR. SACKS:  And people that are --.

 9                THE COURT:  Yeah.  I mean, by the way, and in

10        criminal -- and in criminal cases, you know, you deal

11        with criminals all the time and when they are --.

12                MR. SACKS:  Your Honor, I'm talking about the

13        civil context here.

14                THE COURT:  Yeah.  Okay.  Let's limit to a

15        civil case.

16                MR. SACKS:  I'm talking about the people who

17        walk in our door and complain to us --

18                THE COURT:  Yeah.

19                MR. SACKS:  -- that something bad has happened

20        to them.

21                THE COURT:  Yeah.  Go ahead.

22                MR. SACKS:  And we get -- we get people that

23        are -- that are, you know, you might consider neat, and

24        we get people that -- that can't read, and probably have

25        records.  And maybe -- and maybe the thing that happened

1      to them that their complaining about is only the fifth

2      worse thing that's happened to them that week.  But we

3      still get their complaints and we still have -- we have

4      an obligation to bring those complaints.  No -- no one

5      that walks through our door is -- is a perfect person.

6      And if the -- if the -- the test that I'm hearing from

7      the Court is that if the person that comes through, if at

8      some point in time someone might think that she said

9      untrue then we can't bring a case on her behalf.  Your

10     Honor, we're out of business because many of the people

11     that walk in our doors are going to have these same

12     problems.  And that is not the standard for bringing a

13     case.  Like -- like I said earlier, the standard is

14     whether or not the facts as presented to us satisfy the

15     elements of a reasonable accommodation claim.  And the

16     Congressman that passed that Statute 3612(O), it said

17     that the attorney general shall file and maintain a

18     complaint.  And that -- that is our obligation, Your

19     Honor.  And we did that here.  We reviewed the record.

20     It met the elements and we filed the complaint.

21               THE COURT:  Yeah.  Mr. Troy.

22               MR. TROY:  I need to be heard on this please --

23     the -- the -- because I had only read part of it.  But

24     the first letter, there's misrepresentations by Carla

25     Black to HUD, the -- I -- I presume -- I don't know what

1       she said to the D.O.J.  I wasn't allowed to get into

2       that.  And more importantly there's record -- there's

3       misrepresentations, fraudulent misrepresentations to the

4       Dorchester, and the other owners in seeking to get this

5       dog in.  The May 17, 2016, letter Carla Black said, I am

6       licensed mental health professional who is currently

7       treating Louise Hamburg for her emotional and mental

8       health condition.  She said that, changed that to who is

9       helping in 2017.  She -- and that was what the cross-

10      examination was about, not that she had a license.  But

11      the misrepresentation that she was treating with this

12      lady.  Louise Hamburg is a lawyer.  She's smart, a very

13      smart lady.  She went with that fraud and she ran with

14      it.  And Your Honor, when the government brought this

15      case, the Washington office took it, and all the lawyers,

16      the lawyers who are on the case got out of it, and her

17      counsel in front of you, the local office didn't do

18      anything with it.  They took a case knowing that they had

19      obtained letters here and represent that this woman had

20      done this in the same two years that they were trying to

21      complain or that she suffered damages.  And they were

22      doing it, arguing that -- that this is one of many and

23      then they recruited, and Your Honor heard how they called

24      every resident in the Dorchester including Frank Devine's

25      wife.  They recruited like Nick Saben and the Alabama

1    High School trying to get other people to come forward

2    and join the -- the fraudulent claims of Ms. Hamburg.

3             THE COURT:  All right.  My -- my question to

4    you is, the Dr. McClymons.  So he testified and you would

5    agree he will -- he would meet the statute -- the

6    requirements under the statute of being a licensed mental

7    health professional, right?

8             MR. TROY:  Yes.  Yes.

9             THE COURT:  All right.  And he also -- he

10   actually treated Ms. Hamburg.

11            MR. TROY:  Yes.

12            THE COURT:  All right.  So does that cure any

13   problems that arise out of Ms. Hamburg having testified

14   and the jury having found against her?

15            MR. TROY:  No, it does not at all.  In fact you

16   can rightfully infer that -- that -- and seeing where the

17   jury found against her, that they did not find her

18   credible.  And remember that Dr. McClymons, he's the one

19   that --.

20            THE COURT:  Well, you know, how can I conclude

21   that the jury didn't find him credible?  I mean --.

22            MR. TROY:  No, not him, her, you know.

23            THE COURT:  Well, yes but -- but the fact that

24   the government -- that she went to see Dr. McClymons,

25   that he treated her, that he was licensed, and then he

1      testified in front of the jury.

2              MR. TROY:  Uh-huh.

3              THE COURT:  Does that cure any deficiencies

4      that may have existed with Ms. Hamburg as a complainant

5      called by the Department of Justice?

6              MR. TROY:  No, because they chose as their only

7      party plaintiff and regardless of the fact that she had

8      one two-hour visit with Dr. McClymons.  They had a file

9      in which they knew that their -- their lead party

10     plaintiff, their only party plaintiff had misrepresented

11     for over two years, that this person -- that Carla Black

12     was her treating therapist.

13             THE COURT:  Okay.

14             MR. TROY:  And that's --.

15             THE COURT:  All right.  Thank you.  All right.

16     Tell you what I'm going to do now, I'm going to have Dr.

17     -- Mr. and Mrs. Halpern come up to sidebar with counsel -

18     - on the record.

19             (Side Bar Conference 2

20             Under Separate Cover)

21             THE COURT:  All right.  I'm going to ask Ms.

22     Desanti that if there's a request for a transcript that

23     the sidebar transcript would be separate from the rest of

24     the hearing today, okay.  And I'm not saying it has to be

25     under seal.  But it should just be a -- a separate

1      transcript.  All right.  All right.  I just want to see

2      if I have -- all right.  So let me -- I want to go back

3      to one of my questions, Mr. Sacks.  And this is under --

4      this is C two.  C two is the Crowley.  Does the record

5      allow the Court to conclude that the government filed

6      this case knowing that Louise Hamburg had made any one or

7      more of these false statements before or after the

8      complaint was filed?  Your answer if I understand it, is

9      that you did not -- the government did not consider that

10     Louise Hamburg had made any false statements.  Is that

11     correct?

12              MR. SACKS:  Not that we didn't consider that.

13     We didn't think that she made any untrue statements to

14     us.

15              THE COURT:  And you still think that?

16              MR. SACKS:  Yes.

17              THE COURT:  All right.  Okay.  Wait.  Okay.

18     That was D.  What does the record show as to when the

19     Dorchester adopted a policy concerning emotional support

20     animals?  Is he correct that Dor -- that the Dorchester

21     did not allow any emotional support animals until after

22     the government filed this case in 2020.  What's your

23     position or what's the government position about that?

24              MR. SACKS:  The answer to the second question

25     is yes, that Dorchester did not allow any emotional

1    support animals in until they granted Mr. Halpern's

2    accommodation request in June of 2020 which is --

3              THE COURT:  Okay.

4              MR. SACKS:  -- three months after United States

5    filed its complaint in this matter.

6              THE COURT:  All right.  Now you wanted to bring

7    up the issue of punitive damages.  So now is your chance

8    to explain that.

9              MR. SACKS:  Your Honor had another -- Your

10   Honor had another question about when the Dorchester

11   first adopted an emotional support animal policy.

12             THE COURT:  Yes.

13             MR. SACKS:  It is -- the Dorchester did not

14   adopt an emotional support animal policy until April of

15   2019.  And that is shown in Plaintiff's Nine, and

16   Plaintiff's Ten which are the meeting minutes from the

17   Dorchester I believe in April of 2019 and maybe -- maybe

18   May of 2019.  So prior to that, the Dorchester had an

19   assistance animal policy that simply did not contemplate

20   emotional support animals.  And because of that, that is

21   in fact why the Dorchester sent -- had to -- had to

22   develop a policy after the Halperns applied in October of

23   2018 which resulted in -- in the Dorchester making the

24   Halperns fill out a second application in June of 2019.

25             THE COURT:  Okay.

1          MR. SACKS:  So prior to April of 2019, the

2     Dorchester simply did not, you know, allow emotional

3     support animals.

4          THE COURT:  All right.  All right.  Now what

5     did you -- what would you like to says about punitive

6     damages?

7          MR. SACKS:  Regarding --?

8          THE COURT:  Mr. Troy, have a seat.  You can --

9          MR. TROY:  Okay.

10         THE COURT: -- I'll give a couple of minutes

11    when he stops.  I'm sure you're against punitive damages.

12    But I want to be -- I promised to give Mr. Sacks the

13    opportunity to explain why he thinks punitive damages

14    should be awarded.

15         MR. SACKS:  Yes, Your Honor.  I -- I would

16    start with the standard.  I -- we do believe -- the

17    United States does believe that punitive damages are

18    appropriate in this case.  And under Kolstad versus

19    American Dental Association, 527 U.S. 526, and Alexander

20    versus Riga which is a case that we cited at length in

21    our -- in our post trial briefing regarding a -- a --

22    regarding punitive damages.

23         Punitive damages are appropriate and warranted

24    when the Defendant acts with -- with -- with the

25    knowledge or "a perceived risk that their actions could

1      be in violation of Federal civil rights laws." And here,

2      the evidence show us exactly that.  We know from Mr. --

3      from Mr. Devine's testimony that in 2015, he began

4      researching the Fair Housing Act in order to come up with

5      an assistance animal policy.  And at that time, he

6      reviewed HUDs 2013 guidance which provided that emotional

7      support animals are a -- a form of reasonable

8      accommodations.  So as of -- as of 2015, Mr. Devine knew

9      that emotional support animals were required in the Fair

10     Housing Act.  And then again in 2017, we all know that

11     the Third Circuit issued Revock versus Cowpet Bay in

12     which the Third Circuit which is the binding -- binding

13     rule -- binding the Court in this jurisdiction.  They

14     also said, if there was any doubt that reasonable

15     accommodations were required -- sorry, that emotional

16     support animals were required into the Fair Housing Act

17     so the Dorchester knew or knew this when it enacted its -

18     - its -- its policy.  Yet in -- it wasn't until 2019 that

19     the Dorchester had a policy that even -- even allowed for

20     emotional support animals.  So in -- in drafting the

21     private policy and acted with the -- with the knowledge

22     that what it was doing was not -- was not allowing for

23     and not honoring the rights of people that needed

24     emotional support animals.

25              Now there's other evidence too that shows that

1       the -- the Dorchester acted with the sort of malice and

2       reckless indifference in this case that work -- that --

3       that justifies punitive damages.  We heard from -- we

4       heard from Ms. Minkovich, what happened to her, and how

5       rather than allow her to proceed with her reasonable

6       accommodation request, they had a meeting with her.  And

7       they -- they told her that she should sell her unit

8       rather than go forward.  So -- and she had a right to an

9       accommodation, Your Honor.  And rather than let her have

10      that right, they -- they -- they made her cry, Your

11      Honor.  And -- and they tried to get her to sell her

12      unit.  We also heard from the -- the Dorchester's own

13      council members.  We heard from Joe Morgan, and we heard

14      from Ed Cortland, and we heard from Joe Weiss.  And all

15      of theme expressed disdain for emotional support animals.

16      And -- and -- or they otherwise stated that they didn't

17      believe people needed them.  So we know that the decision

18      makers in this case, they didn't even believe that

19      emotional support animals were -- were an accommodation

20      under the Fair Housing Act.  And we also have -- we also

21      have the -- the email or the emails that the Dorchester

22      circulated right around the time that they were

23      considering Ms. -- right around the time that the

24      Halperns first applied for an accommodate -- or first

25      approached the -- the Dorchester regarding an

1    accommodation request.  And they -- they exchanged emails

2    making fun of therapy horses.  They -- they joked about

3    which -- which unit the therapy horse would go in.  So we

4    know that the Dorchester acted with this sort of malice

5    that punitive damages require.

6           And, Your Honor, there needs to be punishment

7    so that the next condo  association knows that it cannot

8    discriminate under the Fair Housing Act.  If the

9    Dorchester only receives a slap on the wrist, which is --

10   which is what their seeking, then -- then the next condo

11   association is going to make the same decision that they

12   did.  It is going to say you know what it's unlikely that

13   we're going to get punished for this and we might as well

14   just deny the reasonable accommodation and -- and roll

15   the dice and we're going to get off with a slap of the

16   wrist as well.  So the jury has found that the Dorchester

17   violated the Fair Housing Act in numerous ways.  And the

18   Court should render a judgment that -- that honors that

19   and awards punitive damages.

20          THE COURT:  Okay.  Thank you.  All right, Mr.

21   Troy.

22          MR. TROY:  Your Honor, I want to start with

23   your first question about that policy.  The Dorchester

24   adopted a reasonable accommodation policy in 2015 that

25   would apply to any requests such as this.  After

1      Pennsylvania adopted new laws concerning assistance

2      animals, the Dorchester adopted an updated policy April

3      3, 2019.  And this was all on the record.  After HUD

4      issued guidance January 28, 2020, the Dorchester adopted

5      -- issued an updated policy March 4, 2020.  This board is

6      doing this.  There's no lawsuit filed at this point.

7      They're doing all this to do their best to comply with

8      the law.  What we then did and you saw this, we as

9      counsel, sent this to counsel for the government, Mr.

10      Bazwari to Exhibit D301 and we said is this good, March

11      4, 2020.  Is this policy good?  Because we're trying to

12      resolve this.  We're trying not to be here.  It's nice to

13      be here with you, Your Honor, and thank you for your time

14      very much on behalf of all the unit owners.  But were

15      trying not to be here.  We got no response from Mr.

16      Bazwari.  You saw that and instead, eight days later they

17      filed the lawsuit because they wanted to make a public

18      splash with this, riding the fraudulent claims of Louise

19      Hamburg.  That's what's going on here.  That's why they

20      were recruiting.  After the first phase of trial, in an

21      attempt again, the D.O.A. adopted an updated policy, July

22      5, and -- and that was provided to Plaintiff's counsel

23      who had indicated approval provided we could work out the

24      financial aspects.  That was Exhibit D307.  All of this

25      shows good faith attempts to comply with the law, Your

1    Honor, completely different from the cases cited by

2    Plaintiff concerning punitive damages.  And as to March

3    of 2020, to your question, at that time, the Minkovich

4    was pending but the Halperns -- remember their dog Gracie

5    had died in January.  When this suit was filed, there was

6    no pending request from the Halperns.  Gracie had passed

7    away.  And they didn't get the next dog until, I think it

8    was April or early May that they submitted a new request.

9    And this time without an internet letter from Anne Miller

10    in which the Dorchester had been suspicious of because of

11    what they learned with Carla Black.  Without that, the

12    Dorchester promptly granted it.  And they've granted six

13    animals total since, basically everybody except Louise

14    Hamburg.

15          So this is absolutely not a punitives case in

16    any way.  Any delay here, when you look at this record,

17    any delay here is caused by the government's failure to

18    just refuse to say anything to the Dorchester in response

19    to attempting to craft an acceptable policy or in the

20    case of the Halperns, you remember they were sent the

21    questions, ten questions because of the internet letter

22    from Anne Miller.  Will you answer this for us?  They

23    said they didn't like question ten so they never

24    responded, so Mrs. Halpern's unwillingness to engage in

25    the interactive process with the DOA.  And she refused --

1    and she admitted to refusing to answer those questions.

2    So, Your Honor, what you see here and have before you in

3    the D.O.A. is not anything like any of the -- the

4    Defendants in the case as cited by the Plaintiff's.  You

5    have an organization with a board.  I don't know --

6    hearing -- if anyone learned of this case, I don't know

7    why anyone would ever want to serve on such a board with

8    the sacrifice they make and here with accusations such as

9    this.  But -- and you also have I should point out, in

10   the trial, you have the testimony of Ms. Yahna Halva

11   (phonetic spelling), Mr. Maloney, and Frank Divine.  All

12   of which are in the transcript of what their trying to do

13   particularly Ms. Yahna Halva.  And we're trying to get

14   HUD to give us feedback.  They're -- they keep trying and

15   they can't get any help from the government.

16            THE COURT:  Okay.

17            MR. TROY:  So the government in this case, Your

18   Honor, has never been a help to emotional support animals

19   and they have been nothing but a hindrance and that's

20   what the record reflects.  Thank you.

21            THE COURT:  Okay.  All right.  Thank you.  Mr.

22   Troy, one of the things, just a loose housekeeping.  On

23   October 17th, the government filed a -- a brief that I

24   had requested during the form of judgment.  I don't think

25   you've responded yet, but I would like you to respond if

```
1        you want to.

2                MR. TROY:  Okay.  We will file a response.

3                THE COURT:  It was E.C.F. 267.

4                MR. TROY:  Yep.  I --

5                THE COURT:  All right.  Now the next question

6        is whether either of your or both want to file anything

7        subsequent after this concerning the chronology that I

8        submitted.

9                MR. SACKS:  Yes, Your Honor.  The United States

10       would like to file a response, you know, to the --

11               THE COURT:  All right.  How much time do you

12       need --

13               MR. SACKS:  -- court chronology.

14               THE COURT:  --what -- and I'd like it done on

15       the same day to have a joint filing.  So I'm not -- I'm

16       not going to pressure you, you know.  But I'd like to --

17               MR. SACKS:  I mean, I -- I honestly, I have --

18       I have work travel the next two weeks.  So that's --.

19               THE COURT:  All right.  You're going to have

20       that by the end of November.

21               MR. SACKS:  If we can have three days.  That

22       would be --

23               THE COURT:  Does that give you enough time?

24               MR. SACKS:  The end of November would be --

25       would be appreciated. Your Honor.
```

1              THE COURT:  Does that work for you, Mr. Troy?

2              MR. TROY:  It does, Your Honor.  And just so

3       we're clear, when you say a joint filing, you're not

4       suggesting we would agree on the chronology.

5              THE COURT:  Yes.

6              MR. TROY:  But you want it done.  Everybody has

7       seen the other --

8              THE COURT:  Well, what I'd like you to do is to

9       take my chronology --

10             MR. TROY:  Yeah.

11             THE COURT:  -- and either submit objections or

12      -- or disputes if you don't think it's accurate and/or

13      add things that I did not include.

14             MR. SACKS:  Yes.  That's exactly what -- what

15      we were planning on doing, Your Honor.

16             THE COURT:  Yeah.

17             MR. SACKS:  And that -- that takes us to our

18      next question.  And that's that we're still not sure what

19      the record is because the Court and -- and -- and Mr.

20      Troy were referring to a -- a document that was -- that

21      you, that Your Honor excluded from the record.  So I --

22      you know --.

23             THE COURT:  Okay.  Well, I'll tell you what

24      we'll do.  You'll both file on November 30th.  And then

25      by December -- what's two weeks after that?  We're about

```
1          December 14.

2                    MR. TROY:  December 14.

3                    THE COURT:  Right.

4                    MR. TROY:  And I'm assuming it would be

5          December 14, Your Honor.

6                    THE COURT:  Yeah.  But so I'll say 14 days,

7          plus 14, and you can then file objections to the other's

8          chronology.

9                    MR. SACKS:  And again are we -- like the United

10         States would like to know whether or not we are limited

11         to evidence on the record, admitted to trial.

12                   THE COURT:  Okay.  Here's -- here is my point

13         of view, but you're -- you -- you don't have to accept

14         this.  I think clearly anything that was admitted in the

15         trial is -- is -- is appropriate, okay, whether testimony

16         or exhibits, all right?  But I don't think it's useful to

17         -- well, I'll leave it like that.  That you can put

18         anything in the chronology that was in the trial record

19         either -- okay.  I also think that either side can put

20         into the chronology public documents created by HUD

21         because HUD is a government agency and it -- and it if --

22         if for example we could not find the HUD complaint in the

23         actual trial evidence, okay?  But I think either party

24         could refer to that because HUD is a government agency

25         and it was a -- and it was filed of record with HUD
```

**Associated Reporters Int'l., Inc.   518-465-8029**

1    although its not -- HUD is not a Court obviously.  But we

2    know exactly what their complaint is because it was part

3    of the pretrial exhibits.  But we can't find if it was

4    admitted into the trial record.

5         MR. SACKS:  Your Honor, there's another issue

6    that's related to this and that's that on -- on the

7    Court's chronology, there's made -- there's references

8    that are made to -- to -- to an event that occurred where

9    the Court says no evidence of the 2014 diagnosis was

10   presented and that's the May 17, 2016, entry on -- on the

11   Court's chronology.  Now that's -- that's the -- there --

12   there is evidence of a 2014 diagnosis and that's through

13   -- Ms. Hamburg saw a psychologist in 2014.

14        THE COURT:  Right.

15        MR. SACKS:  A licensed psychologist named Dr.

16   Rebecca Harvey and there was some testimony about her

17   that -- that is not mentioned by the Court and we'll --

18   we'll correct the record.

19        THE COURT:  Yeah.  All right.

20        MR. SACKS:  But there's also documents that we

21   presented to the Defendant during discovery that confirm

22   that Ms. -- that Dr. Harvey evaluated Ms. Hamburg and

23   diagnosed her with general anxiety disorder and actually

24   wrote her a letter to that effect.

25        THE COURT:  Right.

1              MR. SACKS:  And that I think is relevant to

2      this because if the Court is --

3              THE COURT:  All right.

4              MR. SACKS:  -- of the Court sort of wants to

5      know about the -- the mindset of Ms. Hamburg when -- when

6      she -- when she fills out the form on the doctor

7      questionnaire, it should know what Ms. Hamburg knew, and

8      that that's she had been diagnosed in 2014 by Dr. Rebecca

9      Harvey.

10             THE COURT:  Yeah.  Okay.  All right.

11             MR. SACKS:  So I'd like to include that as

12     well.

13             THE COURT:  Fair.

14             MR. TROY:  And yeah, Your Honor, those -- we

15     got those records after discovery closed.  With that

16     being said, it sounds like what you're telling us is just

17     to indicate was it admitted or not when we cite to

18     something and that's not difficult.

19             THE COURT:  Well, I don't want to prevent

20     anybody from submitting something they think is --

21             MR. TROY:  Yeah.

22             THE COURT: -- is relevant to the issue sort of

23     pending here.

24             MR. TROY:  Yep.

25             THE COURT:  But as I said, you know, I'm

1      repeating myself, because the Department of Justice is

2      the Plaintiff here, in my view they have a higher burden

3      than an ordinary Plaintiff does in filing civil

4      litigation.  That's the reason for my concern.  All

5      right.  I'd like to see Mr. and Mrs. Hal -- Halpern up

6      here again because you're not Mr. and Mrs. -- the

7      Halperns come on up.

8                 MS. HALPERN:  Okay.

9                 (Off-the-record)

10                CERTIFICATION

11  I, Judith Spriggs, court approved transcriber, certify that

12  the foregoing is a correct transcription from the official

13  electronic sound recording of the proceeding in the above-

14  entitled matter.

15

16

17  _____/

18  Judith Spriggs

19  Associated Reporters Int'l., Inc.   6th day of November, 2022

20

21

22

23

24

25

800.523.7887          11-3-2022, WORD INDEX, Dorchester case        Associated Reporters Int'l., Inc.

Page 1

**A**

**a.m** 1:7
**A.S.A.s** 27:21
**Ab** 24:22
**able** 11:18 12:14 25:15 42:12 57:16
**abled** 27:15
**above-** 83:13
**absence** 18:16
**absolutely** 24:12,22 76:15
**accept** 80:13
**acceptable** 76:19
**accommodate** 4:13 73:24
**accommodation** 13:23 14:21 20:17 21:16,18 33:18 53:22 54:2,12 56:10 65:15 70:2 73:6,9,19 74:1,14,24
**accommodations** 72:8,15
**accurate** 8:5,10 10:10 79:12
**accusations** 77:8
**accused** 58:7
**accusing** 39:5
**acknowledged** 41:24 49:2
**Act** 19:13 24:13,18 27:22 28:3 72:4,10,16 73:20 74:8,17
**acted** 72:21 73:1 74:4
**action** 3:8 12:24
**actions** 33:22 71:25
**activities** 23:22
**activity** 20:10
**acts** 71:24
**actual** 80:23
**adapting** 30:12
**add** 3:23 57:21 79:13
**addition** 24:15 39:23
**additional** 26:16
**additions** 8:3 9:7
**addressed** 40:8
**adjourn** 3:25
**admission** 30:19
**admit** 38:20 47:13,15,25
**admitted** 7:6,10,15 9:8,13,17,22 29:10 36:13 37:14 38:22 40:2 43:16 46:14,17 77:1 80:11,14 81:4 82:17
**adopt** 70:14
**adopted** 57:6 69:19 70:11 74:24 75:1,2,4,21
**adverse** 5:21

**afford** 33:7
**Aged** 33:9
**agency** 52:11 80:21,24
**agenda** 7:1
**aggrieved** 24:17
**agree** 4:21,21,22 11:16,18 14:6 26:8 67:5 79:4
**agreed** 35:20
**ahead** 42:9 53:5,5,8 56:15 64:21
**al** 3:6
**Alabama** 66:25
**Alexander** 71:19
**allegations** 32:15
**alleged** 20:10
**allegedly** 60:2
**allow** 8:18 30:6 31:19 32:19 62:20 69:5,21,25 71:2 73:5
**allowed** 17:8 20:22 29:6 33:12 38:12 53:12 59:8 62:18 66:1 72:19
**allowing** 72:22
**allows** 60:10
**AMERICA** 1:3
**American** 71:19
**amount** 17:19
**and/or** 10:12 79:12
**angle** 18:5
**animal** 38:15 40:19,21 54:21 70:11,14,19 72:5
**animals** 20:22 69:20,21 70:1,20 71:3 72:7,9,16,20,24 73:15,19 75:2 76:13 77:18
**Anna** 24:8 27:2 28:12,17,23 29:21 32:3
**Anne** 76:9,22
**answer** 5:18 6:2,3 9:11 10:6 23:12 24:2 27:22 28:10 35:5 54:4 55:10,11 61:17 62:2 69:8 69:24 76:22 77:1
**answered** 6:21 10:14 23:23 26:22 26:23 27:5,12,16
**answers** 28:5 34:13
**anxiety** 54:20 81:23
**anybody** 82:20
**anymore** 63:2,20
**apartment** 31:2 32:20
**apparent** 41:4
**apparently** 25:5
**APPEARANCES** 1:10
**application** 70:24

800.523.7887          11-3-2022, WORD INDEX, Dorchester case      Associated Reporters Int'l., Inc.

Page 2

**applied** 55:6 70:22 73:24
**applies** 30:15 53:2 62:1
**apply** 74:25
**appreciate** 4:19 14:23 53:6
**appreciated** 78:25
**approached** 73:25
**appropriate** 22:20 25:5 30:13
  49:19 71:18,23 80:15
**approval** 17:22 75:23
**approved** 83:11
**approximately** 13:21
**April** 70:14,17 71:1 75:2 76:8
**argue** 54:7
**arguing** 58:23 66:22
**argument** 1:8 10:20 28:4 30:5
  32:23 59:17
**arguments** 31:1 54:7
**arranged** 4:3
**articles** 48:19
**ASA's** 27:9
**aside** 3:21 22:6 24:6 55:24
**asked** 10:4,24 23:11 26:25 33:18
  34:7 43:11,20 44:4 58:2
**asking** 35:11 46:24
**aspects** 75:24
**assigned** 33:19
**assistance** 17:12 18:1 40:19,21
  54:20 70:19 72:5 75:1
**Associated** 2:10 83:18
**association** 1:6,22 3:8 20:20
  71:19 74:7,11
**assuming** 51:8 80:4
**assure** 6:11
**Attached** 45:20,21
**attempt** 4:23 75:21
**attempting** 76:19
**attempts** 75:25
**attesting** 52:14
**attorney** 53:14 62:22 65:17
**authority** 18:17,21
**authorizes** 19:3
**available** 12:5 16:18 30:18,20
  48:20
**Avenue** 1:18
**avoid** 60:21
**awarded** 71:14
**awards** 74:19
**aware** 18:19 40:24 42:5,6 48:7
  58:22 63:3

| B |
|---|

**B** 26:23 34:5
**back** 9:17 18:7 20:18 22:6 25:14
  32:16 34:1,24 41:13 50:22
  54:19 58:8,21 69:2
**background** 40:13 52:6 61:11
**bad** 64:19
**barely** 25:16
**base** 11:11
**based** 20:16 33:19 38:8 54:11
**basic** 9:11
**basically** 54:21 76:13
**basis** 54:23,25
**bathroom** 34:14
**battery** 54:18
**Bay** 72:11
**BAYLSON** 1:9
**Bazwari** 44:15 57:11 75:10,16
**began** 48:11,21 72:3
**behalf** 5:14 21:15 65:9 75:14
**believe** 3:25 6:22 7:9 9:2 11:18
  12:18,21 14:25 17:6,25 18:18
  18:25 23:18 35:4 37:7,7 38:5
  38:25 39:16 46:25 51:5 53:15
  54:8 60:17 70:17 71:16,17
  73:17,18
**benefit** 10:8
**Bernie** 24:6
**best** 75:7
**bet** 41:15
**better** 61:16
**beyond** 7:19
**binding** 72:12,12,13
**bit** 25:11
**Black** 35:20 36:21,22 37:3,11,12
  38:2,6,6,9,11 40:25 41:3,17
  42:1,11,14,24,25 43:8,13,15
  43:19,21,23 44:24 45:22 46:1
  48:9,10,18 50:2,22,23,24 51:8
  51:12,15,16,17,18,19 54:9
  55:3 57:1 58:11,19 59:1 61:14
  64:1 65:25 66:5 68:11 76:11
**Black's** 37:16 41:7 43:7 45:7,24
**blaming** 53:1
**board** 75:5 77:5,7
**branch** 52:11
**break** 4:5,6 34:14
**bridge** 51:9
**brief** 56:23 77:23

800.523.7887          11-3-2022, WORD INDEX, Dorchester case     Associated Reporters Int'l., Inc.

Page 3

**briefed** 18:18 31:9
**briefing** 7:25 71:21
**briefly** 28:11
**briefs** 31:11
**bring** 24:13 52:13 57:15 58:21
  65:4,9 70:6
**bringing** 36:19 54:24,25 65:12
**broad** 49:24
**broader** 6:3
**brought** 5:14 19:1,1,4 21:15
  64:2 66:14
**building** 20:22
**buildings** 38:13
**burden** 63:15 83:2
**business** 59:1 65:10

---
                    **C**
**C** 1:22 34:6,20,25 69:4,4
**California** 37:2,24 48:22
**call** 4:15
**called** 15:22 16:2,10 19:3 22:14
  64:3 66:23 68:5
**Carl** 58:18
**Carla** 35:20 36:21,22 37:3,11
  38:2,6,6 40:25 41:17,25 42:11
  42:14,24,25 43:7,8,19,23
  44:23 45:7,22 48:9,10,18 50:2
  50:22,23,24 51:8,12,15,16,17
  51:18,19 54:9 55:3 56:25
  58:11,18,19 59:1 61:14 65:24
  66:5 68:11 76:11
**Caroline** 50:5
**carry** 7:23
**case** 1:3 3:5 10:21 18:23 20:15
  20:19 21:6 22:13 24:24 25:1
  29:5 30:13 31:16 32:2,20 33:5
  33:8 36:22 40:25 44:8,12 45:2
  45:3 48:15 50:1 53:22 57:15
  58:17,22 59:4 60:14,14 62:22
  63:15 64:2,15 65:9,13 66:15
  66:16,18 69:6,22 71:18,20
  73:2,18 76:15,20 77:4,6,17
**cases** 31:15 63:9 64:10 76:1
**cause** 40:11
**caused** 28:25 76:17
**certain** 6:20,24,25 7:3,8,8 10:5
**CERTIFICATION** 83:10
**certify** 83:11
**chance** 51:14 57:12 70:7
**changed** 66:8

**changes** 50:23
**charge** 40:12 41:9 53:20 54:25
  56:10 60:7
**charged** 19:5 53:16
**check** 46:22
**checked** 52:16
**Cheryl** 40:10
**choice** 29:11
**chose** 68:6
**Christmas** 41:21
**chronology** 5:16 6:15,16 8:3,4,5
  9:6,14,15,18,22 10:1,3,9 34:3
  44:3 78:7,13 79:4,9 80:8,18
  80:20 81:7,11
**Cindy** 24:6
**Circuit** 4:2 8:21 18:17,20 19:15
  33:8,11 59:21 72:11,12
**circulated** 73:22
**cite** 18:21 22:16 82:17
**cited** 71:20 76:1 77:4
**cites** 11:19 46:5
**citizen** 49:20 54:22
**citizens** 63:8
**City** 25:15
**civil** 1:14 3:8 6:14 64:13,15
  72:1 83:3
**claim** 4:18 5:15 6:4 10:24 19:2
  19:4,5,7,21 20:11,12 21:14,16
  26:7 28:24 32:15 38:10 53:13
  53:16,21 54:3 56:10 58:25
  65:15
**claimed** 57:5
**claims** 5:14 18:25 20:15 24:13
  62:8 67:2 75:18
**clarification** 5:9 61:21
**clarifying** 61:23
**class** 20:17
**clean** 61:13
**cleaned** 61:15
**clear** 5:22 15:9 17:10 20:4
  36:20 44:23 49:17,17 50:20
  52:2 79:3
**clearly** 12:12 24:2 60:10,20
  80:14
**clears** 56:16
**client** 52:10 55:9,14,15,21
**clinical** 45:23
**close** 4:1
**closed** 82:15
**come** 9:17 10:9 11:1 12:14 18:7

800.523.7887          11-3-2022, WORD INDEX, Dorchester case      Associated Reporters Int'l., Inc.

Page 4

32:16 41:13 67:1 68:17 72:4
83:7
**comes** 61:7 65:7
**comfortable** 17:25 25:6
**commenced** 48:22
**comments** 8:13
**common** 22:11,12 23:7
**communication** 4:10
**communications** 55:21
**commute** 25:14
**compelled** 25:22
**complain** 64:17 66:21
**complainant** 36:14,17 40:16,19
43:14,18,22,23 64:3 68:4
**complainant's** 40:21
**complainants** 64:6
**complained** 39:22
**complaining** 65:1
**complaint** 36:7,12 39:9,13,15,16
39:18,19,25 40:5,14 41:23
45:3,9,14 48:8 49:20 52:6,13
54:24 56:14 57:3 58:3,6,10
65:18,20 69:8 70:5 80:22 81:2
**complaints** 40:14 65:3,4
**complete** 8:18 23:2,3
**completed** 40:16
**completely** 25:6 52:18 76:1
**comply** 75:7,25
**composition** 23:2,4
**compromised** 63:25
**concede** 13:5,5 14:24 42:13
**concern** 60:11 83:4
**concerned** 6:23 60:16
**concerning** 4:11 69:19 75:1 76:2
78:7
**concerns** 60:8
**conclude** 67:20 69:5
**concluded** 40:18 51:10,20,21
**conclusions** 7:23
**condition** 14:18 43:2 46:3 57:5
66:8
**conditions** 21:22
**condo** 36:20 74:7,10
**conduct** 24:14,17
**conducted** 56:6
**confer** 34:15,16
**conference** 4:11,14 5:9
**confidential** 4:22 16:15,22 17:1
17:17,21
**confidentiality** 15:12,16 16:7

16:22
**confidentially** 20:14
**confirm** 81:21
**conflates** 18:25
**Congress** 31:1,19 32:18
**Congressman** 65:16
**connected** 43:12,15
**connection** 44:17 48:20
**consequences** 30:8
**consider** 8:22 21:7,9 24:4 26:20
60:4 63:16 64:23 69:9,12
**consideration** 53:19,23
**considering** 4:19 59:5 73:23
**consistent** 23:4,5
**constantly** 22:24
**constitution** 63:14
**construe** 33:3
**Cont'g** 2:1
**contact** 44:14
**contains** 7:5 33:5
**contaminate** 61:11
**contemplate** 6:12 70:19
**context** 64:13
**continues** 45:25
**continuing** 41:21
**contrary** 42:20,21
**correct** 6:8 17:24 19:19 20:24
30:5 35:4 38:2,5 39:10 41:16
47:21 50:24 69:11,20 81:18
83:12
**correctly** 60:24
**correspondence** 15:2
**Cortland** 73:14
**council** 2:7 73:13
**counsel** 2:7 3:24 4:6 5:24 6:19
8:15,16 9:25 10:8,12 40:9,10
46:8 47:21 66:17 68:17 75:9,9
75:22
**country** 60:13
**couple** 24:11 71:10
**court** 1:1,9 2:9 3:2,4,6,13,15
3:20 5:12 6:9,12 9:21 11:7,10
11:15 12:6,8,16 13:3,7,9,12
13:14,16,19,24 14:3,5,10,13
14:15,19,22 15:6,10,15,18,21
15:23 16:6,8,12,14,20,24 17:4
17:13 18:3,10,16,17 19:8,9,12
19:14,16,22 20:3,12 21:3,12
21:23 22:4,7,9,15,16,19,20
23:6,10,17 24:7,10,20,23 25:1

800.523.7887          11-3-2022, WORD INDEX, Dorchester case     Associated Reporters Int'l., Inc.

Page 5

25:3,17,20 26:1,6,12,14 28:14
28:17,20 29:13,17,20 30:13,24
31:8,18 32:4,8 33:10,15,20,25
34:12,18,24 35:4,4,11,12,13
35:18,23,23,24,25 36:4 37:3,5
37:9,13,20,22,25 38:16,19
39:7,12,20 41:13,15,22 42:7,9
42:13 43:5 44:9,16,20 45:1,5
45:11,18,20 46:10,14 47:2,5,8
47:13,15,18 48:1,5,12,17
49:13,15 50:9,13,17,20 51:2,7
52:20,22 53:8,18 55:8,13,16
56:3,5,8,12,15,20 57:18,20,23
58:1,4,12 59:5,5,8,10,23 60:3
60:6 61:1,23 62:10,13,18,20
62:24 63:1,4,5 64:7,9,14,18
64:21 65:7,21 67:3,9,12,20,23
68:3,13,15,21 69:5,15,17 70:3
70:6,12,25 71:4,8,10 72:13
74:18,20 77:16,21 78:3,5,11
78:13,14,19,23 79:1,5,8,11,16
79:19,23 80:3,6,12 81:1,9,14
81:17,19,25 82:2,3,4,10,13,19
82:22,25 83:11
**Court's** 5:10,16 8:3 23:5 34:9
  35:5,10,21 81:7,11
**Courts** 8:22 10:14 22:23,24 33:2
  33:2
**cover** 3:23,24 5:4 45:12
**COVID** 16:18
**Cowpet** 72:11
**craft** 76:19
**created** 80:20
**credentials** 61:16
**credibility** 59:9
**credible** 67:18,21
**criminal** 64:10,10
**criminals** 64:11
**critical** 52:4
**cross** 42:17 51:9 56:25
**cross-** 66:9
**cross-examined** 50:21
**Crowley** 69:4
**cry** 33:17 39:3 73:10
**culminating** 41:22
**cure** 67:12 68:3
**currently** 66:6

---

**D**

**D** 55:19 69:18

**D.O** 56:18
**D.O.A** 27:1,7,19 28:1 29:15 44:6
  75:21 77:3
**D.O.J** 44:14,24 52:12,17,22
  53:11 55:17,19,23 61:9 66:1
**D11** 37:18 41:5
**D115** 41:6
**D138** 43:13
**D301** 75:10
**D307** 75:24
**damage** 12:21,24 14:6
**damaged** 12:22 13:6
**damages** 1:8 14:7,9 15:4 26:15
  29:5 32:16 66:21 70:7 71:6,11
  71:13,17,22,23 73:3 74:5,19
  76:2
**date** 8:6 12:21,23 13:3,4,12
  14:5,11,12,16 44:10
**dated** 40:20
**dates** 6:24 8:10 34:7,21 44:4
**David** 24:8 32:6
**day** 41:21 55:4 78:15 83:18
**days** 13:20,21 14:2 24:15 75:16
  78:21 80:6
**DC** 1:15,19
**deal** 64:10
**dealing** 59:1
**decades** 20:18
**December** 13:13,14,15,17,17
  36:16 57:11 79:25 80:1,2,5
**decided** 7:22 21:13 48:15 51:23
  62:15
**decision** 73:17 74:11
**defects** 61:13
**Defendant** 1:6,21 2:1 5:13 49:2
  59:19 71:24 81:21
**Defendant's** 24:14,16 36:1 37:19
  46:20 54:5,6
**Defendants** 58:23 77:4
**defense** 5:15 6:4
**deficiencies** 68:3
**define** 22:20,24
**defined** 22:11
**defining** 25:5
**definition** 22:21,23 23:1
**degree** 60:17
**delay** 26:8 76:16,17
**delayed** 27:2
**deliberated** 60:7
**deliberating** 63:17

800.523.7887         11-3-2022, WORD INDEX, Dorchester case      Associated Reporters Int'l., Inc.

Page 6

deniable 53:22
denial 54:12 56:9
denied 20:23 28:2 54:5
Dental 71:19
deny 74:14
depart 60:12
Department 34:5,6 40:6 44:2,5
  44:11,11 52:9 60:12 63:6,7,10
  63:11,24 64:6 68:5 83:1
Department's 53:18,19
deposition 42:1
deprived 20:17
Desanti 68:22
described 38:23
deserve 31:12
despite 45:9 57:16
detail 9:2 55:25 56:2
determination 40:11
determinations 59:9
determine 46:13 56:7
determined 53:17 54:11
develop 10:2 70:22
developed 6:16 8:21
Development 34:6 40:7
DEVIN 2:7
Devine 16:17 17:14 72:8
Devine's 66:24 72:3
diagnosed 81:23 82:8
diagnosis 81:9,12
dice 74:15
dictionaries 22:24
dictionary 22:13,22
died 76:5
difference 20:6 27:15
differences 11:24,25
different 11:6 39:2 56:21 76:1
differently 35:11
difficult 29:4 82:18
direct 25:14
directed 35:8 59:20
directly 15:7 17:14 41:25
disabilities 27:9,12,20,21
disability 21:19 24:1,2 27:9
disabled 27:15,16
disagreed 36:25
DiSanti 2:9
disbelieved 32:12
discovery 44:2 81:21 82:15
discriminate 74:8
discriminated 21:10,21

discrimination 20:16 21:2 31:15
  36:12 40:12
discriminatory 14:17 20:10
  24:14,17
discuss 12:25 17:3,8,16 18:5
discussed 18:13
discussion 4:25 8:11
disdain 73:15
disorder 54:20 81:23
dispute 12:13 17:5 36:22,24
disputes 11:21 12:10 79:12
DISTRICT 1:1,1,9
District's 57:14
Divine 77:11
Division 1:14
DOA 76:25
doctor 50:8,11 82:6
doctor.net 43:14 45:8
doctrine 63:3
document 5:7 11:16,19 13:25,25
  79:20
documents 7:8 9:14,20 36:6
  80:20 81:20
dog 30:21 66:5 76:4,7
doing 30:16 39:6 57:14 58:15
  66:22 72:22 75:6,7 79:15
DOJ-CRT 1:13,18
door 64:17 65:5
doors 65:11
Dor 69:20
Dorch 41:20
Dorchester 1:5,22 3:8,16 4:21
  5:13 6:5 7:23 10:21 11:21
  12:1,9,25 14:1,16 15:2,4 17:2
  17:12 19:6 20:20 21:1,19,21
  23:24 25:16,24 27:8 30:21
  32:9 33:17 34:5 35:2 39:5,10
  39:15,17,17 40:1,9 41:20,25
  42:22 43:25 44:8 53:4 58:7
  59:14,18 66:4,24 69:19,20,25
  70:10,13,17,18,21,23 71:2
  72:17,19 73:1,21,25 74:4,9,16
  74:23 75:2,4 76:10,12,18
Dorchester's 12:24 32:1 33:21
  35:7 73:12
doubt 72:14
Dr 41:10 54:15 55:4 60:23 61:5
  61:16 63:22 67:4,18,24 68:8
  68:16 81:15,22 82:8
drafting 72:20

800.523.7887                11-3-2022, WORD INDEX, Dorchester case        Associated Reporters Int'l., Inc.

Page 7

**dragged** 17:5
**draw** 62:15,19,20
**DRISCOLL,L.L.P** 1:23
**Drive** 2:10
**drop** 18:4
**dropped** 32:14
**due** 21:18
**dwellings** 27:8

**E**

**E** 34:1
**E.C.F** 5:10  10:14  35:8  78:3
**E.S.A** 24:1  36:18,19  48:24
**earlier** 35:12  60:22  65:13
**early** 76:8
**easily** 57:17
**EASTERN** 1:1
**economic** 14:9
**Ed** 73:14
**edited** 43:6
**edits** 43:3
**effect** 81:24
**eight** 27:24  36:15  44:12  48:3
  75:16
**either** 7:5  8:6  9:13  12:24  30:8
  43:21  53:17  78:6  79:11  80:19
  80:19,23
**elected** 53:17
**election** 44:7
**electronic** 2:12  83:13
**element** 19:21
**elements** 54:2,12  65:15,20
**elevator** 12:11
**email** 1:16,20,25  2:4  15:9  45:20
  45:22  73:21
**emailed** 36:17
**emails** 42:21  73:21  74:1
**emotional** 20:22  38:14  40:22
  43:2  46:2  57:5  66:7  69:19,21
  69:25  70:11,14,20  71:2  72:6,9
  72:15,20,24  73:15,19  77:18
**enacted** 72:17
**enclosed** 46:4
**ended** 16:9  57:14
**engage** 76:24
**engaged** 59:14
**English** 19:24  25:7  30:12  31:6
**enjoy** 27:21
**entered** 5:12
**entire** 20:17  59:17

**entirely** 49:19
**entitled** 5:8  31:19  38:13  40:11
  51:6  83:14
**entrance** 12:11
**entries** 6:14  8:14  9:6,15,24
**entry** 81:10
**epitome** 60:13
**ESQ** 1:13  2:6,7
**established** 8:25
**et** 3:6
**evaluate** 54:18
**evaluated** 38:2,6  39:1  40:18
  41:11  43:19  51:17  55:5  81:22
**evaluation** 38:8  41:12  43:21
  54:16
**event** 81:8
**events** 5:16  6:25  30:15
**everybody** 76:13  79:6
**everybody's** 11:9
**everyday** 23:7
**evidence** 7:6,10  9:9  12:12  18:23
  20:5,8,19  21:1,16,20,24  25:18
  26:9,12,14,16  27:7,18  28:1
  29:9  30:19  31:25  32:9  33:3,6
  33:13  36:2,13,25  37:6  39:24
  41:5,10  48:10,14  53:20  54:14
  58:24  59:13  72:2,25  80:11,23
  81:9,12
**evidentiary** 8:2  9:16
**exact** 50:5  54:7
**exactly** 22:14  23:5,15  36:9
  54:13  72:2  79:14  81:2
**exam** 25:14
**examination** 42:18  66:10
**example** 22:13  80:22
**exchanged** 74:1
**excluded** 46:8,16,20  79:21
**excuse** 10:19
**executive** 52:11
**exhibit** 7:14  9:13,17,23  36:13
  42:6,22,24  43:11,13  44:1,25
  46:8  47:10  48:2  75:10,24
**exhibits** 7:6  9:8  80:16  81:3
**existed** 68:4
**existing** 9:6  30:7
**experiences** 40:23
**explain** 28:11  70:8  71:13
**expressed** 73:15
**extent** 7:4,11  11:24  30:6  59:7

800.523.7887          11-3-2022, WORD INDEX, Dorchester case          Associated Reporters Int'l., Inc.

Page  8

**F**

**fact** 6:13 7:7,13,19,21 21:25
  28:17 35:1 38:7 39:22 60:22
  61:10,12,21 62:15 63:24 67:15
  67:23 68:7 70:21
**facts** 9:25 34:4 52:1 53:19,24
  54:1 56:9 58:9,11 65:14
**factual** 12:13 58:16
**fails** 19:24
**failure** 76:17
**fair** 19:13 24:13,18 27:22 28:3
  56:17 72:4,9,16 73:20 74:8,17
  82:13
**faith** 75:25
**false** 39:3 41:23 48:7,15 49:22
  49:22 60:2,19 69:7,10
**familiar** 24:23 46:3,3
**far** 6:22,22 11:3 26:2 32:25
  39:3 58:22 60:16
**favor** 5:13,13 7:22 26:3 28:7
  32:13 59:6 63:19
**favorable** 33:3
**feared** 28:25
**feasible** 4:15
**February** 41:22 42:1
**Federal** 4:2 6:14 44:9 52:12
  53:17 72:1
**feedback** 77:14
**feel** 11:22
**fifth** 65:1
**figure** 57:16
**figures** 23:2,3
**file** 5:22 10:16 39:16,25 44:24
  52:22 53:13,15 55:18,25 56:2
  56:14,22 57:10 65:17 68:8
  78:2,6,10 79:24 80:7
**filed** 5:7 13:22 16:4 36:12 39:9
  39:15,18,19 41:9 44:13 48:4,8
  48:8 49:9 61:21 65:20 69:5,8
  69:22 70:5 75:6,17 76:5 77:23
  80:25
**filing** 78:15 79:3 83:3
**fill** 38:7 70:24
**filled** 40:7,7 43:18,20
**fills** 82:6
**finally** 14:17 29:10 43:16 56:17
**financial** 75:24
**find** 9:16 27:6,17,25 67:17,21
  80:22 81:3

**finding** 28:7 30:6
**findings** 6:13 7:7,13,19 31:20
  32:19 44:7
**finish** 40:3,3 51:13
**firm** 40:8 44:16,17 60:1
**first** 4:9 5:20 8:4 10:23 12:21
  12:23 13:12,22,22 19:9,10
  21:6 23:19 30:11 35:24 41:20
  41:24 44:14 46:7 49:16,18,21
  65:24 70:11 73:24,24 74:23
  75:20
**five** 27:5,11 28:6,20 29:12,25
  30:2
**five-minute** 34:10,19
**fly** 38:12
**fob** 11:8 12:3,5 25:21
**followed** 43:21
**follows** 9:5 36:16 40:15
**forced** 11:9
**foregoing** 83:12
**form** 26:18 72:7 77:24 82:6
**forming** 23:2,3
**forms** 54:9
**forth** 9:1 25:15 50:22
**Forty** 42:25
**forward** 67:1 73:8
**found** 9:16 18:15 19:6 21:17,19
  22:1 23:19,20 26:2,19 27:1
  32:12,13 33:21,22 59:13 63:19
  63:21 67:14,17 74:16
**four** 26:24 27:4 28:6,6,20 30:2
**fourteen** 32:10
**Frank** 2:7 66:24 77:11
**fraud** 54:9 57:17 66:13
**fraudulent** 48:24 57:8 66:3 67:2
  75:18
**free** 17:3
**freight** 12:11
**front** 47:22 66:17 68:1
**fully** 27:21
**fun** 74:2
**functional** 46:4
**further** 23:14 43:16 46:5

**G**

**gather** 11:2
**general** 7:15 53:14 65:17 81:23
**generalized** 54:19
**generic** 60:19
**getting** 17:7 32:5 36:4 43:9

**give** 3:22 8:15 10:8 13:3,4 22:2
  31:10 51:13 71:10,12 77:14
  78:23
**given** 46:14 59:12,12
**gives** 63:23
**go** 4:8,18 7:19 10:25 18:7 25:17
  25:17 37:17 41:19 42:9 44:21
  50:4 53:5,5,8 56:15 62:11
  64:21 69:2 73:8 74:3
**going** 4:12 5:4 8:20 9:4 10:17
  11:18,25 12:13 14:8 17:19,25
  18:4,5 20:18 26:2 30:11 31:10
  34:1 40:3 61:5 65:11 68:16,16
  68:21 74:11,12,13,15 75:19
  78:16,19
**good** 3:2,3,10,10,12,14,15,16,18
  3:19 18:9 75:10,11,25
**gotten** 51:16
**government** 4:10,22 6:20,23 10:5
  14:24 15:24 17:16 20:13 31:21
  34:21 39:22 47:23 52:4,11,12
  56:19 57:1,9 61:6,10 66:14
  67:24 69:5,9,22,23 75:9 77:15
  77:17,23 80:21,24
**government's** 4:19 13:12 15:13
  16:4 76:17
**governments** 25:22
**governs** 8:2
**Gracie** 76:4,6
**granted** 14:20 27:22 28:2 70:1
  76:12,12
**granting** 33:18
**great** 53:6 63:8
**group** 4:2 18:15,15,22 19:4,17
  19:20,21 20:2,9 21:5,6,8,10
  22:6 23:1,8,14,15,16 24:4,11
  24:19 25:7,8 27:5,10,13,25
  28:2,9 30:4,8 31:4,22 32:9,17
  58:25 59:15,15
**guess** 39:2
**guidance** 19:14 22:7 72:6 75:4
**guise** 59:5 60:4

---

**H**

**hair** 29:4
**Hal** 83:5
**Halp** 14:6
**Halpern** 15:7 17:15 24:6,6 29:21
  30:3 32:2,2 68:17 83:5,8
**Halpern's** 13:6 70:1 76:24

**Halperns** 4:18,20 10:23 12:3,10
  12:22 13:21,21 14:7,17 16:16
  17:2,2,6 18:6 20:11 25:11,14
  26:3,22,24 29:6,11,14 30:19
  32:13 33:23 70:22,24 73:24
  76:4,6,20 83:7
**Halva** 77:10,13
**Ham** 51:10
**Hamburg** 3:6,7 5:14,17,19,19
  7:22 10:12 20:23 21:7,10,15
  22:6 23:20 24:1,3,4,5 25:13
  26:19 29:21 30:3 32:11 34:4
  34:25 35:6,14 36:5,12,25
  37:10,13 38:1,7,17,19 39:18
  39:18 41:11,24 42:11,18 43:1
  43:3 44:6,8 45:21,23 46:2,21
  46:21 49:3,8,11,18 50:2 51:11
  51:20,23 54:15 55:20,24 56:2
  57:4,6,17 58:18 60:1,16,18,23
  61:2,5,8,11,15 62:8,16,19
  63:19 66:7,12 67:2,10,13 68:4
  69:6,10 75:19 76:14 81:13,22
  82:5,7
**Hamburg's** 40:13
**Hamburg/Carla** 64:1
**Hamburgs** 25:22
**hand** 11:9
**happen** 4:12 6:25
**happened** 6:20 12:12 64:19,25
  65:2 73:4
**happening** 16:15
**happens** 53:18
**happy** 3:23 51:15
**Harrisburg** 40:9
**Harvey** 81:16,22 82:9
**HCE** 1:14
**health** 36:18,23 40:22 43:1 46:1
  46:2 50:11,12 57:3,5 61:3
  66:6,8 67:7
**hear** 30:25
**heard** 20:6,7,19 21:1 24:14
  25:10,13 32:6,11 35:25 44:9
  47:24 65:22 66:23 73:3,4,12
  73:13,13,14
**hearing** 3:5,21 8:18 10:22 31:11
  65:6 68:24 77:6
**hearings** 6:16
**help** 38:11 77:15,18
**helpful** 14:22 15:1
**helping** 42:24 43:1 46:2 57:4

66:9
**helps** 40:22
**hiding** 58:7
**high** 63:15 67:1
**higher** 83:2
**hindrance** 77:19
**Hold** 36:9
**holding** 48:1
**Home** 33:9
**Homeowner** 2:7
**honest** 11:13
**honestly** 78:17
**honor** 3:3,12,14,18,19 4:3 6:8
  11:5,17,23 12:9 13:2,13,18
  14:14 15:5,8,12 16:25 17:17
  17:24 18:24 19:25 20:4 21:9
  22:3 25:6 28:11 29:2,4,9
  30:11 31:24 33:14,24 34:9,10
  35:3,21 36:24 37:17 38:5,22
  39:11 41:2,18 43:10,11,25
  44:3,22 45:16 46:18,23 47:17
  47:20 48:6,19 49:1,12 50:14
  53:7 54:5,10,14 55:7,12 56:1
  56:16,23 57:19 61:19 62:6,17
  64:5,12 65:10,19 66:14,23
  70:9,10 71:15 73:9,11 74:6,22
  75:13 76:1 77:2,18 78:9,25
  79:2,15,21 80:5 81:5 82:14
**HONORABLE** 1:9
**honoring** 72:23
**honors** 74:18
**hope** 11:16
**horse** 74:3
**horses** 74:2
**hotel** 32:21
**hours** 3:21 4:4
**house** 31:2 32:20
**housekeeping** 77:22
**housing** 19:13 20:18 24:13,18
  27:22 28:3 34:5 36:12 40:6
  72:4,10,16 73:20 74:8,17
**huckster** 54:10
**HUD** 9:20 36:6 39:8,9,14,15,16
  39:16,17,23,24,25 40:5 42:4,8
  43:10,17 44:1,10 45:9 48:2,14
  49:19,21 52:1,2,3,5,5,6,10,10
  52:10,18 53:11,16 54:25 55:9
  55:20,24,25 56:2,10,22 57:10
  58:13 60:20,22 61:9 65:25
  75:3 77:14 80:20,21,22,24,25

81:1
**HUD's** 41:9,9 44:24
**HUD's** 44:6 52:22
**HUDs** 72:6
**hundred** 32:10,10
**hurt** 32:1,2,2,3

---

### I

**I'll** 41:6
**I've** 22:1
**idea** 49:11
**ideals** 63:25
**ill** 46:5
**illness** 46:5
**impact** 7:16
**impacted** 20:9
**impairment** 23:21
**implies** 30:16
**importance** 52:1
**important** 6:24 20:8 43:25 44:3
  63:13
**importantly** 48:6 66:2
**imposed** 14:18
**inaccurate** 8:12 57:9 60:18,18
  60:20 61:8,11
**include** 52:8 58:6 79:13 82:11
**included** 5:6 8:8 12:3 27:25
  47:10 57:2 58:2,10
**including** 20:8 52:15 55:6 58:11
  66:24
**inclusion** 21:2 28:12,24
**independent** 52:17 55:17
**indicate** 9:22 82:17
**indicated** 36:19 75:23
**indication** 49:25
**indifference** 73:2
**individual** 11:12 26:7 31:4,22
  31:22 32:22 53:11
**individually** 21:15
**individuals** 30:8
**indulgence** 34:9
**infer** 67:16
**inference** 58:14
**inferences** 50:15 59:6 62:14,19
  62:20
**information** 44:25 45:9
**informed** 23:25 39:17
**injured** 19:17 24:13 33:23
**injury** 31:4,21 32:21
**inquire** 60:11 63:23

instance 43:21
instructed 23:6
instruction 23:5
insufficient 30:9 58:24
Int'l 2:10 83:18
intend 3:22 8:15,25 9:12 10:2
intended 31:1 32:18
interactive 76:25
interest 58:9 63:7
interested 17:7 52:25
internet 48:20 76:9,21
interrogatories 29:20
intervener 10:12
interview 43:22
interviews 62:21
intricacies 62:4
introduce 58:13
introduced 21:24 39:23 52:5
introducing 61:6
investigate 56:19
investigated 56:19
investigation 48:22 52:16,17
 55:17 56:7
involve 31:15
involved 20:13 31:16 59:25
involvement 44:12
involves 22:12
involving 60:14
issue 4:17 12:25 15:12 26:15
 28:23 31:9,18 39:21 56:23,25
 59:17 70:7 81:5 82:22
issued 37:24 72:11 75:4,5
issues 3:24 5:1 18:7 29:23
 63:17,18
it'll 58:20,21
it's 35:15 46:25 52:10 58:5

**J**

J 2:1
J.N.O.V 53:4
January 14:11,13,14 41:21 75:4
 76:5
job 63:8
Joe 73:13,14
Johnson 40:10
join 67:2
joint 11:1,4 12:14 78:15 79:3
joked 74:2
judge 1:9 7:18 8:22 14:24,25
 15:23 32:19 57:21 60:10

judges 4:2
judgment 5:13 6:6 54:6 55:7
 74:18 77:24
judicial 4:14
Judith 83:11,18
July 40:1 42:6,10 43:12 44:7,9
 75:21
June 9:9 15:13 20:6 23:8 47:1,3
 47:4 70:2,24
jurisdiction 60:4 72:13
jury 5:12 7:17,18,21 9:9 19:5,5
 19:6 21:8,13,17,20,25 23:6,6
 23:11,11,19 25:10 26:2,10
 27:1,5,16 31:19 32:12,19 33:7
 33:19 47:24 51:10,20,21,22
 57:16 59:12,12,12,13 60:7,21
 61:9 62:14,15 63:16,19 67:14
 67:17,21 68:1 74:16
jury's 5:20 7:20 33:7
jury's 28:5
justice 34:6 44:2,5,11 52:9
 60:12,13 63:6,7,10,11,12,24
 64:6 68:5 83:1
Justice's 44:12
justifies 73:3

**K**

KANE 1:23 2:2
keep 4:21,22 48:9,14 77:14
key 11:8 12:2,4 25:21 29:1
 43:10 56:23
kind 5:23
knew 29:15 30:21 43:10 49:14
 51:15,17 52:1,2 54:15,17,17
 54:23 55:1,1,2 57:9,10 64:1
 68:9 72:8,17,17 82:7
KNOELL 1:23 2:2
know 4:8 7:2,14 8:7,7 11:13,24
 12:17,20 13:9 15:3 16:1,3,8
 16:10 19:15 23:18 26:2,12
 27:19 28:16,23,25 32:9,16,22
 35:7,23 38:9 39:9 41:11 42:4
 42:4,15,15 45:7 46:23 47:2,11
 47:23,24 48:7 49:6,8,17,23
 50:2 51:4 52:2 53:25 55:2,11
 55:18,22,23 57:7 58:9 59:11
 59:25 60:16 61:22 62:7,12
 64:10,23 65:25 67:20,22 71:2
 72:2,10 73:17 74:4,12 77:5,6
 78:10,16 79:22 80:10 81:2

800.523.7887          11-3-2022, WORD INDEX, Dorchester case      Associated Reporters Int'l., Inc.

Page 12

82:5,7,25
**knowing** 57:16 64:1 66:18 69:6
**knowledge** 12:4 50:15 71:25
  72:21
**known** 23:25
**knows** 74:7
**Kolstad** 71:18
**KRAMER** 2:2

---
**L**

**lady** 42:19 66:12,13
**laid** 42:17
**language** 50:5 51:3 53:16
**late** 16:4
**latest** 42:10
**law** 5:25 17:23 30:9 40:8 60:3
  75:8,25
**laws** 63:14 72:1 75:1
**lawsuit** 44:13 49:10 75:6,17
**lawyer** 53:1 66:12
**lawyers** 53:2 66:15,16
**lead** 68:9
**learned** 25:20,20 56:17 76:11
  77:6
**leave** 36:1 51:23 80:17
**left** 17:11
**legal** 7:15 8:2,25 10:12 29:23
  31:8,18
**length** 71:20
**let's** 18:4,7 51:9 53:9,10 64:14
**letter** 5:3,4 7:1 10:18,19 34:2
  36:17 37:11,16,18,23 38:9,11
  38:12 40:20 41:5 42:16,23,25
  43:7,7 45:22,25 46:5 49:23
  50:23 51:4,4,15 54:11 56:25
  65:24 66:5 76:9,21 81:24
**letterhead** 40:6
**letters** 48:24 66:19
**liability** 19:3,6,7 21:13 29:5
  31:2 33:19
**license** 36:17 37:1,24 41:7
  42:16 49:5 56:24 63:23 66:10
**licensed** 35:19,20 36:8,8,23
  37:1,12,14,15 40:18,25 41:3
  42:14,23,25 46:1 49:1,3 50:8
  50:9,11,13 51:9 57:3 61:3
  66:6 67:6,25 81:15
**lied** 42:11 54:8
**life** 23:22 54:21
**light** 33:3

**limit** 64:14
**limitations** 46:4
**limited** 9:7,12 23:21 80:10
**lingering** 31:12
**list** 3:22 10:6 37:13
**litigation** 44:18 83:4
**little** 25:11
**live** 38:12,13 54:22
**lived** 29:11
**LLP** 2:2
**local** 66:17
**long** 38:7
**long-running** 3:5
**longer** 6:1 10:15 61:25 62:22
**look** 11:11 17:4 22:24 34:20
  46:24 55:20,20 76:16
**looked** 15:1 54:10,14
**looking** 26:4 36:11
**loose** 77:22
**Lori** 2:9
**lost** 11:15
**lot** 31:14 58:15
**lots** 43:6
**Louise** 3:6,7 5:17,19,19 7:22
  10:12 20:23 21:7 23:20,25
  24:3,4,5 25:12 26:19 29:21
  34:3,25 36:5,12 43:1,2 44:6
  45:21 46:2 49:18 50:1 51:10
  51:11,19,23 55:19,24 56:2
  57:4,6 58:18 61:14 66:7,12
  69:6,10 75:18 76:13
**lunch** 4:3
**lurch** 17:11

---
**M**

**M** 1:9
**main** 1:15 48:16
**maintain** 53:15 65:17
**major** 23:22 64:3
**makers** 73:18
**making** 6:13 7:7 16:15 50:15
  52:14 54:7 70:23 74:2
**malice** 73:1 74:4
**Maloney** 77:11
**map** 12:22
**March** 48:21 54:6 75:5,10 76:2
**married** 24:10
**Massena** 2:11
**material** 12:1 55:4 57:1 58:15
  58:16

800.523.7887          11-3-2022, WORD INDEX, Dorchester case     Associated Reporters Int'l., Inc.

Page 13

**matter** 5:15 9:10 21:25 44:10
  60:3 70:5 83:14
**McClymons** 41:10 43:7 54:11,15
  55:5 60:23 61:5,16 63:22 67:4
  67:18,24 68:8
**mean** 8:25 11:11 17:1 22:25 49:5
  55:2 61:4 64:9 67:21 78:17
**meaning** 22:12,12
**meanings** 23:7
**means** 19:15 35:23 49:25 52:6
**meant** 23:7
**medical** 50:8,9
**meet** 12:25 67:5
**meeting** 70:16 73:6
**members** 20:21 24:19 73:13
**memorandum** 4:20
**mental** 23:20,20 36:18,23 40:22
  43:1 46:1,2 50:11,12,13 57:3
  57:5 61:3 66:6,7 67:6
**mental-health** 43:2
**mentioned** 25:2 41:3 61:20 81:17
**Merriam** 22:15,22,25
**message** 16:11
**met** 57:11 65:20
**MICHAEL** 1:9
**Michigan** 24:9 32:7
**middle** 4:6
**Mike** 55:9
**Miller** 76:9,22
**mindset** 82:5
**minimum** 33:6
**Minkovich** 20:12 24:8 27:2 28:12
  28:17,23 29:22 30:3 32:3,14
  33:16 73:4 76:3
**minute** 4:15 10:18 22:2 26:1
  45:11,18,18 62:10
**minutes** 70:16 71:10
**misrepresentation** 66:11
**misrepresentations** 65:24 66:3,3
**misrepresented** 68:10
**misstatements** 38:21
**mitigate** 40:23
**monetary** 15:3
**months** 29:12 44:12 48:3 70:4
**Moran** 2:6 3:13,14 16:2,9
**Morgan** 73:13
**morning** 3:2,3,5,10,10,12,14,15
  3:17,18,19,21 6:11 8:24
**motion** 5:9,22 6:6 33:2 35:7
  36:1 53:5 54:5 58:23 59:9,20

  60:5,10 61:21,25
**motions** 5:2 6:10 7:16 8:23
  10:16 51:24

---

**N**

**named** 81:15
**nature** 7:9
**NE** 1:15
**neat** 64:23
**necessarily** 20:2
**necessary** 4:16 8:16 29:22 40:21
**need** 4:6 7:13 17:22 31:5,24
  34:14,16 35:3 44:21 47:18
  65:22 78:12
**needed** 24:1 27:20 38:14 40:19
  54:20 72:23 73:17
**needs** 74:6
**negative** 62:20
**negotiations** 20:13
**never** 6:20 35:16 39:22 41:25
  42:19 43:9 48:25 51:17,18
  52:4 56:18 76:23 77:18
**new** 2:11 6:6 18:20 43:24 63:18
  75:1 76:8
**nice** 75:12
**Nick** 66:25
**nine** 43:16 47:6 70:15
**nineteen** 35:9
**ninety-nine** 25:12
**Noah** 1:13 3:9
**noah.sacks@usdoj.gov** 1:16
**non-** 27:15
**non-moving** 33:4 59:7
**noon** 4:1,1
**Norristown** 1:24 2:3
**note** 41:8
**notebook** 47:8,12
**notice** 21:18
**notwithstanding** 6:7
**November** 1:7 5:8,10 78:20,24
  79:24 83:18
**number** 5:11 6:12 7:23 15:3
  26:21,25 27:4,4,11,14,17
  28:11,18 30:14,15 37:24 40:12
  41:7
**numbers** 9:23
**numerous** 74:17
**NW** 1:18

---

**O**

**object** 17:20,20 50:14
**objected** 28:12
**objection** 26:18 29:1
**objections** 59:25 79:11 80:7
**obligation** 65:4,18
**obtained** 45:23 66:19
**obvious** 58:5
**obviously** 5:6 23:14 56:21 81:1
**occurred** 81:8
**Ocean** 25:15
**October** 5:5 7:1 10:19,19 25:25
  34:2 70:22 77:23
**Off-the-record** 34:22 68:19 83:9
**offer** 15:4 16:16 17:7
**offered** 47:15
**offers** 17:2
**office** 40:7 57:14 66:15,17
**office's** 44:14
**official** 83:12
**okay** 3:4,20 4:7 5:6,17 6:9,15
  8:5 9:21 10:11,15,17 11:10
  12:6,16,17 13:7,9,19,24 14:3
  14:19,22 15:6,21 16:7,12
  17:15,16 18:3,6,19 21:3 23:17
  24:3,20 25:19 26:3,22 27:2,3
  27:24 29:17,22,24 30:24 31:8
  31:11 32:11 33:20,25 34:18,24
  34:24 35:3 36:5,10 39:12 42:9
  44:22 45:12,19 46:23 48:5,17
  49:16,19,21,25 50:13 51:2,7,7
  51:7,9,9 53:6,22 55:8 56:3,8
  57:18 60:21 64:14 68:13,24
  69:17,17 70:3,25 71:9 74:20
  77:16,21 78:2 79:23 80:12,15
  80:19,23 82:10 83:8
**On-the-record** 3:1 34:23 68:20
**Ondrade** 1:17 3:10,12
**ones** 3:23
**online** 40:16
**Oops** 53:6
**opportunity** 31:10 71:13
**oral** 1:8 10:20 17:7
**order** 5:10 8:17 10:14 13:1
  54:21 72:4
**ordinary** 63:6 83:3
**organization** 77:5
**originally** 43:12
**other's** 80:7
**outright** 57:8
**outstanding** 3:25 6:5

**overall** 50:1
**overnight** 29:12
**oversight** 38:24
**Owner's** 20:20
**owners** 1:5,22 3:8 20:21 66:4
  75:14

## P

**page** 9:23 22:19 41:8 42:25
  43:13,16
**pages** 35:8 47:1,6,7
**paragraph** 36:15,15 40:15 45:3
  45:14,24
**paragraphs** 45:13 58:3,6
**parse** 62:5,6
**part** 4:4 21:6,7,10 24:4 56:23
  61:11 62:22 63:10 65:23 81:2
**partially** 5:18
**participate** 10:13
**particular** 31:4 44:16
**particularly** 9:19 77:13
**parties** 8:3 9:7 53:2
**party** 5:17,20 6:1 10:16,24 33:4
  45:8 53:17 59:7 68:7,9,10
  80:23
**passed** 65:16 76:6
**pattern** 18:14 19:2,10,16,19,25
  20:15,25 25:7 27:19 28:8 30:6
  30:11,14,15 31:3,6,20 32:1
  58:24 59:14
**Paul** 1:22 3:16
**peacefully** 20:14
**pending** 5:1 76:4,6 82:23
**Pennsylvania** 1:1,6,18,24 2:3
  75:1
**people** 27:8,12,16,20 28:2 32:1
  32:11 63:12 64:8,16,22,24
  65:10 67:1 72:23 73:17
**perceived** 71:25
**percent** 25:12
**perfect** 65:5
**permit** 27:20
**Perry** 42:5
**person** 20:1 41:11 50:3 54:16
  55:5 65:5,7 68:11
**person's** 19:4
**personal** 12:4
**personnel** 55:24
**persons** 20:9 24:17 48:24 58:25
  59:16

800.523.7887          11-3-2022, WORD INDEX, Dorchester case      Associated Reporters Int'l., Inc.

Page 15

pertain 5:16
pertaining 5:1 26:24
pertains 10:21
phase 29:9 75:20
Philadelphia 1:6
phonetic 41:10 57:11 77:11
photo 30:22
phrase 35:22
phrased 35:11,12
place 4:24 7:3 10:5 58:8
plain 19:24 25:7 30:12 31:6
plaintiff 1:4,11 2:6 5:14 62:21
  63:6 68:7,10,10 76:2 83:2,3
plaintiff- 10:11
Plaintiff's 20:15 47:9,9,12
  70:15,16 75:22 77:4
plaintiffs 23:24 27:6,18,25
planes 38:12
planning 79:15
play 9:3 63:13
please 3:4 22:9,17 25:18 34:11
  34:20 65:22
plus 29:12 80:7
point 6:17 8:19 19:8 25:8,19
  42:16 43:10 51:7 60:22 65:8
  75:6 77:9 80:12
points 30:10
policy 69:19 70:11,14,19,22
  72:5,18,19,21 74:23,24 75:2,5
  75:11,21 76:19
posed 6:18
position 7:3 15:13 16:4 17:18
  19:23 24:21 31:23 32:18 35:16
  41:17 69:23,23
possibility 16:23
possible 16:21 31:1
post 51:24 59:20 61:25 71:21
post- 6:5,22
post-trial 5:22 7:16 8:23 9:3
  10:16 35:8 36:1
practice 18:14 19:2,11,17,20,25
  20:15,25 25:7 27:19 28:8 30:7
  30:12,14,16,16 31:3,20 32:1
  58:25 59:14
prepare 10:25
prepared 34:3 60:15
preparing 10:13
preponderance 27:7,18 28:1
prescribing 36:18
presence 40:22

Present 2:5 3:9,15
presented 9:8 53:20 65:14 81:10
  81:21
pressure 78:16
presumably 32:12 44:5 61:9
presume 65:25
pretrial 81:3
prevailed 19:1
prevent 4:23 82:19
previously 10:4
primarily 26:7
primary 10:4
principles 7:15 63:25
prior 6:16 70:18 71:1
private 72:21
privileged 55:22
probably 64:24
problem 28:25 32:8,17
problems 58:17 65:12 67:13
procedure 6:14 62:18
proceed 45:2 73:5
proceeded 61:10
proceeding 83:13
proceedings 2:12 9:4
process 76:25
produced 2:13
product 56:18
productive 54:22
professional 36:18,23 43:1 46:1
  50:9 57:4 61:3 66:6 67:7
promise 51:13
promised 14:1 71:12
promptly 76:12
pronounce 60:24
proof 23:24
properly 20:11
prosecute 48:15
prosecution 57:14
prospects 16:14
proud 63:9,11
prove 27:6 53:25
proved 27:18 28:1
provide 34:7
provided 72:6 75:22,23
providing 48:24
psychologist 35:19 36:8 81:13
  81:15
psychotherapist 40:18,20 41:1,4
  42:14 45:23 49:3
ptroy@kanepugh.com 1:25

Case 2:20-cv-01396-MMB   Document 280   Filed 11/14/22   Page 99 of 106

800.523.7887              11-3-2022, WORD INDEX, Dorchester case       Associated Reporters Int'l., Inc.

Page 16

**public** 7:9 9:19 20:17 39:25
  48:19 75:17 80:20
**PUGH** 1:23 2:2
**pull** 42:5,12
**punished** 74:13
**punishment** 74:6
**punitive** 70:7 71:5,11,13,17,22
  71:23 73:3 74:5,19 76:2
**punitives** 76:15
**purpose** 6:13
**pursuant** 6:13 53:13
**pursue** 32:14
**put** 8:6 45:8 49:22 51:3 80:17
  80:19
**putting** 22:5 24:5

---

**Q**

**qualify** 9:19
**quantity** 33:6
**question** 4:17 5:11,18,19 6:3,12
  7:11 8:1,1 9:5,21 10:1,11,23
  17:13 18:12,24,25 21:7,24
  22:7 23:11,19,19,23,23 24:7
  26:16,17,21,25 27:4,4,11,13
  27:14,17,24,24 28:9,18,20
  31:12,25 34:1,1,20,25 35:21
  42:3 47:22 49:5,15,16,21
  51:25 52:7 53:11 55:12,16
  61:2,3,4 63:15 64:4 67:3
  69:24 70:10 74:23 76:3,23
  78:5 79:18
**questioned** 43:16
**questionnaire** 38:7 43:19,20
  82:7
**questionnaires** 40:17,17
**questions** 4:9 5:4 6:18,19 7:2
  10:20 26:20,24 28:5,6 29:25
  30:1,17 34:13 35:6,10,10
  46:24 49:16 53:3,7 57:25
  60:14 62:2 63:20 69:3 76:21
  76:21 77:1
**quote** 45:15
**quoted** 36:5

---

**R**

**racial** 20:16 31:15
**raised** 4:10 29:1,23 39:21 58:19
  63:16,17,18
**raising** 60:9
**ran** 57:6 66:13

**reach** 31:25
**read** 5:11 36:15 46:19 64:24
  65:23
**reading** 46:8
**real** 6:9
**really** 32:14 34:13 49:18 50:4
  51:17
**rear** 12:11
**reason** 10:4 12:24 29:17 34:3
  50:2 51:22 83:4
**reasonable** 13:22 21:16,18 33:7
  40:11 53:22 54:2,12 56:10
  59:6 65:15 72:7,14 73:5 74:14
  74:24
**reasonably** 23:25
**reasons** 21:18 58:14
**Rebecca** 81:16 82:8
**recall** 10:24 15:13 23:11 26:19
  52:4 60:6
**received** 37:11 38:11 41:10
**receives** 74:9
**recess** 34:10,19
**reckless** 73:2
**recognize** 46:22
**recollection** 47:16
**reconcile** 11:22
**record** 5:21,21 6:18 7:4,5,12
  8:19 9:13 11:20 33:5,13 34:24
  36:20 39:25 40:2,24 44:1
  47:19 48:14,19 50:1,20 51:18
  52:2,7 54:10 60:8,17 61:12,13
  65:19 66:2 68:18 69:4,18 75:3
  76:16 77:20 79:19,21 80:11,18
  80:25 81:4,18
**recorded** 2:12
**Recorder** 2:9
**recording** 2:12 83:13
**records** 7:9 9:19 11:8 12:3,5
  25:22 48:3 54:17 64:25 82:15
**recruited** 66:23,25
**recruiting** 75:20
**refer** 9:24 30:3 37:17 41:6
  80:24
**reference** 21:6 27:10
**referenced** 57:2
**references** 81:7
**referred** 44:10 48:3
**referring** 35:19 36:21 42:23
  45:21 50:3,7 79:20
**reflects** 20:24 77:20

800.523.7887          11-3-2022, WORD INDEX, Dorchester case      Associated Reporters Int'l., Inc.

Page 17

refuse 76:18
refused 76:25
refusing 12:25 77:1
regard 15:1 28:8 29:25
regarding 14:9 35:6,14 38:9
  71:7,21,22 73:25
regardless 47:21 68:7
regards 30:1
Regional 40:10
regular 30:16
regulations 39:23 52:5
related 26:20,21 27:14 81:6
relates 4:18 10:23 28:20
relation 52:8
relationship 42:11 51:12 52:10
  53:11 58:19 61:14 64:2
relaxed 15:19
release 14:17
relevant 52:23 53:4 82:1,22
relied 60:15
relief 33:7
Relington 33:9
rely 7:7,11,15 8:25 52:18 55:17
remain 17:17
remaining 6:4
remains 5:15
remember 25:9 39:20 43:3 48:9
  67:18 76:4,20
remove 61:7
render 74:18
rendered 25:10
repeat 23:3 47:2
repeated 36:7 41:23
repeating 83:1
REPORTER 50:7,11
Reporters 2:10 83:18
reprehensible 33:22
represent 25:23 66:19
representation 57:8
representations 52:15
represented 5:23
representing 42:20,21
represents 63:7
request 13:22 68:22 70:2 73:6
  74:1 76:6,8
requested 4:11 77:24
requests 74:25
require 19:17 74:5
required 21:5 56:13 72:9,15,16
requirement 18:14,22,22 21:5

28:8
requirements 67:6
requires 5:25 50:4 53:14
research 8:9,16 31:13 47:19
researching 72:4
resident 66:24
residents 32:10
resistance 27:20
resolve 75:12
resolved 20:13
resolving 57:13
respond 4:9,12 12:2 14:1 35:6
  61:18 62:7 77:25
responded 35:9 76:24 77:25
Respondents 36:17
responding 27:2
response 10:13 16:3 30:4 35:7
  52:8 57:24 75:15 76:18 78:2
  78:10
responsibility 52:13
rest 68:23
resulted 70:23
retained 44:17
return 7:18
returned 25:24
returns 5:12
revert 30:2
review 52:23 55:25
reviewed 9:2 56:2 65:19 72:6
revisions 8:4 9:7
Revock 72:11
riding 75:18
Riga 71:20
right 5:7,10 6:7,17,18 7:19 9:5
  10:1,17,18,21 12:8,16,16,17
  13:7,10 14:3,5,15,22,23 15:18
  16:6,13,21,24,24 17:21 18:8
  18:10,10,12,12 19:18,22,22
  20:3 21:3,4 22:1,4 23:13,15
  24:20,21 30:25 31:15 33:11,15
  33:25 34:18,18,19 36:11 39:7
  39:7,8 40:4 41:15 42:13 44:20
  45:1 46:6 48:5,12 49:20 51:5
  51:8 52:21 55:8,13,22 56:5,8
  56:12,15,20 57:18 59:10,15,23
  60:6 61:1 64:7 67:3,7,9,12
  68:15,15,21 69:1,1,2,17 70:6
  71:4,4 73:8,10,22,23 74:20
  77:21 78:5,11,19 80:3,16
  81:14,19,25 82:3,10 83:5

Case 2:20-cv-01396-MMB   Document 280   Filed 11/14/22   Page 101 of 106

800.523.7887                11-3-2022, WORD INDEX, Dorchester case        Associated Reporters Int'l., Inc.

Page 18

**rightfully** 67:16
**rights** 1:14 6:2 27:22 28:2 72:1
 72:23
**risk** 71:25
**River** 2:10
**Roberts** 14:25
**role** 9:3 63:13
**roll** 74:14
**Romero** 57:12
**rule** 6:14 8:21 9:3 18:16 33:1
 33:11 35:24 52:15,25 53:1
 56:21 58:23 59:9 60:5,9 61:20
 62:1,1,3,19 72:13
**ruled** 6:10
**rules** 10:15
**running** 32:25,25

**S**

**Saben** 66:25
**Sacks** 1:13 3:3,9 5:2 6:3,17
 10:3 11:10,14,17 12:9 13:13
 13:15,17,20,25 14:4,9,11,14
 14:16,20 16:25 17:6,24 18:9
 18:24 19:10,13,19 21:4,9,14
 22:3,5,10,18 24:5,8,12 25:3
 28:4 31:23,24 32:6,24 33:13
 33:16,21 34:9,16 35:3,14,21
 36:4,20,24 37:4,7,10,16,21,23
 38:4,17,22 39:11,14 41:2
 45:12,16,19 46:7,11,16,18
 47:4,6 49:1,8,11 50:14,18,25
 51:3 52:19,21 53:6,9 55:11,15
 56:1,4,6,9,13 57:19,21,24
 58:2,5,20 59:4,11,24 60:7,25
 61:19,24 62:12,17,25 63:3
 64:5,8,12,16,19,22 69:3,12,16
 69:24 70:4,9,13 71:1,7,12,15
 78:9,13,17,21,24 79:14,17
 80:9 81:5,15,20 82:1,4,11
**Sacks'** 30:5
**sacrifice** 77:8
**Samantha** 1:17 3:10
**samantha.ondrade@usdoj.gov** 1:20
**satisfied** 18:23
**satisfies** 55:6
**satisfy** 54:2 65:14
**saw** 15:9 20:8 42:19 49:3 51:18
 60:23 75:8,16 81:13
**saying** 16:5 27:11 32:17 38:25
 40:20 68:24

**says** 37:24 40:15 41:6 42:16
 45:14 50:8 51:5 57:1 59:21
 71:5 81:9
**School** 67:1
**seal** 68:25
**seat** 71:8
**seated** 3:4
**second** 4:17,17 36:9 39:8 61:20
 62:9 69:24 70:24
**Secondly** 8:8
**see** 7:13 16:20 57:12 67:24 69:1
 77:2 83:5
**seeing** 67:16
**seek** 63:12,12
**seeking** 66:4 74:10
**seen** 35:19 36:7 54:15 55:4 79:7
**sell** 33:18 73:7,11
**semantics** 36:5
**sense** 22:11,12 23:7
**sent** 5:5 8:11 40:10 70:21 75:9
 76:20
**separate** 18:25 19:3,7 29:24
 54:18 68:23,25
**separately** 34:4 35:1
**September** 13:16
**serve** 77:7
**service** 2:10,13
**set** 3:21
**settle** 17:22
**settled** 28:24
**settlement** 4:21 16:15,22 17:1,1
**seven** 27:17 28:6,21 30:2 43:13
**seventeen** 40:15
**sheet** 22:1 23:18 26:4 28:13,25
 29:2
**shore** 29:8
**short** 4:5 34:10
**show** 21:25 31:21 46:19 51:19
 69:18 72:2
**showed** 12:3
**showing** 31:3 32:21
**shown** 21:20 30:19 70:15
**shows** 7:4 12:12 21:16 31:25
 72:25 75:25
**side** 80:19
**sidebar** 18:5 68:17,23
**sides** 31:10
**sign** 52:14
**signed** 36:14
**similar** 11:6

800.523.7887                 11-3-2022, WORD INDEX, Dorchester case        Associated Reporters Int'l., Inc.

**simply** 35:22 70:19 71:2
**single** 11:16,18
**sit** 40:1
**six** 20:22 27:14 28:6,21 30:2
 76:12
**slap** 74:9,15
**smart** 66:12,13
**solicited** 29:10
**somewhat** 61:15
**sorry** 24:25 39:14 72:15
**sort** 32:24 39:3 58:9 61:7 73:1
 74:4 82:4,22
**sorts** 64:6
**sound** 2:12 83:13
**sounds** 82:16
**source** 62:3
**sources** 8:14
**speak** 40:4
**specific** 15:3,4 29:20 30:7 31:3
 31:21 32:21 34:7,20 51:3
 59:19,22
**specifically** 6:5,17 26:22 41:19
 55:19
**specified** 6:23
**spelling** 41:10 57:11 77:11
**spending** 10:7
**spent** 25:12,23
**splash** 75:18
**split** 29:4
**spoke** 56:1
**Spriggs** 83:11,18
**stand** 4:23 43:8
**standard** 8:2,2,20 32:25 33:2
 36:2 46:12 55:6 58:21 62:12
 65:12,13 71:16
**standards** 9:1 36:2
**standing** 24:11,12
**Stanford** 24:24 25:1
**start** 53:10 71:16 74:22
**started** 6:19 35:5 58:21
**starting** 41:21
**state** 23:14 37:2 45:6 48:21
**stated** 43:13,14,18,23,23 73:16
**statement** 12:14 34:4 35:18,22
 36:2 39:4
**statements** 5:16 35:1,15,17 39:4
 40:13 41:23 48:8,15 49:22,23
 60:2,2,8,18,20 61:8 62:5,6,8
 69:7,10,13
**states** 1:1,3,9 3:6,7,9 5:8 17:3

19:1 28:7 33:5 35:15,16,17
 36:3 45:25 53:21 54:13 60:3
 63:8 70:4 71:17 78:9 80:10
**statute** 19:2 22:10 30:6 31:6
 50:3,4,6 53:13,14 65:16 67:5
 67:6
**statutory** 18:14,22 21:5 22:21
**stay** 25:15
**Stephen** 40:8
**stop** 18:11 46:23
**stops** 71:11
**straighten** 30:1
**Strawbridge** 15:23
**Street** 1:15,23 2:2
**strike** 12:19
**strong** 58:17
**studied** 11:12
**stuff** 48:10 58:11
**Sub-A** 35:1
**submit** 9:25 10:13 11:13 31:11
 79:11
**submitted** 11:5,19 25:21 26:13
 26:18 36:6 41:5 47:9,10 50:24
 76:8 78:8
**submitting** 82:20
**subsequent** 25:20 26:10 78:7
**substantial** 53:3
**substantially** 23:21
**substantiate** 53:21,24,25 54:1
**suffered** 12:23 66:21
**sufficient** 4:5
**suggesting** 79:4
**suit** 48:4,21 76:5
**Suite** 1:15
**summary** 8:12 54:6 55:7
**supervisor** 34:17
**supplement** 9:22
**support** 20:22 28:4 38:14 58:24
 69:19,21 70:1,11,14,20 71:3
 72:7,9,16,20,24 73:15,19
 77:18
**supporting** 56:9
**Supreme** 18:17 19:14 22:7,15,19
 22:20 30:13
**sure** 3:24 7:10 16:17 30:10 31:9
 39:12 40:2 41:14 46:12 47:4
 56:22 62:2 71:11 79:18
**suspended** 48:23 49:4,6
**suspicious** 76:10
**sustained** 33:8

800.523.7887          11-3-2022, WORD INDEX, Dorchester case          Associated Reporters Int'l., Inc.

Page 20

**Swede** 1:23 2:2
**symptoms** 40:23

---

**T**

**taint** 61:7
**take** 4:5 9:3 34:10,19 60:15
  79:9
**takes** 79:17
**talk** 7:24 17:9 49:24 55:24
**talked** 18:20 55:19
**talking** 17:11 18:11 29:13 35:23
  35:24,25 62:1 64:12,16
**Tanveer** 22:14,14,18,19
**telephone** 4:11,15 5:9 43:22,22
**tell** 3:20 12:20 17:18,19 18:3,4
  44:6 50:19 68:16 79:23
**telling** 82:16
**ten** 47:7 70:16 76:21,23
**term** 22:11,20 49:24 60:19
**terminated** 14:7
**terms** 14:17 21:22,22 22:25 53:2
**terrible** 24:16
**test** 65:6
**testified** 33:17 37:10 38:8,20
  38:24 43:3 52:3 63:22 67:4,13
  68:1
**testify** 29:6 51:11
**testimony** 7:5 9:8,13 51:14
  52:24 72:3 77:10 80:15 81:16
**tests** 54:18
**thank** 34:19 41:18 55:8 68:15
  74:20 75:13 77:20,21
**theme** 73:15
**theories** 19:7
**theory** 19:3,4
**therapist** 37:1,12 38:25 39:1
  42:23 43:9 57:6 68:12
**therapy** 74:2,3
**they're** 27:11
**thing** 33:23 62:9 64:25 65:2
**things** 6:20 7:3 10:5 12:4 24:16
  30:16 43:6 46:7 51:5 52:16
  53:10 57:22 58:20 60:9,11
  77:22 79:13
**think** 4:4,16 6:6,24 7:6,18 8:6
  10:9 11:5,20,24 12:13 15:24
  19:24 24:10,10 26:1 31:9,12
  31:18,24 32:24,24 36:21 37:16
  38:5 51:20 52:25 53:4,9 58:5
  62:3,13,14 63:11,15,20,23

65:8 69:13,15 76:7 77:24
  79:12 80:14,16,19,23 82:1,20
**thinks** 71:13
**third** 4:25 8:21 18:17,20 19:15
  33:8,11 36:15 45:8 59:21
  72:11,12
**thirteen** 32:10
**thirty** 13:20,21 14:2
**Thomas** 2:1 3:16
**thought** 8:9,10,12 15:24 29:22
**three** 26:25 28:18 54:18 70:4
  78:21
**threshold** 42:3
**Thursday** 16:2
**time** 4:6 8:18 10:7 12:23 18:20
  25:12,24 35:10,25 37:11 41:20
  41:24 59:2 61:20 64:11 65:8
  72:5 73:22,23 75:13 76:3,9
  78:11,23
**timeline** 4:19 11:1,5,19 12:2,3
  44:23
**timelines** 10:25,25 11:12 20:8
  25:21
**times** 57:7
**Timothy** 2:6 3:13
**today** 4:1,12 7:2,24 10:7 16:15
  16:18 20:21 54:7,24 61:20
  68:24
**told** 12:10 15:23 73:7
**top** 37:23 41:8
**topic** 18:5
**topics** 3:22 4:8
**total** 76:13
**town** 4:14 16:11
**transcriber** 83:11
**transcript** 1:8 2:13 9:23 11:20
  23:9 46:19,25 47:1,22 68:22
  68:23 69:1 77:12
**transcription** 2:10,13 83:12
**travel** 29:8 78:18
**traveling** 4:14
**treated** 38:1,10 41:25 42:19
  48:25 61:2,17 63:22 67:10,25
**treating** 43:8,24 57:6 66:7,11
  68:12
**treatment** 43:9 51:19
**trial** 5:20 6:6,6,23 7:5,17 9:8
  9:8,9,12,22,23 23:6 24:15
  25:11 26:14,15 38:20 39:21
  46:9,15 47:10 48:10 50:21

800.523.7887                11-3-2022, WORD INDEX, Dorchester case      Associated Reporters Int'l., Inc.

Page 21

51:24 52:3,24 56:17 58:13
59:18 61:7,10,25 63:23 71:21
75:20 77:10 80:11,15,18,23
81:4
**trials** 60:1
**tried** 16:1 29:4 46:20 48:9 62:7
73:11
**triggered** 44:11
**Troy** 1:22 2:2 3:16,18 6:7,8
11:2,4,8,23 12:7,18,20 13:2,4
13:8,11 15:5,8,11,16,20,22
16:1,7,13,17,21 19:22,24 20:4
23:13 24:21,22,25 25:2,4,19
26:5,9,13 28:10,16,19,22
29:15,19 30:10 31:5,17 41:14
41:16,18 42:8,10,15 43:6
44:19,22 45:2,6 46:12,17 47:8
47:12,14,16,20 48:2,6,13,18
49:4,9,14 55:14 56:16,21 59:3
61:18 65:21,22 67:8,11,15,22
68:2,6,14 71:8,9 74:21,22
77:17,22 78:2,4 79:1,2,6,10
79:20 80:2,4 82:14,21,24
**true** 46:10 55:1
**truth** 63:12
**truthfully** 25:23 51:11
**try** 11:1 15:1 16:2
**trying** 21:24 50:22 57:12 66:20
67:1 75:11,12,15 77:12,13,14
**turn** 5:2 6:10 10:18 22:6,25
**turned** 22:15,22
**turning** 22:12
**twenty-six** 45:4
**twenty-two** 35:9
**two** 3:21 4:4 6:12 18:1,25 19:7
23:1,3 24:15 26:21,23,23
30:10,10 47:6,6,7 57:21 58:20
66:20 68:11 69:4,4 78:18
79:25
**two-hour** 41:12 54:16 68:8
**type** 50:3
**tzimmerman@kanepugh.com** 2:4

---

**U**

**U.S** 10:20 40:6 71:19
**U.S.A** 42:4
**Uh-huh** 68:2
**unable** 4:13 11:2
**unavailable** 27:8 29:2,3 30:18
**understand** 29:13 30:25 33:1

39:5 62:24 69:8
**understanding** 17:10 18:2
**understood** 37:12
**undisputed** 49:18
**unit** 20:21 23:2,3 29:3,7,12
30:20 33:19 73:7,12 74:3
75:14
**United** 1:1,3,9 3:6,7,9 5:8 17:3
19:1 28:7 33:5 35:15,15,17
36:2 53:21 54:13 60:3 63:8
70:4 71:17 78:9 80:9
**unreasonably** 27:1,2
**unresolved** 15:12
**untrue** 34:4 35:1,15,16,22 38:3
39:4 49:23,23,24 60:2 62:8
65:9 69:13
**unwillingness** 76:24
**updated** 75:2,5,21
**Urban** 34:5 40:6
**USA** 1:12
**use** 8:20 12:11 22:11 23:6 27:5
29:7 30:4,22,23
**useful** 80:16
**uses** 35:22
**usual** 25:24

---

**V**

**v** 1:4
**verbally** 16:16
**verbatim** 5:11 36:16
**verbiage** 38:23
**verdict** 5:12,20 6:7 7:18,20
20:24 21:8 22:1 23:18 25:10
26:3,18 28:13 29:2 33:7 35:8
59:21 62:19,21 63:18
**verdicts** 29:24
**versus** 3:6,7,7 10:20 22:14,18
22:18 71:18,20 72:11
**view** 5:25 7:20,21 9:25 10:15
11:11 17:21,23 21:8 26:7 28:5
29:23 52:9 55:9 80:13 83:2
**violated** 59:15 74:17
**violating** 19:13
**violation** 72:1
**visit** 68:8
**visiting** 4:2

---

**W**

**wait** 26:1,1 45:11,11,11 62:10
62:13,13 69:17

800.523.7887          11-3-2022, WORD INDEX, Dorchester case     Associated Reporters Int'l., Inc.

Page  22

**waited** 60:23
**waived** 59:18
**walk** 64:17 65:11
**walks** 65:5
**want** 3:20,23 4:3,8,9,12,18 8:4
 8:7,15 12:17 15:3 17:4,9,10
 17:11,17 18:11 22:6 28:11
 32:14 34:15 44:22 48:13 54:23
 62:6 69:1,2 71:12 74:22 77:7
 78:1,6 79:6 82:19
**wanted** 10:8 19:8 61:22 70:6
 75:17
**wants** 82:4
**warranted** 71:23
**Washington** 1:15,19 66:15
**wasn't** 20:13 21:17 29:8 46:14
 49:5 55:3 57:1 66:1 72:18
**way** 4:23 5:3 8:9 11:22 21:2
 26:17,17 29:6 42:20 64:9
 76:16
**ways** 21:22 74:17
**we'll** 18:6,7 34:14,19 41:13,13
 56:22 61:18 79:24 81:17,18
**we're** 10:17 11:18 12:13 18:4
 32:24,24 33:1,1 36:4 46:12,12
 53:12 56:13 58:22,22 59:1
 62:1 63:3 65:10 74:13,15
 75:11,12 77:13 79:3,18,25
**we've** 10:7 18:5,13 35:25
**website** 40:17 43:14,15 45:7,8
 45:24 51:16
**Webster** 22:15,22 23:1
**week** 65:2
**weeks** 78:18 79:25
**Weiss** 73:14
**welcome** 8:13
**went** 23:13 29:6 42:17 43:3,15
 49:18,21 55:3 61:16 66:13
 67:24
**weren't** 25:15
**who's** 42:7,7
**wife** 66:25
**Williams** 40:8
**willing** 14:25
**winner** 33:4
**wiped** 61:13
**wisely** 54:10
**witness** 48:16 61:6 64:3
**woman** 50:16 54:8 66:19
**wonder** 34:14

**word** 19:20 25:5 27:5,25 29:2
 30:4,13,17 36:9 38:23
**work** 56:18 73:2 75:23 78:18
 79:1
**working** 18:1
**worse** 65:2
**wrist** 74:9,16
**writing** 14:1
**wrong** 8:7 51:1
**wrongdoing** 18:15
**wrote** 38:9 40:20 81:24

---
### X
---
### Y
**Yahna** 77:10,13
**yeah** 12:7 13:11 15:10,15 16:1
 21:23,23 25:3,4 28:14,19
 29:19 31:7,17 34:12 35:13
 45:5,6 47:5,14,20 49:4 50:20
 56:15 58:1,4,12 64:9,14,18,21
 65:21 79:10,16 80:6 81:19
 82:10,14,21
**year** 49:9
**years** 18:1 66:20 68:11
**yep** 11:14 45:12 78:4 82:24
**yesterday** 4:10,20 5:3,8 16:5
 61:22
**York** 2:11

---
### Z
**zero** 47:6
**Zimmerman** 2:1 3:16,19

---
### 0
---
### 1
**1.2** 23:9
**10** 2:10 23:8
**10:06** 1:7
**11** 9:3 35:24 52:15,25 53:1
 56:21 60:9 61:20 62:1,3
**115** 37:19,21,22
**11th** 14:11,13,14
**12** 48:21
**125** 36:13 37:20
**13662** 2:11
**138** 42:6 43:11 44:1 46:17 47:10
 48:2
**139** 44:25

800.523.7887          11-3-2022, WORD INDEX, Dorchester case     Associated Reporters Int'l., Inc.

**14** 80:1,2,5,6,7
**141** 22:19
**150** 1:15
**17** 40:20  45:22,25  66:5  81:10
**17th** 37:18  77:23
**19** 57:11
**19401** 2:3
**19401-4886** 1:24
**1A** 23:23
**1st** 5:10  13:13,14,15,17

---
**2**
---

**20** 10:19  13:16  45:14
**20-1396** 3:8
**20-cv-1396-MMB** 1:3
**2013** 72:6
**2014** 81:9,12,13  82:8
**2015** 72:3,8  74:24
**2016** 40:16  43:18  66:5  81:10
**2017** 36:16  37:18  40:16,20  41:21
  43:19  45:22,25  66:9  72:10
**2018** 13:15,17  41:22  42:10  43:12
  48:23  70:23
**2019** 40:1  44:7,9,24  48:23  49:7
  70:15,17,18,24  71:1  72:18
  75:3
**202-514-4713** 1:19
**202-598-6366** 1:16
**2020** 48:21  69:22  70:2  75:4,5,11
  76:3
**2021** 14:20  42:2
**2022** 1:7  5:10  9:9  10:20  14:11
  14:13,14  47:1,4  83:18
**20530** 1:15,19
**209** 47:1
**20th** 5:5  7:1  10:19  34:2
**210** 47:1
**25th** 36:16
**26** 45:13,14
**267** 78:3
**27** 45:24
**274** 5:10  10:14
**275** 5:7
**28** 75:4
**2nd** 5:8

---
**3**
---

**3** 1:7  75:3
**30** 10:19
**30th** 79:24

**335** 35:8
**3612(O)** 53:13  56:13  65:16
**3614(a)** 19:2

---
**4**
---

**4** 42:25  75:5,11
**4/26** 36:14
**4/30/07** 37:24
**40** 42:22
**44511** 37:24
**486** 22:19
**491** 22:19
**4con** 1:14,18

---
**5**
---

**5** 75:22
**50** 33:1  58:23  59:9  60:5  62:1,20
**510** 1:23  2:2
**52** 8:22
**526** 71:19
**527** 71:19
**52A** 6:14

---
**6**
---

**6-10** 9:9
**610-215-2000** 2:3
**610-275-2000** 1:24
**6th** 83:18

---
**7**
---

**7** 47:4
**7th** 47:1

---
**8**
---

**8.1202** 1:15
**8th** 40:1  44:7

---
**9**
---

**9** 42:6,10
**950** 1:18

ARII@courtsteno.com                              www.courtsteno.com