**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **THE UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>  **v.**<br><br>**THE DORCHESTER OWNERS ASSOCIATION,**<br>**Defendant,** | **CIVIL ACTION**<br><br>**NO. 20-1396** |

**MEMORANDUM RE: POST-TRIAL MOTIONS**

Baylson, J.                                                                                      **January 25, 2023**

## I.     INTRODUCTION

The principal issue in this case is whether The Dorchester Apartment in Philadelphia adopted regulations and/or engaged in a "pattern or practice" to prevent or delay approval for residents who qualify for an emotional support animal ("ESA") to live with them in their apartment.

This dispute started, slowly and quietly, as a complaint to a federal administrative agency, much as the eight double basses are plucked gently at the beginning of Wagner's Das Rheingold to initiate his famous "Ring" opera cycle. But soon the opera, as well as this case, "changed its tone" after the Department of Justice ("DOJ") filed its Complaint on March 12, 2020. The theme of the Opera is a dispute over control of the "gold" –initially guarded by the Rhinemaidens – but the gold changes form as the opera develops. In this case the issue is who controls the allowance of ESAs in a traditionally no-pet apartment building. The DOJ asserted that the DOA's policies and practices violated federal law. Hostility develops between the opera characters just as it grew

between the parties in this case.  A jury verdict settled most of the issues.  This memorandum will dispose of all remaining issues.

As the DOJ gathered facts, it asserted that The Dorchester was unlawfully hostile to ESAs, but The Dorchester rebutted those accusations with evidence that it had tried to act reasonably in the evolution of its policy concerning ESA's.  Eventually, a jury trial took place, and as in the opera, there are now winners and losers.  Nonetheless, post-trial motions have been filed.  The Government continues to press for punitive damages, a civil penalty, and injunctive relief.

For the reasons stated below, the split verdict reached by the jury will be followed by a "split decision" by this Court on the pending Rule 50 Motions, and this Memorandum and accompanied Order will hopefully be the finale of this case in this Court.

The Dorchester is located on Rittenhouse Square in Center City, Philadelphia.  Consisting of approximately 541 units with a population of approximately 1,700, The Dorchester is one of several high-rise condominiums ranging around Rittenhouse Square.  Trial Tr. Day 4, 6/9/22 (ECF 233) at 108:15-20.  The Defendant, Dorchester Owners Association ("the DOA"), manages The Dorchester and is governed by a group of residents ("the DOA Council") who serve as directors of the DOA on a voluntary basis without compensation.  The DOA over the years, as is common in many high-rise apartment houses, has adopted a series of rules and regulations by which the residents must abide.  The DOA is supported by assessments made on the residents.

In its Complaint against the sole Defendant, the DOA, the U.S. Department of Justice states "this action is brought on behalf of Louise Hamburg" pursuant to 42 U.S.C. § 3612(o).  Compl. (ECF 1) ¶ 1.  The Complaint identifies Louise Hamburg ("Ms. Hamburg") as a person with a disability as defined by the FHA, with additional details.  Id. at ¶ 7.

The Complaint then proceeds to describe the DOA's assistance animal policies, starting (allegedly) in 2009 through amendments made in 2020.  Id. at ¶¶ 9-23.  According to the Complaint, the policy did not distinguish between service animals and emotional support animals ("ESAs") but required residents to inform the DOA of their need for an assistance animal, fill out a form, and provide any additional information requested by the DOA.  Id. at ¶¶ 12-13.  The DOJ alleged that the DOA imposed additional restrictions, including not allowing any assistance animals in the common areas, requiring that applicants obtain a $1 million insurance policy, and requiring documentation come from "treating medical doctors," among other restrictions.  Id. at ¶ 14.  The DOJ alleged that the DOA revised their policy from 2018 to 2019, waiving application fees, but continuing to prohibit assistance animals in common areas.  Id. at ¶¶ 17-18.  The DOJ alleged that in April 2019, the DOA again revised it policy, reincorporating the $1 million insurance police and the prohibition of all animals in common areas, re-establishing a height and weight restriction, and adding a muzzle requirement if an animal were in a common area.  Id. at ¶¶ 20-21.  In March 2020, the DOA allegedly revised its policies again.  Id. at ¶ 22-23.

The Complaint alleges certain facts concerning Ms. Hamburg's efforts to bring an ESA into The Dorchester, including an email she sent on December 25, 2017 addressed to the DOA general manager to which she attached "a May 17, 2017 letter from Carla Black, a clinical psychotherapist, which Ms. Hamburg obtained through Ms. Black's website."[1]  Id. at ¶¶ 24-45.  The DOJ cited further details of the May 17, 2017 letter, including the following:

> The letter [from Carla Black to Ms. Hamburg] states that Ms. Black is helping to treat Ms. Hamburg "for a mental and emotional disability recognized in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM V")."

---

[1] Ms. Hamburg's timing in sending her first email on this topic on Christmas Day, attaching a letter she had received seven (7) months prior, may have been among the facts motivating the jury to find against her in its verdict.

<u>Id.</u> at ¶ 27.

As the facts at trial showed, and as discussed below, this statement made in the letter by Carla Black, as well as statements made by Ms. Hamburg regarding the letter and Ms. Hamburg's interactions and relationship with Ms. Black, were false, and the DOJ had reason to know it was false at the time it filed the Complaint.

Further details about the allegations concerning Ms. Hamburg are not relevant to the pending post-trial motions, if only because the jury issued a verdict finding the DOA not liable to Ms. Hamburg, as discussed further below.

Count I of the Complaint was limited to seeking relief on behalf of Ms. Hamburg.  Compl. ¶¶ 50-53.  Count II alleges that condo owners other than Hamburg have been injured by the DOA's discriminatory housing practices and are thus "aggrieved persons" within the law, and that the DOA's conduct had constituted a "pattern or practice of resistance to the full enjoyment of rights granted by the FHA" and "a denial to a group of persons of rights granted by the FHA" which raises an issue of general public importance, all in violation of federal law.  <u>Id.</u> ¶¶ 53-56.

The last paragraph of the Complaint states that: "The Defendants' discriminatory actions as set forth above were intentional, willful, and taken in reckless disregard for the rights of others." Compl. ¶ 56.

## II.     <u>THE FAIR HOUSING ACT AND RELATED GUIDELINES</u>

The Fair Housing Act ("FHA") makes it unlawful

"to discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of (A) that buyer or renter, (B) a person residing in or intending to reside in that dwelling after it is sold, renter, or made available; or (C) any person associated with that buyer or renter."

42 U.S.C. § 3604(f)(1).  Discrimination includes

> "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling[.]"

42 U.S.C. § 3604(f)(3)(B).  "Handicap" means

> "(1) a physical or mental impairment which substantially limits one or more of such persons major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment[.]"

42 U.S.C. § 3602(h).

The United States may bring an action against "any person or group of persons" that has "engaged in a pattern or practice of resistance to the full enjoyment of any of the rights" or denied "any group of persons" "any of the rights granted by" the Fair Housing Act.  42 U.S.C. § 3614(a).  Neither the Supreme Court nor the Third Circuit has addressed the meaning of the term "pattern or practice" as found in the FHA.  Nonetheless, it is clear that Congress passed the FHA in order to deter discrimination against protected classes, including people with disabilities.  431 East Palisade Avenue Real Estate, LLC v. City of Englewood, 977 F.3d 277, 283 (3d Cir. 2020).  The FHA was "intended by Congress to have 'broad remedial intent.'"  Alexander v. Riga, 208 F.3d 419, 425 (3d Cir. 2005) citing Havens Realty v. Coleman, 455 U.S. 363, 380 (1982).

In 2013, the Department of Housing and Development ("HUD") issued guidance in accordance with the FHA and the Americans with Disabilities Act describing a housing provider's obligations regarding service animals and ESAs, also referred to as "assistance animals."  HUD FHEO-2013-01 (April 25, 2013) ("2013 HUD Guidance").[2]  The 2013 HUD Guidance states that the FHA does not require that an assistance animal be individually trained or certified.  Id. at 2.

---

[2] The HUD regulations are a typical type of regulatory agency "Yin" and "Yang" that go back and forth as to various considerations that should be considered when an apartment resident wants to have an ESA live with them in their apartment.  The Dorchester never asserted that the HUD regulations were vague or improper in any fashion and thus, the Court will not delay the resolution of this case by offering any opinions or resting any decision on the regulations themselves.

Housing providers were required to consider two points: (1) whether the person seeking to use and live with the animal had a disability; and (2) whether the person making the request had a disability-related need for an assistance animal.  Id. at 3-4.  If an applicant satisfied both points, the housing provider was required to provide an exception to any "no pets" rule and to permit the assistance animal "in all areas of the premises where persons are normally allowed to go, unless doing so would impose an undue financial and administrative burden or would fundamentally alter the nature of the housing provider's services."  Id. at 4.  The 2013 HUD Guidance stated:

> The request may . . . be denied if: (1) the specific assistance animal in question poses a direct threat to the health or safety of others that cannot be reduced or eliminated by another reasonable accommodation, or (2) the specific assistance animal in question would cause substantial physical damage to the property of others that cannot be reduced or eliminated by another reasonable accommodation. Breed, size, and weight limitations may not be applied to an assistance animal.

Id. (emphasis omitted).  Furthermore, pet conditions and restrictions such as pet deposits could not be applied to assistance animals.  Id.  "Housing providers may ask individuals who have disabilities that are not readily apparent or known to the provider to submit reliable documentation of a disability and their disability-related need for an assistance animal."  Id.

> [T]he housing provider may ask persons who are seeking a reasonable accommodation for an assistance animal that provides emotional support to provide documentation from a physician, psychiatrist, social worker, or other mental health professional that the animal provides emotional support that alleviates one or more of the identified symptoms or effects of an existing disability.  Such documentation is sufficient if it establishes that an individual has a disability and that the animal in question will provide some type of disability-related assistance or emotional support.
>
> [. . .]
>
> A housing provider . . . may not ask an applicant or tenant to provide access to medical records or medical providers or provide detailed or extensive information or documentation of a person's physical or mental impairments.

Id. at 5-6 (emphasis original).  Finally,

[a] request for a reasonable accommodation may not be unreasonably denied, or conditioned on payment of a fee or deposit or other terms and conditions applied to applicants or residents with pets, and a response may not be unreasonably delayed.

Id. at 6.

Less than two months before the DOJ filed its Complaint, and after some negotiations between the parties had taken place (about which there was very little evidence introduced at trial), HUD issued a new Guidance replacing the 2013 HUD Guidance.  HUD FHEO-2020-01 (Jan. 28, 2020) ("2020 HUD Guidance").  There, HUD provided clarification on what kind of ESA recommendations would satisfy the requirements for an application and addressed the rising issue of "internet form-letters" available for sale.  HUD emphasized:

> Assistance animals are not pets.  They are animals that do work, perform tasks, assist, and/or provide therapeutic emotional support for individuals with disabilities.  There are two types of assistance animals: (1) service animals, and (2) other animals that do work, perform tasks, provide assistance, and/or provide therapeutic emotional support for individuals with disabilities (referred to in this guidance as a "support animal").  An animal that does not qualify as a service animal or other type of assistance animal is a pet for purposes of the FHA and may be treated as a pet for purposes of the lease and the housing provider's rules and policies.

Id. at 3 (emphasis original).

Addressing support animals other than service animals, such as ESAs, HUD suggested that housing providers ask several questions to guide the decision as to whether an animal meets the definition of a support animal, including:

> (1) Whether the individual "requested a reasonable accommodation – that is, asked to get or keep an animal in connection with a physical or mental impairment or disability (id. at 8);

> (2) Whether the person has an observable disability or whether the housing provider "already ha[s] information giving them reason to believe that the person has a disability" (id. at 9);

> (3) Whether "the person requesting the accommodation provided information that reasonably supports that the person seeking the accommodation has a disability" (id. at 9);

(4) Whether the person requesting the accommodation showed that "the animal does work, performs tasks, provides assistance, and/or provides therapeutic emotional support with respect to the individual's disability" (id. at 11); and

(5) Whether the animal is "commonly kept in households" (id. at 12).

Addressing the second question relating to observable and unobservable disabilities, HUD provided further guidance.

Certain impairments, however, especially including impairments that may form the basis for a request for an emotional support animal, may not be observable. In those instances, a housing provider may request information regarding both the disability and the disability-related need for the animal.  Housing providers are not entitled to know an individual's diagnosis.

Id. at 9.  It encouraged applicants to engage in an "interactive process" with housing providers, but also noted:

The housing provider may not insist on specific types of evidence if the information which is provided or actually known to the housing provider meets the requirements of this guidance (except as provided above).  Disclosure of details about the diagnosis or severity of a disability or medical records or a medical examination cannot be required.

Id. at 14 (emphasis original).

Addressing the third question of adequate information regarding a disability, HUD stated that "[i]nformation confirming disability from a health care professional – e.g., physical, optometrist, psychiatrist, psychologist, physician's assistant, nurse practitioner, or nurse" may satisfy this requirement.  Id. at 10.  HUD also addressed the issue of "documentation from the internet":

Some websites sell certificates, registrations, and licensing documents for assistance animals to anyone who answers certain questions or participates in a short interview and pays a fee.  Under the Fair Housing Act, a housing provider may request reliable documentation when an individual requesting a reasonable accommodation has a disability and disability-related need for an accommodation that are not obvious or otherwise known.  In HUD's experience, such documentation from the internet is not, by itself, sufficient to reliably establish that an individual has a non-observable disability or disability-related need for an assistance animal.

By contrast, many legitimate, licensed health care professionals deliver services remotely, including over the internet. One reliable form of documentation is a note from a person's health care professional that confirms a person's disability and/or need for an animal when the provider has personal knowledge of the individual.

Id. at 11.  Finally, HUD acknowledged that "[t]he FHA does not require a dwelling to be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others."  Id. at 13.

## III.   **BACKGROUND FACTS**

The evidence showed, without contradiction, that while The Dorchester was originally a "no pets" building, the DOA had adopted its first regulation allowing assistance animals under certain circumstances by 2015 at the latest.  Trial Tr. Day 4, 6/9/22 (ECF 233) at 52:14-22.  The policy was amended from time to time, including in 2019 and 2020.  Id. at 52:6-53:8.

Although the parties had negotiations prior to the filing of the Complaint, there are few details in the record.  The Complaint notes as to prior proceedings that HUD received a complaint from Louise Hamburg on April 30, 2018.  Compl. ¶ 47.  In an apparent reference to Bernard and Cynthia Halpern ("the Halperns"), the Complaint states that "two other owners of a unit at [T]he Dorchester" had filed a request for an ESA on August 14, 2018, but the DOA delayed responding to the request.  Compl. ¶ 46.  Following an investigation, HUD issued a Charge of Discrimination on July 8, 2019.  Compl. ¶ 47.  On July 29, 2019, HUD and Ms. Hamburg elected to resolve the charge in federal court.  Compl. ¶ 48.

## IV.   **TRIAL TESTIMONY SUMMARY**

### A.   **Plaintiff's Evidence**

The liability trial in this case took five trial days.  As stated in the Complaint, and as her trial testimony showed, Ms. Hamburg submitted a request for an ESA in December 2017 in which

she falsely claimed that the letter prescribing her an ESA was from "her" licensed mental health professional, Carla Black.  Trial Tr. Day 2, 6/7/22 (ECF 231) at 182:25-185:3, 194:3-196:17.   In truth, Ms. Hamburg had never met or personally communicated with Black, but only received a letter from Ms. Black through a website.   Id. at 103:12-104:16; 182:25-185:3, 186:23-187:9. Ms. Hamburg made several edits to the letter but failed to correct the statement in the letter that Carla Black was "a licensed mental health professional who is currently treating Louise Hamburg for her emotional mental health condition."  Id.  After a few months of communications between Ms. Hamburg and The Dorchester (during which Ms. Hamburg did not repeat the false statements, but also did not correct them), Ms. Hamburg filed a complaint against the Dorchester with HUD in April 2018 in which she still characterized Ms. Black as Ms. Hamburg's "licensed mental health professional".  Id. at 200:20-203:8.

Eventually, Ms. Hamburg later met with and was evaluated by a licensed psychologist, Dr. McClymonds, who evaluated Ms. Hamburg and provided her with another letter prescribing an ESA.  Id. at 17:13-16, 20:23-21:23, 45:4-9, 197:1-3.

In addition to testimony from Ms. Hamburg, the Plaintiffs introduced evidence from other witnesses and documents including testimony from Bernard Halpern, his wife Cynthia Halpern, Dr. Wieman, Dr. McCormick, Vanessa Scotto, and Anna Minkovich.  Mr. Halpern testified about his struggle with depression, the process of applying for his ESA, the interactions and delays he experienced with the DOA while waiting for them to respond to his ESA applications, and conditions that the DOA imposed on Mr. Halpern's ESA.  Trial Tr. Day 1, 6/6/22 (ECF 230) at 102:24-172:17.  Mrs. Halpern testified about her husband's need for an ESA and their application to the DOA, the delays she and her husband experienced, her communications with the DOA, and the conditions placed on the approval of their ESA.  Id. at 173:9-216:8.  Dr. Wieman testified as

to Mr. Halpern's mental and emotional disabilities, the benefits of ESAs and the ways in which the Halperns' dog served as an ESA for Mr. Halpern, the letters he wrote prescribing Mr. Halpern an ESA, and the effect that the DOA's delay had on Mr. Halpern.  Id. at 217:15-254:10. Dr. McClymonds testified about his examination, assessment, and treatment of Louise Hamburg. Trial Tr. Day 2 at 10:11-67:25.  Ms. Scotto testified about her interactions with Ms. Hamburg and the benefits Ms. Scotto observed Ms. Hamburg experience after obtaining an ESA.  Id. at 229:19-240:13.  Ms. Minkovich testified about her mental disability and need of an ESA, her application to the DOA to bring an ESA into her condo, the meetings with the DOA in which they suggested she should sell her condo rather than bring in an ESA, and the effect the conversations and delays had on her.  Id. at 240:25-262:15; Trial Tr. Day 3, 6/8/22 (ECF 232) at 5:7-19:15.

The DOJ also played deposition designations of several of the members of the DOA Council, including Mary Lou Savarese, David Smith, Ed Kurland, James Morgan, Joe Weiss, and Frank Devine.  In the deposition of Ms. Saverese, she reviewed Mr. Halpern's application for an ESA to which she did not have any objection, but could not explain why the DOA delayed in responding to Mr. Halpern's application, and expressed doubts as to the credibility of Ms. Hamburg's application.  Trial Tr. Day 1 at 255:7-264:7.  In Mr. Smith's deposition, he acknowledged that the ESA policy was not publicly available, explained the process of reviewing an ESA application, and stated that he was not aware of the Halperns' ESA application being discussed by the DOA prior to May 2020.  Id. at 264:10-275:21, Trial Tr. Day 2 at 4:8-9:16.  In the deposition of Mr. Kurland, he expressed skepticism about the validity of ESAs, saying "[u]nless proven otherwise, I would think that a – an emotional support animal could be just a ruse to bring a pet in" but classified that as his "personal opinion."  Trial Tr. Day 3 at 21:10-32:13. Mr. Morgan also expressed disbelief that anyone would need an ESA in order to enjoy a condo at

The Dorchester, but also stated that personal opinions were not relevant to the DOA's decisions. Id. at 32:18-44:6.  Mr. Weiss stated that he did not "buy into" the concept of ESAs or that there are people who "have emotional problems and need an animal for their emotional problem."  Id. at 46:5-61:25.  Finally, the DOJ presented the deposition testimony of Frank Devine, in which Mr. Devine discussed the details and process of reviewing the ESA applications at issue in the case and the issues the DOA identified with Ms. Hamburg's applications.  Id. at 62:3-84:23.

At the conclusion of the Plaintiff's case, the DOA moved for a directed verdict as follows:

1. That the DOJ had failed to show that the DOA was presented with credible evidence that either Mr. Halpern or Ms. Hamburg suffered from a substantial impact of a major life function (id. 92:2-10); and

2. That the DOJ had not presented any evidence of "outrageous conduct on the part of The Dorchester" (id. at 92:14-23).

The Court advised counsel that it would hold the Motion under advisement and did not make any rulings.  Id. at 87:5-14.

### B.    Defendant's Evidence

The DOA then introduced testimony and exhibits summarized as follows.  The DOA called as witnesses Patricia Yonekawa, Matthew Perks, Stephen Mechanick, Samir Edwards, Frank Devine, Lawrence Hall, Donald Hadfield, Scott Badami, Roy Kardon, and Kyle Maloney.  Ms. Yonekawa, the former General Manager of The Dorchester, testified about prior negative interactions with Ms. Hamburg, Ms. Hamburg's application for an ESA, the ESA applications from the Halperns, the ESA application from Anna Minkovich, and the development of the DOA's ESA policy.  Id. at 95:5-139:9, 149:4-229:12.  Mr. Perks, the former president of the DOA, testified regarding prior interactions with Ms. Hamburg.  Id. at 233:17-236:21.  Dr. Mechanick

testified regarding standard interpretation of psychiatric tests, questioning the reliability of Ms. Hamburg as well as the diagnoses and prescribed treatments for Ms. Hamburg and Mr. Halpern.  Id at 237:11-295:1, Trial Tr. Day 4, 6/9/22 (ECF 233) at 4:4-26:2.  Mr. Edwards, a concierge at The Dorchester, testified about negative interactions he had experienced with Ms. Hamburg.  Trial Tr. Day 4 at 27:10-39:22.  Mr. Devine, the President of the DOA Council, testified credibly as to the DOA's ESA policies, the process of developing those ESA policies, the DOA Council's review and analysis of Ms. Hamburg and Mr. Halpern's ESA applications, the doubt and concerns he had with Ms. Hamburg's ESA application (particularly due to the letter from Carla Black) and Mr. Halpern's first ESA application, and other DOA Council members' dismissive statements about ESAs.  Trial Tr. Day 4 at 42:22-64:24, 82:3-128:9, 144:13-220:1, 222:8-241:23.

Mr. Hall, a housekeeper at The Dorchester, testified further about negative interactions between Ms. Hamburg and the staff of The Dorchester.  Id. at 72:4-75:4.  Mr. Hadfield, a maintenance supervisor at The Dorchester, also testified regarding negative interactions between Ms. Hamburg and the staff of The Dorchester.  Id. at 75:22-79:11.  Mr. Badami, an attorney with FHA experience, testified regarding the DOA's ESA policies and the actions taken by the DOA Council to try to adhere to the FHA and HUD guidelines, both in drafting the ESA policies and in responding to the ESA applications, his opinion that the DOA was justified in asking for additional medical information about the applicants, and the doubts he had about the legitimacy of the letters prescribing an ESA to Ms. Hamburg and Mr. Halpern.  Id. at 242:18-264:25. Mr. Kardon, an employee of The Dorchester, testified about negative interactions with Ms. Hamburg.  Id. at 265:9-269:5.  Finally, Mr. Maloney, a resident services director at The Dorchester, testified about

his communications with the Halperns regarding their ESA application and the promptness of his replies to them.  Id. at 269:19-282:10.

The DOJ did not present testimony on rebuttal.

After all evidence had been presented but before closing arguments, the DOA counsel again moved for a directed verdict as follows:

1. That Ms. Hamburg was not handicapped within the meaning of the statute (id. at 304:25-305:7);

2. That the DOJ had not sustained its burden to show that the requested accommodations were necessary (id. at 304:25-305:11);

3. That the DOJ had not sustained its burden to show that the DOA refused a reasonable accommodation (id. at 304:25-305:1, 305:12-305:15); and

4. That the DOA could not be found liable for a "pattern or practice" claim (id. at 322:20-323:15).

## V.     SUMMARY OF THE CHARGE AND VERDICT

### A.     Jury Charge

The Court conferred with counsel prior to charging the jury to formulate a verdict sheet that would address all the issues being presented to the jury.  Id. at 324:4-329:13.  The Court overruled the objections that both parties had to portions of the proposed verdict sheet and will deny any post-trial motions requesting a new trial because of an improper verdict sheet, as addressed below.

The jury was first asked to decide several questions concerning Ms. Hamburg: whether she had a mental impairment; whether the DOA knew or should have known of her disability; whether she needed an ESA to use and enjoy her dwelling; whether the DOA refused to provide her a

reasonable accommodation; whether the DOA unreasonably delayed responding to her request; whether Ms. Hamburg was injured by the DOA's conduct, and the amount of monetary damages she was owed.  Jury Verdict (ECF 219) at Questions 1-1f.

The jury was then asked similar questions regarding Bernard and/or Cynthia Halpern, categorizing the Halperns together in the same questions.  The jury was asked if either of the Halperns had a mental impairment; if their unit had been made unavailable to them; if the conditions imposed on the Halperns were not imposed on non-disabled residents of The Dorchester; and if the DOA unreasonably delayed responding to the Halperns' request for an ESA. Id. at Questions 2-2c.

As to Anna Minkovich, her status in this trial was somewhat vague because she had apparently signed a release to the DOA for any claim, but the Court nonetheless submitted to the jury one interrogatory as to whether the DOA had unreasonably delayed in responding to Ms. Minkovich's request for an ESA.  Id. at Question 3.

 Questions Nos. 4-8 were not limited to any specific person, but rather addressed the DOJ's allegations that the DOA had violated the Fair Housing Act including whether the DOA had made units unavailable to disabled persons, whether the DOA had imposed different terms and conditions on people with disabilities compared to those without disabilities; whether the DOA failed to provide reasonable accommodations to people with disabilities; whether the DOA engaged in a pattern or practice of discrimination; and whether the DOA discriminated against a group of people.  Id. at Questions 4-8.  Finally, the jury was asked whether the DOJ was entitled to monetary damages for the DOA's conduct, though, unlike in the interrogatory regarding Ms. Hamburg, the jury was not asked to name a specific amount.

**B.      The DOA's Objections to the Jury Interrogatories**

The DOA argues that it is entitled to a new trial because the jury interrogatories were improper and should not have been presented to the jury.  DOA Motion for JNOV (ECF 229) at 14-20.  Specifically, the DOA argues Ms. Minkovich had no viable claim against the DOA, and so she should not have appeared on the verdict sheet.  Id. at 14, 18.  The DOA suggests that the other jury interrogatories were "defective," but does not provide any details, focusing instead on the lack of evidentiary support for the jury's verdict, discussed below.  Id.  at 15-20.

The formulation of jury interrogatories, including their use and form, is entrusted to the discretion of the trial judge.  Armstrong v. Dwyer, 155 F.3d 211, 216 (3d Cir. 1998); McNally v. Nationwide Insurance Co., 815 F.2d 254, 266 (3d Cir. 1987).  "The trial judge has considerable discretion so long as the special interrogatories present the case fairly."  In re Merritt Logan, Inc., 901 F.2d 349, 368 (3d Cir. 1990).  The fact that a trial court does not embrace a party's theory of the case in the interrogatories does not render them unfair.  Id.  "The only limitation [on this discretion] is that the questions asked of the jury be adequate to determine the factual issues essential to the judgment." Armstrong, 155 F.3d at 216 (citations omitted).

The DOA's only specific objection to the jury interrogatories is that Ms. Minkovich did not bring a separate claim against the DOA, and so the jury should not have been presented with an interrogatory about her.  DOA Mot. for JNOV at 14, 18.  However, Ms. Minkovich's testimony was not presented by the DOJ for the purposes of presenting a claim on Ms. Minkovich's behalf, as the DOA suggests (id. at 18), but rather to show evidence of a pattern or practice of discrimination by the DOA, or evidence of discrimination by the DOA against a group.  DOJ Response in Opposition (ECF 235) at 7.  The jury interrogatory was crafted for this purpose and did not give the jury any opportunity to award Ms. Minkovich damages.  It was adequate for the

jury to determine the factual issues essential to a determination on the issue of the "pattern or practice" and "group" claims and was appropriate.[3]

### C.   Jury Verdict

In response to the first question regarding Ms. Hamburg, the jury found that Ms. Hamburg had a mental impairment that substantially limited one or more of her major life activities, but found against Ms. Hamburg that Plaintiffs did not prove by a preponderance of the evidence that the DOA knew, was informed of, or reasonably should have known that Ms. Hamburg had a disability and needed an ESA because of her disability.  Jury Verdict (ECF 219) at Questions 1-1a.

After the verdict was recorded, the Court entered judgment in favor of the DOA and against Ms. Hamburg, in view of this verdict.   Order, June 13, 2022 (ECF 220).   This resulted in Ms. Hamburg being dismissed from the case as a Plaintiff and not being awarded any damages. No post-trial motions were ever filed on behalf of Ms. Hamburg.

As to Question No. 2 concerning Bernard and/or Cynthia Halpern, the jury found that one or both of the Halperns had a mental impairment that substantially limited one or more of their major life activities, that the DOA had made their dwelling at The Dorchester fully unavailable to them because of a disability, that the DOA imposed terms and conditions on them that were not imposed by other non-disabled people because of their disability, and that the DOA unreasonably delayed responding to a request for a reasonable accommodation in the form of a permission for them to live in The Dorchester with an ESA.  Id. at Questions 2-2c.  As a result of these findings, the Halperns are clearly entitled to an award of damages, as discussed below.

---

[3] The Court notes a somewhat unusual appearance of counsel for the Plaintiff in this district. Although the United States Attorney and several assistants have been identified in the papers and the pleadings and briefs, to this Court's recollection, not one locally based attorney for the Government or the U.S. Attorney's Office appeared during the trial.

As to Ms. Minkovich, the jury found that Plaintiff had proved that the DOA unreasonably delayed responding to Ms. Minkovich's request for a reasonable accommodation for an ESA to live with her in The Dorchester.  Id. at Question 3.

Regarding the DOJ's allegations that the DOA had violated the FHA generally, the jury found and answered to Question Nos. 4-8 that the Plaintiffs had proved by a preponderance of the evidence:

1) The DOA imposed different terms, conditions, or privileges, on people with disabilities who needed ESAs from those that were imposed on other non-disabled people who resided in, owned property in, or rented a dwelling in The Dorchester.
2) The DOA failed to provide reasonable accommodations to people with disabilities who needed ESAs to have an opportunity to use and enjoy dwellings in The Dorchester that was equal to the opportunity non-disabled people had to use and enjoy dwellings in The Dorchester.
3) The DOA engaged in a pattern or practice of resistance to permit people with disabilities who needed ESAs because of their disabilities to fully enjoy rights to them by the Fair Housing Act.
4) The DOA denied a group of people the rights that are granted to them by the Fair Housing Act.

Id. at Questions 4-8.

It is obvious that the verdict of the jury was a "split" verdict and was perhaps a compromise in coming to a conclusion after the parties had finished presenting their evidence and contentions in closing argument.  There is nothing necessarily wrong or illegal with a jury, in deciding a civil case, where the Court has presented a somewhat complex verdict slip, reaching different results. Many cases have held that there is nothing wrong with inconsistent verdicts and also nothing wrong with verdicts that are a "compromise."  Former Judge Rice explored many of these issues in Care v. Reading Hospital.  448 F. Supp. 2d 657, 663 (E.D. Pa. 2006) (Rice, J.) (case collecting). In the City of Los Angeles v. Heller, a split verdict had been reached in a civil rights case, and the Supreme Court observed that the verdict seemed to reflect a compromise but did not criticize the

lower court for proceeding to final judgment.  475 U.S. 796, 799, (1986), id. at 804 n.10, 806 n.12 (Stevens, J., dissenting).

The Third Circuit has also recognized compromise verdicts and that there is nothing necessarily wrong with an inconsistent verdict.  The Third Circuit has held that, so long as a jury's verdict is supported by sufficient evidence, inconsistencies resulting from apparent compromise will stand.  Montgomery County v. Microvote Corp., 320 F.3d 440, 451 n.5 (3d Cir. 2003); Mosley v. Wilson, 102 F.3d 85, 90 (3d Cir. 1996).

## VI.   SPLIT VERDICT AND ITS AFFECT ON RULE 50 ANALYSIS

Concerning "split verdicts" sometimes referred to as "compromise verdicts," no precedents have been found dictating how a court must resolve these verdicts different from any other case.  The Third Circuit has applied the Rule 50 standard to a split verdict in Mancini v. Northampton Cty.  836 F.3d 308 (3d Cir. 2016).  There, the Third Circuit addressed a situation where the plaintiff sued the County and two individuals in their official capacity for violation of her Constitutional rights; the jury found that the County was liable, but the two individuals were not.  Id.  at 313.  The County moved for Rule 50 judgment.  Id.  The Third Circuit did not lay out any specified standard of review for a split verdict, instead holding that the motion may be granted "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability."  Id. at 314.

Judges in this District have similarly not established any unique method of reviewing evidence in the context of a Rule 50 motion following a split verdict.  See Kremsky v. Kremsky, 2017 WL 5615106, at *2 (E.D. Pa. Nov. 21, 2017) (Kearney, J.) (applying normal standard of review); Bedrock Stone and Stuff, Inc. v. Manufacturers and Traders Trust Co., 2006 WL 890993,

at *2-3 (E.D. Pa. Mar. 31, 2006) (Gardner, J) (laying out the "pertinent facts" as the jury found them based on "the pleadings, record papers, exhibits and the testimony of the witnesses at trial" in an apparent attempt to reconcile the different findings of facts).

In this case, there is nothing necessarily inconsistent with the jury finding against Louise Hamburg on her claim and in favor of the Halperns on their claim for damages. Given Heller and other appeals from split verdicts, this Court believes that the appropriate course is to respect the jury's verdict on its findings and their effects, particularly as pertains to witness credibility. However, where there has been substantive and uncontradicted firsthand testimony, as Mr. Devine gave in this case regarding the drafting of the DOA policies, the Court sees no reason not to consider it as framing the general background and chronology, and other matters relating to the governance of The Dorchester, about which Mr. Devine was very familiar.

The difficulty of the post-trial motions in this case is that they attempt to resolve all issues in favor of either the DOJ or the DOA, and neither party recognizes the full weight that the Court must accord to the jury's verdict. This is particularly true as to the claims of Bernard Halpern, who has qualified as an "aggrieved individual" – the jury's verdict in favor of Mr. Halpern clearly entitles him to an award of damages.

The jury found in Question No. 9 that the United States "is entitled to monetary damages for the DOA's discriminatory conduct." Jury Verdict at Question 9.

## VII.   RULE 50 ANALYSIS

This case has both a split verdict by the jury, and also a split Rule 50(a) decision by the Court. The Court will:

    1. Sustain the jury's verdict in favor of the Halperns as to liability;

    2. Grant the DOA's Rule 50(a) Motion as to the jury's "pattern or practice" decision;

3.   Deny the DOA's Rule 50(a) Motion as to the other violations found by the jury.

**A.   Standard of Review**

Rule 50 of the Federal Rules of Civil Procedure provides that in the aftermath of a jury

trial, a court may grant a motion for judgment as a matter of law if it determines that there was no

"legally sufficient evidentiary basis" for a reasonable jury to have found for a particular party on

an issue, and that, without a favorable finding on that issue, the party cannot maintain his claim

under controlling law.  Fed. R. Civ. P. 50(a)(1).  In determining whether to grant judgment as a

matter of law, the court "must view the evidence in the light most favorable to the non-moving

party, and determine whether the record contains the 'minimum quantum of evidence from which

a jury might reasonably afford relief.'"  Glenn Distribs. Corp. v. Carlisle Plastics, Inc., 297 F.3d

294, 299 (3d Cir. 2002) (quoting Mosley v. Wilson, 102 F.3d 85, 89 (3d Cir. 1996)).  A court may

grant judgment as a matter of law "only if, viewing the evidence in the light most favorable to the

nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient

evidence from which a jury reasonably could find liability."  LePage's, Inc. v. 3M, 324 F.3d 141,

145-46 (3d Cir. 2003) (quoting Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir.

1993)).  "Although judgment as a matter of law should be granted sparingly, a scintilla of evidence

is not enough to sustain a verdict of liability."  Lightning Lube, 4 F.3d at 1166.

In this endeavor, "[t]he court may not weigh evidence, determine the credibility of

witnesses, or substitute its version of the facts for that of the jury," but rather may grant a Rule 50

motion only "if upon review of the record, it can be said as a matter of law that the verdict is not

supported by legally sufficient evidence."  Parkway Garage, Inc. v. City of Philadelphia, 5 F.3d

685, 691-92 (3d Cir. 1993); see also LePage's, 324 F.3d at 146 ("[R]eview of the jury's verdict is

limited to determining whether some evidence in the record supports the jury's verdict.").

**B.      The DOA Failed To Reserve An Objection To The "Group" Interrogatory**

The DOA requests judgment because there was insufficient evidence of a "group."  DOA

Mot. for JNOV at 19.  The DOJ argues that the DOA has forfeited its right to raise an argument

about the "group" interrogatory because it failed to reserve the issue at trial.  DOJ Resp. at 3-4.

The DOA argues that the Court reserved the issue on the DOA's behalf by including the issue of

"group" in its June 13, 2022 Order requesting further briefing.  DOA Reply (ECF 238) at 2.

However, Third Circuit case law is clear that it is the responsibility of the party to reserve an issue

for Rule 50(b) motions, not the court.  Kutner Buick, Inc. v. Am. Motors Corp., 868 F.2d 614, 617

(3d Cir. 1989) (ruling that a post-trial renewal of a Rule 50(a) motion "can only be made on

grounds specifically advanced in a motion for a directed verdict at the end of plaintiff's case.")

(citation omitted); see also Williams v. Runyon, 130 F.3d 568, 571–72 (3d Cir. 1997) ("[A]

defendant's failure to raise an issue in a Rule 50(a)(2) motion with sufficient specificity to put the

plaintiffs on notice waives the defendant's right to raise the issue in [its] Rule 50(b) motion.").  In

point of fact, at trial this Court specifically noted that the DOA could raise an argument about the

definition of "group," which the DOA failed to do.  Tr. Tr. Day 4 at 317:23-318:2.  When the DOA

raised point-by-point issues to each interrogatory after both parties had rested but before closing

arguments, it did not raise any objection specific to the "group" interrogatory.  Id. at 319:16-

323:15.  The DOA does not cite any case law to support its argument that a court's order after a

verdict can be used by a party to retroactively reserve a matter for Rule 50(a) briefing.  The DOA's

failure to reserve the "group" issue is fatal, and that claim must be denied.

**C.      Pattern or Practice Analysis**

**1.   Adequacy of Mr. Halpern's Testimony**

The DOA argues that the evidence presented in support of the Halperns' claims was

inadequate to show that Mr. Halpern had a disability, and therefore the DOJ had failed to establish

a claim with regard to the Halperns.  DOA Reply at 2-4.  Here, there is enough evidence on the record to support the jury's verdict in favor of the Halperns.  The jury heard testimony that Mr. Halpern suffered from a mental disability (Trial Tr. Day 1 at 105:20-108:13, 175:25-177:17), that it limited major life activity (id. at 252:3-18); that the Halperns were unable to use or enjoy their condo (id. at 123:24-124:20, 192:20-194:6), and that the DOA imposed certain terms on the Halperns in order for their ESA application to be approved (Id. at 192:20-194:6, 199:6-20, 205:18-208:24).  As such, the DOA's objection to the jury's verdict in favor of the Halperns is denied.

### 2.  Adequacy of Minkovich's Testimony

The DOA argues that the evidence presented in support of Ms. Minkovich's claims was inadequate to show that she had a disability, and therefore the DOJ had failed to establish a claim with regard to Ms. Minkovich.  DOA Reply at 5-6.  However, like the "group" issue discussed above, the DOA failed to reserve this issue at trial.  As such, it has waived any objection to the jury's finding regarding Ms. Minkovich.

Even if the DOA had reserved the issue, the Third Circuit has stated that it is possible that a party herself "might offer a description of treatment and symptoms over a substantial period that would allow the jury to determine that the plaintiff did suffer from a disability."  Marinelli v. City of Eire, 216 F.3d 354, 360 (3d Cir. 2000), quoting Katz v. City Metal Co., 87 F.3d 26, 32 (1st Cir. 1996).  Ms. Minkovich testified about her diagnosis and the symptoms she suffered as a result of her condition.  Trial Tr. Day 2 at 242:11-245:20.  She supplied evidence in the form of a letter from a licensed psychologist that provided a detailed list of symptoms that she suffered from.  Id. at 248:1-25.  She also testified that it took three years before the DOA allowed her to bring her ESA into the building.  Trial Tr. Day 3 at 15:10-12.  The record "contains the 'minimum quantum of evidence from which a jury might reasonably afford relief.'"  Glenn Distribs. Corp. v. Carlisle

Plastics, Inc., 297 F.3d 294, 299 (3d Cir. 2002) (quoting Mosley v. Wilson, 102 F.3d 85, 89 (3d Cir. 1996)).  The DOA's claim objecting to the jury's verdict finding that the DOA unreasonably delayed responding to Ms. Minkovich's ESA request is therefore denied.

### 3.  Adequacy of Evidence of a "Pattern or Practice"

The DOA's argument in favor of judgment notwithstanding the verdict on the "pattern or practice" charge relies on its argument that either the Halperns' claim or Ms. Minkovich's claim, or both, fails, and so there is no "pattern."  DOA Mot. for JNOV at 18-19.  Although the jury's verdict regarding both the Halperns' claim and Ms. Minkovich's claim stands, as discussed above, the question remains whether the success of the claims pertaining to the Halperns and Ms. Minkovich, when combined with other evidence, are enough to establish a pattern or practice.

The United States may bring an action against an entity that has "engaged in a pattern or practice of resistance to the full enjoyment of any of the rights" or denied "any group of persons" "any of the rights granted by" the Fair Housing Act.  42 U.S.C. § 3614(a).  The Third Circuit has not yet addressed the meaning of the term "pattern or practice" as found in the FHA.  Neither party points to any binding Third Circuit case law on this point.

The closest case in which the Third Circuit discusses the meaning of "pattern or practice" is a Title II case addressing racial discrimination.[4]  United States v. Lansdowne Swim Club, 894 F.2d 83 (3d Cir. 1990).  There, the Third Circuit ruled that the United States must "prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts. It [must] establish by a preponderance of the evidence that . . . discrimination was [the defendant's] standard operating procedure—the regular rather than the unusual practice."  Id. at 88 (citing Int'l. Bhd. of

---

[4] The Court rejects any argument that the right to an ESA falls lower on the hierarchy of civil rights than the right to be protected from racial discrimination.  Accordingly, the Third Circuit's analysis of the language provides helpful guidance here, despite the different contexts.

Teamsters v. United States, 431 U.S. 324, 336 (1977)).  While the Third Circuit did not establish a minimum number of acts required to establish a "pattern or practice," the District Court noted in its case citation that "more than two acts will ordinarily be required."  U.S. v. Lansdowne Swim Club, 713 F. Supp. 785, 807 (E.D. Pa. 1989) (O'Neill, J.) (citing Ste. Marie v. Eastern R.R. Ass'n, 650 F.2d 395, 406 (2d Cir. 1981)).

Under the analogous Americans with Disabilities Act, plaintiffs bear the burden of showing that the defendant "has adopted, as its 'standard operating procedure,' a pattern or practice of discrimination prohibited under the [Americans with Disabilities Act]."  Hohider v. United Parcel Service, Inc., 574 F.3d 169, 184 (2009) (emphasis added).  "A plaintiff can prove a pattern or practice of discrimination by the existence of an express discriminatory policy, or by numerous instances of discrimination and anecdotal evidence from which a discriminatory pattern or practice can be inferred."  U.S. v. Nobel Learning Comm's, Inc., 676 F. Supp. 2d 379, 383 (E.D. Pa. 2009) (McLaughlin, J.) (also addressing a claim brought under the Americans with Disabilities Act).

Both the Supreme Court and the Third Circuit are clear that plaintiffs can succeed on individual claims of discrimination and still fail to establish a "pattern or practice" claim. Cooper v. Federal Reserve Bank, 467 U.S. 867, 878 (1984) ("Given the burden of establishing a prima facie case of a pattern or practice of discrimination, it was entirely consistent for the District Court simultaneously to conclude that [the two individual plaintiffs] had valid individual claims even though it had expressly found no proof of any class[-]wide discrimination[.]"); Croker v. Boeing Co. (Vertol Division), 662 F.2d 975, 989, 996 (3d Cir. 1981) (addressing a Section 1981 action, "although the employees had shown some individual acts of discrimination . . ., the sum of evidence presented demonstrated neither a policy of intentional race discrimination nor a pattern or practice of purposeful discrimination against the class.").

The jury was not presented with any evidence that the DOA implemented an expressly discriminatory policy, nor any evidence that it was the DOA's "standard operating procedure" to reject ESAs prior to the beginning of this case. To the contrary, the DOA established a policy for admitting assistance animals by 2015. Trial Tr. Day 4 at 52:14-22.

The DOJ's burden must therefore rest on a showing that there were "numerous instances of discrimination and anecdotal evidence from which a discriminatory pattern or practice could be inferred." Nobel Learning, 676 F. Supp. 2d at 383. The jury was instructed that the FHA makes it unlawful for "any person or group of persons to engage in a pattern or practice of resistance to the full enjoyment of any of the rights granted by the Fair Housing Act." Trial Tr. Day 5 at 83:1013. No additional guidance was required or requested in the jury instructions or verdict sheet.

The evidence presented at trial does not support such an inference. The evidence showed that Ms. Hamburg's ESA request was the first ESA request that the DOA received. Trial Tr. Day 3 at 182:18-22. Because the jury found against Louise Hamburg and in favor of the DOA on issues relating to Hamburg's claims, specifically on the question of whether the DOA knew or should have known of Hamburg's disability, this Court must review this finding in favor of the DOA as requiring the Court to consider the Plaintiffs' evidence of discrimination and delay against Ms. Hamburg as insufficient. As such, this Court cannot and will not consider any testimony by or about Ms. Hamburg as supporting DOJ's "pattern or practice" contentions and will cite this verdict as a negative factor on the "pattern or practice" issue.

The jury found that the DOA delayed in responding to the ESA applications from two people with mental impairments: Bernard Halpern[5] and Anna Minkovich. The DOA argues that

---

[5] The jury considered testimony from Bernard Halpern's wife, Cynthia Halpern. However, neither party claimed that Mrs. Halpern submitted a separate application for an ESA for her own benefit – her testimony was in support of her husband's ESA application. The jury was asked to consider

a claim for "pattern or practice" cannot be established by merely two or three witnesses.  DOA Reply at 6-7, citing Cooper v. Fed. Reserve Bank of Richmond, 467 U.S. 867, 879 (1984) (suggesting "two or three instances of discrimination" would not suffice for a Title VII pattern or practice claim).  The DOJ does not cite any Third Circuit case law to support its argument that testimony from two witnesses or witness-groups is enough to establish a pattern or practice.  DOJ Resp. at 10, citing United States v. W. Peachtree Tenth Corp., 437 F.2d 221, 227–28 (5th Cir. 1971) (relying on two rejected rental applications, in addition to other evidence, to conclude that there was a pattern or practice of denying rentals to black applicants); United States v. E. River Hous. Corp., 90 F. Supp. 3d 118, 155–59 (S.D.N.Y. 2015) (holding that allegations that defendant failed to grant accommodations requested by three different persons with disabilities sufficiently alleged a pattern or practice of discrimination).  Absent Third Circuit case law establishing that testimony from two aggrieved persons is enough to satisfy a showing of "pattern or practice," this Court will follow the general wisdom that once may be happenstance, twice may be a coincidence.  Neither proves a pattern.[6]  As such, there was insufficient evidence for the jury to find a pattern or

---

the Halperns' ESA application as one issue.  Jury Verdict Questions 2-2(c).  As such, this Court will consider Mr. and Mrs. Halpern to be a single witness-group, seeking a single ESA for a single dog, residing in a single condo, and suffering from a single instance of delay. This Court will not double count the Halperns' joint experience as two instances of discrimination.

[6] This Court is aware that the last phrase of that adage would imply that three instances of discrimination may be a pattern.  Without rendering such a decision, the Court notes that the evidence shows that the DOA did not have the opportunity to engage in a pattern or practice of discrimination due to the DOJ's decision to file this suit.  While there is evidence of subjective feelings by members of the DOA that may discriminate against people seeking ESAs (see Kurland Deposition Testimony, Trial Tr. Day 3 at 23:2-7 ("Unless proven otherwise, I would think that a – an emotional support animal could be just a ruse to bring a pet in"); Morgan Deposition Testimony, id. at 34:22-36:8 (disbelieving that anyone would need an ESA in order to enjoy The Dorchester); Weiss Deposition Testimony, id. at 51:15-52:9 (saying that he did not "buy into" the concept of ESAs); Devine Testimony, Trial Tr. Day 4 at 197:4-200:2 (discussing email communications in which Council members expressed skepticism regarding ESAs)), these intentions were nipped in the bud before a pattern or practice could form.  The DOA subsequently corrected course and has since approved all ESA applications except, correctly, Ms. Hamburg's.

practice of discrimination against the DOA.  The DOA's Rule 50(b) motion will therefore be granted on this issue.

## VIII.   <u>CALCULATION OF DAMAGES FOR THE HALPERNS</u>

### A.   **Denial of Jury Trial**

The Court denied a jury trial on damages in this case because it is not required under existing law.  The denial of an ESA under the FHA is of course not a claim that was recognized "under common law," and thus, the Seventh Amendment does not apply.  <u>Tull v. United States</u>, 481 U.S. 412, 418-21 (1987) (engaging in a historical analysis of the nature of a claim to determine the applicability of the Seventh Amendment).  Furthermore, the Government can only cite one precedent where a court had empaneled a jury to find damages on a violation of the FHA, which is not binding.  DOJ Mot. (ECF 228) at 17-18, citing <u>United States v. Balistrieri</u>, 981 F.2d 916 (7th Cir. 1992).  The Third Circuit has no such precedent that this Court was bound to follow.

A binding and more analogous ruling is <u>Tull v. United States</u>, in which the Supreme Court determined that, where a legal claim is joined with an equitable claim, the Seventh Amendment assures a right to a jury trial as to liability, but not as to injunctive relief and civil penalties, as are sought here.  481 U.S. at 425-26.  The Seventh Amendment requires that a jury be granted to determine liability, but "the trial court and not the jury should determine the amount of penalty, if any." <u>Id.</u> at 427.

The basic thrust of an FHA claim is for injunctive relief and civil penalties.  42 U.S.C. § 3614(d)(1) (granting courts the power to award injunctive relief, civil penalties, and other relief as appropriate).  Numerous courts have issued injunctions, particularly in the civil rights area, to

---

Devine Testimony, Trial Tr. Day 4 at 86:19-87:9.  The evidence therefore does not show that it was "standard operating procedure" by the DOA to discriminate against people seeking an ESA.

enjoin discriminatory behavior or to award other relief requiring various equitable principles against school boards or local governments that are found to have acted in a discriminatory manner. See U.S. v. City of Philadelphia, 573 F.2d 802, 808 (3d Cir. 1978) (affirming award of injunctive relief by a court to prevent further sex-based discrimination). It is well established that civil penalties are not the business of juries, and a court sitting without a jury is fully authorized to allow and quantify a civil penalty. Tull, 481 U.S. at 426 ("The assessment of civil penalties thus cannot be said to involve the 'substance of a common-law right to a trial by jury,' nor a 'fundamental element of a jury trial.'" (citations omitted)). "[A] monetary award 'incidental to or intertwined with injunctive relief'" may also be equitable. Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry, 494 U.S. 558, 571 (1990), citing Tull, 481 U.S. at 424. In fact, in one of the cases that the DOJ presents as an example of the form of relief it seeks, the judge, not a jury, held a hearing and determined damages, as was done here. DOJ's Statement re: Form of Judgment (ECF 267) at 3, citing Final Judgment, ECF 419, United States v. Bahr, No. 22:08-cv-573 (M.D. Ala. Aug. 16, 2011).

Here, the relief sought against the DOA was primarily for equitable relief and thus, there was no requirement that a jury be empaneled on the question of damages. The government is seeking injunctive relief and a civil penalty, as well as additional relief "on behalf of" the Halperns. DOJ Statement re: 10/26/22 Order (ECF 276) at 2; DOJ Request for Damages (ECF 272) at 1.

The Court initially denied the DOA's Motion to bifurcate the issues of liability from any damages (Order, June 2, 2022 (ECF 192)), but the Court eventually agreed that the Halperns' claim would be bifurcated and a separate trial on the Halperns' damages was held on September 8, 2022.

If the Halperns were successful, the Court felt it would be fairer to give them time, following the liability verdict in their favor, to assemble facts and develop the chronology which

this Court has found very helpful and useful to determine the amount of the Halperns' damages. This is for the very simple and undisputed reason that the Halperns were not deprived of an ESA in The Dorchester on any continuous basis.  The Halperns did not occupy their apartment for several months at a time because, during the summer, they often lived at their summer vacation home in New Jersey.  The Court felt it would be fairer to the parties, after the jury had found the liability verdict in favor of the Halperns, to give both parties the chance to assemble evidence and arguments that would enable this Court, sitting without a jury, to come to a fair calculation of damages.  For these reasons, a timeline of events was required from counsel (see DOJ Statement of Damages; Exhibit B Timeline (ECF 261-2); DOA Response to Statement (ECF 266)).

### B.  Compensatory Damages to the Halperns

There are a number of factors that the Court considered as to the Halperns' damages.  In the first place, because the jury found in their favor, the Court takes evidence in the light most favorable to the Halperns and will disregard any contrary testimony.  However, it is important to note that the Halperns were not actually prevented from having their ESA at their apartment while living at The Dorchester, but only that for certain times they were violating The Dorchester regulations by having an ESA with them in their apartment.  Trial Tr. Day 1 at 126:20-128:16.  At other times, the Halperns were under regulations that required them to use the freight elevator and the rear doors, rather than the front doors of The Dorchester – which they considered as insulting and being treated as "second class citizens."  Id. at 124:21-126:19.  The Court will recognize these inconveniences but notes that nonetheless, the Halperns had their ESA with them at all times that they were at The Dorchester, except an interim period when one dog died and several months passed before they secured a new dog.  Id. at 110:5-16.  The DOA has no responsibility for this interruption.

As noted above, the Court had required counsel to prepare a "timeline" of periods when the Halperns were not occupying their apartment and days when there was not specific evidence as to whether they had been in the apartment for part of the time or not.  See DOJ Statement of Damages; Exhibit B Timeline (ECF 261-2); DOA Response to Statement (ECF 266).

It is important to note that the jury interrogatory was phrased in terms of "delay" in getting full enjoyment of their ESA in their apartment, and not "deprivation."  Jury Verdict at Question 2c. Thus, the damages will primarily reflect the concept of delay.

The Court will also note but reject the DOA's contentions that the Halperns were themselves unreasonable or over-emphasized the inconvenience or insulting nature of the DOA restrictions because many Dorchester residents without an ESA also used the freight elevator and rear door, without making a complaint.  Damages Trial Tr., Day 1, 9/8/22 (ECF 257) at 94:9-16.

The Court has reviewed the chronologies prepared by the parties and notes that there were few disputes, which the Court has resolved as below.  The Court has decided that a per diem award of damages is the best method.  For days when the Halperns were partially at the Dorchester, partially elsewhere (covering the period of time when the Halperns were most affected by the DOA's delay), the Court awards $50 per day.  For days when the Halperns were not in The Dorchester due to DOA inaction, the Court awards $30 per day, recognizing that some of this period of time covers dates when the Halperns were affected by the DOA's delay.  However, the Court excludes an approximation of periods when the Halperns used their summer home in New Jersey.  For days when the Halperns visited their condo at The Dorchester with their ESA despite lack of final or condition-free approval from the DOA, the Court awards $20 per day, recognizing that the Halperns accessed and used their condo during this time.  For days when the Halperns were in Philadelphia but not at The Dorchester, days when the Halperns did not have an ESA, and

the remaining days when the Halperns' location is unknown, the Court will award no damages. The chart below will show this computation. This is not a scientific or precise calculation, but it is fair, reasonable, and reflects the evidence.

| Category | 8/14/18 – 6/8/2022 ESA with the Halperns even though ESA not allowed | 6/8/2020 – 3/11/2022 ESA allowed but must use freight elevator and rear exit | Total Number of Days | Damage Calculation |
|---|---|---|---|---|
| Part at Dorchester with ESA, part not in Philadelphia, delay when the Halperns were moving from Radnor to The Dorchester | 319 | 10 | 329 | $50/day, totaling $16,450 |
| Not in Philadelphia because of DOA delay | 217 | 430 | 647 | $30/day, totaling $19,410 |
| At Dorchester with ESA | 121 | 143 | 264 | $20/day, totaling $5,280 |
| In Philadelphia, not at Dorchester | 9 | 0 | 9 | -0- |
| At Dorchester without ESA because first dog died | 33 | 0 | 33 | -0- |
| Part at Dorchester without ESA because first dog died, part not in Philadelphia | 4 | 0 | 4 | -0- |
| Unknown | 1 | 0 | 1 | -0- |

The Court will reduce the award for the approximate 245 days when the Halperns lived in their summer home over three and a half years of delay. At an average of $35 per day for 245 days, the subtotal of $41,140.00 will be reduced by $8,575.00, totaling $32,565.00. In addition, in view

of the jury's verdict, the Court will add a lump sum of "overall pain and suffering" of $2,500.00 for the Halperns, plus out of pocket expenses of $2,366.00 for mileage reimbursement.  The total amount awarded is $37,431.00, which will be reflected in the judgment.

The Court will reject the Halpern's request for any damages based on reduced value of their condominium, or reduction of their condominium fees or parking fees.  Under the evidence, the Halperns failed to show this was a compensatory damage, as the Court concludes they would have been responsible for the condominium and parking fees even if they did not occupy their apartment for any period of time.

In setting these damages, the Court takes into account the fact that the Halperns were not represented by counsel, and that the award is not taxable, so they will get to keep the entire amount of the award, without any deductions.

### C.    Punitive Damages

Although certain members of the DOA Council expressed skepticism about ESAs, they concede they were personal beliefs.  See Kurland Dep., Trial Tr. Day 3 at 29:14-32:12; Morgan Dep., id. at 34:22-36:8; Weiss Dep., id. at 52:3-9; Trial Tr. Day 4 at 197:4-200:2.  The Court refuses to conclude the DOA itself has or had any intent to violate the FHA.  Instead, the DOA's evidence establishes its intent to develop a policy which complied with federal law.  Punitive damages are only appropriate where the defendant's conduct "involved reckless or callous indifference to the federally protected rights of others."  Alexander v. Riga, 208 F.3d 419, 430-31 (3d Cir. 2000) (citation omitted).  "Malice" and "reckless indifference" refer to a housing provider's "knowledge that it may be acting in violation of federal law."  Id. at 431.  The evidence of delay cited by the DOJ as showing that the DOA was aware that it was at risk of violating the FHA was rebutted by evidence that the DOA was seeking to gain an understanding of what process

is required under the law and establishing a newly drafted ESA policy.  That the DOA was revising

its ESA policy in accordance with HUD's 2013 and 2020 Guidance shows that it did not have

"knowledge that it may [have been] acting in violation of federal law."  Id.  The DOJ has approved

recent ESA applications.  DOA Mot. to Supplement with Report (ECF 296) at ¶13.  Overall, there

is not enough evidence to support an award of punitive damages.

## IX.    CIVIL PENALTIES AND INJUNCTIVE RELIEF

The DOJ argues that the Court should impose a civil penalty of $50,000 on the DOA

because the jury determined that the DOA had discriminated against people based on their

disabilities, engaged in conduct meant to dissuade people from applying for an ESA at all, and

unreasonably delayed in responding to applications.  DOJ Motion (ECF 228) at 17.  In response,

the DOA argues that nothing the DOA did justifies a civil penalty.  DOA Resp. (ECF 236) at 16-

17.  The DOJ replies that the DOA's refusal to acknowledge the jury's verdict and accept

responsibility further supports a civil penalty and reiterates its argument that the "intentional"

discrimination by the DOA justifies a civil penalty.  DOJ Reply (ECF 237) at 8.

The language of the FHA is very permissive: the statute states that "in a civil action under

subsection (a) or (b), the court [. . .] may, to vindicate the public interest, assess a civil penalty

against the respondent."  42 U.S.C. § 3614(d)(1)(C).  There does not appear to be any Supreme

Court, Third Circuit, or Eastern District of Pennsylvania case law on the question of whether civil

penalties are required.  As such, the permissive nature of the statutory language is unchallenged.

The jury's verdict also does not require civil penalties.  Regarding damages, the jury was

only asked two questions:

(1) Whether Louise Hamburg was entitled to monetary damages, and what amount, which the jury did not respond to given their verdict against her (Jury Verdict at Question 1f); and

(2) Whether the United States was "entitled to monetary damages for the DOA's discriminatory conduct," which the jury answered affirmatively (id. at Question 9).

The jury verdict form does not make any reference to civil penalties. In its Statement Regarding the Form of Judgment, the DOJ indicates that it sought "monetary damages" for "every . . . person injured by the Defendant's discriminatory practices, pursuant to [42 U.S.C. §] 3614(d)(1)(B)." DOJ Statement Re: Form of Judgment at 1. This section of the statute states that the court "may award such other relief as the court deems appropriate, including monetary damages to persons aggrieved[.]" 42 U.S.C. § 3614(d)(1)(B). This provision, which provides the basis for the award to the Halperns, is separate from the section granting courts the power to award civil penalties. 42 U.S.C. § 3614(d)(1)(C). Thus, the DOJ's Statement Regarding Form of Judgment suggests that the monetary damages referenced in the jury verdict refers not to civil penalties, but to the damages that the DOJ indicates should be awarded "in favor of" the United States and "distributed to" the Halperns. DOJ Statement Re: Form of Judgment at 2-3.

It therefore appears that the only damages that the Court is required to award are the monetary damages to the Halperns. Because the jury's verdict does not make any reference to civil penalties, and because the statutory language is permissive, the question of civil penalties is left to the Court's discretion. While the DOJ provides case law suggesting factors to take into consideration (DOJ Mot. (ECF 228) at 16-17), the cases that the DOJ cites are not binding Supreme Court or Third Circuit decisions.

The Court does not see any reason to penalize the DOA further.  The Court does not know if the DOA has insurance to cover its attorneys' fees and any damages, but that is not a relevant consideration.  The Court concludes that, due to the DOJ's improper reliance on Ms. Hamburg, the jury's verdict against Ms. Hamburg, and the fact that only one person has shown a right to damages in this case, entering a nominal civil penalty of $1.00 is just, and any additional injunctive relief would be entirely disproportionate.

As for a final injunction, the Court has carefully reviewed The Dorchester's "Reasonable Accommodation Policy for an Emotional Support or Service Animal," adopted on July 5, 2022 and submitted to the Court as Exhibit 1 of the DOJ's Motion for Permanent Injunction, Civil Penalty and Jury Trial (ECF 228-1).  The Court finds that this policy is fully in accordance with existing law.  The Court will require one sentence be added to the Final Introduction of the policy, as follows: "The DOA shall promptly review and act on every application that has been submitted in accordance with the existing policy."  The DOA shall also maintain its records of all ESA applications and its decisions on each for a period of three (3) years

## X.    RULE 11 INQUIRY

Following an inquiry initiated by this Court, the DOJ argues that Rule 11 sanctions would not be appropriate because it had factual support for the allegations made in its Complaint and because the statements made by Ms. Hamburg were not made in a pleading, were not made by an attorney or represented party, and were not presented to this Court.  DOJ Statement (ECF 292) at 3-4.  The DOJ argues that its Complaint was not "patently unmeritorious or frivolous," and that it was obligated to bring the Complaint once HUD decided to issue a Charge of Discrimination. Id. at 4-5.  The DOJ also provides significant information contained in HUD's file which supported the DOJ's determination that the Complaint had factual support.  Id. at 5-7.

The cases cited by the DOA in favor of awarding Rule 11 sanctions do not contradict the above conclusions.  See Lieb v. Topstone Industries, 788 F.2d 151, 157 (3d Cir. 1986) (ruling that Rule 11 is intended to discourage pleadings that are frivolous, legally unreasonable, or without factual foundation, and that it was not being used for an improper purpose); Felleimer, Eichen & Braverman, P.C. v. Charter Tech., Inc., 57 F.3d 1215, 1225 (1995) (differentiating a Rule 11 sanctions' reasonableness test from the analysis addressing a court's inherent power to sanction, which requires a showing of bad faith); Ford Motor Co. v. Summit Motor Prods., Inc., 930 F.2d 277, 289 (3d Cir. 1991) (defining reasonableness as an "objective knowledge or belief at the time of the filing of a challenged paper that the claim was well-grounded in law and fact."); Business Guides, Inc. v. Chromatic Comm's Enterprises, Inc., 498 U.S. 533, 549 (1991) (confirming the reasonableness test for represented parties as well as attorneys without changing the test or analysis); Mary Ann Pensiero, Inc. v. Lingle, 847 F.2d 90, 94 (3d Cir. 1988) (ruling that Rule 11 is meant to ensure that counsel conduct "a reasonable investigation of the facts and a normally competent level of legal research.") (citing Lieb, 788 F.2d at 157).

The DOA argues that it immediately suspected Ms. Hamburg of being dishonest, but that HUD and the DOJ were inexplicably unsuccessful in finding issues with her statement and so must not have performed an adequate investigation; and that the DOJ should have prosecuted Carla Black once they learned of the issues with her letter.  DOA Suppl. Post-Trial Brief (ECF 291) at 9-13.  The DOA conflates Ms. Hamburg's Dec. 2018-June 2019 statements and HUD's investigation in 2019 with the DOJ's lawsuit in March 2020.  By the time of March 2020, the issue with Carla Black's initial letter had, apparently, been resolved with Dr. McClymond's letter.  Trial Tr. Day 2 at 137:1-143:15.  The DOJ presents a reasonable explanation for its decisions in its

Dec. 13, 2022 Statement regarding this Court's Rule 11 inquiry.  DOJ Statement (ECF 292) at 5-12.  As such this Court finds that Rule 11 sanctions are not appropriate.

A.    **DOJ's Presentation of False or Misleading Evidence**

This Court's Rule 11 inquiry was spurred by the apparent dishonesty of Ms. Hamburg and the DOJ's willingness to rely on her to build its case despite knowledge of her previous dishonest statements.  While Rule 11 sanctions are not appropriate, as discussed above, the question remains of what recourse, if any, a court has to address a situation where the government brings a civil action against a private entity based on flawed or false evidence or testimony.

There are not very many cases discussing instances where the government brings a civil suit based on false information.  Most cases involving the government relying on witnesses who have previously lied or committed crimes are in criminal cases, or Section 1983 cases, and therefore apply criminal case law.  The Supreme Court has left open the question of whether Brady v. Maryland obligations adhere to government suits in civil cases.  Goldberg v. United States, 425 U.S. 94, 98 n.3 (1976).  There does not appear to be any Third Circuit guidance on the issue.

The most analogous case in which the government brought a purely civil suit that was later found to be based on false evidence is U.S. v. Sierra Pacific Ind.  100 F. Supp. 3d 948, 953 (E.D. Cal. 2015).   There, Sierra Pacific claimed that the government had advanced an allegedly fraudulent "origin and cause" investigation and had allowed investigators to falsely testify their work, misrepresented witness statements, proffered allegedly false testimony and evidence, and failed to take remedial action to fix these incorrect statements.  Id. at 962.  Sierra Pacific argued that the government had committed fraud on the court.  Id. Sierra Pacific further argued that, under Brady v. Maryland and its related line of cases, "the government is held to a higher standard than non-government parties not just in criminal cases but in civil cases as well."  Id. at 956-957.

The Eastern District of California disagreed, noting that perjury by a party or witness "does not, by itself, amount to fraud on the court." Id. at 956 (citation omitted). The court also specifically ruled that Brady v. Maryland and its related line of cases, including Mooney v. Holohan, did not apply:

> In contrast to a criminal case where there is a potential loss of liberty, a civil action . . . is strictly about money. Except that the government happens to be the plaintiff, this case is no different from any other civil case in which one party pursues recovery of damages allegedly cause by the other party.

Id. at 957.

The Ninth Circuit affirmed the decision, determining that "the district court correctly concluded that Brady does not generally apply in civil proceedings," so "the government did not have a specific duty to disclose false . . . information, beyond its standard discovery obligations." U.S. v. Sierra Pacific Industries, Inc., 862 F.3d 1157, 1171-72 (9th Cir. 2017), cert. denied 138 S. Ct. 2675 (June 25, 2018) (No. 17-1153). This suggests that the government lawyers should be treated as any other attorney in civil cases.

All other cases addressing the government's use of false evidence or testimony derive their reasoning from Brady and its progeny. While several courts have distinguished situations where the government's requested remedy involves consequences that "equal or exceed" that which would be available in the criminal setting (Fox ex rel. Fox v. Elk Run Coal Co., Inc., 739 F.3d 131, 138-39 (4th Cir. 2014)), these are always in situations where the result that the government seeks is beyond the scope of a typical civil action. See, e.g., Demjanjuk v. Petrovsky, 10 F.3d 338, 353 (6th Cir. 1993) (finding that Brady applies in denaturalization and extradition proceedings); U.S. v. Edwards, 777 F. Supp. 2d 985, 990 (E.D.N.C. 2011) (Boyle, J.) (finding that Brady/Giglio applies to civil commitment proceedings for sexual offenders). Where a government merely seeks an injunction or monetary penalties, courts have typically not held the government to a standard

higher than a typical civil party.  See U.S. v. Project on Government Oversight, 839 F. Supp. 2d 330, 343 (D.D.C. 2012) (determining that where the stakes of the case are limited to "money and reputation, not 'whether someone will be locked away,'" the government is not held to the higher standards of discovery as laid out in Brady.).  Most courts have not looked favorably on the argument that the civil penalties, like those sought here, go beyond typical civil remedies.  See, e.g., S.E.C. v. ITT Educational Services, Inc., 2017 WL 5508453, at *1-2 (S.D. Ill. Sept. 28, 2017) (Dinsmore, J.) (agreeing that penalties do not rise to deprivation of liberty); S.E.C. v. Pentagon Capital Mgmt. PLC, 2010 WL 4608681, at *1-2 (S.D.N.Y. Nov. 12, 2010) (Sweet, J.) (declining to extend Brady and Giglio to a civil issue in which the government sought a civil penalty).

Here, the DOJ brought a civil action against the DOA, seeking remedies that are identical or closely comparable to relief that is available in civil cases: an injunction, civil penalties, and damages.  DOJ Mot. (ECF 228).  Based on the available case law, does not appear that Brady and its progeny would apply here.  See Fox ex rel. Fox v. Elk Run Coal Co., Inc., 739 F.3d 131, 138-39 (4th Cir. 2016) (ruling that Brady only applies to civil proceedings 'in those unusual cases where the potential consequences equal or exceed those of most criminal convictions." (internal quotation omitted)).  Instead, this Court is restricted to avenues of relief available in the Federal Rules of Civil Procedure or resolving the issue by according the offending piece of evidence less weight.  Sierra Pacific Ins., Inc., 862 F.3d at 1171-73 (ruling that relief under Rule 60(d)(3) was not warranted); see also Sierra Pacific Ind., Inc., 100 F. Supp. 3d at 960 ("Lawyers representing the United States, like lawyers representing any party, must of course comport with the applicable rules governing attorney conduct.").

The jury found that, while Ms. Hamburg likely did have a mental disability, she and the DOJ failed to show that the Dorchester knew, was informed of, or reasonably should have known

of her disability and her need of an ESA.  Jury Verdict at Questions 1-1a.  This would imply that the jury did not find Ms. Hamburg's testimony regarding her communications with the Dorchester about her disability to be credible.  Based on case law and avenues of relief available under the Federal Rules of Civil Procedure, it does not appear that there are any other actions this Court can or should take to address the DOJ's choice to bring a civil action based on the complaint and testimony of a flawed witness.

## XI.   <u>REMAINING ISSUES</u>

Finally, the Court addresses the last issues that remain open in this case.

First, the DOA has moved for a new trial, arguing that the DOA was not able to adequately address the "pattern or practice" claim and the claims related to the Halperns or Ms. Minkovich. DOA Mot. for JNOV at 20; DOA Reply at 9.  A new trial is granted at the discretion of the trial judge.  <u>Duquesne Light Co. v. Westinghouse Elec. Corp.</u>, 66 F.3d 604, 609.  The Court sees no reason to do so here.  The motion for a new trial is therefore denied.

Second, the DOJ argues that Lisa Lubin should be included as an aggrieved person at the damages trial.  DOJ Mot. (ECF 228) at 19.  This Court has already concluded that Ms. Lubin lacked standing under the FHA because she never signed an offer to purchase a unit at The Dorchester.  Trial Tr. Day 2 at 116:4-119:10.  Weighing all the facts, particularly that Ms. Lubin had no contract, agreement, or offer with The Dorchester, this Court affirms its decision at trial that Ms. Lubin did not have standing to join the case as an aggrieved person and denies the DOJ's motion to include Ms. Lubin in the damages analysis.

Finally, all objections raised by the DOA and motions made by the DOA at trial regarding the evidence and interrogatories regarding Ms. Hamburg are denied as moot.  The Motion for Clarification (ECF 275) is denied as moot.

**XII.** <u>**CONCLUSION**</u>

For the foregoing reasons, judgment is **ENTERED** against the Dorchester Owners Association and in favor of the United States in the amount of $37,431.00, to be distributed to Bernard Halpern and Cynthia Halpern.  The DOJ's Motion for Permanent Injunction, a Civil Penalty, and a Jury Trial for Damages is **GRANTED** in part and **DENIED** in part.  The DOA's Motion for JNOV is **GRANTED** in part and **DENIED**.  The Rule 11 inquiry is **DISMISSED** and no sanctions will be imposed.  The Motion for Clarification is **DENIED** as moot. An appropriate order follows.